# EXHIBIT 4

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE FERNANDO M. OLGUIN, U.S. DISTRICT JUDGE

4

5    TAMMY MURILLO, an individual        )
     and as successor in interest to    )
6    JESSE MURILLO, deceased,           ) CASE NO.
                                        ) 21-cv-08738
7                   Plaintiff,          )
                                        )
8           vs.                         )
                                        )
9    CITY OF LOS ANGELES, FRED SIGMAN,  )
     CHRISTOPHER MONTAGUE, DOES 1-50,   )
10   et al.,                            )
                                        )
11                  Defendants.         )
     _____)

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              TRIAL DAY 4 - A.M. SESSION

17             FRIDAY, AUGUST 25, 2023

18                  9:07 A.M.

19             LOS ANGELES, CALIFORNIA

20

21

22

23    _____

          MAREA WOOLRICH, CSR 12698, CCRR
24        FEDERAL OFFICIAL COURT REPORTER
          350 WEST FIRST STREET, SUITE 4311
25        LOS ANGELES, CALIFORNIA 90012
               mareawoolrich@aol.com

                 UNITED STATES DISTRICT COURT

1                        **APPEARANCES OF COUNSEL:**

2

3    **FOR PLAINTIFF:**

4        LAW OFFICES OF DALE K. GALIPO
         BY:  DALE K. GALIPO
5        21800 Burbank Boulevard, Suite 310
         Woodland Hills, CA 91367
6
         LAW OFFICES OF MARO BURUNSUZYAN
7        BY:  MARO BURUNSUZYAN
         550 N. Brand Boulevard, Suite 1050
8        Glendale, CA 91203

9
     **FOR DEFENDANTS:**
10
         TY A. FORD, Deputy City Attorney
11       200 N. Main Street, 6th Floor
         Los Angeles, CA 90012
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          LOS ANGELES, CALIFORNIA; FRIDAY, AUGUST 25, 2023

2                         9:08 A.M.

3                          -oOo-

4

5          THE COURT:  Okay.  We are back on the record in

6     21-8738.  We are going to bring the jury in.

7          I just wanted to see -- just remind you before you

8     do your closing that -- well, I wanted to remind you again

9     about all the exhibits, to be sure that we agree on what has

10    been admitted, and if you don't review the exhibits that will

11    be sent to the jury, then you have waived any and all arguments

12    regarding improper exhibits being sent to the jury.

13          And so the -- let me ask counsel.  Did you -- both

14    counsel, did you all review the exhibits that are going to be

15    sent to the jury?

16          MR. GALIPO:  There's no concerns on behalf of the

17    plaintiff.

18          MR. FORD:  We did, Your Honor.  There were two

19    exhibits that were shown to the jurors during openings that I

20    don't think were ever actually addressed in the presentation.

21    But we have stipulated to admit -- I don't remember the

22    numbers.  What's one of them?  27, page 7, and Exhibit 2,

23    page 2.

24          THE COURT:  Okay.  Thank you.

25          MR. GALIPO:  That's so stipulated.

1          MR. FORD:  Do you want me to say that in front of

2     the jury?

3          THE COURT:  I don't think so but just make sure they

4     get it.

5          MR. FORD:  Right.

6          THE COURT:  Since they did -- it was shown to them

7     at some point.

8          MR. FORD:  All right.  Thank you, Your Honor.

9          THE COURT:  Okay.  So we'll bring the jury back for

10    closing arguments.  Please don't suggest to the jury that they

11    request read back or a transcript because that will --

12          MR. GALIPO:  I will not.

13          THE COURT:  Because otherwise we'll be here --

14          MR. GALIPO:  But it's my understanding -- they've

15    probably seen the video so much by now, I'm not sure they need

16    to see them anymore.  But if they want to see them during

17    deliberations, they'll come out --

18          THE COURT:  If they want to, we'll come out here,

19    and you guys will be here while they watch it.  Unless --I

20    don't know.  Can -- I don't even know.  This is a new

21    courthouse.  Do they have a way to watch it in there?

22          THE COURTROOM DEPUTY:  Yes.  They can supply a

23    laptop if you want them.  It's a blank laptop.  It's clean.

24          THE COURT:  The clerk's office?  I mean the IT

25    people?

1          THE COURTROOM DEPUTY:  Yes.  And then they set it up

2    in the room, and then they can see them on a monitor.

3          THE COURT:  Oh, okay.  This is a new --

4          MR. FORD:  Are we allowed to reference it then?

5          THE COURT:  You can reference the videos.  I told --

6    as long as -- given what my clerk just said, then that's fine,

7    yeah.  Then that's fine.  And --

8          THE COURTROOM DEPUTY:  Do you want a laptop?

9          THE COURT:  Yeah.  We probably should order one just

10   in case.  If they ask for one, at least we'll have it here.

11   They may not.

12          THE COURTROOM DEPUTY:  You are okay with them

13   watching it --

14          THE COURT:  I'm okay with them watching it in the

15   room then, yeah, in the room.  I thought that big screen was

16   for them to watch TV while they were waiting.  I'm kidding.

17   I'm kidding.

18          Okay.  Anything else?  Otherwise, we are going to

19   just bring them in right now.

20          MR. FORD:  Your Honor, I wanted the record just to

21   preserve appellate rights.  I mean, I have reviewed the Court's

22   final verdict form and jury instructions.  And the defense just

23   wanted to preserve the objections made in previous filings and

24   arguments that we submitted.

25          THE COURT:  Yes.  And I looked at everything.  And

1    as you saw yesterday, it was pretty complicated trying to

2    understand, at least for me it was.  You guys do this all the

3    time.  The differences in damages for which claims and things

4    like that.  But okay, we can bring the jury in.

5                 THE COURTROOM DEPUTY:  Okay.

6                 (In the presence of the jury.)

7                 THE COURT:  Good morning and welcome back.

8                 So, ladies and gentlemen, you've now heard all the

9    evidence.  It is now time to hear the arguments of counsel.  I

10   remind you again that what the attorneys say during argument is

11   not evidence.  Counsel will outline his or her interpretation

12   as to what the evidence shows.

13                If they describe the evidence differently from your

14   recollection of the evidence, you should rely on your own

15   recollection of the evidence.  If they discuss the law and it

16   is different from my instructions on the law, you must rely on

17   the law as I have stated it to you.

18                First plaintiff's counsel will give a closing

19   argument, and then defendants will give one as well.

20                Mr. Galipo?

21                MR. GALIPO:  Yes.  Thank you.

22                Good morning to all of you.  First of all, I'd like

23   to thank you all very much for -- on behalf of myself, the

24   other lawyers involved, the family, who is on their way, for

25   being jurors in this case, for paying such close attention to

1    the case, for taking it very seriously, obviously.  We know you

2    have a lot going on in your personal and professional lives,

3    and we really thank you and respect you as jurors.

4           I want to take just a little time in reviewing some

5    of the evidence with you.  I apologize if I will be repeating

6    some of what you already know, but I think it might help you as

7    you go into deliberations.

8           There's going to be a verdict form with separate

9    questions on it for you to answer.  So I want to go over that

10   with you a little bit during my closing so you have a little

11   preview of what the questions will be.

12          The judge at the end of the closing arguments is

13   going to read the jury instructions to you which you'll have a

14   copy of in the jury room which is the law that applies to the

15   case.  So I want to review that just a little bit with you as

16   well because ultimately you want to apply the facts that you

17   find to the law to make your decision.

18          I have always felt that jury deliberations are the

19   most important part of the case because it's then that you get

20   to share your thoughts and views with your fellow jurors.  I

21   want to remind you of a few things at the outset.

22          First, this is not a criminal case.  That's probably

23   pretty obvious.  But it's important for at least two reasons.

24          First, the burden of proof is different in a civil

25   case, which this is, than a criminal case.  Many of you have

1   heard the phrase "proof beyond a reasonable doubt," for

2   example.  That's the burden in a criminal case.  It's a very

3   high burden because someone's liberty's at stake.  So the

4   burden is extremely high.  Some people say it's 99 percent or

5   95 percent or whatever it is.

6            But in this case, as the judge will instruct you,

7   the burden is much, much lower.  It's called preponderance of

8   the evidence.  It means more likely true than not true.  You'll

9   get an instruction on this.

10           If you want to think about the scales of justice, if

11  they are even and they just tip a little bit in favor of one

12  side, that's enough.  If you want to think about percentages,

13  it could be 50.01 percent.  That's all that you need to find

14  the force was excessive or to find that there were damages

15  incurred in this case.

16           You still may have some questions.  You still may

17  have some doubts in your mind about some things.  But as long

18  as balancing everything together you feel more likely true than

19  not, that suffices.  We feel it's much, much higher than a

20  close call in this case.  But that's for you to decide.

21           The second thing is we don't have to prove the

22  officers committed any crime, that they intended to kill or

23  they had any malice.  Maybe you'll find that there was some bad

24  intent here, but we don't need to prove that, nor is that part

25  of the jury instructions.

1           The only thing we need to prove is that they

2    intentionally pressed the trigger, which they all agreed,

3    Sigman five times, Montague two times, and that it was not

4    necessary to defend human life.  That's part of what the

5    instruction will say, whether it was necessary to defend human

6    life.  And I'll go over that instruction in a little bit with

7    you.

8           We believe the evidence shows certainly, more likely

9    true than not true, it was not necessary to defend human life.

10          And remember, the law and the evidence you heard is

11   a potential threat is not enough.  A threat, a potential

12   threat, even a potential deadly threat is not enough.  It has

13   to be an immediate or imminent threat of death or serious

14   bodily injury when the shots are being fired.

15          Now, in this case, I'll state the obvious.  He

16   didn't have a gun.  They had no information he had a gun.  They

17   never saw anything they thought was a gun.  If he was pointing

18   a gun at them or trying to shoot at them, then obviously they

19   have a right to defend themselves.

20          But in this case, depending on whose testimony you

21   listen to, he was running with either no objects in his hand,

22   which is what Officer Vidal told us yesterday.  He was watching

23   him run and saw no objects in his hand as he was running.  Or

24   Officer Montague that says he had one item in his hand but he's

25   not sure which hand.  Or Officer Sigman who says he had a

1   hammer in his right hand and an object in his left hand that he

2   thought was a machete, and he was waving them above his head as

3   he was directly running at him.

4           Now, the obvious is this.  With a contact weapon,

5   whether it's a pull bar or a knife or machete or a hammer, a

6   potential contact weapon, you have to get to the person in

7   order to cause serious injury or death.  You can't do it from a

8   distance.  You can't.  You have to be within striking distance,

9   three to five feet.  And you have to actually take the action.

10          Here he never got even close to them.  They say the

11  closest he got was 14 feet.  But that, as we've seen on the

12  video, is as he's running away from them.  Then they want to

13  say, well, maybe he was going to throw it.  There's no evidence

14  that he was going to throw it or attempted to throw it.

15          Another thing you get to do as jurors is judge

16  credibility, how believable do you find certain testimony when

17  you compare it to the video, when you compare it to other

18  testimony.  I would submit to you we are here in a trial,

19  putting this family through trial why?  Because the defense

20  denies all responsibility, all accountability.

21          I would submit a reasonable inference from you

22  listening to this evidence is the defense's case is a complete

23  exaggeration and a complete mischaracterization of the

24  evidence.  You are the ones that will decide.

25          So what are the issues?  Whether it was necessary to

```
1    defend human life.  We say it was not, and I'll explain why.
2              And what are the damages?  There will be different
3    questions on the verdict form.
4              There's actually three elements of damages that are
5    permissible under the law.  One is the pre-death pain and
6    suffering.  And that's why we show video clips after the
7    shooting, at the scene, in the ambulance.  That's why Dr. Omalu
8    talked about his pre-death pain and suffering after he was
9    shot.
10             A second element is the loss of his life.  All life,
11   obviously, has value.  When you are 32 years old and you have
12   the whole world ahead of you, that has value.  And so you heard
13   about things he liked to do, things he enjoyed with his mom and
14   himself.  You are going to have to put a value on the loss of
15   his life.  There's a line on the verdict form for that.
16             And finally, there's wrongful death damages for the
17   mother's loss of her son.  It was pretty obvious, I think, when
18   she took the stand how close she was with her son.  And I think
19   we all can understand the special bond between a parent and a
20   child, including between a mother and her son.  And no mother
21   wants to have a child die before they do.  Imagine the loss.
22             We heard that she misses his hugs, his kisses, his
23   smiles.  She just wants to touch him and hug him and talk to
24   him.  And she thinks every day he's going to be walking through
25   that door.  She left his stuff exactly how it is.  It's been
```

1    almost what?  Six years.  She would go in his room to smell his

2    clothes.  Imagine the loss, the daily heartache.  You heard her

3    say, "When he died, a piece of me died."

4            And you saw pictures of him.  And you were told what

5    a loveable person he was.  And we learned about his enlistment

6    and time in the Navy, getting his welder certificate, his

7    handyman business.  We learned about his love for music, his

8    love for cooking, his love for his mother, his nieces and

9    nephews.  And you saw, you know, several pictures of him in the

10   trial and his family.  This was a very loved person.  And his

11   picture in the Navy.

12           You know, what's really important when you want to

13   think about police officers using deadly force, what's really

14   important is the reverence for human life.  Human life is very

15   valuable.  Anybody has people that love them, has a family who

16   cares and loves them.  So that really has to be the backdrop

17   when you are thinking about whether something was necessary or

18   not to defend human life.

19           And the issues are not whether Jesse Murillo did

20   something you think wrong or did something stupid or did

21   something you would not have done.  That's not the issue here

22   in this case.  The issue is whether it was necessary to kill

23   him.

24           So let me talk to you just a little bit about the

25   evidence.  And then we'll go to the jury instructions and to

**UNITED STATES DISTRICT COURT**

1    the verdict form.

2            Well, first of all, we called Officer Sigman; right?

3    And then Montague.  And, again, I'm going to tell you probably

4    what you already know.

5            We know Officer Sigman fired five shots.  We know

6    his first shot was from 25 or 28 feet away.  He testified, "I

7    told him, 'Hey, stop.'"

8            You heard Mr. Bryce say, "That's no real command.

9    He probably didn't even hear it."  His partner didn't even hear

10   it.  You have to give the person the command and an opportunity

11   to comply with the command.  And you should give a verbal

12   warning before you use deadly force.

13           He shot him almost immediately.  He said, "Hey,

14   stop" and shot him within a split second.  He said he was

15   25 feet away when he said "Hey, stop."  He was 25 feet away

16   when he shot him.  Was that an opportunity to comply?  Was that

17   de-escalation?  Was that a last resort?  Was someone about to

18   be killed at that moment?

19           These officers had cover.  They had the protection

20   of their vehicles.  They had guns in their hand.  They could

21   shoot him at any time if he would have come into the street

22   towards them, which he never did.

23           And think about the background information they had.

24   They tried to exaggerate that he was hacking up the family.

25   There's clearly no evidence of that at all.  The only evidence

 1  of any injury they had was someone that thought they might have

 2  a hurt shoulder or dislocated shoulder, and that person was

 3  taken to Kaiser.  That's it.

 4          You heard yesterday from Officer Vege.  He was the

 5  one at the scene.  He says, at least now, "Oh, I saw something

 6  in one hand," which we know is the pull bar, that he says he

 7  thought was a machete.  You'll have to decide if that looks

 8  like a machete.  No sharpened edge.  No blade.  And now he

 9  says, "Oh, I saw a hammer in his hand."  Of course, he never

10  broadcast that over the radio that he saw the hammer in his

11  hand.  But nonetheless, he said he was ten feet away.

12          And think about this for a moment.  Did Jesse

13  attack Officer Vege?  He's ten feet away from him.  No.  Did

14  Officer Vege shoot him?  No.  What did Jesse do?  He turned

15  immediately and went over a fence.  Because why?  Because he

16  was afraid and trying to get away from the situation and maybe

17  the police at that time.  And everything he did is consistent

18  with him trying to get away.

19          He jumps over the gate.  He goes down the alley.

20  He's going southbound in the alley.  The airship and the

21  officers are announcing he's walking or running southbound in

22  the alley, running to get away.  He's three football fields

23  down.  Does anyone in this room, at least on this side of the

24  room, think he wasn't trying to get away?

25          And then what happens?  He sees the police, and

according to them, he starts running while they are still in

their car.  Now, think about this for a second.  It's

consistent with him trying to get away and running.

He starts running before they get out of their car.

He's running to get away.  He's not running to attack them.

They are not even out of their car when he starts running.

And he had to decide which way to go.  So if he went

straight or to the right, you heard testimony they would have

followed him in the police car.  He got to the sidewalk, and as

we see in the video, he made a sharp left.  He's running away

from the get-go.

And why is this important, ladies and gentlemen?

Because if you believe more likely true than not,

50.01 percent, he was trying to run away, then the use of force

was excessive and unreasonable because it was not immediately

life-threatening.

And why?  First, both experts told you you can't

shoot him for running away.  Second, Officer Sigman admitted

you couldn't shoot him for running away.

In fact, their expert, Mr. Flossy, who

testified by Zoom yesterday -- he has been retained in over

30 cases, 30 officer-involved shooting cases just by the

City of Los Angeles, 70 cases in total.  Think about this.

Every single case he testifies in for the LAPD, every

deposition, every jury trial, just like this jury trial, he

1    comes in and says I believe the officers' use of deadly force

2    was appropriate, even in cases when the people are unarmed,

3    even in cases where they are running away and shot in the back,

4    even in cases where people are shot in the hospital, even in

5    cases where the Board of Police Commissions says this was

6    excessive and unreasonable and out of policy.  Let's just call

7    Mr. Flossy because he'll help us in every case.

8             And that's what they are hoping here.  They are

9    hoping they can get Mr. Flossy here by Zoom, do his little

10   magic with you, and let's go on to the next case.  Let's go on

11   to the next shooting.  It cannot be that way.

12            He said even on Zoom yesterday and in his

13   deposition, which I referred to, if he was trying to escape, if

14   he was trying to run away, the use of deadly force was

15   inappropriate.  And I pointed out in his report, a portion of

16   his report when he says, "Moments leading into the deadly force

17   response, it appears that Murillo was trying to escape."

18   That's their own expert.

19            Now, Sigman says he's got two objects in his hand.

20   It's really interesting about this hammer.  And just so we are

21   clear, from the plaintiff's perspective, whether he had a

22   hammer and this pull bar in his hand or not, the shooting is

23   excessive any way you look at it, even if he had the objects in

24   his hand because he never tried to throw it, he never got into

25   the street, he never swung it, he never attempted to swing it,

1    he was never attacking anybody.  You can all see that on the

2    video.

3          But he wants to say he had this hammer in his hand.

4    Why?  A reasonable inference is to hype it up, to exaggerate it

5    more, to try to justify an unjustified shooting, to make you

6    nice people think, oh, okay, he said he had a hammer in his

7    hand, that might be more dangerous.

8          But think about it for a second.  Montague is right

9    next to him.  He never sees a hammer in his hand.  Vidal says

10   he's in his car right before Jesse goes down to the ground.

11   He's looking at him just before and during the shots.  He sees

12   no object in either hand.  And, quite frankly, one possibility

13   is this pull bar was somewhere on his body and fell to the

14   ground when he fell.

15         And then what else?  Where did the hammer end up?

16   Inside his zipped jacket.  Now, here's what they want you to

17   believe.  This goes to credibility and common sense, ladies

18   and gentlemen.  They want you to believe this man was shot

19   four times, writhing in pain on the ground, and somehow took

20   that huge hammer that we've all seen without anybody else

21   seeing, no police officer on scene, nobody, unzip his jacket,

22   put the hammer inside, and zip it back up.  That's what they

23   want you to believe.

24         And I asked several officers -- you may remember --

25   "Well, did you tell anyone he had a hammer on him?"  "No."

1   "You didn't mention, hey, be careful.  He's got a hammer?"

2   "No."  A reasonable inference is they never saw a hammer in his

3   right hand.  He had put it inside of his jacket before he was

4   shot.

5          But that's for you to decide.  That's for you to

6   decide.  What's really clear, we believe, from the evidence --

7   and here's another thing, and this becomes important, and I'm

8   going to show you why.  Sigman was asked, "What do you believe

9   the intent was of Mr. Murillo?"  He said, "I didn't know his

10  intent."  He said that in his statement.  He said that here.

11  And I want to show you why this is important, ladies and

12  gentlemen.

13         So the claims we have, there's three claims under

14  state law -- you'll see this when you get the instructions

15  and the verdict form -- are battery, which is unreasonable

16  force; negligence, which we generally know; and a violation

17  of what's called the Bane Act, which is a state law

18  relating to constitutional violations.  And then we have the

19  Fourth Amendment claim, excessive force, that's under the

20  United States Constitution.  That's why we are here in federal

21  court.

22         So look at part of this jury instruction that you

23  will get.  And this is on battery.  And those are the five

24  elements we have to prove; right?  That they intentionally

25  touched him.  Well, in the context of this case, that means

they shot him.  We know seven shots were fired.  We know

four shots struck him.  We know two of the shots, A and C, were

shot by Sigman because they were medium caliber.  One medium

caliber bullet was recovered.  And we know the two .45 calibers

were shot by Montague.  That's shots B and D including the

fatal shot as described by Dr. Omalu.  So one is satisfied.

Two, they used deadly force.  That's satisfied.

Three, the use of deadly force was not necessary to

defend human life.  That's the element.  That's the element.

Was it necessary to defend human life?

We believe it's clear it was not necessary to defend

human life.  And remember, we only have to prove that more

likely true than not.

Four, was he killed?

And five, was their use of deadly force a

substantial factor in causing his harm or death?  Well,

obviously, if you are shooting someone center mass and the

cause of death was multiple gunshot wounds and Omalu explained

to you the main fatal shot was D.  And also Omalu explained to

you, and it's pretty obvious from looking at the videos and the

stills, what the body positioning was.

Remember shots C and D were either from back to

front and totally from the side.  He was on the sidewalk

running east.  You could see it on the video obviously.  And

these officers are some distance away from him shooting at him.

1    And you have to decide whether those shots from that distance

2    as he's facing pure east -- he doesn't even turn towards them

3    ever.  He doesn't try to get into the street.  Whether those

4    shots at that moment were necessary to defend human life.

5    Obviously they weren't.

6           And what's so sad about this case, it's pretty clear

7    that the last shot, the seventh in sequence, the second shot by

8    Montague -- who, as we know, is no longer working with the

9    department -- killed him.  That was the fatal shot.  With the

10   sharp upward trajectory, with the body almost to the ground,

11   after he went to a knee, after his upper body is on the ground.

12   That's how you got the upper trajectory from the shot that hit

13   him in the right flank.

14          Can we say that that was necessary to defend human

15   life?  Remember, they are responsible to justify every shot.

16   Deadly force should only be used if there is an immediate

17   threat of death or serious bodily injury, not subjective fear,

18   not I think something bad could happen, not I'm kind of afraid,

19   not I thought he was going to come and attack me.  No.  Was

20   there an immediate threat of death?  Were there alternatives?

21   Did you give a warning?

22          And the law supports the evidence you've heard, and

23   that's what I want to show you right now.  So because we've

24   heard this term "imminent" and "immediate" and then different

25   people are trying to put their different spin on it, let's see

 1    what the law says.  "A threat of death or serious bodily injury

 2    is imminent when, based on the totality of the circumstances, a

 3    reasonable officer in the same situation would believe that a

 4    person has the present ability, opportunity, and apparent

 5    intent to immediately cause death or serious bodily injury to

 6    the peace officer or another person."

 7         And let's think about that.  They have to have all

 8    three.  The ability, the opportunity, and the apparent intent.

 9    That becomes important because even Sigman said, "I have no

10    idea what his intent was."  So he killed a man, but he had no

11    idea what his intent was according to him.

12         And he didn't have the ability and opportunity to

13    immediately cause their death because he was too far from them,

14    because he didn't have a gun, because he was running away from

15    them.  It's not enough that they come in here and tell you, "I

16    was afraid for my life.  I thought the guy had hacked up the

17    family, I thought he was going to hack me up.  Let's just start

18    shooting and killing everybody."

19         And the law supports that because look at the next

20    sentence.  "An imminent harm is not merely a fear of future

21    harm, no matter how great the fear, no matter how great the

22    likelihood of the harm, but is one that, from appearances, must

23    be instantly confronted and addressed."

24         So even if hypothetically they thought, hey, we

25    didn't know what he was going to do, we thought he could

1   possibly hurt someone down the road, we thought he was running

2   past us, but who knows, maybe he could circle back.  That whole

3   outflanking thing is ridiculous, but I'll let you decide what

4   you think about it.

5         That's not sufficient to kill someone.  It has to be

6   immediately cause death.  He never tried to attack the officers

7   or anyone else, including Officer Vege.

8         And then the next paragraph, which is part of the

9   instruction, is that, "In determining whether the officers' use

10  of deadly force was necessary in defense of human life, you

11  must consider their tactical conduct and decisions before using

12  deadly force and whether the officers used other available

13  resources and techniques."

14        They knew other officers were going to respond.

15  They have training.  People run from the police all the time.

16  Perimeter, containment, de-escalation, slow things down, get

17  less than lethal options available, Tasers, beanbag shotguns.

18  He's got a helicopter overhead with a light.  He's not going

19  anywhere.

20        And can we really say they gave him every

21  opportunity, they gave him appropriate commands with a time to

22  comply, any warning?  Sigman says after my third shot, at about

23  the time of my third shot, and he was in cover for his first

24  three shots, he was deviating his path of travel.  What he

25  really means is he was running eastbound on the sidewalk away

1    from me.  And what does he do?  He fires two more shots.

2          How about Montague?  You saw his body-worn camera.

3    He's literally running eastbound on the sidewalk, and he fires

4    two shots.  The second shot he's either on the ground or going

5    to the ground.  Montague gives no commands.  He gives no

6    warning he's going to shoot.

7          You heard about the concept of contagious fire.  One

8    officer starts shooting, sometimes, for whatever reason, the

9    other officer starts.

10          Now, after you heard from the first two officers --

11    and, of course, you noted a lot of inconsistencies between

12    their testimony.  And you were paying attention.  I don't have

13    to go through all of them.  Some of the obvious ones are

14    Montague never saw a hammer, for example.

15          In fact, there was a still photo that we showed him

16    during the trial, I believe 11-1, where you could see the right

17    hand of Jesse back in this still photo.  I said, "Do you see

18    his right hand in this photo?  Yes.  Do you see anything in

19    it?"  He said, "No."  Now, that's the right hand that's

20    supposed to have the hammer.

21          So then you heard from Dr. Omalu.  And I thought he

22    was very helpful explaining the trajectory of the shots, how

23    they passed through the body, and how those shots are

24    consistent with the stills, the video, and with Mr. Murillo

25    running away from the officers, never directly facing the

1    officers for any of the shots.

2            And towards the latter part of the sequence, it got

3    worse and worse because he's now past their position, and they

4    keep firing.  How about the background?  There's a truck and a

5    garage.  What if someone was in there, had been killed?  They

6    didn't know if anyone was in the truck or the garage.  You want

7    to start shooting shots in a residential neighborhood, that's

8    very dangerous.

9            Now, then you heard from the police practice

10   experts.  And, quite frankly, you probably didn't need police

11   practice experts in this case.  Once you saw the video, I would

12   submit any reasonable person and any reasonable police officer

13   would realize, including Mr. Bryce, would realize that that is

14   excessive and unreasonable and unnecessary killing of a human

15   being.

16           And if you can watch that video and you can honestly

17   say to yourself he was in the process of killing or attacking

18   those officers when he was shot, then maybe they have something

19   to talk about.  But the video does not show that.

20           And Mr. Bryce explained to you why it was excessive.

21   I talked about Mr. Flossy's concessions that it has to be an

22   immediate threat, that subjective fear is insufficient, and you

23   can't shoot him for running or moving away.

24           And then we called a few other officers which I

25   mentioned briefly.  And that would be Officer Vidal.  He's the

one getting out of his car.  Now, this is interesting because

now they want to go to plan -- if you don't believe one thing,

it reminds me -- and I know I'm dating myself here, but there

was a show when I was growing up called Get Smart.  And it was

a comedy show in a way, and he would always come up with

different reasons and excuses to try to get himself out of

difficult situations with KAOS.

        But in any event, he would say, "Would you believe

this?"  And they would say "No."  And then he would come up

with another story.  "Would you believe that?"  And they would

say "No."  And then he would go to a third story.

        So if you don't believe he was attacking us, well,

do you believe maybe we thought, after he ran past us, he was

going to like circle back?  Oh, you don't believe that?  How

about throw?  Maybe he was going to throw something at us.  Do

you believe that?  Oh, how about the other officers coming down

the street that we didn't see and didn't even know where they

were?

        You know, they think if they just throw enough stuff

out there, that you people will say, oh, well, let's give them

a break.  They are the police.  Let them go on to the next

shooting.  That's not how this system could work.  People lose

loved ones.  People are forever damaged.  Why do we have so

much violence?

        But what did Officer Vidal say?  He said, "I'm in my

1    car.  I see him running."  Now, think about this.  "I don't see

2    any object in his hand."  That's their police officer.  "I

3    don't see any object in his hands."

4          Does Officer Vidal say "I saw him running towards

5    the police officers"?  No.  Does he say "I thought he was

6    attacking the police officers"?  No.  He says, "I saw him

7    running eastbound on the sidewalk with nothing in his hands.

8    Then I hear the shots.  And he goes to the ground.  And some

9    metal object" -- he doesn't say "comes out of his hand."  He

10   says "falls from his body."

11         Bolanos, of course, removed the hammer, and you saw

12   the video of that.  And Ferris, incredibly, who was involved in

13   the handcuffing and everything else and is noting all the

14   blood -- imagine how much blood was lost.  Talk about pre-death

15   pain and suffering.  The scene is soaked with blood.  Ferris

16   has got blood all over him.  And he's got 650 cc's of blood

17   inside his body at autopsy.

18         And Ferris comes in here and tells you, "I didn't

19   even know there was an officer-involved shooting.  Nobody told

20   me."  Aren't you supposed to communicate that over the radio so

21   people know?  How was the ambulance and firefighters supposed

22   to be timely alerted to get the person the timely medical

23   attention they need to reduce their pain and suffering, to

24   hopefully save their life if the officers on scene, including

25   Ferris who are waiting to approach him handcuff him, they don't

1    even know, according to Ferris, that there was a shooting.

2              And I talked about Vege.  And, you know, in a way,

3    Vege's testimony is very important.  Because if you have a

4    question in your mind about whether Jesse Murillo was trying to

5    attack people or trying to get away, look at Vege.  He's

6    ten feet from him, and he runs away, hops the fence and runs

7    down the alley.  And quite frankly, Vege's communications were

8    not very helpful here.  He's got a machete.  False.  He's

9    possibly attacking people in the house.  False.

10             And then you heard from Tammy.  Well, I think her

11   testimony speaks for itself and the love and the loss that she

12   has had.

13             Now, I'm sure the defense will say, "Oh, this is a

14   tragedy."  Yeah, but it's a tragedy that should have been

15   avoided, that was not necessary.  And they may say, "Well, this

16   is how these officers perceived it.  This is what they

17   thought."

18             Well, first of all, perceptions have to be

19   reasonable, avoid overreaction, avoid all the subjective fear.

20   They are trained to assess.  Is this person coming into the

21   street to attack me, or is he running eastbound down the

22   sidewalk to try to get away?

23             You watch the video, and you decide what you think

24   is more likely true than not.

25             Now, I want to show you the verdict form briefly.

1          And I know I didn't get into all the evidence.  But

2    by the way, this is the .45 that fired shot D.  "Why do you

3    carry a .45?  Because I'm more accurate with my shooting."

4    That's the large caliber bullet that entered his back right

5    flank and killed him, going through his colon, his intestines,

6    his stomach.  He essentially died over the period of time

7    because of the internal bleeding and loss of blood flow.

8    Dr. Omalu was explaining that to you.

9          So here's the verdict form.  And Question 1 deals

10   with the excessive force claim, which is the Fourth Amendment

11   claim, and the battery claim which is unreasonable force under

12   state law.  That's the jury instruction that I just showed you.

13         And so the Question 1 is "Do you find by a

14   preponderance of the evidence that any of the following officer

15   defendants used force against Jesse Murillo that was

16   unreasonable under the circumstances?"

17         And the reason the preponderance of the evidence is

18   in there is to remind you it's only that 50.01 percent.  It's

19   not a higher burden like clear and convincing or proof beyond a

20   reasonable doubt.  And we believe the evidence clearly supports

21   an answer of yes to both officers on Question 1.

22         Question 2, whether you find it violated the

23   Bane Act.  You'll have an instruction on the Bane Act that

24   talks about acting violently against another person and causing

25   injury or death.  We believe the answer to that should be yes

```
 1   as well.

 2              Negligence, there's a separate instruction on

 3   negligence.  It has a lot of the same or similar language, as

 4   you'll hear when the judge reads, to the battery instruction.

 5   We believe that they both were negligent.  So the answer, based

 6   on the evidence and the law, should be yes to those two

 7   questions.

 8              4 is whether you find that Jesse's negligence was a

 9   substantial factor in causing his death.  And I would like to

10   make these comments.

11              I do think an argument could be made that Jesse was

12   negligent in some ways.  I mean, he was running away and stuff

13   like that.  But I would also argue that his negligence was not

14   the cause of his death.  It was their shooting him seven times

15   that caused his death when they shouldn't have, but you'll have

16   to address Question 4.

17              If you answer no to Question 4, then there's no

18   apportionment in Question 5.  If you answer yes to Question 4,

19   then you're going to decide what percentage to Jesse and to the

20   officers, everything adding up to 100 percent.

21              And then Question 6 and 7.  So 6 is the what are

22   called survival damages, pre-death pain and suffering and loss

23   of life.

24              Now, I want to say this about damages.  It's totally

25   up to you.  From the plaintiff's perspective, this is a
```

1   horrific case with huge damages that should be awarded.  But

2   that's totally your purview.  And I'm going to suggest some

3   ranges.  But you talk to each other, and you see what you agree

4   on.

5           Pre-death pain and suffering I would suggest should

6   be between $5 and $7 million.  Loss of life, between $10 and

7   $15 million.  Now, loss of life is the loss of Jesse's life.

8   Whatever one could do after 32 -- and, of course, 32 to me

9   seems very, very young, I can assure you -- in life, through

10  marriage, through children, through family, through your goals,

11  your dreams.  Everything that people enjoy throughout their

12  life was taken from him at 32.  That should be a large number

13  from plaintiff's perspective.  And that's why I give you the

14  range of 10 to 15 million.

15          And then Question 7 is wrongful death damages.

16  Well, these are Tammy's damages for the loss of her son.  And

17  as you'll read in the instruction, there's past loss and future

18  loss.  Now, we are coming up Christmas.  Imagine what

19  Christmases are like for Tammy.  So this December 23rd will be

20  six years.  Six years.  So what would be a fair number

21  for past loss?  If you gave her $2 million a year, it would be

22  $12 million; $1 million a year, it would be $6 million.

23          But how about for the rest of her life?  The rest of

24  her life?  Never seeing her son again, talking to him, hugging

25  him, kissing him, never again.  She's left with trying to smell

 1    his clothes or something, drive his car, keep everything

 2    intact, hope and pray that someday he's going to walk through

 3    the door.  That's what she's living with every day and will

 4    continue to live with the rest of her life.  That number, in my

 5    opinion, should be $15 to $20 million.  But, again, it is up to

 6    you.

 7              I thank you for listening to me.  And I may have one

 8    last chance to address you for a few moments.  Thank you.

 9              MR. FORD:  Defense also thanks all of the jurors.

10         This is obviously a serious case for everyone, not

11    just the plaintiff but also for Fred Sigman and Chris Montague.

12    They are being accused of the antithesis of what they have

13    trained and spent their whole careers doing which is to uphold

14    the United States Constitution and state law.  This is very

15    serious for them as well.

16         This is my only chance to talk to you.  As counsel

17    just said, he will get an opportunity to rebut what I'm saying

18    now.  I don't get another opportunity.  This is it.  And the

19    reason is because the plaintiff alone carries their burden of

20    proof.

21         And I hope that you all will discuss this case from

22    both sides, what both sides are arguing.  And I can imagine

23    that one of you may say theoretically, well, I just don't think

24    the plaintiff has proved his case -- her case.  And another of

25    you might say, well, I don't think the defendants proved theirs

 1   either.

 2          But I would ask that you all remember that the

 3   defendants don't have to prove anything.  The burden of proof

 4   rests entirely upon the plaintiffs.  And if you decide that you

 5   just can't conclude which theory you believe, you must vote for

 6   the defense.  To use a baseball analogy, the tie goes to the

 7   runner.  And that is true here in court.

 8          A couple jury instructions that you've heard

 9   previously and that I think you are going to hear again I want

10   to point out.  Before the case, the judge read a jury

11   instruction to you that included the phrase "don't let" -- "you

12   must not be influenced by sympathy or bias and let that affect

13   your decision."

14          Now, does the outcome of this incident make you feel

15   sympathy -- make all of us feel sympathy for Ms. Murillo?  Of

16   course it does.  There's not a single person in this courtroom

17   that would not feel sympathy for a parent losing a child.

18   Nobody doubts that she has experienced genuine pain from losing

19   her child.

20          Losing a loved one never seems fair.  And the human

21   instinct is to try to reconcile grief or sympathy by assigning

22   blame and seeking some sort of retribution for that loss

23   against those who are being blamed.

24          Our hearts certainly go out to Mrs. Murillo.  But we

25   have to put our hearts inside.  And what you are asked to do is

1   to make a legal decision not based on sympathy or bias but

2   based on the law.  And what this really comes down to is what

3   the officers reasonably believed at the time they used force.

4         Without the law, you might feel, well, plaintiff has

5   lost her son, and she has experienced tremendous grief.  So

6   doesn't somebody have to pay?  Well, that's the emotion that

7   the plaintiffs want you to base your decision on.  And the law

8   says you cannot.

9         The whole argument that you just heard from counsel

10  is mostly about what they want you to feel.  But your job is

11  not about feelings.  It is about applying the law to the facts

12  of this case as you determine them.

13        I want to remind you, you can only award damages to

14  the plaintiff if you find that she has proven her claims.  You

15  don't get to damages, you don't fill in the blank with a number

16  unless they have proven each and every element of their claims.

17        And essentially what it all boils down to on each of

18  them with some variations that I'll explain is whether or not

19  these officers were reasonable in their belief of an imminent

20  threat of death or serious bodily injury when they decided to

21  use force.

22        When you follow the law, you will see -- or sorry --

23  you will see that you are to judge the officers based on their

24  reasonable belief.  And that's based on the totality of the

25  circumstances, including all reasonable inferences that can be

1    drawn from the officers' perspective that Mr. Murillo posed an

2    imminent threat of death or serious bodily injury to them or

3    others at the time they made the decision to use force.  And

4    unfortunately, it was Mr. Murillo's own actions and his own

5    choices in a span of just a few seconds, three to four seconds,

6    that led to this lethal use of force.

7            Now, the second instruction I want you to keep in

8    mind that you are going to be read in just a moment -- and it

9    may have been referenced earlier -- talks about the concept of

10   hindsight is 20/20, and you are not to use 20/20 hindsight in

11   making your decision.

12           This phrase is an idiom in the English language.

13   Hindsight is 20/20.  Some people also call it Monday morning

14   quarterbacking, a sports analogy.  But the idea is that it's

15   easy to go back and judge decisions that officers had to make

16   in a split second or that sports football players had to make

17   in a split second in a game when it's all over, when the game

18   is over, when there's no more decisions to be made.

19           And that same thing applies to police officers and

20   analyzing their conduct and as their job requires them to make

21   split-second decisions under tremendous stress in very fluid,

22   dynamic, and ever-changing situations.

23           So the concept of 20/20 hindsight that you are not

24   to use, it's a comparison to eyesight.  So 20/20 is perfect

25   vision.  So when we look back at things, we see it perfectly

now that we know everything that we know.  But the officers

didn't know what we know now when they made this decision.  And

the you officers -- you can't judge the officers based on 20/20

hindsight.

So we have examined this case in the peace and order

of this courtroom.  No one is running towards anybody else.

Weapons are safely in boxes.  Nobody is screaming.  Nobody is

being assaulted.  Nobody has access to weapons.  Nobody needs

help.

But police officers do not get the benefit of

20/20 hindsight when they have to make a decision about when

and what force to use.  They have to make split second

decisions.  Because for them and for the public that it is

their job to protect, it can cost lives including their own.

So we sit here today because Mrs. Murillo claims

that these officers have violated the Fourth Amendment right

against unreasonable force that her son had, that we all have.

And they've also sued under three other variations on this same

concept.  But they also, all of them, essentially come down to

whether the officers' use of force was reasonable.

Well, what is reasonable force?  There is a

definition for it in your jury instructions.  But it is not

going to define the word "reason" or "reasonable" for you any

further.  But I think it's exactly the basic dictionary

definition.  It means there was a valid reason to do what they

```
1    did at the time.  Not with 20/20 hindsight but based on what
2    was known to them at the time.
3              We have painstakingly and tediously analyzed what
4    amounts to about three, less than four seconds over three days
5    here, three long days, over and over again for hours, questions
6    and questions and questions about every millisecond of that
7    three to four-second period.
8              But what you have to keep in mind is that the
9    officers didn't have three days to make an analysis when they
10   had to choose what to do to protect their lives and the lives
11   of others.  They had three seconds.  And they made a reasonable
12   decision based on what they reasonably knew and what they
13   reasonably believed during those three seconds.
14             Nobody who has ever used deadly force as part of
15   their job, such as the police, such as the military, including
16   Mr. Murillo, including Officer Montague, none of them ever want
17   to have to use deadly force.  But our society cannot function
18   without those whose job it is to make those split second
19   decisions when the rest of the community is enjoying peace and
20   safety.  This is part of what they signed up for.
21             And some of you might think, well, shouldn't we just
22   give the plaintiff some money because she lost her son?
23   Doesn't she deserve that?  She lost her son.  The answer is no
24   because the law doesn't allow it because these officers did not
25   violate Mr. Murillo's rights.  They did not act unreasonably.
```

```
1              No matter how sympathetic the plaintiff may seem,

2      she has to prove that these officers acted unreasonably, not

3      with the 20/20 hindsight that we now have but based on what

4      they knew at the time that they chose to use deadly force.  And

5      that is based on the totality of the circumstances known to

6      them, including all reasonable inferences that could be drawn

7      from the information that they were given.

8              So let's go over what we know and what they knew.

9      So the first message that they get, the officers are sitting in

10     their report-writing room.  Officer Vege gets on the phone --

11     sorry -- gets on the radio.  And he asks for, number one, an

12     additional unit, another police car as backup.

13             Number two, he gives them information that there is

14     a possible assault with a deadly weapon, suspect in the house,

15     a deadly weapon, assault with a deadly weapon in the house.

16     And then number three, a 59-year-old man has been injured and

17     has a dislocated shoulder.

18             So not with 20/20 hindsight, just that statement

19     alone, what would a reasonable person or reasonable officer

20     think?  There's a problem.  There's a suspect who may have

21     committed assault with a deadly weapon and an officer needs

22     backup and someone needs an ambulance.  It is reasonable to

23     draw that conclusion.  That is the information they were given.

24             Not with what we all know now.  Mr. Galipo gets up

25     here and says, well, they thought this.  Wrong.  They thought
```

1   that.  Wrong.  They didn't know that.  This is what they were

2   told.  And their job was to respond.  So they did.

3          The second message -- this is actually still before

4   they leave the station.  They hear Officer Vege say, "Officer

5   needs help.  8143 De Soto.  Officer needs help."  You've heard

6   that several times.  And you can also hear screaming in the

7   background of that call.

8          So what would a reasonable -- and you've been told a

9   help call is the most serious type of call that an officer can

10  receive.  All hands on deck.  Come from wherever you are.  This

11  officer needs help right now.  What would a reasonable person

12  or reasonable officer think hearing that?  After what they'd

13  already heard.

14         Interestingly, you are in very much the same

15  position that Officer Sigman and Officer Montague were in

16  because there's no evidence in this trial about what actually

17  occurred or was occurring at that house.  You can only draw

18  reasonable conclusions based on the totality of the

19  circumstances which, for the most part, is limited to these

20  messages.

21         You have to consider the inferences that can be

22  drawn from what was said.  Inferences aren't confirmed proof,

23  but they are conclusions every day that we draw that our brains

24  put together based on information that is reasonable.  If

25  there's something that contradicts that, our brains think,

1    well, that doesn't make sense, that doesn't fit.  There was

2    nothing in these lines of messages that would give them any

3    other impression than the one they had.

4          The help call signaled to them that something has

5    changed just in a moment's -- a few seconds ago, it was needs

6    an ambulance, ADW suspect in a house, needs backup.  And then

7    just, I think, less than a minute later it's changed to help

8    call.  I need help.  Officer needs help.  Everyone come to me.

9    That's what it means.  Code 3, lights and siren.

10          And it wasn't just Officer Montague and

11   Officer Sigman that ran out of that station.  It was everyone.

12   They all did.

13          So what did Officer -- what are they to reasonably

14   believe, Officer Sigman and Officer Montague, after they hear

15   the help call?  Well, they said -- they had already heard that

16   they -- there was an ADW suspect who had already required a

17   backup request and an ambulance, and it's at the same location.

18   So what are they to reasonably infer from that?  Well,

19   something dramatic has happened, and it's bad.

20          Again, we don't know what was actually happening in

21   the house, but neither did the officers.  But it is their job,

22   their job to be ready to handle bad things happening.  So they

23   went as fast as they could, lights and sirens, with the belief

24   in their mind that there was an assault with a deadly weapon

25   suspect in a house and has apparently assaulted someone.  That

1    person requires an ambulance.

2              And so while they're en route, they get even more

3    information from Officer Vege.  It doesn't change the analysis.

4    It makes it worse.  It doesn't give them any cause to believe

5    what they previously heard was untrue.  It continues to get

6    worse.

7              The next thing he says is, "I have a male armed with

8    a machete possibly assaulting people inside the residence."

9    Now, just based on what these officers had heard, which is,

10   again, what you are to judge them by, not what we know now in

11   the peace of this courtroom, what they knew and what they

12   reasonably believed, we have to look at this from a reasonable

13   perspective of the officers.

14             So let's add up the totality of the circumstances.

15   Number one was a backup request at this house.  Number two,

16   there's an ambulance request with an injured person at this

17   house.  Number three, there's an assault with deadly weapon

18   suspect, deadly weapon at this location.

19             Number four, in the house there are possible victims

20   corroborated by screaming.  Number five, the suspect has a

21   machete.  That is a deadly weapon.  And counsel tried to

22   suggest to you, I believe, that it has to be a gun for them to

23   use deadly force.  No, it doesn't.  That is not the standard.

24   You will never see anything about a gun in your jury

25   instructions.  It is whether or not they reasonably perceived

        an imminent threat of death or serious bodily injury by any

        means.

                But we know that a machete certainly is a deadly

        weapon.  And I think one of the officers even in his testimony

        talked about having seen people that have been assaulted with

        machetes, and it is gruesome.

                Now, what would a reasonable person think given this

        additional information?  And what reasons would they have for

        thinking this?  You know, police officers unfortunately

        sometimes see the worst in society.  That is their job.  And we

        as a society expect and pay them to deal with the worst because

        the rest of us cannot or don't want to.

                But just knowing those facts, a reasonable person

        would believe exactly what Officer Sigman and Officer Montague

        did, that there is a male with a machete who may have hurt

        people inside this house that they are en route to.

                So Officers Sigman and Montague arrive at the house.

        They see Sergeant Stewart.  And he tells them in very few

        words.  This wasn't a long conversation.  He just used very few

        words and gestures and told them to get back behind the house.

        There wasn't a discussion of, well, did you confirm that what

        we heard earlier was correct?  Was it really -- there was no

        time for that.  It was get back behind the house to try to

        contain the suspect that everyone reasonably believed was a

        danger.  And I submit to you that he was.

1          So they go back.  This is urgent.  There's no time

2     for them to question their supervisor or interview their

3     supervisor about the facts.  They were given an order to set up

4     a perimeter to contain a suspect, a suspect who was a male with

5     a machete who may have hurt people at this house.

6          It was not an exaggeration.  That's what plaintiff's

7     counsel keeps saying.  They were exaggerating.  No, they

8     weren't.  These were honest, genuine, and reasonable beliefs

9     based on what they were told.

10          So next they arrive.  They drive down De Soto

11     Avenue, and they get to Strathern Street.  And another message

12     comes across the radio from Officer Vege again.  This time he's

13     addressing the helicopter that's flying ahead.  And he says,

14     "Air unit, just ran -- he just ran into the backyard of the

15     house.  Male wearing a blue jacket.  He has a gas mask on.

16     Armed with a machete."  So he's telling the helicopter to look

17     for this moving suspect.

18          So this is now additional info that the officers

19     get.  They know that the suspect -- the ADW suspect with a

20     machete is running towards them where they are heading to.  And

21     now he has a gas mask on.

22          Now, let's stop for a second and think about the

23     bizarre nature of Mr. Murillo's behavior and how a reasonable

24     person would interpret it.  There is a police officer in front

25     of the house, Officer Vege, who sees Mr. Murillo run out of the

1    house wearing what appeared -- excuse me -- holding what

2    appeared to be a machete in one hand and a hammer in another.

3    And he's wearing a gas mask.  This is nighttime in December.

4           Ominous?  Indeed.  Does this seem peaceful?  Does

5    this behavior seem innocent?  Or does it seem dangerous?  And

6    why would anyone do such a thing?  Why would anyone with good

7    intentions, with nonviolent intentions run out of a house with

8    screaming people with two bludgeoning weapons in each hand?

9    Why?  We still don't know based on the evidence in this trial.

10          With 20/20 hindsight, we do now know that it was not

11   a machete.  But was it unreasonable to believe this, that it

12   was?  That's what they were told.  That's what it looked like,

13   not just to them but to Officer Vege.

14          And as we heard yesterday, in fact, Jesse Murillo

15   really did own a real machete that he kept in his handyman

16   tools in the garage.

17          So I want to show these exhibits to you again

18   because unless you ask for them, you probably won't see them

19   again.  Now, we are in a nice courtroom here with beautiful

20   lighting.  And you can see this object a lot better than the

21   officers did.

22          But imagine what this must have looked like in the

23   hands of someone running directly towards you.  And one thing

24   that you don't see in the pictures, which I think is

25   interesting, is this label here.  This tool is pretty new.  The

UNITED STATES DISTRICT COURT

1   label was still very nice.  And we can't see from the pictures

2   or the video.  But from a distance, that certainly could look

3   like a handle.  And that would corroborate what the officers'

4   perception was.

5          Not only did he have this in one hand, he had the

6   hammer in the other.  Why is Mr. Murillo running down the

7   street at nighttime under these circumstances fleeing from an

8   officer with these two weapons in his hand?  If you want to

9   call them tools, they are also tools.  But they are weapons as

10   well.

11          I'm not trying to make light of this.  But

12   Mr. Murillo was not out planning to do any floor installation

13   when he was running down the street with this big hunk of

14   metal, 16 and a half inches by three inches wide, in one hand

15   and this large hammer in the other.  This was not a handyman

16   job.

17          He covered his face with this (indicating) running

18   down the street when he had those two objects in his hand.  Why

19   would he do that?  The explanation that we got from plaintiff

20   was that he had this gas mask that he kept from the Navy and

21   that he used it sometimes to go and do work with it.

22          And that might be true.  I don't doubt that.  He was

23   a handyman.  That was his business.  But he wasn't doing work

24   when he was running down the street fleeing from police at

25   night when this happened.  We don't know for sure why he put it

1    on his face.  But I think we can reasonably conclude it was not

2    for work purposes.  He was obscuring his face, or he had some

3    reason why he thought he should wear a gas mask while fleeing

4    from the police.

5           Plaintiffs argue that it was unreasonable for the

6    officers to perceive this as a deadly weapon because, as it

7    turns out, it's a pull bar.  It's a tool.  I think the better

8    question is seeing what I just showed you, why would anyone who

9    is told it was a machete not think that it was a machete?

10          Are we to believe that Mr. Murillo was running down

11   the street to do flooring?  Certainly not.  Why would he have a

12   hammer in his hand?  Why would he have a gas mask?  He's not

13   under his mother's house.  He was not doing work.  He was not

14   going to a job.  Mr. Murillo had armed himself with weapons.

15   And the manner in which he wielded them shows you his intent.

16   It was not peaceful.

17          Why would someone run out of the house in the middle

18   of the night in winter, family screaming, ignore the police,

19   with these tools in his hands, these weapons, after ignoring

20   officers who had been called to the scene?  Something bad

21   indeed was happening at this residence.

22          And I think you can draw the reasonable inference.

23   There were a lot of people in this house, not just Mr. Murillo,

24   but his mother, his adult sister, her six children.  And we

25   know there was another male there at the house.

1          So this is a potential powder keg of emotions two

2     days before Christmas.  A pull bar may not be an edged weapon,

3     but it is nevertheless a deadly weapon.  If that object that I

4     just lifted and showed you is thrown at someone, it is a deadly

5     weapon.  And so is a hammer if it's used on the head.

6          He wasn't carrying a teddy bear and a balloon.  Now,

7     if he was -- and I know that's an absurd example -- and the

8     officers saw him carrying a teddy bear and a balloon and they

9     told you I thought he was going to attack us with the teddy

10    bear and the balloon and they shot him, I would agree with you

11    that is unreasonable.  It is not reasonable to believe that a

12    teddy bear and a balloon is going to harm someone.

13         But these objects are a different story.  They are

14    absolutely deadly weapons, just as the original call said

15    assault with a deadly weapon, suspect in the house.

16         Although we don't know for sure based on the

17    evidence, it is reasonable for you to draw the same conclusions

18    that the officers did.  Something is amiss.  Something bad is

19    happening.  Something dangerous is going on.

20         So Officer Montague and Sigman continue.  They are

21    turning onto Strathern.  And they are given even more

22    information from the helicopter, this time not from Vege but

23    from the helicopter officer.  "I've got your suspect in the

24    north-south alley pushing southbound."  That means heading

25    towards their location where they are driving.  "Gas mask,

UNITED STATES DISTRICT COURT

1    black jacket, blue jeans, coming at you next major street or

2    minor street."

3            The helicopter could see what these officers

4    couldn't see or anybody on the ground.  Mr. Murillo was moving

5    south on the alley.  Officer Sigman, Officer Montague were

6    familiar with this alley.  This was a long alley.  It

7    spanned -- I think the estimate is 10 to 15 houses.  This is a

8    very long alley in the middle of a long, skinny block.

9            They knew where he was going to come out.  They had

10   familiarity with this area.  So they approach the alley.  And

11   what do they see?  Well, they see Mr. Murillo in a gas mask,

12   just like they had been told, with a 16-and-a-half by

13   three-inch metal tapered object in his hand.

14           The officers had been told it was a machete.  It

15   looked like a machete.  There was no reason for them to believe

16   anything else.  It was at night.  It was a distance -- from a

17   distance.  It certainly did look exactly like what they had

18   been told.

19           Now, based on his behavior that they observed --

20   again, this is just a very minute amount of time -- did it

21   appear that he wanted to do harm to themselves or others?  It

22   reasonably did.  Why is this man armed with metal objects in

23   both hands fleeing the police wearing a gas mask if he doesn't

24   intend to do harm?

25           And this is the same man who they had reason to

1    believe, they had been told, had possibly harmed people inside

2    this residence, an ADW suspect, not a peaceful, tool-carrying

3    handyman going to a job.

4           Montague saw him first from the vehicle.  And he

5    says, "Here he comes."  Now, even that choice of words is

6    meaningful.  He's coming.  He's coming here where we are.  Both

7    officers see Mr. Murillo.  And what happens next?  He's walking

8    initially along the fence line.

9           And when they drive up in view, his head with his

10   gas mask turns to them.  And they can't see his eyes, but his

11   head turns.  His neck turns in their direction.  And more

12   importantly, just like that, he immediately changes pace.  He's

13   not walking.  He begins to full on sprint towards these

14   officers.  And I think the estimate was 25 to 28 feet, at least

15   when the first shot was fired.  I don't have a measurement, but

16   that's probably about the distance I am from you.

17          He also changes his direction.  So initially he was

18   walking parallel to the fence in sort of a straight line.  And

19   he begins -- and he turns.  And he runs diagonally towards

20   them.

21          Now, it's true he never ran at Vege.  But that's

22   very important.  And that's why Vege didn't feel that there was

23   an imminent threat of death or serious bodily injury.  He

24   wasn't running towards Vege.  I agree he was running away from

25   Vege.  He wasn't running away from Officer Sigman and

```
 1   Officer Montague.  He was running towards them, directly

 2   towards them.

 3            Now, his arms had weapons in each of them, in each

 4   hand.  And as we know from life experience and basic body

 5   mechanics, if someone goes into a full-blown sprint, they use

 6   the momentum of their arms to achieve that speed.  So that is

 7   why Officer Sigman described to you seeing these weapons up at

 8   or above his head.  That's not unreasonable.  That's what

 9   happened.  You just can't see it on the video.

10            And I think during the course of the trial, there's

11   been sort of some allusions to movies and even maybe some

12   ridicule of those comparisons.  But no one in this courtroom

13   was there except Officer Sigman and Officer Montague.  Nobody

14   saw what they saw.

15            There were a number of bullets fired.  We've talked

16   about them extensively.  But the furthest away he ever was when

17   they shot was 25 to 28 feet.  The closest was 14 feet.

18   14 feet.  And this is someone the plaintiff wants you to

19   believe was running away, trying to get away from them.

20            Officer Montague saw much of the same thing as

21   Officer Sigman.  But remember he was driving.  So what did they

22   see?  The man who meets the description, who they had been told

23   was an ADW suspect, who was in the house, where an ambulance

24   had been called.  And now this man has been located.  And he is

25   heading directly towards them with weapons in each hand wearing
```

1   a gas mask.  And one of the weapons that have been described is

2   a machete, and it reasonably appeared to be a machete.

3          Now, we've talked a lot about the video, and we've

4   analyzed it.  But not everything that they saw was on the

5   video.  And I hope that has been proven to you why that was.  A

6   few points to keep in mind when you are considering the video.

7   No one would disagree it's important evidence, but the video

8   doesn't show everything.

9          First, the body-worn video is not the eye of God.

10  It is not even the eyes of these officers who wear it on their

11  chest about a foot below their eyeballs.  In this case much of

12  what is being debated between the parties occurred off camera

13  because the cameras on their chest were facing the dashboard.

14  That's the initial view of Mr. Murillo when he was walking and

15  then abruptly changed and started sprinting towards them.

16         Second, the body-worn video is not ultra-HD 4K

17  video.  It is poor quality, especially at night, and especially

18  with the limited lighting in these areas.  It has what's called

19  a fisheye lens which is somewhat distorting.  It makes things

20  look further away than they actually are.  And that's to

21  compensate for the width of the horizontal image that the video

22  is designed to capture.

23         But we know that, when the officers fired,

24  Mr. Murillo was as close -- well, at furthest during the shots,

25  28 feet is the highest estimate.  The lowest is 14 feet.

1   Body-worn video is certainly helpful, but it does not

2   definitively paint the whole three-dimensional real-life

3   real-time picture of what these officers saw with their own

4   eyes.

5         Third issue about the video:  Can you clearly see

6   the weapons in Mr. Murillo's hands in the video?  Not clearly.

7   But you can see them.  They are there.  And plaintiff is

8   arguing to you that they are not.  And even some of the experts

9   had difficulty saying what they could see and what they

10  couldn't see.

11        There's no doubt that Mr. Murillo had that pull bar

12  because he dropped it.  And you can see it when he drops it.

13  Plaintiffs aren't arguing to you they didn't have it in his

14  hand.  They are trying to argue to you he didn't have the

15  hammer in his hand.  But that doesn't make sense because we

16  know that Officer Vege saw him with a hammer in his hand when

17  he jumped over the fence.  We know a hammer was uncovered from

18  his person.

19        And if you looked at the video -- and it was

20  fortuitous that plaintiff's counsel actually paused on this at

21  just the right moment.  You can see the head of this hammer in

22  Mr. Murillo's hands -- in his hand during the time that shots

23  were fired.

24        Now, plaintiff wants you to believe no, no, no, that

25  hammer was never in his hand when he was running.  It was in

1    his jacket, in his shirt.  Well, that doesn't make sense

2    either.  The video doesn't show it being removed from a pocket.

3    But let's assume there was a pocket.  If there was a pocket, it

4    would be sticking up here.  This is a long hammer.  The jacket

5    was partially unzipped.

6            I submit to you the video shows that Mr. Murillo

7    stuck that hammer in his jacket as or at the time that he fell.

8    Because the video shows that he tucked his two arms, both of

9    them, under his body.  And it is very likely that he was still

10   holding that hammer, and in the moments that the officers were

11   approaching him to put handcuffs on him, he stuck it right

12   here.  He had already dropped the pull bar.  So he wanted to

13   hide the hammer.

14           Regarding the quality of the video, I don't think

15   it's really been disputed that Mr. Murillo was wearing a gas

16   mask.  That was seen by everyone, including the helicopter.

17   And it certainly was lying there right next to him when he

18   fell, fell off of his head.  But can you clearly see it in the

19   video?  No, not clearly.  But you can see it.

20           But what you can't see is his skin, his face, his

21   nose, his ears, the whites of his eyes, at least when he's

22   coming towards the officer.  You just see a blur.

23           So keep that in mind, the quality of the video.

24   It's not the eyes of God.

25           Fourth about the video, the body-worn video angles

```
1    are misleading.  I mentioned this earlier.  So keep in mind --
2              If we could bring up Exhibit 137, page 2.
3              The officers were part at an angle, as you see here,
4    to that corner of the curb.  So Mr. Murillo was originally
5    here.  And then he went in this direction.  I'm not saying
6    that's exactly right, but I'm showing you a general direction.
7    The officers -- you use the evidence that was done by the
8    officers.
9              The point I'm trying to make is that the video may
10   make it appear to you that the officers were parallel to this
11   sidewalk or curb.  And that is misleading.  They were not.
12   They were at an angle.  And Mr. Murillo was also at an angle
13   when he was coming towards them until he deviated.  He still
14   was running towards them generally.
15             But as we discussed, he began to come sort of in
16   this direction.  And the officers' testimony and the
17   expert's testimony is that he -- they had a concern or belief,
18   sincere belief that he was trying to outflank the cover of
19   Officer Sigman.
20             The only cover Officer Sigman had was this door.  If
21   you want to attack Officer Sigman, you'd have to get around the
22   door.  In order to get around the door, you have to go
23   southeasterly from the angle that Mr. Murillo was running.  And
24   whether you believe that's really what he was intending to do
25   or not, we will never know for sure.  But the important point
```

1   is that is what they sincerely believed based on their training

2   and experience.

3          So I want to talk about a few red herrings if you've

4   ever heard that phrase.  So a red herring is essentially an

5   expression or an argument to bring up something that might

6   mislead or distract you from the relevant or important

7   questions before you.  And there's sort of a story about it.

8   It has to do with hunting dogs in England and how they used red

9   herrings to train the dogs to ignore certain scents.  But

10  anyway, it's just an expression that means a distraction.

11         Plaintiff's arguments and their highly paid experts'

12  opinions are based on several incorrect and false ideas.  First

13  of all, that Mr. Murillo didn't have a hammer in his hand.

14  Well, why would you not conclude that he did?  We know he had a

15  hammer in his hand when he exited the house.  Vege saw that.

16         We also know that he had a hammer in his jacket

17  after the shooting.  And plaintiff said, "Well, I don't see

18  it."  Their expert said, "I don't see it."  But Officer Sigman

19  saw it with his own eyes.  And he saw it on the video, and he

20  showed it to you, during the time that the shots were being

21  fired.

22         And like I said, maybe you didn't see it.  But you

23  can always take another look.  It is there.  And there is no

24  reason for Officer Sigman to make this up.  It's true that

25  Officer Vege never mentioned the hammer.  But he did see it.

1    And we know that Officer Vege was trying to get out an urgent

2    information as efficiently as possible.  Compared to a machete,

3    the hammer is of more concern -- sorry, excuse me -- the

4    machete is of more concern than the hammer.  He put out there

5    was a machete.  He didn't mention a hammer.  But I don't think

6    there's any real debate that Mr. Murillo had a hammer.

7            So as I explained earlier, the logical explanation

8    is he had it, just like the officer said, just like Vege said,

9    and he put it in his jacket as he fell to the ground and tucked

10   his arm arms underneath his body.

11           What about the fact that Officer Montague didn't see

12   the hammer?  Does that mean it wasn't there?  Well, if these

13   two guys were colluding and lying, they would have both said

14   that they saw the same thing.  They would have both said, "Oh,

15   he had a hammer in his hand."

16           But they were honest with the FID investigation.

17   And they were honest here with you.  Montague simply didn't see

18   the hammer.  That doesn't mean it wasn't there.  It doesn't

19   mean that Officer Sigman made this up.

20           Montague was driving a vehicle and at the same time

21   trying to monitor the dangerousness of the scene.  He really

22   got, it sounded like to me, maybe two opportunities to look at

23   Mr. Murillo.  One was while he was driving and as he

24   approached.  He had to then put the car in park, had to take

25   his eyes off Mr. Murillo.  And then when he stepped -- and what

1     he saw was Mr. Murillo, just as Officer Sigman said, abruptly

2     turn his head and begin running directly, diagonally in their

3     direction.

4            By the time Officer Montague had exited the car,

5     Mr. Murillo had closed the distance significantly.  We talked

6     about that.  He gets closer and closer because he's continuing

7     to move at a sprint pace.  Much closer than the first -- so

8     when Officer Montague gets out of the car and fires,

9     Mr. Murillo has closed the gap significantly and is

10    significantly closer than the first time he saw him when he was

11    looking out the windshield before he parked the car.

12           And importantly, the second time Officer Montague

13    sees him, he has deviated his path.  He has crossed the corner

14    of that block.  And he's coming across the apron of that

15    driveway, not the sidewalk.  He's crossing it diagonally.  The

16    sidewalk does intersect it.  But that's not the direction he's

17    going to -- going in.

18           Now, counsel suggested to you and sort of ridiculed

19    the idea that, oh, well, he never threw it so it was

20    unreasonable for the officers to be concerned about that.  The

21    officers are not required nor is any citizen required to wait

22    until they are actually assaulted before defending themselves,

23    including police officers using reasonable force to stop an

24    imminent threat of death or serious bodily injury.

25           At the point that they fired, particularly towards

 1    the end, these officers sincerely -- I mean, including the last

 2    shots, all seven of them, Montague and Sigman sincerely,

 3    genuinely, reasonably believed that Mr. Murillo was trying to

 4    outflank Officer Sigman's cover and to do him serious harm or

 5    death.

 6            And why would they not think that?  Why else would

 7    someone who was fleeing the police after being reported, who is

 8    armed with weapons, covering his face with a gas mask,

 9    sprinting towards the officers, why would they not think he was

10    causing a threat to them?

11            Under these circumstances -- and that is the

12    standard that you are to judge -- any reasonable officer, any

13    reasonable person would believe somebody coming towards them

14    directly in a gas mask with that heavy object in one hand and a

15    hammer in the other is intending to cause them serious harm or

16    death.

17            Now, we may know that it's -- in hindsight that it

18    was, in fact, a pull bar.  Still a dangerous weapon.  But they

19    were told it was a machete.  It looked like a machete.  They

20    believed it was a machete.  No hindsight 20/20 analysis.

21    That's what they believed.  You may find that that belief was

22    unreasonable.  But I don't see how you could.  That's what they

23    were told.  That's what it looked like.  It was reasonable.

24            All right.  Second red herring is Mr. Murillo was

25    really trying to escape and run away from the officers, not

 1   towards them.  Well, first of all, I think you can reasonably

 2   conclude that flight from police is consciousness of something,

 3   something not good.  He's trying to get away from the first

 4   officers.

 5          And then he encounters other officers that he wasn't

 6   expecting to be at the mouth of that alley.  And when he sees

 7   them, he doesn't run away.  He runs toward them.  If he wanted

 8   to get away, he could have gone back like he came, jumped over

 9   any fence of those 10 to 15 houses along the line -- along the

10   way, or he simply could have turned and gone to the other

11   corner.

12          Let's bring up the map again.

13          Mr. Murillo is walking along this fence line.  The

14   officers are over here across the alleyway.  If he wanted to

15   flee from them, all he had to do was turn around and go this

16   way or even easier this way (indicating).  He did not.  By

17   everyone's account, he ran towards these officers.

18          And we know the testimony is there was other

19   officers down here, somewhere in that area.  Now, much has been

20   made of the fact that Officer Sigman and Officer Montague

21   honestly told you "I didn't see those officers, but I knew they

22   were there."  You know who certainly would have seen them,

23   lights and sirens flashing?  Jesse Murillo.  He saw them.  And

24   he ran towards them.

25          He ran towards Officer Sigman and Officer Montague.

1  He deviated his path, still towards Sigman, but he's still --

2  if you believe plaintiff's theory, he's still heading in the

3  direction of other officers that he certainly saw.

4          The third red herring is the bullet trajectories.

5  Now, this is not really being disputed much.  And I don't think

6  they contradict the truth of what Officer Sigman and officer

7  Montague told you.  The bullet trajectories were to the arm,

8  the front, and the last one to the side, what was described by

9  the coroner as the flank, not the back as Dr. Omalu told you if

10  you recall that.  I tried to get him to agree that the flank is

11  not the back.  I don't think any reasonable person would

12  consider where that bullet wound was to be the back.  But

13  that's what Mr. -- Dr. Omalu wanted to tell you.  I showed you

14  the picture.  And you have them.

15          There's no dispute that Mr. Murillo was running

16  rapidly and turning his body when he ran and he was moving

17  rapidly towards them.  And just before he fell and the last, I

18  guess, portion of a second, he trips and falls, or he falls

19  because of the bullets.  But at any rate, the threat is

20  stopped.  And the officers stopped shooting.

21          Now, a couple other comments about the experts.  It

22  is not true that our expert, Mr. Flossy, doesn't testify

23  against officers.  He does.  The majority of the time it's --

24  it is for the officers.  But by the same token, so is Mr. Bryce

25  and Dr. Omalu usually testify for plaintiffs.

```
 1              Counsel said that Mr. Murillo was not trying to go

 2    into the street.  I submit to you that he was trying to go into

 3    the street.  And he would have if the threat had not been

 4    stopped within 14 feet of Officer Sigman.

 5              Another thing I want to point out that I thought was

 6    strange, Mr. Bryce wouldn't even concede that when you are

 7    looking at -- you are aiming your weapon -- when you are

 8    looking at the sights to fire -- this came in the context of

 9    the reactionary gap which may or may not be important to you,

10    but it's certainly something that you should consider.

11              But anyway, Mr. Bryce said that his vision is just

12    as good when he's looking at something close.  Well, any

13    human being knows that's not true.  If you put your finger in

14    front of you and you concentrate on your finger, just like an

15    officer would with the sight, of course the background, the

16    distance is going to be blurry.  That's the only way you can

17    fire a weapon.

18              Now, about reactionary gap.  This is critically

19    important.  And I think that our expert, Flossy, explained it

20    very well.  As human beings, there is a reaction time.  There

21    is a gap between when we make a decision and then our bodies

22    mechanically physically execute that decision.  That, if

23    nothing else, if you don't think some of the shots were

24    reasonable, at least the latter shots, certainly a reactionary

25    gap would explain that.
```

 1            But the issue, again, is not when the bullets struck

 2   Mr. Murillo.  It's when the officers made the decision to use

 3   lethal force.  Was it reasonable?  Was it reasonable based on

 4   the totality of the circumstances that there was an imminent

 5   threat of death or serious bodily injury?

 6            All right.  Just quickly I want to talk about some

 7   of the claims and then the verdict form.  So I'll show you the

 8   verdict form just like Mr. Galipo did.

 9            So there's four claims here.  But the first two are

10   sort of subsumed, the excessive force and a battery claim.

11   Sort of different theories of the same thing.  But they both --

12   these are the questions you have to answer.

13            "Do you find by a preponderance of the evidence that

14   any of the following officer -- defendant officers used force

15   against Jesse Murillo that was unreasonable under the

16   circumstances?"  Your answer should be "no" as to both of them.

17   There was a reason.  It was reasonable.  It was reasonable, not

18   in 20/20 hindsight, but based on what they knew and believed at

19   the time.  And you are given a number of facts -- the judge is

20   going to read them to you -- to take into consideration in

21   making that decision.

22            Sort of alternatively in this same claim is a

23   battery under not federal law but California state law.  But

24   your decision is much the same.  And Mr. Galipo pointed out

25   some of those.  But the key thing is to remember you are to

1    judge them based on whether a reasonable officer -- and that's

2    sort of a fictional person -- a reasonable officer in the same

3    situation would have believed, based on the totality of the

4    circumstances, would have believed -- not now, not here in

5    court, at the time, based on the totality of circumstances --

6    known or perceived by the officers at that time that the deadly

7    force was justified.

8           There's going to be a comment in this jury

9    instruction too about mental health, and this is part of the

10   standard instruction.  But I would ask you not to give that any

11   weight.  There is no evidence in this trial, none whatsoever,

12   about whether or not Mr. Murillo had any sort of mental health

13   or developmental issue.  In fact, you've been -- all the

14   evidence you've got would not lead you to that conclusion.

15          The second claim that you have to decide is what's

16   called the Bane Act.  It's a California state statute.  So this

17   one -- the difference on this one is it's not just that they

18   used unreasonable force.  And this is very important, and I

19   hope that you will analyze this in your deliberations.  It's

20   that the officers acted violently against Mr. Murillo to

21   prevent him from exercising his right to be free from excessive

22   force or retaliate against him for exercising the right.

23          That's a bit of a mind bender there.  But if you

24   read it, maybe it will make sense.  They did what they did not

25   to protect themselves but to prevent Mr. Murillo from

1   exercising his right to be free from excessive force.  That is

2   a high burden.  And there is no evidence that would support

3   that.  And your answer should be no as to both officers.

4          Now, there's also something you have to find,

5   whether or not -- the next claim is going to be negligence.

6   And that means, essentially, that the officers were negligent

7   in using deadly force against Mr. Murillo, that it was

8   unnecessary, and based on the totality of the circumstances,

9   they shouldn't have essentially.

10         But what comes into play on this negligence claim is

11  the plaintiff -- excuse me -- the decedent, Mr. Murillo's own

12  negligence.  And I certainly think we have given you a lot of

13  evidence that it was his choices and his decisions that led to

14  this shooting.  And certainly his fault, I would submit to you,

15  is 100 percent.  But that should defeat all the claims.

16         They acted reasonably.  They acted as an officer

17  would to the threat that they faced based on the circumstances

18  known to them at the time, not hindsight is 20/20 -- excuse me,

19  not with hindsight is 20/20.

20         I want to end here.  I just have a few minutes.  I

21  have a poster in my office.  It's from a movie from about

22  ten years ago.  And I often bring this up.  It's called

23  End of Watch.  And I won't go into the movie, but since we

24  referenced movies here, it's about police officers.  I think

25  it's the most realistic movie ever made about police officers.

```
 1   One of the stars is Jake Gyllenhaal that you may have heard of.
 2           I'm not going to talk about the movie, but I want to
 3   talk about the advertising.  So on the poster -- the reason I
 4   have this in my office is they have -- on movie posters, they
 5   have what they call a tag line.  It's just like a little
 6   slogan to represent the movie.  And I love this one because the
 7   tag line to encapsulate this movie is the following:  Every
 8   moment of your life, they stand watch.  Every moment of your
 9   life, they stand watch.  Not me.  They do.
10           This is a hard job.  It's physically hard.  It's
11   mentally hard.  It is mentally and physically exhausting.  And
12   even when they are mentally and physically exhausted, they dig
13   deep because we, as a society, require our police officers to
14   have the kind of courage that the rest of us maybe don't.  They
15   are trained to make split-second decisions in critical seconds
16   of danger to protect us and to protect themselves.  They take
17   the risks every day so the rest of society doesn't have to.
18           And an unfortunate part of this job is the very real
19   danger that they face and that we don't have to face because
20   they put us between the danger.  The officers don't have just
21   the option, but they have a duty to protect themselves and to
22   protect the society, protect the community.  And sometimes that
23   involves the lethal use of force.
24           And I want to wrap up with what I began with which
25   is the 20/20 hindsight.  The law requires you not to use
```

1    20/20 hindsight, not the peace of this courtroom and the

2    three days we just spent analyzing less than four seconds.  You

3    are to go back in that jury room and talk about these officers,

4    what they knew, what they reasonably believed, everything they

5    believed was reasonable.  Whether or not we now know it's

6    different, that's what they reasonably believed.

7         The law requires you to judge them from that state,

8    not the peace and order of this courtroom.  And this was an

9    event that was nothing -- there was nothing peaceful or orderly

10   about that.

11        Officer Sigman and Officer Montague sincerely,

12   honestly, genuinely, and with good reason believed that

13   Jesse Murillo was going to kill or inflict serious bodily

14   injury at them when he ran directly towards them based on all

15   the factors that I have talked about for the past hour.

16        They were the only ones in this trial that you've

17   heard who were actually there, who actually experienced this

18   incident.  And they have explained their reasons and why they

19   made the choices they did in response to the choices made by

20   Mr. Murillo.  He put them in a situation where they had to use

21   the force that they did.  These choices were made based on

22   reason and under extreme life-threatening duress.

23        So I'm asking you to uphold your oath.  Follow the

24   law.  Go back in that jury room and judge these officers not

25   with 20/20 hindsight but based on what they knew at the time.

1          There would only be -- if you do that, there will

2    only be one just conclusion that you can come to.  And that's

3    that Officer Sigman and Officer Montague reasonably believed

4    that there was an imminent threat of death or serious bodily

5    injury.  The plaintiff has not met her burden of proving

6    otherwise, no matter how sorry we may feel for her.

7          Justice is based on the law, not based on sympathy,

8    and that justice and the jury instructions the judge is going

9    to read to you leads to only one conclusion.  That is a verdict

10   for the defendants, Fred Sigman and Christopher Montague, on

11   each of the plaintiff's claims.

12         THE COURT:  Okay.  I think we'll take our morning

13   break now.

14         Remember, until the trial is over, do not discuss

15   this case with anyone, including your fellow jurors, members of

16   your family, people involved in the trial, or anyone else.  And

17   do not allow others to discuss this case with you.

18         This includes discussing the case in person, in

19   writing, by phone or electronic means, via e-mail, via text

20   messaging, or any internet chat room, blog, website, or

21   application, including but not limited to Facebook, YouTube,

22   Twitter, Instagram, LinkedIn, Snapchat, or any other forms of

23   social media.  If anyone tries to communicate with you about

24   the case, please let me know about it immediately.

25         It is -- we'll come back at -- it's 10:55.  We'll

1    come back at 10:10.  Okay?  Or 15 minutes.

2              THE COURTROOM DEPUTY:  11:00.

3              THE COURT:  Okay.  11:10.  Yeah, sorry.  11:10.

4              Okay.  We'll see you in a bit.

5              (At 10:57 a.m. a recess was taken.)

6              THE COURT:  Okay.  Welcome back.  We are back on the

7    record in 21-8738.

8              Do you have a rebuttal?

9              MR. GALIPO:  Yes, Your Honor.

10             THE COURT:  Okay.  Go ahead.

11             MR. GALIPO:  Thank you.

12             I have a short time to rebut some of the points.

13   Some of you maybe already thought of what Mr. Galipo might say

14   in response.  But I'll say this.

15             First of all, we don't want you to decide the case

16   just on sympathy alone.  That's what no one is asking you to

17   do.  Of course there's sympathy.  You are allowed to have human

18   emotion.  That's a natural part of life and a part of jury

19   deliberations.  We want you to decide the case on the evidence

20   and the law.

21             It's interesting that counsel didn't show you one

22   jury instruction or go into anything specifically about the law

23   the judge is about to read to you.  And the reality is whether

24   he had an object in his hand or not, a hammer, a pull bar,

25   right hand, left hand, two objects, one objects, no objects, it

```
 1   doesn't matter.  None of it matters because of the law.

 2           Remember, someone being a potential threat, someone

 3   having a weapon, someone even having a deadly weapon, even a

 4   gun in their hand, does not justify shooting them.  The law,

 5   it's going to be in two of the instructions you get.  That's

 6   how important it is.  I want you to look at it again.

 7           A threat of death or serious bodily injury is

 8   imminent.  So it has to be an imminent threat of death or

 9   serious bodily injury to say deadly force is necessary to

10   defend human life.  That's the issue.  Not whether they were

11   scared, not whether they thought he did something wrong, not

12   whether they thought they had the right to detain him.

13           In every one of these cases, they want to blame the

14   family, blame the decedent who is not here to speak for

15   himself, not take any responsibility at all.  And here we are.

16           "A reasonable officer in the same situation would

17   believe" -- now, this is the critical part -- "that a person

18   has the present ability, opportunity, and apparent intent to

19   immediately" --  I circled it -- "to immediately cause death or

20   serious bodily injury."  He didn't have the ability, the

21   opportunity, or the intent to cause death or serious bodily

22   injury and definitely not immediately.

23           And how do we know that?  The best evidence in the

24   whole case, the body-worn camera footage.  But they want you to

25   believe it doesn't show what happened.  Why do officers wear
```

1    it?  So we can have some transparency, so the public can see

2    what actually happens and judge for themselves whether they

3    thought it was appropriate.

4             And then, as we go on, very important.  This is the

5    law.  "An imminent harm is not merely a fear of future harm, no

6    matter how great the fear and no matter how great the

7    likelihood of the harm."  It doesn't matter what they think he

8    might possibly do.  You can't kill someone for that.  That is

9    the law.  And you as jurors have to follow the law.

10            And then it goes on to say about other reasonable

11   measures and tactical decisions.

12            And another important part of the law and another

13   instruction the judge will give you is on multiple causation

14   related to the negligence claim.  But this is really important.

15   If their actions were a substantial factor in causing harm to

16   Jesse Murillo -- and we know they were because they both shot

17   him and they both struck him -- then they are both responsible.

18            They cannot avoid responsibility just because some

19   other person, condition, or event was also a substantial factor

20   in causing the harm.  So they are trying to blame Jesse, and

21   them trying to say all the other things they are saying, that

22   does not justify this shooting.

23            And now I'm going to show you what we believe is the

24   strongest piece of evidence in this case.  And that is the

25   video.

```
 1              I'm going to ask Tammy to step out just for a
 2      moment.
 3              And I'm going to play these two videos real quick
 4      back-to-back starting with Officer Sigman's.  And one of the
 5      things you'll notice again he says, "Hey, stop," and then
 6      almost instantaneously starts shooting from 28 feet away.  He
 7      didn't give the guy a chance.
 8              And I want you to look at these videos.  And I want
 9      you to think in your mind, does he appear to be immediately
10      about to cause the death of those officers when they are
11      shooting?  Is he attacking them with a hammer or a pull bar or
12      anything else and about to kill them when the shots are
13      happening?  You watch the video.
14              Let's start with -- I believe it is -- well, this
15      would be Sigman's video; right?
16              Go ahead.
17              (Video recording playing.)
18              MR. GALIPO:  And now look at Montague's video and
19      ask yourself the same question.  Does it look like he's trying
20      to run away?  Does it look like he's trying to kill?
21              (Video recording playing.)
22              MR. GALIPO:  And let's next look at the stills from
23      Officer Montague.  Okay?  So we've got 11-1.  And this is where
24      you see no object in his hand and the right hand visible.  Does
25      it look right there, ladies and gentlemen, like he is about to
```

1    kill the officers?  Or does it look like he's running away?

2           And why is it so important?  There's not one

3    instruction that's going to say, oh, if he's running away, it's

4    okay to shoot him.  The law, the evidence in this case which

5    you have to follow, you can't shoot him for trying to run away,

6    for trying to escape.  Their own expert, their own expert,

7    Mr. Flossy, in his report spent two paragraphs explaining he's

8    on the sidewalk.  He's facing eastbound.  He's running

9    eastbound.  The shots are going off.  He continues to run

10   eastbound.  The shots are still going off.  He goes down to a

11   knee.  There's another shot.

12          And he said it appears -- this is their expert --

13   he's trying to escape.  Case closed.  They have 50.01 percent.

14   I mean, this is like 80, 85, 90 percent.  That's how strong the

15   evidence is in this case that this shooting was excessive.  No

16   shots should have been fired, let alone seven shots, let alone

17   shots --

18          That's okay.  Have her come in.  Take it down.  They

19   got the idea.

20          -- let alone shots as he's running away and going to

21   the ground.  20/20 vision of hindsight, this isn't 20/20 vision

22   of hindsight.  You are actually looking at it from the

23   perspective of the officers because you are looking at it from

24   the body-worn camera.  20/20 vision of hindsight would be an

25   officer and someone is in a dark alley.  He sees a gun pointed

1    at him.  He thinks it's a real gun.  He's about to be killed.

2    So he fires in self-defense.  And afterwards he finds out it

3    wasn't a real gun.  It just looked like a real gun.  That's not

4    this case.

5            So even though we believe the evidence is

6    overwhelming that he didn't have a hammer in his right hand,

7    for all the reasons I said, just so we're clear, it doesn't

8    matter.  Even if he did have a hammer in his hand, even if they

9    thought the pull bar was a machete, it doesn't matter because

10   the law says you can't shoot unless it's an immediate,

11   immediate defense of life, immediate, right then.

12           And they want to talk about 28 feet, 28 feet and

13   14 feet.  I used to love playing basketball.  So I know 15 feet

14   is the free throw.  But I got to tell you, if the center aisle

15   of this courtroom was the sidewalk and the officers are to the

16   side and someone is running straight towards the judge and you

17   are shooting him in the side and in the back, as he's on the

18   ground or going to the ground, you are going to say he was

19   immediately trying to attack you?  Really?

20           And you know what's really sad?  When these officers

21   were asked, "Would you do anything differently now knowing what

22   you know now?"  "No.  I would do the exact same thing."

23           It's up to you.  You are the jurors.  Did you sense

24   one bit of remorse from those officers?  Zero.  It's his

25   actions.  That's what they want to do.  Young kid runs from the

1  police, shot in the back.  Generally speaking, it's his fault.

2  He shouldn't have run.  They always want to blame the other

3  person and not take any responsibility themselves.

4      MR. FORD:  Your Honor, I'm going to object to this

5  line of argument regarding the --

6      THE COURT:  Overruled.  Sit down.

7      MR. GALIPO:  Their actions were unreasonable.  Was

8  it unreasonable to think that maybe he had a weapon?  That's

9  okay.  Was it unreasonable to think that maybe something

10  happened, they weren't sure?  That's okay.  It was unreasonable

11  to kill him under these circumstances as he's not attacking you

12  but running away.

13      And they want you to ignore that, I guess, Vege

14  never mentioned a hammer in the dispatch.  Montague never saw a

15  hammer in his hand.  Vidal never saw a hammer in his hand.  No

16  one said afterwards, "Hey, watch out.  He's got a hammer."  And

17  the hammer ends up inside a zipped jacket.

18      And I talk about exaggeration and unreasonable.

19  They want you to believe, as he's going to the ground and shot

20  four times, he unzips his jacket, puts the hammer in his jacket

21  and zips it back up where both arms -- bullets went through

22  both arms.  Ask yourself how reasonable that is.

23      Montague said it was a long slender object.  He

24  didn't even know what hand it was in.  You saw how big that

25  hammer was.  If he's got this hammer in his right hand and he's

74

```
 1   about the distance I am from you, how is Montague not going to
 2   see it?
 3            And Vidal didn't see any object in his hands.  He
 4   even said in his closing, "Well, they had cover for the first
 5   three shots.  They had protection."  Then why did you shoot?
 6   Montague is on the driver's side.  Sigman has cover from his
 7   door.  He didn't step to the side until Jesse is already past
 8   him and he realized he deviated his path.  He said he was
 9   assessing.  "I realize now he's running east on the sidewalk."
10   Then what the heck are you continuing to shoot for?
11            And if you believe Flossy with this
12   perception-reaction time, well, it takes at least a half a
13   second or three quarters of a second or whatever it is, that
14   would mean that Sigman decided to shoot him before he said,
15   "Hey, stop," because the "Hey, stop" and the shots are like
16   simultaneous.
17            Is that really giving someone a chance?  Is that
18   really giving them a warning before taking another human life?
19   I mean, if someone had to look at this shooting and say is this
20   a close call, I would submit this isn't a close call at all.
21   This is a terrible shooting.  It's awful.  It really is.
22            And, you know, they talk about these constitutional
23   rights.  They are all of our rights as was mentioned by
24   counsel.  All of our rights to be free from excessive force,
25   especially excessive deadly force.
```

1           This can't be business as usual.  This can't be we

2   deny all responsibility.  We call Flossy.  He doesn't even come

3   here, by the way.  We call Flossy.  We get a jury.  We are the

4   police.  We'll just say whatever.  And we'll let Flossy say,

5   you know, seemed okay to me.  Fine.  Police officers have tough

6   jobs.  Let's go on to the next shooting, the next case.  That

7   is not the way it can be.

8           This is not a proposition about police generally.

9   Of course we want to support the police.  I mentioned early in

10  the jury selection I have friends who are police officers.  But

11  we need to have some limitations on their use of deadly force,

12  some accountability, some understanding that we don't want

13  fellow human beings unnecessarily killed like this.

14          And we need jurors like you who have courage -- he

15  mentioned courage -- to stand up for what's right and to say

16  that was excessive and unreasonable.

17          And if the officers had so much courage, then they

18  wouldn't have shot and killed him because shooting someone

19  within a split second of saying "Hey, stop" from 28 feet away

20  is not a courageous thing to do, I would submit.  Nor is it for

21  someone who is running away from you to shoot him a courageous

22  thing to do.

23          They overreacted.  I'm not trying to say they are

24  horrible people.  They totally overreacted, freaked out,

25  whatever you want to say, panicked, contagious fire.  And then

```
 1   when everything was said and done, they were like uh-oh, we've
 2   got to figure something out.  We have to give a statement.
 3   When is the lawyer going to get here?  We've got to figure this
 4   out.
 5          I mean, one reasonable inference from the evidence
 6   is Sigman saw the hammer at the scene, and he said, I'll say he
 7   had the hammer in his hand.  That sounds more dangerous than
 8   that pull bar.
 9          So the slides, the video, the trajectory, the law,
10   the evidence, ladies and gentlemen, everything, everything in
11   this case supports the plaintiff's claim.  And it's not just
12   because it's Tammy Murillo.  And it's not just because she
13   loved her son.  It should be the same no matter who the
14   plaintiff was and no matter who the decedent was under the
15   facts of this case.
16          So I ask you in conclusion to do the right thing
17   here.  But do the right thing based on the evidence and the law
18   and your hearts and discussing it with each other.  And the
19   right thing to do here is to uphold our Constitution and to say
20   you know what?  This was unreasonable.  This was excessive.  No
21   shot should have been fired but certainly not all those shots
22   as he's running away and going to the ground.  And this woman
23   deserves fair compensation.  And we as a jury are going to give
24   value to human life based on the evidence and the law.
25          And that's what I ask you all to do.  And I thank
```

1  you very much.

2          THE COURT:  Members of the jury, now that you have

3  heard all the evidence and the arguments of the attorneys, it

4  is my duty to instruct you on the law that applies to this

5  case.  A copy of these instructions will be sent to the jury

6  room for you to consult during your deliberations.

7          It is your duty to find the facts from all the

8  evidence in the case.  To those facts you will apply the law as

9  I give it to you.  You must follow the law as I give it to you

10 whether you agree with it or not.  And you must not be

11 influenced by any personal likes or dislikes, opinions,

12 prejudices, or sympathy.

13         That means that you must decide the case solely on

14 the evidence before you.  You will recall that you took an oath

15 to do so.

16         Please do not read into these instructions or

17 anything that I may say or do or have said or done that I have

18 an opinion regarding the evidence or what your verdict should

19 be.

20         Plaintiff brings her claim under the federal statute

21 42 USC Section 1983 which provides that any person or persons

22 who under color of state law deprives another of any rights,

23 privileges, or immunity secured by the Constitution or laws of

24 the United States shall be liable to the injured party.

25         In order to prevail under Section 1983 claim against

1    Defendants Fred Sigman and Christopher Montague, the plaintiff

2    must prove each of the following elements by a preponderance of

3    the evidence:

4              One, Fred Sigman and Christopher Montague acted

5    under color of state law; and two, the acts of Fred Sigman or

6    Christopher Montague deprived Jesse Murillo of his rights or

7    the plaintiff of her particular rights under the United States

8    Constitution as explained in later instructions.

9              A person acts under color of state law when the

10   person acts or purports to act in the performance of official

11   duties under any state, county, or municipal law, ordinance, or

12   regulation.  The parties have stipulated that Defendants

13   Fred Sigman and Christopher Montague acted under color of state

14   law.

15             If you find that the plaintiff has proved each of

16   these elements and if you find the plaintiff has proved all of

17   the elements she's required to prove under Instruction No. 21,

18   your verdict should be for the plaintiff.

19             If, on the other hand, you find that plaintiff has

20   failed to prove any one or more of these elements, your verdict

21   should be for Fred Sigman or Christopher Montague.

22             In general, a seizure of a person is unreasonable

23   under the Fourth Amendment if a police officer uses excessive

24   force in making a lawful arrest or in defending himself or

25   others.  Therefore, to establish an unreasonable seizure in

1   this case, the plaintiff must prove by preponderance of the

2   evidence that Fred Sigman or Officer Christopher Montague used

3   excessive force against Jesse Murillo.

4          Under the Fourth Amendment, a police officer may use

5   only such force as is objectively reasonable under all of the

6   circumstances.  You must judge the reasonableness of a

7   particular use of force from the perspective of a reasonable

8   officer on the scene and not with the 20/20 vision of

9   hindsight.  Although the facts known to the officers are

10  relevant to your inquiry, an officer's subjective intent or

11  motive is not relevant to your inquiry.

12         In determining whether the officers used excessive

13  force in this case, consider all the circumstances known to

14  Fred Sigman and Christopher Montague on the scene, including:

15         1, the nature of the crime or other circumstances

16  known to the officers at the time force was applied;

17         2, whether Jesse Murillo posed an immediate threat

18  to the safety of the officers or to others;

19         3, whether Jesse Murillo was actively resisting or

20  attempting to evade arrest by flight;

21         4, the amount of time the officers had to determine

22  the type and amount of force that reasonably appeared necessary

23  in any changing circumstances during that period;

24         5, the relationship between the need for the use of

25  force and the amount of force used;

1          6, the extent of Jesse Murillo's injury;

2          7, any effort made by the officers to tamper or to

3    limit the amount of force;

4          8, the severity of security problem at issue;

5          9, the availability of alternative methods to take

6    Jesse Murillo into custody;

7          10, the number of lives at risks, motorists,

8    pedestrians, police officers, and the parties' relative

9    culpability, i.e., which party created the dangerous situation

10   and which party is more innocent;

11         11, whether it was practical for Fred Sigman or

12   Christopher Montague to give warning of the imminent use of

13   force and whether such warning was given;

14         12, whether the officers were responding to a

15   domestic violence disturbance;

16         13, whether it should have been apparent to the

17   officers that the person they used force against was

18   emotionally disturbed;

19         14, whether reasonable officers would have or should

20   have accurately perceived a mistaken fact;

21         And 15, whether there was probable cause for a

22   reasonable officer to believe that the suspect had committed a

23   crime involving the infliction or threatened infliction of

24   serious physical harm.

25         Probable cause exists when under all the

circumstances known to the officers at the time an objectively

reasonable officer would conclude there's a fair probability

that Jesse Murillo has committed or was committing a crime.

A peace officer may use deadly force only when

necessary in defense of human life.  The plaintiff claims that

Defendants Fred Sigman and Christopher Montague unnecessarily

used deadly force on Jesse Murillo.  To establish this claim --

this is the claim of battery -- the plaintiff must prove all of

the following:

That Fred Sigman or Christopher Montague

intentionally touched Jesse Murillo or caused Jesse Murillo to

be touched;

That Fred Sigman or Christopher Montague used deadly

force on Jesse Murillo.  That was No. 2.

No. 3, that Fred Sigman or Christopher Montague's

use of deadly force was not necessary to defend human life;

4, that Jesse Murillo was killed;

And 5, that Fred Sigman or Christopher Montague's

use of deadly force was a substantial factor in causing

Jesse Murillo's harm or death.

Fred Sigman and/or Christopher Montague's use of

deadly force was necessary to defend human life only if a

reasonable officer in the same situation would have believed,

based on the totality of circumstances known to or perceived by

the defendants at the time, that deadly force was necessary to

1  defend against an imminent threat of death or serious bodily

2  harm to Fred Sigman or Christopher Montague or another person.

3        Deadly force means any use of force that creates a

4  substantial risk of causing death or serious bodily injury,

5  including but not limited to the discharge of a firearm.

6        A threat of death or serious bodily injury is

7  imminent when, based on the totality of circumstances, a

8  reasonable officer in the same situation would believe that a

9  person has the present ability, opportunity, and apparent

10 intent to immediately cause death or serious bodily injury to

11 the peace officer or another person.

12       An imminent harm is not merely a fear of future

13 harm, no matter how great the fear and no matter how great the

14 likelihood of the harm.  But it is one that from appearances

15 must be instantly confronted and addressed.

16       Totality of the circumstances means all facts known

17 to the peace officers at the time, including the conduct of

18 Fred Sigman, Christopher Montague, and Jesse Murillo leading up

19 to the use of deadly force.

20       In determining whether the officers' use of deadly

21 force was necessary in defense of human life, you must consider

22 Fred Sigman's and Christopher Montague's tactical conduct and

23 decisions before using deadly force on Jesse Murillo and

24 whether the officers used other available resources and

25 techniques as alternatives to deadly force if it was reasonably

1    safe and feasible to do so.

2            You must also consider whether Fred Sigman and

3    Christopher Montague knew or had reason to know that the person

4    against whom they used force was suffering from a physical,

5    mental health, developmental, or intellectual disability that

6    may have affected the person's ability to understand or comply

7    with the commands from the officers.

8            The plaintiff claims that Fred Sigman or

9    Christopher Montague intentionally interfered with or attempted

10   to interfere with Jesse Murillo's civil rights by threats of

11   intimidation or coercion.  To establish the plaintiff's Bane

12   Act claim, the plaintiff must prove all of the following:

13           That Fred Sigman or Christopher Montague acted

14   violently against Jesse Murillo to prevent him from exercising

15   his right to be free from excessive force or to retaliate

16   against Jesse Murillo for having exercised his right to be free

17   from unreasonable force;

18           That Fred Sigman or Christopher Montague intended to

19   deprive Jesse Murillo of his enjoyment of the interest

20   protected by the right to be free from unreasonable force;

21           That Jesse Murillo was harmed;

22           And that Fred Sigman or Christopher Montague's

23   conduct was a substantial factor in causing Jesse Murillo's

24   harm.

25           Negligence is the failure to use reasonable care to

1    prevent harm to oneself or to others.  A person can be

2    negligent by acting or by failing to act.  A person is

3    negligent if that person does something that a reasonably

4    careful person would not do in the same situation or fails to

5    do something that a reasonably careful person would do in the

6    same situation.

7         You must decide how a reasonably careful person

8    would have acted in Jesse Murillo's situation.  You must decide

9    how a reasonably careful police officer would have acted in

10   Fred Sigman's and Christopher Montague's situation.

11        A peace officer may use deadly force only when

12   necessary in defense of human life.  The plaintiff claims that

13   Fred Sigman and Christopher Montague were negligent in using

14   deadly force against Jesse Murillo.  To establish this claim,

15   the plaintiff must prove all of the following:

16        1, that Fred Sigman and Chris Montague's were peace

17   officers;

18        2, that Fred Sigman or Chris Montague used deadly

19   force against Jesse Murillo;

20        3, that Fred Sigman or Chris Montague's use of

21   deadly force was not necessary to defend human life;

22        4, that Jesse Murillo was killed;

23        And 5, that Fred Sigman or Christopher Montague's

24   use of deadly force was a substantial factor in causing Jesse

25   Murillo's death.

1          Fred Sigman and/or Christopher Montague's use of

2    deadly force was necessary to defend human life only if a

3    reasonable officer in the same situation would have believed,

4    based on the totality of circumstances known to or perceived by

5    Fred Sigman and Chris Montague at the time, that deadly force

6    was necessary to defend against an imminent threat of death or

7    serious bodily injury to Fred Sigman or Christopher Montague or

8    another person.

9          A threat of death or serious bodily injury is

10   imminent if, based on the totality of the circumstances, a

11   reasonable officer in the same situation would believe that a

12   person has the present ability, opportunity, and apparent

13   intent to immediately cause death or serious bodily injury to

14   the peace officer or to another person.

15         An imminent harm is not merely a fear of future

16   harm, no matter how great the fear and no matter how great the

17   likelihood of the harm, but is one that from appearances must

18   be instantly confronted and addressed.

19         Totality of the circumstances means all facts known

20   to or perceived by the peace officer at the time including the

21   conduct of Fred Sigman, Christopher Montague, and Jesse Murillo

22   leading up to the use of the deadly force.

23         In determining whether the officers' use of deadly

24   force was necessary in defense of human life, you must consider

25   whether Fred Sigman and Christopher Montague's tactical conduct

1   and decisions before using deadly force on Jesse Murillo and

2   whether defendants used other available resources and

3   techniques as alternatives to deadly force if it was reasonably

4   safe and feasible to an objectively reasonable officer.

5          Defendant's claim that Jesse Murillo's own

6   negligence contributed to his death.  To succeed on this claim,

7   defendants must prove both the following:

8          1, that Jesse Murillo was negligent;

9          And 2, that Jesse Murillo's negligence was a

10  substantial factor in causing his death.

11         If defendants prove the above, the plaintiff's

12  damages are reduced by your determination of the percentage of

13  Jesse Murillo's responsibility.

14         I will calculate the actual reduction.

15         A substantial factor in causing harm is a factor

16  that a reasonable person would consider to have contributed to

17  the harm.  It must be more than a remote or trivial factor.  It

18  does not have to be the only cause of the harm.  Conduct is not

19  a substantial factor in causing harm if the same harm would

20  have occurred without that conduct.

21         A person's negligence may combine with another

22  factor to cause harm.  If it you find that Fred Sigman or

23  Christopher Montague's negligence was a substantial factor in

24  causing Jesse Murillo's harm, then Defendant Fred Sigman or

25  Christopher Montague is responsible for the harm.  Fred Sigman

1    and Christopher Montague cannot avoid responsibility just

2    because some other person, condition, or event was also a

3    substantial factor in causing Jesse Murillo's harm.

4         You may decide that more than one of the defendants

5    was negligent but that the negligence of only one of them could

6    have actually caused Jesse Murillo's harm.  If you cannot

7    decide which defendant caused Jesse Murillo's harm, you must

8    decide that each defendant is responsible for the harm.

9    However, if defendants prove that they did not cause Jesse

10   Murillo's harm, then you must conclude that defendants are not

11   responsible.

12        In this case, Defendants Fred Sigman and

13   Christopher Montague were employees of Defendant City of

14   Los Angeles.  If you find that Fred Sigman or Christopher

15   Montague were acting within the scope of their employment when

16   the incident occurred, then the City of Los Angeles is

17   responsible for any harm caused by Fred Sigman or

18   Christopher Montague's negligence.

19        It is the duty of the Court to instruct you about

20   the measure of damages.  By instructing you on damages, the

21   Court does not mean to suggest for which party your verdict

22   should be rendered.  If you find for the plaintiff on any of

23   her claims, you must determine the plaintiff's damages.  The

24   plaintiff has the burden of proving damages by a preponderance

25   of the evidence.

```
 1              Actually, let me back up.  I should have said:  If
 2    you find for the plaintiff on any of his or her claims, you
 3    must determine the plaintiff's damages.  The plaintiff has the
 4    burden of proving damages by a preponderance of the evidence.
 5    Damages means the amount of money that will reasonably and
 6    fairly compensate Jesse Murillo and/or the plaintiff for any
 7    injury you find was caused by the defendants.
 8              In determining the measure of damages, you should
 9    consider:
10              1, the nature and extent of Jesse Murillo's
11    injuries;
12              2, Jesse Murillo's loss of enjoyment of life;
13              And 3, the mental, physical, and emotional pain and
14    suffering Jesse Murillo experienced.
15              It is for you to determine what damages, if any,
16    have been proved.  You must -- your award must be based upon
17    evidence and not upon speculation, guesswork, or conjecture.
18              If you decide that Tammy Murillo has proved either
19    her negligence or unreasonable use of force claim against
20    defendants for the death of Jesse Murillo, you must decide how
21    much money will reasonably compensate Tammy Murillo for the
22    death of Jesse Murillo.  This compensation is called damages.
23              Tammy Murillo does not have to prove the exact
24    amount of these damages.  However, you must not speculate or
25    guess in awarding damages.  The damages claimed by
```

1    Tammy Murillo are noneconomic damages for the loss of

2    Jesse Murillo's love, companionship, comfort, care, assistance,

3    protection, affection, society, and moral support.  No fixed

4    standard exists for deciding the amount of noneconomic damages.

5    You must use your judgment to decide a reasonable amount based

6    on the evidence and your common sense.

7            For these noneconomic damages, determine the amount

8    in current dollars paid at the time of judgment that will

9    compensate Tammy Murillo for those damages.  In determining

10   Tammy Murillo's loss, do not consider:

11           One, Tammy Murillo's grief, sorrow, or mental

12   anguish;

13           Two, Jesse Murillo's pain and suffering;

14           Or three, the poverty or wealth of Tammy Murillo.

15           Before you begin your deliberations, elect one

16   member of the jury as your presiding juror.  The presiding

17   juror will preside over the deliberations and serve as a

18   spokesperson for the jury in court.  You should diligently

19   strive to reach agreement with all of the other jurors if you

20   can do so.  Your verdict must be unanimous.

21           Each of you must decide the case for yourself, but

22   you should do so only after you have considered all of the

23   evidence, discussed it fully with the other jurors, and

24   listened to your views.

25           It is important that you attempt to reach an

1    unanimous verdict but, of course, only if each of you can do so

2    after having made your own conscientious decision.  Do not be

3    unwilling to change your opinion if the discussion persuades

4    you that you should.  But do not come to a decision simply

5    because other jurors think it is right or change an honest

6    belief about the weight and effect of the evidence simply to

7    reach a verdict.

8          Because you must base your verdict only on the

9    evidence received in the case and on these instructions, I

10   remind you that you must not be exposed to any other

11   information about the case or to the issues it involves.

12   Except for discussing the case with your fellow jurors during

13   your deliberations, do not communicate with anyone in any way

14   and do not let anyone else communicate with you in any way

15   about the merits of the case or anything to do with it.

16         This includes discussing the case in person, in

17   writing, by phone, tablet, computer, or any other means, via

18   e-mail, via text messaging, or any internet chat room, blog,

19   website, or application, including but not limited to Facebook,

20   YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any

21   other forms of social media.  This applies to communicating

22   with your family members, your employer, the media or press,

23   and the people involved in the trial.

24         If you are asked or approached in any way about your

25   jury service or anything about this case, you must respond that

1    you've been ordered not to discuss the matter and to report the

2    contact to the Court.

3            Do not read, watch, or listen to any news or media

4    accounts or commentary about the case or anything to do with

5    it.  Do not do any research such as consulting dictionaries,

6    searching the Internet, or using other reference materials.

7    And do not make any investigation or in any way try to learn

8    about the case on your own.  Do not visit or view any place

9    discussed in this case.  And do not use Internet programs or

10   other devices to search for or view any place discussed during

11   the trial.

12           Also, do not do any research about this case, the

13   law, or the people involved including the parties, the

14   witnesses, or the lawyers until you have been excused as

15   jurors.  If you happen to read or hear anything touching on

16   this case in the media, turn away and report it to me as soon

17   as possible.

18           These rules protect each party's right to have the

19   case decided only on the evidence that has been presented in

20   court.  Witnesses here in court take an oath to tell the truth,

21   and the accuracy of their testimony is tested through the trial

22   process.  If you do any research or investigation outside the

23   courtroom or gain any information through improper

24   communications, then your verdict may be influenced by

25   inaccurate, incomplete, or misleading information that has not

1   been tested by the trial process.

2          Each of the parties is entitled to a fair trial by

3   an impartial jury.  And if you decide the case based on

4   information not presented in court, you will have denied the

5   parties a fair trial.  Remember, you have taken an oath to

6   follow the rules, and it is very important that you follow

7   these rules.

8          A juror who violates these rules jeopardizes the

9   fairness of these proceedings, and a mistrial could result that

10  would require the entire trial process to start over.  If any

11  juror is exposed to any outside information, please notify the

12  Court immediately.

13         If it becomes necessary during your deliberations to

14  communicate with me, you may send a note through the clerk

15  signed by any one or more of you.  No member of the jury should

16  ever attempt to communicate with me except by a signed writing.

17  I will not communicate with any member of the jury on anything

18  concerning the case except in writing or here in open court.

19         If you send out a question, I will consult with the

20  lawyers before answering it which may take some time.  You may

21  continue your deliberations while waiting for the answer to any

22  question.  Remember that you are not to tell anyone, including

23  the Court, how the jury stands, whether in terms of vote count

24  or otherwise, until after you have reached a unanimous verdict

25  or have been discharged.

1            A verdict form has been prepared for you.  After you

2    have reached unanimous agreement on the verdict, your

3    foreperson should complete the verdict form according to your

4    deliberations, sign and date it, and advise the clerk that you

5    are ready to return to the courtroom.

6            Will the clerk please swear in the bailiff?

7            THE COURTROOM DEPUTY:  Yes.

8            Do you solemnly swear to keep this jury together in

9    some private and convenient place, that you will not permit any

10   person to speak to them or communicate with them yourself

11   unless by order of the Court or to ask them whether they have

12   agreed upon a verdict, and that you will return them into the

13   court when they so have agreed or when ordered by the Court so

14   help you God?

15           THE BAILIFF:  Yes.

16           THE COURTROOM DEPUTY:  Thank you.

17           THE COURT:  Okay.  So if you want to go ahead and

18   take them back then.  Thank you.

19           THE BAILIFF:  Yes, Your Honor.

20           THE COURTROOM DEPUTY:  All rise.

21           (Outside the presence of the jury.)

22           THE COURT:  You can be seated.  Just leave a number

23   where you can be called.  Try to be ten minutes away or so if

24   you can.  And we'll call you if any questions or anything comes

25   up.  Okay?  Thank you.

1          MR. GALIPO:  Thank you, Your Honor.

2          MR. FORD:  Thank you, Your Honor.

3          THE COURTROOM DEPUTY:  Court is in recess.

4          (At 12:02 p.m. the lunch recess was taken.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5          I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT

7    FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

8    THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

9    THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

12   IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL

13   CONFERENCE OF THE UNITED STATES.

14

15

16          DATED THIS  9TH  DAY OF OCTOBER, 2023.

17

18

19          /S/ MAREA WOOLRICH

20          _____
            MAREA WOOLRICH, CSR NO. 12698, CCRR
21          FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

**UNITED STATES DISTRICT COURT**