Dale K. Galipo (Bar No. 144074)
dalekgalipo@yahoo.com
**LAW OFFICES OF DALE K. GALIPO**
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Telephone:   (818) 347-3333
Facsimile:   (818) 347-4118

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMMY MURILLO, individually and as a successor in interest to JESSE MURILLO, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES, FRED SIGMAN, CHRISTOPHER MONTAGUE,<br><br>Defendants. | Case No. 2:21-cv-08738-FMO-AGR<br><br>*Hon. Fernando M. Olguin*<br><br>**DECLARATION OF DALE K. GALIPO IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES**<br><br>[*Notice of Motion and Motion; Declarations and attached Exhibits filed concurrently herewith*] |

# **DECLARATION OF DALE K. GALIPO**

1.     I am an attorney licensed to practice law in the United States District Court for the Central District of California and before all courts in the state of California. I was the lead trial counsel for Plaintiff, Tammy Murillo, in this instant action. I make this declaration in support of Plaintiff's Motion for Attorneys' Fees pursuant to 42 U.S.C. § 1988. I have personal knowledge of the matters stated herein and could and would testify competently thereto if called.

2.     I have maintained contemporaneous time records reflecting the work, activity and time spent on this case. I have exercised billing judgment, and I have reduced or written off unproductive time or other time that would not ordinarily be charged to a fee-paying client. To date, I have spent 404.70 hours on this matter. A copy of my time records for this case is attached hereto as **"Exhibit 1"**.

3.     I graduated with a B.B.A. from the University of Michigan in Ann Arbor, Michigan in 1981. I attended law school at UCLA from 1981 to 1984.

4.     Since 1991, I have managed my own law firm originally specializing in personal injury and criminal defense. Due to my experience in personal injury law and criminal defense law, and my significant trial experience, prosecuting civil rights actions involving police misconduct causing serious injury or death was a natural transition for me. I have specialized in handling police misconduct civil rights litigation for over twenty years, and I take on very difficult liability cases that require extensive expertise in this area of law.

5.     I have obtained numerous recognitions for my work in civil rights, including receiving the Defender of the Constitution Award in 2012 from the Inland Empire Chamber of the Federal Bar Association. Other recipients of the award include Judge Virginia A. Phillips and Judge Terry J. Hatter.

6.     I have also been elected as a "Super Lawyer" every year since the year 2013.

7.      In 2018, I was contacted by associate professor Dennis Cota, who has become a Magistrate Judge in Redlands, California, and was honored to have the Top Trial Advocacy Award for the Martin Luther King, Jr. Moot Court Competition to be given in my name.

8.      In 2019, I was selected to the Inner Circle of Advocates, considered to represent the top one hundred civil plaintiff's attorneys in the United States. I am currently an active member of the Inner Circle. There are only approximately fourteen active members in the entire state of California, including such prominent plaintiff attorneys as Bruce Broillet, Brown Greene, Lawrence Grassini, and Brian Panish.

9.      Also in 2019, I was elected as a Fellow of the American College of Trial Lawyers, which is recognized as the preeminent organization of trial lawyers in North America, dedicated to maintaining and improving the standards of trial practice, professionalism, ethics, and the administration of justice.

10.      I was chosen by UCLA School of Law to give the Irving H. Green Memorial Lecture to students and faculty in 2019. Irving H. Green was a much-honored trial attorney known for representing the underdog in courts across the county. In honor of his memory, the Green family created a program designed to bring outstanding trial lawyers to inspire law students and engage in an exchange with them. Past attorneys who have been honored with this recognition include Johnnie Cochran, Jr. Attached hereto as **"Exhibit 2"** is a true and correct copy of the program for the 2019 Irving H. Green Memorial Lecture.

11.      In 2020, I received the "Trial Lawyer of the Year" award from the Consumer Attorneys Association of Los Angeles ("CAALA"). Prior to being awarded CAALA Trial Lawyer of the Year 2020, I was recognized by CAALA in 2018 and 2019 for my trial successes and nominated for Trial Lawyer of the Year in each of those years in which I finished as runner up.

12. Also in 2020, I received the "2020 Consumer Attorney of the Year" award from the Consumer Attorneys of California ("CAOC").

13. CAALA selected me to speak on the Masters' Panel in August 2019, in recognition of my skill and accomplishments as a trial attorney. There were approximately eight hundred attorneys present for the presentation, which took place in Las Vegas, Nevada at the CAALA annual convention. I also recently taught at the CAALA 2023 Plaintiffs Trial Academy from June 5 to June 7, 2023, and I spoke on jury selection at the CAALA conference in Las Vegas on September 1, 2023.

14. I have been invited to speak to the law students at UCLA and UC Irvine on several occasions, and I have also spoken to students at Cal. State Dominguez. I am also scheduled to speak to the law students at UCLA on November 15, 2023. I have been asked to speak at seminars and webinars on several occasions on various topics of civil rights litigation. I am routinely called for consultation by various civil rights attorneys throughout the state and country with regard to my opinions and input on civil rights cases.

15. In May, 2023, I taught a course for twelve hours over two days to a group of civil rights attorneys regarding litigating a civil rights case through trial.

16. I have tried well in excess of one hundred civil cases through verdict. I have won the majority of my civil jury trials and I have had numerous seven and eight-figure verdicts. I am listing here some of my most notable trial successes in civil rights cases between approximately 2011 and 2016, and I am separately listing below the jury verdicts and trial successes I have more recently received within approximately the last six years. Some of my jury verdicts and trial successes between approximately 2011 and 2016 include:

> ➢ $1.1 million jury verdict in *Gilbert v. City of Los Angeles* (false arrest) (January 2011)

1       ➢ $2 million jury verdict in *Nash v. City of San Bernardino* (excessive

2           force) (April 2011);

3       ➢ $4.5 million jury verdict in *Cotton v. City of Eureka* (excessive force)

4           (September 2011);

5       ➢ $3.2 million jury verdict in *P.C. v. City of Los Angeles* (excessive

6           force) (April 2012);

7       ➢ $5.7 million jury verdict in *Contreras v. City of Los Angeles* (2011);

8       ➢ $6.5 million jury verdict in *R.S. v. City of Long Beach* (police

9           shooting) (April 2013);

10      ➢ $8.825 million jury verdict in *Simplis v. Culver City* (police shooting)

11          (May 2013);

12      ➢ $1 million jury verdict in *Salinas v. City of San Jose* (June 2013);

13      ➢ $2 million jury verdict in *Gutierrez v. County of Los Angeles* (police

14          shooting) (October 2013);

15      ➢ $7.81 million jury verdict in *Howard v. County of Riverside* (police

16          shooting resulting in paralysis) (June 2014);

17      ➢ $1 million jury verdict in *Munoz v. County of Riverside* (police

18          shooting) (August 2014);

19      ➢ $2.925 million jury verdict in *Ramirez v. City of Oxnard* (excessive

20          force and denial of medical care) (June 2015);

21      ➢ $4.9 million settlement during trial in *Thomas v. City of Fullerton*

22          (excessive force) (October 2015)

23        17.    I tried the case *Ramirez v. City of Oxnard* in 2015, referenced above,

24  in federal court before the Honorable Michael Fitzgerald. In that case, there was

25  no offer of settlement and cause of death was highly disputed. The decedent

26  swallowed an eight ball of methamphetamine before the police responded.

27  Plaintiffs contended the decedent died of restraint asphyxia due to improper and

28

excessive police restraint. The defense argued that the restraint was not excessive, and that death was caused by drug intoxication. Following the $2.925 million-dollar jury verdict, back in 2015, Judge Fitzgerald awarded me $900 per hour in the related attorney fee motion under 42 U.S.C. § 1988. A true and correct copy of Judge Fitzgerald's September 17, 2015, Order awarding me $900 per hour is attached hereto as **"Exhibit 3."** As indicated in detail below, subsequent to this 2015 award, federal judges have awarded me higher hourly rates in more recent years.

18.     In addition to the above-listed verdicts, in the approximately the last six years, I have prevailed in approximately twenty-eight jury trials. Twenty-six of the jury trials were civil rights cases. Two of the trials were criminal cases in which there was a related civil rights case where the plaintiff was shot by the police and then charged with various crimes, including assault with a deadly weapon and resisting by force. Although the majority of my cases settle, it should be noted that in the majority of my trial success, there was little to no offer of settlement prior to trial. My specific trial successes in approximately the last six years include:

(1)     $3.05 million jury verdict in *Amaya v. County of Los Angeles* (police shooting, no offer) (May 2017);

(2)     $2.5 million jury verdict in *Borges v Humboldt County* (denial of medical care, no offer) (August 2017);

(3)     $6.5 million jury verdict in *Rose v. County of Sacramento* (police shooting, no offer) (September 2017);

(4)     $3.5 million jury verdict in *Herrera v. City of Los Angeles* (police shooting, no offer) (October 2017);

(5)   $200,000 ($1.755 million settlement with statutory fees) jury verdict after re-trial in *Huizar v. City of Anaheim* (police shooting, no offer) (October 2017);

(6)   $350,000 settlement during trial in *Lopez v. City of Inglewood* (police excessive force) (January 2018)

(7)   $5.5 million jury verdict in *Mears v. City of Los Angeles* (excessive force/taser-related death, no offer) (October 2017);

(8)   Criminal case of *People v. Fajardo*, charged with five (5) felony counts and received a hung jury (6-6) on all felony counts. All felony counts were thereafter dismissed. (January/February 2018);

(9)   $1.45 million settlement following jury verdict on liability in *Hernandez v. City of Los Angeles* (excessive force/restraint asphyxiation, no offer) (February 2018);

(10)   $33.5 million jury verdict in *Archibald v. County of San Bernardino* (police shooting, no offer) (March 2018);

(11)   Criminal case of *People v. Juarez* (eighteen (18) acquittals, convicted on only one felony and one misdemeanor) (January/February 2019);

(12)   $4.75 million verdict in the *Estate of Casimero Casillas v. City of Fresno* (police shooting, offer of $50,000) (March 2019);

(13)   $3.4 million jury verdict in *Craig v. County of Orange* (police shooting, no offer) (April 2019);

(14)   $3 million jury verdict in *Schroeder v. City of Rialto* (excessive force, offer of $50,000) (June 2019);

(15)   $13.2 million jury verdict in *Valenzuela v. City of Anaheim* (excessive force/asphyxia) (December 2019);

DECLARATION OF DALE K. GALIPO

(16) $4.5 million jury verdict in *L.D. v. City of Los Angeles* (excessive force/police shooting; no offer) (January 2020); and

(17) $500,000 jury verdict in *Donastorg v. City of Ontario* (excessive force) (June 2021)

(18) $1.77 jury verdict in *Bowles v. City of San Jose* (police shooting) (July 2021)

(19) $17,002,00 jury verdict in *French v. City of Los Angeles* (police shooting) (October 2021)

(20) $500,000 jury verdict in *Gomez v. City of Santa Clara* (police shooting) (December 2021)

(21) $4.5 million jury verdict in *Ramos v. County of San Bernardino* (police shooting) (April 2022)

(22) $2,165,000 jury verdict in *V.V. v. City of Los Angeles* (police shooting) (July 2022)

(23) $1,000,000 jury verdict (reduced by contributory fault) in *Weick v. County of San Diego* (police shooting) (November 2022)

(24) $1,165,000 settlement during trial in *Cooke v. City of Los Angeles* (police shooting) (November 2022)

(25) $7.5 million (reduced by contributory fault) in *Alves v. County of San Bernardino* (restraint death) (April 2023)

(26) $10 million jury verdict in *Najera v. County of Riverside* (police shooting) (April 2023)

(27) $23.8 million jury verdict in *Murillo v. City of Los Angeles* (police shooting) (August 2023)

(28) $13.5 million jury verdict in *Zelaya v. City of Los Angeles* (restraint death) (October 2023)

19.     I tried the case *L.D. v. City of Los Angeles*, referenced above, in federal court in January 2020 in front of the Honorable Philip Gutierrez. In that case, there was no offer of settlement. Plaintiffs contended that the individual defendant LAPD SWAT officers used beanbag shotguns, hot gas, and Tasers against the decedent, who was inside his own bedroom and committing no crime, eventually forcing the decedent out of the house, where he was fatally shot by a SWAT officer. The defense argued that the decedent refused to drop a pair of scissors and that the decedent injured an officer with the scissors immediately prior to the shooting. The jury awarded Plaintiffs a verdict of $4.5 million, and Judge Gutierrez awarded me an hourly rate of $1,100 in ruling on the attorney fee motion brought post-trial pursuant to 42 U.S.C. § 1988. A true and correct copy of Judge Gutierrez's April 23, 2020 Order awarding me $1,100 per hour is attached hereto as **"Exhibit 4."**

20.     I tried the case *Donastorg v. City of Ontario*, also referenced above, in federal court in June 2021 before the Honorable Jesus G. Bernal. In that case, Plaintiff contended that City of Ontario police officers deployed Tasers, beanbag shotguns, hot gas, and a K9 against the Plaintiff who was unarmed inside his vehicle, boxed in between patrol cars and a bearcat. The defense argued that Plaintiff refused to comply with numerous commands, attempted to maneuver his vehicle around the patrol cars, striking several cars in the process, and grabbed the K9 and attempted to choke the K9 while using the dog as a shield. The jury awarded the plaintiff a verdict of $500,000. In ruling on Plaintiff's post-trial motion for attorney's fees brought pursuant to 42 U.S.C. § 1988, Judge Bernal awarded me $1,100 per hour. A true and correct copy of Judge Bernal's September 23, 2021 Order awarding me $1,100 is attached hereto as "**Exhibit 5**."

21.     I tried the *French v. City of Los Angeles* case, also referenced above, in October 2021 in federal court before the Honorable Jesus G. Bernal. This was a

1  legally complex case in which the City of Los Angeles contended that the

2  shooting officer was not acting under color of law or in the course and scope of

3  his employment with the City at the time of the shooting. The City of Los Angeles

4  made no settlement offer and filed numerous dispositive motions in an attempt to

5  preclude plaintiffs from having their day in court. The plaintiffs prevailed and

6  obtained a $17,002,000 jury verdict award. In ruling on plaintiffs' post-trial

7  motion for attorney's fees brought pursuant to 42 U.S.C. § 1988, Judge Bernal

8  awarded me $1,100 per hour and applied a 1.5 multiplier. Attached hereto as

9  "**Exhibit 6**" is a true and correct copy of Judge Bernal's May 10, 2022 Order

10  awarding me $1,100 per hour and applying a 1.5 multiplier to the lodestar

11  calculation.

12           22.      I tried the case *Craig v. County of Orange*, also referenced above, in

13  April of 2019 in federal court before the Honorable Cormac J. Carney. In that

14  case, there was no offer of settlement, and the facts of the case were highly

15  disputed. Plaintiffs contended that the deputy shot and killed the unarmed

16  decedent, who was lawfully seated in his car, and at most committed a

17  misdemeanor. The defense argued that the decedent, who under the influence of a

18  large amount of methamphetamine, failed to comply with commands, reached for

19  a gun and was about to shoot the deputy defendant. The plaintiffs prevailed,

20  obtaining a $3.4 million-dollar jury verdict. Judge Carney awarded me $1,000 per

21  hour in the related attorney fee motion under 42 U.S.C. § 1988. The defendants

22  then appealed to the Ninth Circuit, wherein the Ninth Circuit affirmed the jury

23  verdict. Defendants then appealed to the Supreme Court but, after requesting a

24  response to the petition, the Supreme Court denied certiorari. Judge Carney

25  subsequently awarded me $1,200 per hour in the related attorney fee motion for

26  all work done on the defendants' appeal to the Ninth Circuit and the Supreme

27

28

1  Court. Attached hereto as "**Exhibit 7**" is a true and correct copy of Judge

2  Carney's February 21, 2023 Order awarding me $1,200 per hour.

3        23.    In November 2019, I tried the case *Valenzuela v. City of Anaheim*,

4  also referenced above, in federal court before the Honorable Cormac J. Carney.

5  The plaintiffs contended that the officers asphyxiated the decedent by improperly

6  applying a controversial air choke hold while decedent was not actively resisting

7  and posed no threat. The defense argued that the decedent had a long history of

8  drug abuse, had preexisting health issues, and was under the influence of

9  methamphetamine at the time of his encounter with law enforcement during which

10  he refused to comply with officers' commands and exhibited "superhuman"

11  strength. After the plaintiffs prevailed and was awarded a verdict of $13.2 million,

12  the defendants appealed to the Ninth Circuit and subsequently to the Supreme

13  Court. After the Supreme Court denied certiorari, Judge Carney awarded me

14  $1,200 per hour, pursuant to a 42 U.S.C. § 1988 attorney's fees motion, for my

15  work done in response to the defendants' appeal to the Ninth Circuit and the

16  Supreme Court. Attached hereto as "**Exhibit 8**" is a true and correct copy of the

17  February 23, 2023 Order awarding me $1,200 per hour.

18        24.    In approximately the last twelve years, I have had approximately

19  fifteen published opinions in civil rights cases, and I have argued numerous

20  appellate cases before the Ninth Circuit Court of Appeals.

21        25.    I started work on this case since September 2022, and I have worked

22  diligently on this case for Plaintiff, Tammy Murillo since that time. The extensive

23  number of hours I worked on this case precluded me and my office from accepting

24  other cases and employment opportunities.

25        26.    Based on the difficulty of this case and the skill, experience and

26  ability necessary to prevail in this case, I believe an hourly attorney fee rate for

27  my services under the circumstances should be $1,300 per hour. I am respectfully

28

1  requesting this hourly fee on the basis of my extensive trial experience, extensive

2  experience in civil rights cases, my accomplishments in this case and other civil

3  rights cases, and my previous awards of $1,200 per hour by the United States

4  District Court.

5       27.    This was a difficult case, including because there was information

6  that the decedent, Jesse Murillo, had assaulted his mother's fiancé just prior to the

7  incident, was allegedly assaulting family members with a machete, and was

8  running down a residential street with a hammer and an object that appeared to be

9  a machete while wearing a gas mask. The officers testified that the decedent was

10  running toward officers while wielding a hammer in one hand and a machete in

11  the other.

12       28.    Given that top litigators at top law firms are billing their clients

13  between $1,200 to $1,800 per hour for trial work and preparation, I am

14  respectfully requesting an hourly fee award of $1,300 based on my trial

15  experience and accomplishments as a civil rights attorney as a trial attorney in

16  general. Given that I have had my own law firm for three decades and have tried

17  well over 100 civil rights cases, I believe that I have more trial experience and

18  expertise than most law firm partners. Considering that civil rights cases are

19  thought to be the most difficult cases for plaintiffs to prevail on, and considering

20  that I have prevailed on more excessive force cases than probably anyone in the

21  country, I believe $1,300 per hour is an appropriate rate.

22       29.    In addition to my work on this case, my senior associate Renee V.

23  Masongsong has managed and litigated this case from September 2022 to the

24  present, including providing direction to my junior associate Shannon Leap. Since

25  that time, Ms. Masongsong has handled the case with skill and diligence. Ms.

26  Masongsong has worked for my firm exclusively on civil rights cases in my office

27  for over ten years. In that time, her skilled legal research and writing, as well as

28

her attention to detail and diligence in the day-to-day management of approximately twenty cases per year, has resulted in numerous six, seven, and eight-figure settlements and jury verdicts for my clients. In my opinion, Ms. Masongsong is a dedicated, reliable, and intelligent attorney. Given Ms. Masongsong's experience and competency in civil rights litigation, I believe it would be appropriate to compensate Ms. Masongsong's work at $700 per hour.

30.     My associate Shannon Leap also handled the day-to-day matters and law and motion work on this matter with Ms. Masongsong. Ms. Leap has worked exclusively on civil rights cases at my firm for approximately a year and a half, since June 2022. Ms. Leap is a diligent, smart, and responsible attorney with a bright future in the civil rights field. Based on Ms. Leap's skills and experience, I believe it would be appropriate to compensate Ms. Leap's work at $400 per hour.

31.     My associate Benjamin S. Levine has worked exclusively on civil rights cases at my firm since joining in October 2022. In my opinion, Mr. Levine is an intelligent and hardworking attorney with a promising future in the civil rights field. Before joining my firm, Mr. Levine clerked for federal district court judge William B. Shubb in the United Stated District Court for the Eastern District of California. During law school, Mr. Levine heavily focused his work and study on § 1983 litigation, specifically police misconduct. Since joining my firm, Mr. Levine has proven himself to be a diligent and fast learner, which contributed to Mr. Levine quickly becoming an associate I can rely on for excellent work. Based on Mr. Levine's experience, skills, and work on this case, I believe it would be appropriate to compensate Mr. Levine's work at $400 per hour.

32.     Mr. Mayne joined my firm in March 2023 and has worked exclusively on civil rights cases since. Prior to joining my firm, Mr. Mayne took a range of specialized courses regarding civil rights and police misconduct in law school and served as a law clerk for federal district court judge William J.

1  Martinez in the United States District Court for the District of Colorado. Since

2  joining my firm, I am continually impressed by Mr. Mayne's diligence, hard

3  work, and attention to detail. Based on Mr. Mayne's experience and skills, I

4  believe it would be appropriate to compensate Mr. Mayne's work at $400 per

5  hour.

6      33.    Our office's paralegal Karen Slyapich supported the attorneys

7  working on this case in preparation for trial.  Ms. Slyapich has been working for

8  me for almost seven years. Ms. Slyapich received her paralegal certificate from

9  the University of California Dominguez Hills and has over 20 years of legal

10  experience. I am continually impressed by the quality of Ms. Slyapich's work, her

11  professionalism, her skill level, and her diligence in working on our civil rights

12  cases.  I believe it would be appropriate to compensate Ms. Slyapich's work at

13  $225 per hour based upon her years of experience, knowledge and it is a

14  comparable rate for paralegals of her skill and experience.

15      34.    Our office's legal assistant Santiago Laurel also supported the

16  attorneys working on this case in preparation for trial.  Mr. Laurel has been

17  working for me for over two years, and he has been in the legal field for

18  approximately 16 years. I believe it would be appropriate to compensate Mr.

19  Laurel's work at $200 per hour based upon his years of experience, knowledge

20  and it is a comparable rate for legal assistants of his skill and experience.

21      35.    The work done on this case by Ms. Masongsong, Ms. Leap, Mr.

22  Levine, Mr. Mayne, Mr. Laurel, and Ms. Slyapich, in my opinion, was of high

23  quality and was instrumental in helping the Plaintiff prevail at trial.

24      36.    My office takes all of our civil rights cases, including the present

25  case, purely on a contingent fee basis, paying costs in advance, including

26  considerable expert fees, and at considerable risk with the ultimate result open to

27  question. Practicing in this area of law involves a great deal of risk as these cases

28

are often subject to motions to dismiss, can be lost on the merits, or on appeal. The Law Offices of Dale K. Galipo takes these cases on a contingency basis despite the considerable expense involved, because of the critically important civil and human rights issues at stake. Few attorneys are willing to run such a risk of recovery in order to press for a victory for civil rights. My office has turned down cases that could potentially result in settlement or verdict for much higher amounts than our average verdict or settlement, specifically because those cases are not civil rights cases and detract from the time spent on these cases of vital importance to our nation. Upon first review of this case, I was aware of the difficulty, risk, and expense that would follow. Nevertheless, these are just the type of cases that my firm does not readily turn away—a testament that truly difficult cases such as this require truly dedicated and highly skilled representation.

37.    The California Supreme Court has explained that a full award in a contingent case should provide a rate well above the ordinary market billing rate for fee-paying clients in order to reflect full compensation. *See, e.g.*, *Ketchum v. Moses*, 24 Cal. 4th 1122, 1133 (2001). In light of the substantial risks of contingency litigation and the need for experienced and competent counsel to represent plaintiffs in civil rights litigation, it is important that courts award enhanced compensation in contingent risk litigation. Attorneys expect to receive compensation well in excess of their hourly billing rate in cases in which their compensation is contingent upon success, and would decline to represent plaintiffs in risky civil rights cases if it were not for this expectation.

38.    Plaintiff's counsel in this case, including myself, my associates, and my co-counsel, have demonstrated experience and hard work in dealing with the issues presented by this case and in preparing for trial. Indeed, the jury's verdict in this case awarded Plaintiff $23.8 in damages at trial. This is a great result for the

Plaintiff, considering that Defendants did not make any settlement offer after my office associated into the case. To litigate this case, I compensated the attorneys and legal assistants at the Law Offices of Dale K. Galipo for the last several years, in addition to the costs incurred by my office, without any interim payments from the Plaintiff or any guarantee of success at trial.

39.     For each of the reasons stated above and stated within Plaintiff's motion for attorneys' fees filed concurrently herewith, I respectfully request an hourly rate of $1,300.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this was executed this 7th day of November 2023 at Woodland Hills, California.


_____
                Dale K. Galipo

# EXHIBIT 1

Dale K. Galipo
Timekeeping Record

Tammy Murillo v. City of Los Angeles et al
Case No.2:21-cv-08738-FMO-AGR

| DATE | DESCRIPTION | HOURS |
|---|---|---|
| 9/6/22 | Review initial case materials | 1.20 |
| 9/7/22 | Review initial case materials | 0.80 |
| 9/8/22 | Review initial case materials | 1.50 |
| 9/9/22 | Review initial case materials | 1.00 |
| 9/9/22 | Substitution of Attorney; Review and discuss with team | 0.30 |
| 9/22/22 | Review case materials | 2.70 |
| 9/24/22 | Review case materials | 2.30 |
| 9/25/22 | Review case materials | 3.00 |
| 9/26/22 | Review case materials | 3.30 |
| 9/27/22 | Review case materials | 1.50 |
| 9/28/22 | Review additional case materials | 2.50 |
| 9/29/22 | Consultation with experts | 1.30 |
| 9/30/22 | Review additional case materials | 1.40 |
| 10/1/22 | Consultation with experts | 2.40 |
| 10/8/22 | Consultation with experts | 1.40 |
| 10/9/22 | Review expert reports | 2.60 |
| 10/10/22 | Review Initial Expert Disclosures | 2.10 |
| 10/11/22 | Review expert reports | 2.30 |
| 10/22/22 | Prepare for Flosi deposition; Review case materials | 3.40 |
| 10/23/22 | Prepare for Flosi deposition; Review case materials | 3.60 |
| 10/26/22 | Prepare for Flosi deposition | 2.50 |
| 10/27/22 | Prepare for and conduct Flosi deposition | 4.00 |
| 11/4/22 | Prepare for and attend mediation with R. Copeland | 3.60 |
| 11/28/22 | Preparation for Omalu deposition | 1.40 |
| 11/29/22 | Preparation for Omalu deposition | 1.60 |
| 12/1/22 | Preparation for Bryce deposition | 2.00 |
| 12/2/22 | Preparation for Bryce deposition | 2.50 |
| 12/17/22 | Review statements (Sigman, Montague, Vege) | 4.20 |
| 12/21/22 | Review depositions (Montague, Sigman) | 3.60 |
| 12/22/22 | Review depositions (Vidal, Babaians) | 2.40 |
| 12/28/22 | Review Statements (Bolanos, Ferris, Vidal, Babaians) | 3.80 |
| 1/3/23 | Review and discuss continuation of Pre-trial dates | 0.50 |
| 1/8/23 | Review expert report and deposition (Flosi) | 2.30 |
| 1/14/23 | Review autopsy report and deposition (Nguyen) | 2.70 |
| 1/15/23 | Review videos | 2.30 |
| 1/17/23 | Review medical records; autopsy report; paramedic records | 2.30 |
| 1/18/23 | Review M.E. report; Deposition | 2.70 |
| 1/19/23 | Outline officer statements (Sigman, Montague, Vege) | 2.30 |
| 1/20/23 | Outline officer depositions (Sigman, Montague) | 3.20 |
| 1/21/23 | Outline expert depositions and reports (Flosi, Bryce) | 3.40 |

Dale K. Galipo
Timekeeping Record

Tammy Murillo v. City of Los Angeles et al
Case No.2:21-cv-08738-FMO-AGR

| 4/27/23 | Review exhibits | 1.10 |
|---|---|---|
| 4/28/23 | Review plaintiff's deposition (T. Murillo) | 2.10 |
| 4/29/23 | Review videos | 0.90 |
| 4/30/23 | Review witness deposition (Mark Guerero) | 1.70 |
| 5/1/23 | Review medical and paramedic records; Team meeting | 1.50 |
| 5/2/23 | Prepare for mediation with M. Morrow; Team meeting | 1.50 |
| 5/3/23 | Prepare for and attend mediation with M. Morrow | 4.50 |
| 5/3/23 | Review Minute Order re trial date; Discuss strategy | 0.80 |
| 5/15/23 | Review officer statements | 2.70 |
| 5/16/23 | Review witness statements | 1.50 |
| 5/17/23 | Review videos and recordings | 1.50 |
| 5/18/23 | Review medical records and autopsy report | 1.50 |
| 5/19/23 | Review police reports | 1.80 |
| 5/20/23 | Review investigation file | 2.20 |
| 5/21/23 | Review expert reports | 1.70 |
| 5/22/23 | Review depositions (Sigman, Montague, Vege) | 2.30 |
| 5/24/23 | Review depositions (Sigman, Montague) | 3.10 |
| 5/25/23 | Review depositions (Flosi, Bryce) | 2.90 |
| 5/26/23 | Review stipulation to continue trial; Discussions | 0.30 |
| 6/24/23 | Review expert reports and depositions (Flosi, Bryce) | 2.50 |
| 6/25/23 | Revivew statements (Sigman, Montague) | 1.50 |
| 6/26/23 | Review statements (Vege, Gunther, Bolanos) | 1.30 |
| 6/28/23 | Review statements (Babaians, Ferris, Vidal) | 1.20 |
| 6/29/23 | Review statements (Mendenhall, Blackwell, Schiller) | 0.90 |
| 6/30/23 | Review depositions (Sigman, Montague) | 1.90 |
| 7/1/23 | Outline expert examinations (Omalu) | 2.90 |
| 7/2/23 | Outline expert examinations (Flosi, Bryce) | 4.10 |
| 7/3/23 | Outline defendant examination (Sigman, Montague) | 4.20 |
| 7/4/23 | Outline defendant examination (Sigman, Montague) | 3.80 |
| 7/8/23 | Outline defendant examination (Sigman, Montague) | 2.40 |
| 7/9/23 | Outline defendant examination (Sigman, Montague) | 2.60 |
| 7/11/23 | Review of statements; Designations (Sigman, Montague, Vege) | 2.20 |
| 7/13/23 | Review of statements; Designations (Sigman, Montague) | 1.80 |
| 7/14/23 | Review of depositions; Designations (Sigman, Montague) | 2.00 |
| 7/15/23 | Outline Opening Statement | 5.10 |
| 7/16/23 | Outline Opening Statement; Revisions | 2.90 |
| 7/20/23 | Meeting with Police Practices Expert | 1.00 |
| 7/22/23 | Outline Closing Argument | 5.40 |
| 7/23/23 | Outline Closing Argument; Revisions | 3.60 |
| 7/25/23 | Review of depositions (Flosi, Babaians, Vidal) | 2.50 |

Dale K. Galipo
Timekeeping Record

Tammy Murillo v. City of Los Angeles et al
Case No.2:21-cv-08738-FMO-AGR

| Date | Description | Hours |
|------|-------------|-------|
| 7/29/23 | Outline Closing Argument and Rebuttal Argument; Revisions | 4.30 |
| 7/30/23 | Review exhibits; Videos | 1.70 |
| 7/31/23 | Review pre-trial documents | 2.00 |
| 8/1/23 | Review exhibits; Video clips | 1.50 |
| 8/2/23 | Review exhibits; Video clips | 1.00 |
| 8/3/23 | Review officer outlines/examinations; Revisions | 5.70 |
| 8/4/23 | Review opening statement outline; Revisions; Team meeting (1) | 2.10 |
| 8/5/23 | Review closing argument outline; Outline rebuttal; Revisions | 4.90 |
| 8/6/23 | Review officer examination outline; Work on opening; Revisions | 5.10 |
| 8/7/23 | Review officer examination outline; Closing statement | 2.70 |
| 8/8/23 | Review officer examination outline; Closing argument; Team meeting (.5) | 3.30 |
| 8/9/23 | Review officer examination outline; Closing argument | 2.10 |
| 8/10/23 | Review officer examination outline; Revisions; Team meeting (.5) | 2.90 |
| 8/11/23 | Prepare for and attend Final Pre-Trial Conference and hearing on Motions in Limine; Team meeting (1) | 2.70 |
| 8/11/23 | Review exhibits; Trial preparation* | 1.80 |
| 8/12/23 | Review pre-trial documents; Trial Preparation* | 8.20 |
| 8/13/23 | Trial Preparation* | 7.10 |
| 8/14/23 | Trial Preparation*; Meet and confer in person | 7.80 |
| 8/15/23 | Trial Preparation* | 8.90 |
| 8/16/23 | Trial Preparation* | 8.20 |
| 8/17/23 | Trial Preparation* | 7.00 |
| 8/18/23 | Prepare for and attend Further Pre-Trial Conference (appear by phone) | 1.30 |
| 8/18/23 | Trial Preparation* | 9.70 |
| 8/19/23 | Trial Preparation* | 12.30 |
| 8/20/23 | Trial Preparation* | 13.40 |
| 8/21/23 | Trial Preparation* | 12.40 |
| 8/22/23 | Trial - Trial Preparation* | 15.20 |
| 8/23/23 | Trial - Trial Preparation* | 15.80 |
| 8/24/23 | Trial - Trial Preparation* | 16.20 |
| 8/25/23 | Trial - meetings | 16.00 |
| 8/30/23 | Review post-trial motions; Research | 2.70 |
| 8/30/23 | Review opposition to post-trial motion | 2.30 |
| 8/30/23 | Review trial transcripts | 3.20 |
| 8/30/23 | Review trial transcripts | 2.80 |
| 8/30/23 | Review reply to post-trial opposition | 1.50 |

Dale K. Galipo                    Tammy Murillo v. City of Los Angeles et al
Timekeeping Record                   Case No.2:21-cv-08738-FMO-AGR

| | | | |
|---|---|---|---|
| 11/4/23 | Work on motion for attorneys fees | | 1.50 |
| 11/5/23 | Work on motion for attorneys fees | | 2.00 |
| 11/6/23 | Work on motion for attorney's fees | | 1.00 |
| 11/7/23 | Final review of motion for fees | | 0.60 |
| | | | |
| | TOTAL TIME | | 406.20 |
| TOTAL HOURS | | | |

*Trial preparation includes: discussions and meetings with co-counsel and staff, meeting
with and preparing witnesses, reviewing statements, investigation reports, medical records,
photos, audio, video, depositions, expert reports, pleadings, pre-trial documents including
jury instructions, verdict form, exhibits, client preparation, preparation for voir dire, opening
statement, direct and cross examination, closing and rebuttal arguments.

# EXHIBIT 2

## The Irving H. Green Memorial Lecture

"Becoming a Civil Rights Trial Lawyer"
Dale K. Galipo '84

Monday, April 8, 2019 / 12:15 - 1:15 pm / Room 1310 / UCLA School of Law

UCLA SCHOOL OF LAW

## THE IRVING H. GREEN MEMORIAL LECTURE

1994
Johnnie L. Cochran, Jr.

1995
William W. Vaughn '55

1997
Ned Good

1998
Roxanne Barton Conlin

1999
Elizabeth J. Cabraser

2000
Bryan Stevenson

2002
James J. Brosnahan

2005
Kenneth R. Feinberg

2006
A. Barry Cappello '65

2007
Kent Burton '75
Brad Baker '75

2008
Barbara Hadsell '78

2009
David R. Glickman '57
Steven C. Glickman '82

2010
Winston McKesson '82

2011
Anna Y. Park '92

2012
Harland W. Braun '67

2013
Arnoldo Casillas '91

2014
Brad N. Baker '75
Harland W. Braun '67
A. Barry Cappello '65
Anna Y. Park '92
Stephen C. Yeazell

2016
Mark D. Baute '86

2017
Moses Lebovits '75

2018
Marc Seltzer '72

2019
Dale K. Galipo '84

# Dale K. Galipo '84

Principal, The Law Offices of Dale K. Galipo



Dale K. Galipo is the founder and principal of The Law Offices of Dale K. Galipo, located in Woodland Hills, California. Originally from a suburb of Cleveland, Ohio, Mr. Galipo attended Orange High School and graduated from The University of Michigan, Ann Arbor, with a degree in business administration. Mr. Galipo obtained his Juris Doctor from the University of California, Los Angeles School of Law in 1984. In 1989, The State Bar of California admitted him to practice, and Mr. Galipo has since earned a reputation as one of the top civil rights attorneys in the nation.

Starting his own law firm in 1991, Dale Galipo began specializing in personal injury cases. Soon thereafter, he started obtaining multi-million dollar jury verdicts. During the 1990's Mr. Galipo also handled numerous criminal cases and achieved so much success in criminal law that he was dubbed "The Strikes Man" by the Daily Journal for multiple jury acquittals in "three strikes" cases. He won approximately 90% of his criminal trials, with several of his high-profile cases covered by local and national print as well as televised media. From 1995 thru 1996, Mr. Galipo obtained six jury acquittals in a row on major felony cases.

In 2002, Dale Galipo started to specialize in civil rights cases involving police misconduct. The majority of his cases were excessive force cases, but he also handled jail cases, false arrest, denial of medical care and sexual misconduct cases. In 2004, Mr. Galipo started obtaining multi-million dollar jury verdicts for victims of police misconduct and police abuse. In 2012, Mr. Galipo was awarded the Defender of the Constitution Award by the Inland Empire Chapter of the Federal Bar Association and was more recently the Honoree for the MLK award presented in his name at the UC Davis School of Law. In the last six years, he has prevailed in 46 Jury trials and obtained more than 70 seven-figure verdicts and settlements.

With twelve published opinions in civil rights cases, Dale Galipo has been selected to the Southern California's SuperLawyers list for the past six years. Having recently been a finalist for the CAALA Trial Lawyer of the Year, he is often asked to speak at the annual CAALA convention as well as to law students and lawyers about his civil rights practice, most often on how to successfully try a civil-rights case. Recently inducted as a Fellow of The American College of Trial Lawyers, Mr. Galipo has gone to trial and won more cases against the police than any other attorney in the country.

---

Irving H. Green was a much-honored trial attorney known for representing the underdog in courts across the country. During his career, Green received numerous awards — including the Ted Horn Memorial Award, given by the Los Angeles Trial Lawyers Association. He also was a member of the Inner Circle of Advocates, a group whose membership is limited to 100 outstanding trial lawyers in the United States.

Born in Minneapolis, Minnesota in 1905, Irving Green grew up poor and attended night school, graduating from law school when he was only 20. While waiting a year to be sworn into that state's bar (its legal minimum age was 21), he worked for West Publishing Company, selling law books so that he could earn enough money to open his own law office. Mr. Green was admitted to practice in California in 1952, and he practiced in Los Angeles until 1981.

Irving Green's enthusiasm for his work, his determination to help those who had no other champion, and his excellence and creativity serve as an inspiration today. Of his father, UCLA Professor of Mathematics Mark Green has said, "He lived his convictions while having a successful career." In a letter written about her late husband before the inaugural lecture, Fay Bettye Green noted, "Irving Green never forgot his background ...The trial of a case was his raison d'être— his research was thorough, and his skills enabled him to convince the jury of his client's cause."

The Green family has chosen to honor Irving Green by creating a program designed to bring truly outstanding trial lawyers to UCLA to inspire law students and to engage in an exchange with them focused on the often unpopular role of lawyer.



**EXHIBIT 3**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV-13-01615-MWF (ANx)**          **Date:  September 17, 2015**
Title:     Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

Present:   The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

           Deputy Clerk:                              Court Reporter:
           Rita Sanchez                               Not Reported

           Attorneys Present for Plaintiff:           Attorneys Present for Defendant:
           None Present                               None Present

**Proceedings (In Chambers):**   ORDER RE MOTIONS FOR ATTORNEYS' FEES
                                    [189] [192] [193]

      This matter is before the Court on three Motions for Attorneys' Fees.  The Motion for Attorneys' Fees and Costs (the "Bamieh Motion"), filed for attorneys' fees incurred by Bamieh & Erickson, PLC ("B&E") as representatives of Plaintiffs Guillermo Ramirez and Teresa Ramirez (Docket No. 189); the Motion for Attorneys' Fees (the "Galipo Motion"), filed by Plaintiffs on July 24, 2015 for attorneys' fees for the Law Offices of Dale K. Galipo, (Docket No. 192) incurred as trial counsel for all Plaintiffs; and the Motion for Attorneys' Fees and Costs (the "Vogel Motion") for attorneys' fees for the Law Officers of Brian A. Vogel, PC ("Vogel Law") as counsel for Plaintiff R.R.  (Docket No. 193).  Defendants filed an Opposition to Plaintiffs' Motions for Fees and Costs (the "Opposition") addressing all three Motions on August 3, 2015.  (Docket No. 201).  Plaintiffs filed a Reply to Defendants' opposition to Motion for Attorneys' Fees (the Law Offices of Dale K Galipo) (the "Galipo Reply") and a Reply Brief in Further Support of Motion for Attorneys' Fees and Costs (the "Vogel Reply").  There was no reply filed to the Bamieh Motion.

      The Court has reviewed and considered the papers on this Motion, and held a hearing on **August 24, 2015**.  For the reasons stated below, the Court in general **GRANTS** the Motions with the alterations as noted.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-13-01615-MWF (ANx)          Date:  September 17, 2015
Title:      Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

## I.   BACKGROUND

The Motions arise out of a jury verdict in favor of Plaintiffs after a jury trial on claims of civil rights violations by members of the Oxnard Police Department, which resulted in the death of Robert Ramirez.  (Docket Nos. 179, 188).

As reflected in the Jury Verdict and the Judgment after Trial, the jury found in favor of Ramirez on the first claim for excessive force against Defendant Steven Ramirez; in favor of Guillermo Ramirez, Teresa Ramirez, and R.R. on the third claim for interference with a family relationship in violation of the Fourteenth Amendment as to all Defendants; and for Ramirez on the fourth claim for negligence as to all Defendants.  The jury awarded Ramirez damages of $75,000, R.R. damages of $1,600,000, and Guillermo and Teresa Ramirez each $625,000.  (Docket Nos. 179, 188).  The jury found in favor of Defendants on the second claim for deliberate indifference to medical needs.

### A.   The Representation of Counsel

The case was taken to trial by Law Offices of Dale K. Galipo ("Galipo Law"), with Dale Galipo and Eric Valenzuela serving as trial counsel.  Galipo Law came onto the case very late, substituting in on the day of the Court's first Pretrial Conference on February 3, 2015.  Prior to February 2015, B&E and Vogel Law had represented the Plaintiffs.

#### 1.  Vogel Motion Fees

The Vogel Motion makes the following request:

| Attorney/Staff | Years of Experience | Hours worked (Merits) | Hours Worked (Motion) | Rate | Lodestar Total |
|---|---|---|---|---|---|
| Brian Vogel | 22 | 445.95 | 12.2 | $700 | $ 320,705 |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV-13-01615-MWF (ANx)            Date:  September 17, 2015**
Title:      Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| Heather Quest | 17 | 463.35 | 18.25 | $500 | $ 235,800 |
| Steve Marshall | 2.5 | 63.6 | 3.4 | $300 | $ 20,100 |
| Paralegals | 22/11 | 102.1 | 4 | $200 | $ 21,220 |
| Total | | | | | $ 597,825 |

(Declaration of Brian Vogel, ¶¶ 3, 18, 22–25 (Docket No. 194); Declaration of Heather Quest, ¶¶ 10–11 (Docket No. 195); Declaration of Steve Marshall ¶¶ 7–8, Ex. 1 (Docket No. 196)).

The billing from Vogel Law continues up to February 3, 2015, the date of the Pretrial Conference, at which point Galipo Law took over as primary counsel.

**2.  Bamieh Motion Fees Request**

| Attorney/Staff | Years of Experience | Hours worked (Merits) | Hours Worked (Motion) | Rate | Lodestar Total |
|---|---|---|---|---|---|
| Ron Bamieh | 23 | 109.2 | 3.8 | $700 | $ 118,650 – $ 123,900 |
| David Ring | 27 | 32.6 | 5.7 | $500 | $ 28,725 |
| Laura Cota | 8 | 11.4 | | $350 | $ 5,985 |
| Administrative Assistants | | 18.9 | 9.5 – 14.5 | $200 | $ 5,670 |
| Total | | | | | $ 159,030 – $ 164,280 |

(Bamieh Mot. at 6–7).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-13-01615-MWF (ANx)          Date:  September 17, 2015
Title:       Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

The billing is similarly limited to the period up to early February until Galipo Law took over representation.

### 3.  Galipo Motion Fees

The Galipo Motion requests the following fees;

| Attorney/Staff | Hours | Rate | Lodestar Total |
|---|---|---|---|
| Dale Galipo | 630.6 | $900 | $ 567,540 |
| Eric Valenzuela | 248.3 | $350 | $ 86,905 |
| Total | | | $ 654,445 |

(Galipo Mot. at 19–20).

### B.      Comparative Rates

In support of the Motions, Plaintiffs present the average law firm billing rates for partners and associates for a number of regions and the nation as obtained from the *Los Angeles Daily Journal*.

| Location | Position | 2012 | 2011 | Percent Increase |
|---|---|---|---|---|
| Los Angeles | Partner | $797 | $766 | 4.0 |
| | Associate | $550 | $516 | 6.6 |
| San Diego | Partner | $568 | $568 | 0 |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV-13-01615-MWF (ANx)**          **Date:  September 17, 2015**
Title:     Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

|               | Associate | $394 | $378 | 4.2 |
|---------------|-----------|------|------|-----|
| San Francisco | Partner   | $675 | $654 | 3.2 |
|               | Associate | $482 | $449 | 7.3 |
| National      | Partner   | $750 | $725 | 3.4 |
|               | Associate | $495 | $460 | 7.5 |

(Declaration of Dale Galipo, Ex. B (Docket No. 192-1)).

## II.    BASIS FOR ATTORNEYS' FEES

Plaintiffs request attorneys' fees, pursuant to 42 U.S.C. § 1988.  Under § 1988(b), "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs" in an action enforcing 42 U.S.C. § 1983.  42 U.S.C. § 1988(b).

"A plaintiff must be a 'prevailing party' to recover an attorney's fee under § 1988."  *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939, 76 L. Ed. 2d 40 (1983).  Typically, "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  *Id.* (internal quotation marks and citation omitted).  This jury found in favor of Plaintiffs on three claims, and awarded Plaintiffs considerable damages on these claims.  Therefore, Plaintiffs have succeeded on significant issues in this litigation and achieved substantial benefits.  Accordingly, Plaintiffs are the prevailing parties for purposes of § 1988 and Federal Rule of Civil Procedure 54(d).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-13-01615-MWF (ANx)          Date:  September 17, 2015
Title:      Guillermo Ramirez, et al. -v- Oxnard Police Department, et al.

## III.    CALCULATION OF ATTORNEYS' FEES

### A.    Legal Standard

"In the Ninth Circuit, the customary method of determining the permissible amount of attorneys' fees under § 1988 is the 'lodestar' method." *Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006).  The lodestar "is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 406 (9th Cir. 1990).

"The *Kerr* factors are used in this preliminary determination of the lodestar." *Id.* In *Kerr*, the Ninth Circuit adopted the following guidelines:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

"After the lodestar is determined, the court may make adjustments, depending on the circumstances of the case." *United Steelworkers*, 896 F.2d at 406 (citing *Blum v. Stenson*, 465 U.S. 886, 897, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)).  "Factors subsumed in the original determination of reasonable hours and rates, however, should not be used to adjust the lodestar figure." *Id.*  "[T]here is a strong presumption" that the lodestar calculation "is a reasonable fee." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-13-01615-MWF (ANx)            Date:  September 17, 2015
Title:        Guillermo Ramirez, et al. *-v-* Oxnard Police Department, et al.

### B.    <u>Discussion</u>

Defendants present five arguments as to the attorneys' fees requested in the three motions.  ***First***, the Vogel Motion is mistaken in its request for fees for opposing Defendants' summary judgment motion because that success did not make R.R. a prevailing party.  ***Second***, even if fees are to be awarded it was unreasonable to expend 166 attorney hours opposing summary judgment.  ***Third***, the Vogel Firm and B&E's billing rates are too high especially in light of counsel's refusal to take the case to trial.  ***Fourth***, the lodestar amount should be reduced because of the partial success achieved by all attorneys.  ***Fifth***, a multiplier is inappropriate in a straightforward case such as this.

"Fee awards pursuant to § 1988 must be reasonable, both as to the number of hours spent in advancing the successful claim(s) and the billing rate per hour."  *Harris v. Marhoefer*, 24 F.3d 16, 18 (9th Cir. 1994) (holding district court did not abuse its discretion in reducing fee award by 50 percent given the recovery of only $25,000).  As indicated above, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hensley*, 461 U.S. at 433.

### 1.    R.R. is a Prevailing Party for the Purpose of Obtaining Fees for all Components of the Litigation

Defendants argue that the Vogel Motion's request for fees incurred in opposing Defendants' motion for summary judgment is impermissible because the motion did not alter the parties' legal relationship and so does not qualify Vogel Law's client, R.R., as a prevailing party.  (Opp. at 2).

In support of this position, Defendants cite a number of cases holding that to be a prevailing party, a party must receive some form of relief from a court.  (Opp. at 3).  Success in defeating summary judgment did not provide any relief and so R.R. may not be a prevailing party entitled to attorneys' fees for opposing summary judgment.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-13-01615-MWF (ANx)          Date:  September 17, 2015
Title:      Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

───────────────────────────────────────────────────────────

Vogel Law argues that this ignores the fact that R.R. achieved substantial success at trial, and is undeniably a prevailing party as the beneficiary of a substantial jury verdict.  Even if counsel did not act as trial counsel, they nonetheless are responsible for getting the case to trial, and for the bulk of the work leading up to early February when Galipo Law took over, without which success would not have been possible.

R.R. is entitled to attorneys' fees to cover all legal services, including those incurred in opposing summary judgment because it is R.R. as the prevailing party, not his attorneys, as prevailing attorneys, who is entitled to fees.  Defendants' case law is readily distinguishable because it addresses instances in which the *party* did not prevail.

Defendants rest their argument primarily on *Citizens for Better Forestry v. U.S. Department of Agriculture*, 567 F.3d 1128 (9th Cir. 2009).  In *Citizens* the Ninth Circuit held that plaintiffs were not prevailing parties and so not entitled to attorneys' fees under a similar statute.  Plaintiffs had sued the Department of Agriculture ("USDA") and United States Forest Service seeking injunctive relief to prevent the implementation of a new national forest management policy based on allegations that the defendants had failed to comply with certain statutory procedural requirements.  The USDA withdrew the policy and issued a new one.  Plaintiffs dismissed the case and moved for attorneys' fees.  The Ninth Circuit denied their request because despite achieving their goal, it concluded that to be a prevailing party, "a party must receive 'some relief' from a court."  *Id*. at 1131.

This is not an analogous situation.  R.R. undoubtedly obtained relief from the court in the form of a judgment for $1,675,000 against Defendants.  Defendants' position is that because Vogel Law's requested billing stops once Galipo Law took over, they are not entitled to fees because they did not achieve success as defined by *Citizens*.  However, as Defendants' note in the Opposition, "the term 'prevailing party," as used in fee shifting statutes, is a legal term of art which refers to one who has been awarded some relief by the Court."  (Opp. at 4).  Defendants present no authority that in determining a prevailing the Court must look to counsel's involvement, and it

───────────────────────────────────────────────────────────

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-13-01615-MWF (ANx)                Date:  September 17, 2015
Title:      Guillermo Ramirez, et al. -v- Oxnard Police Department, et al.

declines to do so here.  Section 1988 awards attorneys' fees to prevailing parties, not
prevailing attorneys.

## 2.  Hours Expended by Vogel Law Counsel

Defendants also take issue with Vogel Law's request for 166 hours expended on
opposing their summary judgment motion.  They argue that the opposition produced by
Vogel Law totaled 52 pages, counting the point and authorities in opposition (22
pages), the statement of facts and conclusions of law (24 pages), and counsel's
declaration (6 pages).  Defendants maintain that this is excessive and providing for one
hour per page, or only one full work week, for a total of 50 hours is more appropriate.

In support of this contention Defendants note that counsel's task was greatly
simplified by the fact that the Ventura County Coroner's report supported Plaintiffs'
position and that this was a "garden variety excessive force case."  (Opp. at 8–9).

The request for 166 hours is comprised of 96.6 hours from Vogel, 42.5 hours
from Quest, and 27.3 hours from Marshall.  The total amount reflects a full month of
billing to oppose summary judgment.  Having considered the parties' briefing on the
motion for summary judgment, and the material presented on the Vogel Motion, the
Court determines that a reasonable amount of time spent opposing summary judgment
is 60 hours.  This is approximately 36 percent of the hours requested.  The Court
reduces the amount spent by each attorney to 36 percent of the amount requested.
Therefore the appropriate number of hours for each attorney is, 35 for Vogel, 15 for
Quest, and 10 for Marshall.

The Court has added 30 hours to the figures discussed at the hearing, to reflect
use of pre-trial work at trial.

## 3.  Hourly Rates for Vogel Motion and Bamieh Motion

Defendants' third argument is that the hourly rates requested in the Vogel
Motion and the Bamieh Motion are too high when compared to fees awarded in other
cases, to those requested in the Galipo Motion, and in light of their refusal to take this

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-13-01615-MWF (ANx)              Date:  September 17, 2015
Title:        Guillermo Ramirez, et al. -v- Oxnard Police Department, et al.

case to trial.  Accordingly, Defendants argue, their billing rates should be reduced by half.

Defendants argue that the Court should follow *Ingram v. Oroudjian*, 647 F.3d 925 (9th Cir. 2011), a case involving attorneys' fees awarded after successful fair housing litigation.  In that case, the Ninth Circuit upheld the district court's ruling that $325 to $375 an hour was an appropriate hourly fee in the Los Angeles legal market.

Defendants further argue that $350 an hour for Bamieh and Vogel is an appropriate given that neither attorney was willing to take the case to trial, and this is the amount requested in the Galipo Motion for Valenzuela.

The Vogel Firm argues that the case was a difficult one, with complicated issues of causation resulting from Ramirez's drug ingestion, and counsel took on substantial risk in litigating the case.  Therefore, in line with the average billing rates as indicated in the *Daily Journal* and for similarly situated lawyers, the $700 an hour for Brian Vogel is appropriate.  This is also true given the level of his experience and many accolades.  (Vogel Mot. at 17; Vogel Reply at 14–15; Vogel Decl. ¶¶ 4–12; Declaration of Barrett Litt ¶¶ 26–33, (Docket No. 200)).

The Court appreciates the challenges the case presented.  It has also considered the evidence presented to support the claimed rates.  However, the challenges in the case arose primarily in trying the case to a jury, and overcoming doubts as to causation, as well as the potentially unsympathetic circumstances surrounding the incident that gave rise to this litigation.  Neither Bamieh nor Vogel were involved in preparation for trial, and new counsel made substantial changes to the pre-trial material to ready the case for trial.  Absent this crucial participation on the part of counsel from Vogel Law and B&E, the Court cannot conclude that the rates being requested are reasonable.

Therefore, based on the Court's knowledge of the legal market in Los Angeles, and the nature of the involvement of Vogel Law and B&E in litigating the case, the Court determines that following hourly rates are reasonable and serve the purposes of § 1988:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV-13-01615-MWF (ANx)             Date:  September 17, 2015**
Title:      Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

| Attorney | Hourly Rate |
|---|---|
| Brian Vogel | $450 |
| Heather Quest | $300 |
| Steve Marshall | $200 |
| Paralegals | $100 |
| Ron Bamieh | $450 |
| David Ring | $300 |
| Laura Cota | $200 |
| Administrative Assistants | $100 |

Defendants do no contest the hourly rates proposed by either Galipo or Valenzuela.

**4.  Discount for Degree of Success**

In response to all three Motions, Defendants argue that the total lodestar figure should be reduced to reflect the partial success Plaintiffs achieved at trial.  Defendants argue that there are a number of ways to view the verdict, but all indicate that the numbers of hours worked should be cut in half.

First, Defendants argue the case can be conceived of presenting two theories of liability: excessive force and failure to summon medical care.  (Opp. at 12).  Because Plaintiffs failed to prevail on their second claim, they failed on that theory.  Their success on the other claims was duplicative and so they effectively achieved success on only half the case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-13-01615-MWF (ANx)                Date:  September 17, 2015
Title:       Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

_____

Second, the Court could consider 28 possible findings of liability, based on multiple claims against multiple defendants.  The jury returned a verdict on 15 of those claims, which is just a little over half.

Third, the jury found Ramirez to be 48 percent responsible in assessing the negligence claim, which also suggests a reduction by about half.

Plaintiffs argue that the first two methods provide a false metric of success and that the third metric, based on a state law claim that does not give rise to an award of attorneys' is irrelevant.  Plaintiffs note the considerable difficulty the case presented given the complications in proving causation because of Ramirez's substantial drug use, as well as the likely inherent bias of any jury in favor of the police and against illegal drug users.  This resulted in four medical experts testifying, three of whom testified on behalf of Defendants.  The case was therefore considerably more complicated than a normal excessive force case where the cause of injuries, typically by firearm, Taser or physical beating, is straightforward.

They also argue that Defendants' claim that this was a straightforward and easy case is belied by the fact that Defendants made no settlement offer at any point.  Therefore, Defendants' attempts to characterize the case as easy, is belied by the fact that until the verdict was handed down Defendants were confident that there was little risk that they would lose.  However, the jury awarded a total of $2,925,000 in damages on what amounted legally to four counts – excessive force, battery, deliberate interference, and negligence.

Further, Defendants' attempt to use the comparative negligence finding to reduce the award is inappropriate.  An award for attorneys' fees under § 1988 is for a constitutional violation and the Constitution and federal law does not consider comparative negligence when evaluating whether a violation occurred.  Therefore, Defendants' attempts to use substantive California law to reduce an award of attorneys' fees under federal law is inappropriate.

The Ninth Circuit has held that "success in a lawsuit is not always measured by the formal relief obtained." *Clark*, 803 F.2d at 990 (citing *Maher v. Gagne*, 448 U.S.

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.**  CV-13-01615-MWF (ANx)          **Date:  September 17, 2015**
Title:       Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

122, 129 (1980)).  In the present case, however, it is clear that counsel obtained substantial success.  The Court is not persuaded that a jury award of almost $3 million is not considerable success, especially where success on further counts would not have amounted to further damages because such an award would have been duplicative.

Accordingly, the Court will not reduce the attorneys' fees award based on the contention that Plaintiffs achieved only partial success.

### 5.  Multiplier

Defendants' fifth argument is that a multiplier of the lodestar calculation is not warranted in the present case.  The Vogel Motion and the Bamieh Motion both request a multiplier of 1.5 because of the difficulty of the case and the financial risk counsel took by litigating the case.  Defendants argue that Plaintiffs' request is based on outdated case law, the continued validity of which is suspect given intervening Supreme Court precedent.  (Opp. at 14).

In *Perdue v. Kenny A. ex rel Winn*, 559 U.S. 542 (2010) Supreme Court addressed use of enhancement to a lodestar amount and laid out the six factors to be considered in deciding reasonable attorneys' fees under federal fee shifting statutes such as § 1988.  ***First***, a reasonable fee is one that induces a capable attorney to take representation of a meritorious case.  ***Second***, the lodestar method is presumptively sufficient. ***Third***, a multiplier has never been upheld by the Court for performance, but "may be awarded in 'rare' and 'exceptional' circumstances."  *Id.* at 552.  ***Fourth***, "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," and enhancement may not consider something contained within the lodestar calculation.  *Id.* at 553.  ***Fifth***, burden of proving an enhancement is borne by the fee applicant.  *Id*.  ***Sixth***, this burden is met only with the production of "specific evidence." *Id.*

Plaintiffs rely on *Clark v. City of Los Angeles*, 803 F2d 987 (9th Cir. 1986) in which the district court gave a multiplier of 1.5.  The district court did so because of the continent nature of the fee arrangement counsel had with plaintiffs and the risk and delay in payment "inherent in these fee arrangements."  The Ninth Circuit upheld the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

Case No.  CV-13-01615-MWF (ANx)              Date:  September 17, 2015
Title:      Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

district court's decision as to the multiplier, explaining that "a contingent-fee arrangement may justify an upward fee adjustment when the record shows that an adjustment is necessary to award counsel the 'reasonable' fee to which he is entitled under section 1988." *Id*. at 991 (citing *Blum v. Stenson*, 465 U.S. 886, 897 (1984)).

The Ninth Circuit upheld the multiplier in substantial part because the district court had carefully analyzed the record and applied the factors articulated by *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975).  However, the Supreme Court held in *City of Burlington v. Dague*, 505 U.S. 557 (1992) that in considering a fee award under the Solid Waste Disposal Act and Clean Water, a court may not apply a multiplier because counsel took the case on a contingency basis.  The Ninth Circuit has recognized that this ruling bars using the contingent nature of representation as a basis for enhancing a lodestar figure.  *Davis v. City & Cnty. of San Francisco*, 976 F.2d 1536, 1549 (9th Cir. 1992) opinion vacated in part on denial of reh'g, 984 F.2d 345 (9th Cir. 1993).  The *Davis* panel explained that "*Dague* represents an outright rejection of contingency as a factor relevant to the establishment of a reasonable fee; it would seem to be immaterial whether the consideration of contingency occurs in deciding to apply a multiplier to the lodestar fee or in initially calculating the lodestar." *Id.* at 1549.

For their part, Defendants contend that *Perdue* stands for the proposition that multipliers are "virtually preclude[ed]."  (Opp. at 15).  As is clear from the factors laid out from *Perdue* above, this is not the case, although the bar is high, and Plaintiffs do not get over it.

Having addressed summary judgment, and presided over the trial, the Court is not persuaded that this case was a "garden variety" police excessive force case.  As noted above, the case involved complicated causation issues as a result of Ramirez's massive consumption of methamphetamine, shown by the testimony of four medical experts.  However, these challenges were present primarily in persuading a jury at trial, and the counsel who bore, and ultimately carried that burden, did not request a multiplier.  Plaintiffs have not presented specific evidence to indicate that this case involved the "rare" and "exceptional" circumstances that warrant a multiplier.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV-13-01615-MWF (ANx)            Date:  September 17, 2015**
Title:       Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

Accordingly, the Court will not give a multiplier. The lodestar calculations outlined below constitute a reasonable attorneys fee.

### 6.  Fees for Filing Motion

The Vogel Motion and Bamieh Motion both request fees for filing the respective Motions.  Defendants do not challenge those hours.  However, on review it is apparent to the Court that they are not reasonable.

The Vogel Firm spent almost 40 hours working on the Vogel Motion.  B&E spent 18 to 23 hours depending on the calculations.  The Court determines that reasonable fees are for 10 hours for each motion at the rates for Brian Vogel and Ron Bamieh.

### 7.   Fees for Opposing Defendants' Motions For New Trial and Judgment as a Matter of Law

Dale Galipo and Eric Valenzuela request compensation for the respective 24 hours and 91.4 hours spent on opposing Defendants' Motions for a New Trial and Judgment as a Matter of Law.  (Docket Nos. 215, 215).  The Court determines that reasonable fees are for 10 hours at the rate of Dale Galipo and 20 hours at the rate of Eric Valenzuela for each of the two motions.

### C.   Lodestar Calculation

| Attorney | Hourly Rate | Compensable Hours | Total |
|---|---|---|---|
| Brian Vogel | $450 | 415 | $186,750 |
| Heather Quest | $300 | 435.85 | $130,755 |
| Steve Marshall | $200 | 46.3 | $9,260 |
| Vogel Law Paralegals | $100 | 102.1 | $10,210 |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV-13-01615-MWF (ANx)          Date:  September 17, 2015**
Title:      Guillermo Ramirez, et al. *-v-* Oxnard Police Department, et al.

| | | | |
|---|---|---|---|
| Motion Work | $450 | 10 | $4,500 |
| **Total** | | | **$341,475** |
| Ron Bamieh | $450 | 109.2 | $49,140 |
| David Ring | $300 | 32.6 | $9,780 |
| Laura Cota | $200 | 11.4 | $2,280 |
| Administrative Assistants | $100 | 18.9 | $1,890 |
| Motion Work | $450 | 10 | $4,500 |
| **Total** | | | **$67,590** |
| Dale Galipo | $900 | 650.6 | $585,540 |
| Eric Valenzuela | $350 | 288.3 | $100,905 |
| **Total** | | | **$686,445** |

    **D.      Requests for Costs**

        In addition to attorneys' fees, the Vogel Motion requests $4,379.48 in costs not
covered by the amount requested in the Bill of Costs.  The Bamieh Motion requests
$19,132.77 in costs not otherwise part of the request to tax costs submitted to the Clerk
of the Court.

Under § 1988 a prevailing plaintiff may recover "as part of the award of attorney's fees
those out-of-pocket expenses that 'would normally be charged to a fee paying client.'"
*Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (quoting *Chalmers v. City of Los
Angeles*, 796 F.2d 1205, 1216 n. 7 (9th Cir.1986), reh'g denied and opinion amended,
808 F.2d 1373 (9th Cir.1987)).  Defendants do not challenge these requests.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No.  CV-13-01615-MWF (ANx)**          **Date:  September 17, 2015**

Title:      Guillermo Ramirez, et al. -*v*- Oxnard Police Department, et al.

## IV.  <u>CONCLUSION</u>

In accordance with the reasoning above, the Court **GRANTS** the Motions as follows:

| Motion | Attorneys' Fees | Costs | Total |
|---|---|---|---|
| Vogel Motion | $341, 475 | $4,379.48 | $345,854.48 |
| Bamieh Motion | $67,590 | $19,132.77 | $86,722.77 |
| Galipo Motion | $686,445 | | $686,445 |

IT IS SO ORDERED.

**igrubbs@galipolaw.com**

| | |
|---|---|
| **From:** | cacd_ecfmail@cacd.uscourts.gov |
| **Sent:** | Thursday, September 17, 2015 4:19 PM |
| **To:** | ecfnef@cacd.uscourts.gov |
| **Subject:** | Activity in Case 2:13-cv-01615-MWF-AN Guillermo Ramirez et al v. Oxnard Police Department et al Order on Motion for Attorney Fees |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered on 9/17/2015 at 4:18 PM PDT and filed on 9/17/2015
**Case Name:**      Guillermo Ramirez et al v. Oxnard Police Department et al
**Case Number:**      2:13-cv-01615-MWF-AN
**Filer:**
**WARNING: CASE CLOSED on 07/09/2015**
**Document Number:** 219

**Docket Text:**
**MINUTES (IN CHAMBERS) ORDER Re Motions for Attorneys' Fees [189], [192], [193] by Judge Michael W. Fitzgerald: The Court GRANTS the Motions asfollows: Vogel Motion Attorneys' Fees in the amount of $341,475 Costs $4,379.48. Total $345,854.48; Bamieh Motion Attorneys' Fees in the amount of $67,590. Costs $19,132.77, Total $86,722.77; Galipo Motion Attorneys' Fees $686,445. (jp)**

**2:13-cv-01615-MWF-AN Notice has been electronically mailed to:**

Heather Anderson Quest      brian@bvogel.com

Eric Valenzuela      evalenzuela@galipolaw.com

Dirk DeGenna      ddegenna@wps-law.net, sobryant@wps-law.net, krobson@wps-law.net

Alan E Wisotsky      bkeighron@wps-law.net, awisotsky@wps-law.net

Brian Arnold Vogel      heather@bvogel.com, brian@bvogel.com, cindy@bvogel.com, liisa@bvogel.com

James N Procter      sobryant@wps-law.net

Laura Cota      lcota@boyceschaefferlaw.com

Dale K Galipo      igrubbs@galipolaw.com, tseabaugh@galipolaw.com, dgalipo@galipolaw.com, hlee@galipolaw.com, rvalentine@galipolaw.com, rvasquez@galipolaw.com, dkg.courtmail@yahoo.com, mpartow@galipolaw.com, dalekgalipo@yahoo.com, evalenzuela@galipolaw.com

**2:13-cv-01615-MWF-AN Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**

**EXHIBIT 4**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4626 PSG (SKx) | Date | April 23, 2020 |
|---|---|---|---|
| Title | Juan Frias v. City of Los Angeles, et al. | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge | |
|---|---|---|

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings (In Chambers):**    **Order GRANTING IN SUBSTANTIAL PART Plaintiffs' motion for attorneys' fees**

Before the Court is Plaintiffs Juan Frias and L.D.'s ("Plaintiffs") motion for attorneys' fees. *See* Dkt. # 156 ("*Mot.*"). Defendants City of Los Angeles, Bruce Adam, Enrique Anzaldo, Guy Dobine, Joe Dominguez, Juan Garcia, Joseph Goosby, Synthia Lee, Ruben Lopez, Valentin Martinez, and Leon Maya's ("Defendants") oppose the motion. *See* Dkt. # 171 ("*Opp.*"). Plaintiffs filed a reply. *See* Dkt. # 191 ("*Reply*"). The Court finds the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); L.R. 7-18. After considering the arguments in the moving papers, the Court **GRANTS IN SUBSTANTIAL PART** Plaintiffs' motion.

I.    Background

On January 30, 2020, after a jury trial, a jury returned a verdict in favor of Plaintiffs. *See* Dkt. # 142. Specifically, the jury found against Officer Defendants Dobine, Dominguez, Maya, and Goosby on Plaintiffs' Fourth Amendment excessive force claim and Fourteenth Amendment denial of medical care claim. *See id.* The jury also found Officer Defendants Maya and Goosby liable for denial of medical care, and imposed liability for battery and under California's Bane Act. *See id.* The jury entered $4,500,000 in compensatory damages against Defendants. Dkt. # 150.

Plaintiffs now move to recover their attorneys' fees under 42 U.S.C. § 1988 and the Bane Act, Cal. Civ. Code § 52.1. *See generally Mot.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4626 PSG (SKx) | Date | April 23, 2020 |
|---|---|---|---|
| Title | Juan Frias v. City of Los Angeles, et al. | | |

II.   <u>Legal Standard</u>

Under 42 U.S.C. § 1988, a court may, in its discretion, award the prevailing party in a § 1983 action reasonable attorneys' fees and costs.[1]  *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1110 (9th Cir. 2014) ("A party who prevails on a claim under § 1983 is entitled to reasonable attorneys' fees unless special circumstances would render such an award unjust."). To calculate the reasonable fee, courts apply the "lodestar" method, which is the "number of hours reasonably expended on the litigation multiplied by the reasonable hourly rate."  *See id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  The lodestar computation is a presumptively reasonable amount under § 1988.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).  After computing the lodestar, the district court is to assess whether additional considerations require the court to adjust the figure. *See Caudle v. Bristow Optical Co. Inc.*, 224 F.3d 1014, 1028 (9th Cir. 2000).

III.   <u>Discussion</u>

Plaintiffs request attorneys' fees totaling $2,592,727.50.  *See Reply* 12.  This calculation is based on a $1,728,485 lodestar amount and a 1.5 multiplier.  *See id.*

As an initial matter, Defendants object to Plaintiffs' fee request because Plaintiffs' counsel has not provided Defense counsel or the Court with the financial arrangements between firms, or between counsel and the Plaintiffs.  *See Opp.* 1–2.  Defendants argue that without information on these financial arrangements, and particularly information on whether Plaintiffs' counsel will reap any of Plaintiffs' damages award, they cannot determine whether the requested fee is unconscionable.  *See id.*

The Court disagrees.  While Defendants are correct that Plaintiffs' counsel may not receive an unconscionable fee, they merely speculate that Plaintiffs' counsel has a contingent fee arrangement that will result in fees on top of the fees sought here.  *See id.* 1:10–2:20.  The case that they cite in support, *Tarver*, merely discusses the unconscionability of a fee that "was almost twice the amount of the actual award of monetary damages"; it does not support Defendants' argument that Plaintiffs' counsel must disclose financial arrangements before receiving court-ordered fees.  *See Tarver v. State Bar*, 37 Cal. 3d 122, 134 (1984).  Conversely, Defendants do

---

[1] Attorneys' fees are also recoverable under the Bane Act.  Cal. Civ. Code § 52.1(i) ("In addition to any damages, injunction, or other equitable relief awarded . . . the court may award the . . . plaintiff reasonable attorney's fees.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4626 PSG (SKx) | Date | April 23, 2020 |
|---|---|---|---|
| Title | Juan Frias v. City of Los Angeles, et al. | | |

not cite any authority for their proposition that "Plaintiffs' counsel are not entitled to recover any fees from the City pursuant to the instant Fee Motion because they have failed to provide this Court with any evidence indicating that the total fees they seek to have awarded would not be 'unconscionable.'" *See Opp.* 2:21–24. Accordingly, the Court will move forward with the fees calculation.

Defendants contest the reasonableness of Plaintiffs' attorneys' fees request based on what it views as unreasonably high requested rates, excessive hours, improper staffing, and block billing. *See Opp.* 6–17. The Court first calculates a reasonable fee using the lodestar method, and then considers whether Plaintiffs' counsel's performance merits a multiplier.

    A.    <u>Lodestar Calculation</u>

        i.    *Rate*

The reasonable hourly rate is the rate prevailing in the community for similar work. *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1200 (9th Cir. 2013) ("[T]he court must compute the fee award using an hourly rate that is based on the prevailing market rates in the relevant community." (citation omitted)); *Viveros v. Donahue*, CV 10-08593 MMM (Ex), 2013 WL 1224848, at *2 (C.D. Cal. Mar. 27, 2013) ("The court determines a reasonable hourly rate by looking to the prevailing market rate in the community for comparable services."). The relevant community is the community in which the court sits. *See Schwarz v. Sec. of Health & Human Servs.*, 73 F.3d 895, 906 (9th Cir. 1995).

Plaintiffs' counsel seeks hourly rates of $1200 for Dale Galipo, $550 for Renee Masongsong, $525 for Cameron Sehat, and $400 for Marcel Sincich. *See Mot.* 13:22–14:2. They also seek $150 for litigation assistant Alejandro Monguia. *See id.* 22:6. Defendants counter that the appropriate rates are $650 for Galipo, between $510 and $355 for the other attorneys, and nothing for Monguia. *See Opp.* 8:8–15.

The Court consults the *2018 Real Rate Report: The Industry's Leading Analysis of Law Firm Rates, Trends, and Practices* ("Real Rate Report") as a starting point in its analysis. *See Eksouzian v. Albanese*, No. CV 13-728 PSG (AJWx), 2015 WL 12765585, at *4–5 (C.D. Cal. Oct. 23, 2015). The Real Rate Report identifies attorney rates by location, experience, firm size, areas of expertise and industry, as well as specific practice areas, and is based on actual legal billing, matter information, and paid and processed invoices from more than eighty companies. *See Hicks v. Toys 'R' Us-Del., Inc.*, No. CV 13-1302 DSF JCG, 2014 WL 4670896, at *1 (C.D.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4626 PSG (SKx) | Date | April 23, 2020 |
|---|---|---|---|
| Title | Juan Frias v. City of Los Angeles, et al. | | |

Cal. Sept. 2, 2014).  The Real Rate Report lists the median rate for litigation partners at $650 per hour, with those in the upper quartile making $908 per hour, and the median rate for litigation associates at $510 per hour, with those in the upper quartile making $670 per hour.  *See* Real Rate Report, at 27.  Also of note, the Real Rate Report lists the nationwide range of paralegal rates for general liability related to crime, dishonesty, or fraud as between $138 and $289 per hour.  *See* Real Rate Report, at 14.  With these figures in mind, the Court finds that the requests of $550 for Masongsong, $525 for Sehat, $400 for Sincich and $150 for Monguia are all appropriate.

As for Dale Galipo, the Court finds that a modest reduction of the requested rate is warranted.  Galipo requests $1200 per hour, which outpaces the upper quartile of litigation partners in this forum by almost $300.  *See* Real Rate Report, at 27.  However, as another court within this District has put it "[w]hen it comes to police excessive force cases in Los Angeles, Mr. Galipo is without question at the top of his field."  *Valenzuela v. City of Anaheim, et al.*, SACV 17-278 CJC (DFMx), Dkt. # 435, at 34.  This Court agrees, and as1,6 such concurs that Galipo should receive a rate above the upper quartile.  Accordingly, the Court finds that a rate of $1100 per hour is appropriate.

In sum, the Court finds the following rates reasonable:

| Attorney Name | Hourly Rate |
|---|---|
| D. Galipo | $1100 |
| R. Masongsong | $550 |
| C. Sehat | $525 |
| M. Sincich | $400 |
| A. Monguia | $150 |

### ii.     *Hours Expended*

"The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked."  *United States v. $28,000.00 in U.S. Currency*, 802 F.3d 1100, 1107 (9th Cir. 2015) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992)).  "The district court . . .  should exclude from this initial fee calculation hours that were not reasonably expended."  *Hensley*, 461 U.S. at 434 (internal quotation marks omitted).  Hours not reasonably expended are those that are "excessive, redundant, or otherwise unnecessary."  *Id.*  A district court may reduce hours by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4626 PSG (SKx) | Date | April 23, 2020 |
|---|---|---|---|
| Title | Juan Frias v. City of Los Angeles, et al. | | |

either conducting an hour-by-hour analysis or by making an across-the-board percentage cut. *See $28,000.00 in U.S. Currency*, 802 F.3d at 1106.

Plaintiffs' counsel billed a total of 2,349.3 hours on this case. *See Reply* 12. Along with timekeeping records, each attorney submitted a declaration summarizing their contributions. Dale Galipo served as lead trial counsel on the case, billing 830.8 hours. *See Supplemental Declaration of Dale K. Galipo*, Dkt. # 191-2 ("*Galipo Decl. II*"), ¶ 11. In this role, he handled the opening and closing arguments at trial, examined and cross-examined most of the witnesses, as well as other trial and pretrial preparation. *See id.* Masongsong billed 748.5 hours and spent her time communicating with Plaintiffs, handling all pleading matters including drafting the complaint and opposing the motion to dismiss, reviewing and managing discovery disclosures, taking several depositions, and engaging in trial preparation. *See Declaration of Renee V. Masongsong*, Dkt. # 158 ("*Masongsong Decl.*"), ¶ 12. Sehat, who accounts for 170.2 hours, drafted pretrial documents, defended witness depositions, took an expert deposition, and prepared trial witnesses. *See Declaration of Cameron Sehat*, Dkt. # 161 ("*Sehat Decl.*"), ¶ 6. Sincich billed 562.1 hours for tasks such as taking and defending depositions, drafting pleadings for pretrial and trial motions, and second-chairing the trial, including cross-examining five officers. *See Declaration of Marcel F. Sincich*, Dkt. # 159 ("*Sincich Decl.*"), ¶¶ 12–13. Lastly, Monguia billed 37.7 hours, spending time on organizing discovery materials and other evidence, preparing trial materials, and deposition logistics. *See Declaration of Alejandro Monguia*, Dkt. # 160 ("*Monguia Decl.*"), ¶ 6.

Defendants make several objections to these hours. First, they broadly assert that the hours were unreasonable because they were either duplicative or excessive. *See Opp.* 10–16. Second, they contend that Plaintiffs' counsel improperly block-billed their hours. *See id.* 16:7–17:7. The Court takes each set of arguments in turn.

*a. Duplicative and Excessive Hours*

Defendants argue that Plaintiffs' counsel improperly seeks compensation for duplicative and excessive hours. *See id.* 10–16. They contend that this case was a relatively straightforward excessive force case and that Plaintiffs' counsel engaged in "overkill" by, for example, deposing officers who the LAPD Force Investigation Division ("FID") had already thoroughly interviewed. *See id.* 10. Defendants offer Officer Anzaldo's deposition as an example. *See id.* 11:5–19. In addition, Defendants object to Plaintiffs' counsel's staffing decisions, arguing that Plaintiffs' counsel inappropriately sent multiple attorneys to meetings, depositions, and court

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4626 PSG (SKx) | Date | April 23, 2020 |
|---|---|---|---|
| Title | Juan Frias v. City of Los Angeles, et al. | | |

appearances. *See id.* 15:10–22. Lastly, Defendants argue that Dale Galipo performed work that junior lawyers should have done, such as legal research. *See id.* 15:22–16:6.

Plaintiffs reply first that counsel did not engage in duplicative work with respect to Officer Anzaldo because his deposition involved complicated trajectory issues and references to multiple SWAT weapons systems and operations not utilized in standard police excessive force cases. *See Reply* 6:20–27. Further, that deposition led Plaintiffs' counsel to amend the complaint to name additional officers and altered Plaintiffs' strategy on experts. *See id.* 6:23–27. Other than the exceptional case of Anzaldo's deposition, where Plaintiffs had three attorneys present, Plaintiffs maintain that their staffing was appropriate with no more than two attorneys at the other seventeen depositions. *See id.* 6:8–7:4. Plaintiffs additionally argue that having three attorneys at trial was justified based on the complexities of the case. *See id.* 7:5–18.

Turning first to the depositions of the officers, the Court does not find that any hours were duplicative. Even though Plaintiffs' counsel had the FID statements, it is not "overkill" for an attorney to separately depose a witness because the goals of a deposition are distinct from that of an FID interview. *See Opp.* 10. In the case of Officer Anzaldo, for instance, discussion between Plaintiffs' counsel following the deposition led Plaintiffs to amend the complaint to name additional officers who used force and to depose the medical examiner and consult with experts regarding trajectory and exit and entry wounds. *See Reply* 6:23–27. The Court will not reduce counsel's hours on this basis.

The Court also disagrees with Defendants that Plaintiffs' counsel's staffing decisions were duplicative. Masongsong and Sincich took many depositions on their own. *See id.* 6:8–7:4. And, even though Plaintiffs sent multiple attorneys to depositions like Anzaldo's, it is not uncommon for multiple attorneys to attend depositions. Finally, the Court will not reduce counsel's hours for staffing three attorneys at trial. The Court agrees with Plaintiffs' counsel that this case was far from a routine excessive force case because of the number of officer-Defendants, experts, and non-Defendant officers involved. *See id.* 7:5–18.

By contrast, the Court will reduce counsel's hours for failure to properly delegate certain tasks to junior associates. In particular, the Court finds it inappropriate that Galipo, at his proposed $1200 per hour rate, did not delegate legal research to another attorney. *See, e.g.*, *Asset Mktg. Sys., Inc. v. Gagnon*, No. 03-CV-2234-B (CAB), 2009 WL 10720557, at *6 (S.D. Cal. May 7, 2009) ("By contrast, a senior attorney should delegate appropriate tasks to associates, for example, legal research."). Accordingly, the Court will deduct 7.2 hours from Galipo's total.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4626 PSG (SKx) | Date | April 23, 2020 |
|---|---|---|---|
| Title | Juan Frias v. City of Los Angeles, et al. | | |

       *b.*    *Block Billing*

       Defendants next argue that some of the hours requested were improperly block billed. *Opp.* 16:7–17:7.  "Block billing is the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks."  *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945 n.2 (9th Cir. 2007) (internal quotation marks omitted) (quoting *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1554 n.15 (10th Cir. 1996)).  Although courts can reduce fees due to block-billing when it hinders their ability to discern the reasonable hours worked, *see Mendez v. Cty. of San Bernardino*, 540 F.3d 1109, 1128–29 (9th Cir. 2008), *overruled on other grounds by Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (en banc), block-billing is not per se objectionable, *see PQ Labs, Inc. v. Qi*, No. 12-0450 CW, 2015 WL 224970, at *3 (N.D. Cal. Jan. 16, 2015).

       Defendants' primary contention is that Galipo's time entries are vague, using descriptions such as "Trial Preparation" in lieu of detailed task descriptions.  *See Opp.* 16:7–25.  Defendants also argue that some entries in Masongsong's billing records, in which she billed for reading and indexing deposition testimony for use at trial, are block billed because these entries lump together multiple tasks (reviewing deposition testimony and indexing deposition testimony).  *See id.* at 16:28.

       Masongsong's entries, and those like them, are not block billed.  Sticking with the example of Masongsong's reading and indexing of deposition testimony, while they contain multiple actions ("reviewing" and "indexing"), both actions were part of the singular task of marking up the deposition for trial.  Requiring attorneys to bill these activities in separate increments would result in hundreds of thirty-second entries for things like "indexing," "reading," "cross referencing" and so on.  To do so would penalize attorneys for keeping diligent records and instead improperly force them to "record in detail how each minute . . . was expended."  *See Hensley*, 461 U.S at 437 n.12.  Most entries that Defendants allege were block billed by counsel mirror this example.  Accordingly, these minor errors do not necessitate a reduction in hours.

       By contrast to the entries just discussed, which are infrequent, provide specific details on work completed, lump together only related tasks, and occupy short amounts of time, some of Galipo's entries are improperly block-billed.  Galipo includes 390.5 hours billed for "Trial Preparation."  *See Declaration of Dale K. Galipo*, Dkt. # 157 ("*Galipo Decl.*"), ¶ 2, Ex. 1.  While his timesheet includes a footnote describing the tasks involved in trial preparation, the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4626 PSG (SKx) | Date | April 23, 2020 |
|---|---|---|---|
| Title | Juan Frias v. City of Los Angeles, et al. | | |

mere label "Trial Preparation" does not indicate when these tasks happened and to what degree.[1]
*See id.*  Moreover, the order from Judge Carney that Galipo attaches to his declaration in support
of his fees request includes a reduction in Galipo's "Trial Preparation" hours due to this exact
same practice.  *See id.* ¶ 10, Ex, 4, 8:26.  Without a breakdown of how much time Galipo spent
on these tasks, the Court is unable to say that it was reasonable to spend 390.5 hours on trial
preparation.  As such, the Court reduces the "Trial Preparation" hours by 10 percent, or 39.1
hours, to 351.4.

Overall, the Court deducts 46.3 of Galipo's hours from Plaintiffs' counsel's lodestar
calculation for excessive hours and block-billing.

iii.   *Lodestar Calculation*

Plaintiffs' counsel originally requested $1,728,485 in attorneys' fees before the proposed
multiplier is applied.  Based on the adjustments discussed above, the Court finds that **$1,594,475**
is a reasonable lodestar amount.

| Attorney Name | Hourly Rate | Number of Hours Worked | Total |
|---|---|---|---|
| D. Galipo | $1100 | 784.5 | $862,950 |
| R. Masongsong | $550 | 748.5 | $411,675 |
| C. Sehat | $525 | 170.2 | $89,355 |
| M. Sincich | $400 | 562.1 | $224,840 |
| A. Monguia | $150 | 37.7 | $5,655 |
| | | *Lodestar Amount* | **$1,594,475** |

---

[1] These tasks include review of pleadings, written discovery, statements, investigation reports,
medical records, photos, audio, video, depositions, expert reports, MSJ briefing and separate
statements, pre-trial documents, including pre-trial conference order, exhibit list, witness list,
motions in limine, jury instructions, verdict form, exhibits, client preparation, preparation for
voir dire, opening statement, direct and cross examination, opening, closing and rebuttal
arguments.  *See Galipo Decl.* ¶ 2, Ex. 1.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4626 PSG (SKx) | Date | April 23, 2020 |
|---|---|---|---|
| Title | Juan Frias v. City of Los Angeles, et al. | | |

B.   Multiplier

Plaintiffs' counsel seeks a 1.5 multiplier of the lodestar amount.  A court awarding attorneys' fees under Cal. Civ. Code § 52.1 may adjust the calculated lodestar amount upwards or downwards based on a number of factors, including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, and (4) the contingent nature of the fee award." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001).  In contingency cases, the initial lodestar figure may be adjusted upward in order to compensate attorneys for the risk of taking on a case for which they might not have been compensated.  *Id.* at 1332–33.

The Court finds that counsel's requested multiplier is justified based on the financial risk counsel assumed in litigating this case on a contingency basis, the difficulty of this case, and counsel's demonstrated skill.  Counsel invested over 1,000 hours, $1 million in services, and $40,000 in advanced costs without payment from Plaintiffs.  *See Galipo Decl.* ¶ 29.  The case posed a challenge for Plaintiffs, as they had to navigate an array of officer accounts about the incident, negative evidence about Cesar Frias, and fierce advocacy from Defendants.  *See Mot.* 18:13–15.  Finally, the Court observed throughout trial Plaintiff's counsel's exceptional skill in drawing evidence out from witnesses and making their case to the jury.

The Court is aware, as Defendants point out in opposition, "that the cost of this litigation will 'fall on the shoulders of California taxpayers.'"  *See Opp.* 21:15–22:4; *Rodriguez v. Cty. of Los Angeles*, 96 F. Supp. 3d 1012, 1026 (C.D. Cal. 2014), *aff'd*, 891 F.3d 776 (9th Cir. 2018) (quoting *Nw. Energetic Servs., LLC v. California Franchise Tax Bd.*, 159 Cal. App. 4th 841, 881 (2008)).  It nonetheless believes that consideration of the *Ketchum* factors, as analyzed above, warrants awarding the multiplier.  Although Defendants make this argument strongly and Plaintiffs do not address it on reply, denying a multiplier on this consideration alone in a civil rights case would "effectively immunize large or politically powerful defendants engaging in conduct that harms the public."  *See Rodriguez*, 96 F. Supp. 3d at 1026 (internal quotation marks omitted).

Accordingly, the Court applies a 1.5 multiplier to the lodestar calculation of $1,594,475 for a total award of **$2,391,712.50.**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-4626 PSG (SKx) | Date | April 23, 2020 |
|----------|----------------------|------|----------------|
| Title | Juan Frias v. City of Los Angeles, et al. | | |

IV.   <u>Conclusion</u>

    For the foregoing reasons, the Court **GRANTS IN SUBSTANTIAL PART** Plaintiffs' motion for attorneys' fees.  Plaintiffs are entitled to fees in the amount of **$2,391,712.50.**

    **IT IS SO ORDERED.**

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 18-992 JGB (SPx)** | | Date | September 23, 2021 |
|---|---|---|---|---|
| Title | ***Richard Donastorg v. City of Ontario, et al.*** | | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):          Attorney(s) Present for Defendant(s):

None Present                                    None Present

Proceedings:    **Order (1) GRANTING IN PART Plaintiff's Motion for Attorneys' Fees
(Dkt. No. 128).**

Before the Court is Richard Donastorg's ("Plaintiff") motion for attorneys' fees.
("Motion," Dkt. No. 128.).  The Court held a hearing on the Motion on September 20, 2021.
Upon consideration of the papers filed in support of and in opposition to the Motion, as well as
the argument of counsel, the Court GRANTS IN PART the Motion.

## I.  BACKGROUND

On May 7, 2018, Plaintiff commenced an excessive use of force action against the City of
Ontario ("City") and fifteen City police officers. ("Complaint," Dkt. No. 1.)  The Complaint
originally asserted a total of ten claims for relief. (Id.)  By stipulation of the parties, however,
several of the original parties and claims were dismissed.  (Dkt. Nos. 30, 36, 57.)  At the time of
trial, the remaining Defendants were the City and twelve officers: Joe Estrada, Brennan
Falconieri, Flesher, Edward Flores, Gabriel Gutierrez, Joseph Giallo, Corey Hettinga, Joshua
Hovey, William Mlodzinski, Christina Nelsen, Matthew Ross, and Bryce Wilson (collectively,
"Defendants"). (See Compl.; Dkts. Nos. 30, 36, 57.)  Plaintiff's two remaining claims alleged:
(1) excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983, and (2) infliction
of emotional distress. (See Compl.; Dkt. Nos. 30, 36, 57.)

A jury trial began on June 8, 2021 and lasted seven days.  (Dkt. Nos. 98, 99, 100, 101, 105,
106, 108.)  On June 17, 2021, the jury reached a verdict in favor of Plaintiff's Fourth Amendment
excessive use of force claim against Defendant Joshua Hovey.  ("Verdict," Dkt. No. 123.)  The
jury awarded Plaintiff damages totaling $500,000.  (Id.)  The jury made no finding of liability as

to Defendants City of Ontario, Bryce Wilson, James Flesher, William Mlodzinski, Joseph
Estrada, Gabriel Gutierrez, Joseph Giallo, Edward Flores, Christian Nelsen, Matthew Ross,
Corey Hettinga, and Brenna Falconieri.  (Id.)  On August 5, 2021, the Court entered judgment
and allowed Plaintiff to apply to the Court for an award of costs and reasonable statutory
attorneys' fees as permitted by federal law.  ("Judgement," Dkt. No. 127.)

On August 19, 2021, Plaintiff timely moved for an award of attorneys' fees against
Defendants.  (See Mot.)  In support of the Motion, Plaintiff included the following documents:

- Declaration of Dale K. Galipo in Support of the Motion ("Galipo Declaration," Dkt. No.
  128-1);
- Timekeeping Record for Dale K. Galipo ("Galipo Declaration, Ex. 1," Dkt. No. 128-2);
- Biography of Dale K. Galipo for the Irving Green Memorial Lecture ("Galipo
  Declaration, Ex. 2," Dkt. No. 128-3);
- Order on Motion for Attorneys' Fees in Ramirez, et al. v. Oxnard Police Dep't, No. 13-
  1615, slip op. (C.D. Cal. Sept. 17, 2015) ("Ramirez Order," Dkt. No. 128-4);
- Order on Motion for Attorneys' Fees in Craig v. County of Orange, 2019 WL 12379198,
  at *1 (C.D. Cal. Sept. 5, 2019) ("Craig Order," Dkt. No. 128-5);
- Order on Motion for Attorneys' Fees in Frias v. City of Los Angeles, 2020 WL 4001620,
  at *1 (C.D. Cal. Apr. 23, 2020) ("Frias Order," Dkt. No. 128-6);
- Declaration of James S. Terrell in Support of the Motion ("Terrell Declaration," Dkt.
  No. 128-7);
- Timekeeping Record for James S. Terrell ("Galipo Declaration, Ex. 6," Dkt. No. 128-8);
- Declaration of Sharon J. Brunner in Support of the Motion ("Brunner Declaration,"
  Dkt. No. 128-9);
- Timekeeping Record for Sharon J. Brunner ("Galipo Declaration, Ex. 7," Dkt. No. 128-
  10);
- Declaration of Hang D. Le in Support of the Motion ("Le Declaration," Dkt. No. 128-
  11);
- Timekeeping Record for Hang D. Le ("Galipo Declaration, Ex. 8," Dkt. No. 128-12);
- Declaration of Karen Slyapich in Support of the Motion ("Slyapich Declaration," Dkt.
  No. 128-13);
- Timekeeping Record for Karen Slyapich ("Galipo Declaration, Ex. 9," Dkt. No. 128-14);
- Declaration of Marielle Sider in Support of the Motion ("Sider Declaration," Dkt. No.
  128-15);
- Timekeeping Record for Marielle Sider ("Galipo Declaration, Ex. 10," Dkt. No. 128-16);
- Declaration of John Burton ("Burton Declaration," Dkt. No. 128-17);
- Declaration of Michael J. Haddad ("Haddad Declaration," Dkt. No. 128-18);
- Declaration of Paul Hoffman ("Hoffman Declaration," Dkt. No. 128-19); and
- Declaration of Benjamin Nisenbaum ("Nisenbaum Declaration," Dkt. No. 128-20).

//

Defendants opposed the Motion on August 30, 2021.  ("Opposition," Dkt. No. 130.)  In support of the Opposition, Defendants included the following documents:

- Declaration of Sean Struebing in Support of Opposition ("Struebing Declaration," Dkt. No. 131); and
- Declaration of Daniel S. Roberts in Support of Opposition ("Roberts Declaration," Dkt. No. 132.)

Plaintiff replied on September 3, 2021.  ("Reply," Dkt. No. 133.)

## II.  LEGAL STANDARD

### A.  42 U.S.C. § 1988

Under 42 U.S.C. § 1988, a court may, in its discretion, award reasonable attorneys' fees in a suit seeking to vindicate rights under 42 U.S.C. § 1983.  Braunstein v. Ariz. Dep't of Transp., 683 F.3d 1177, 1187 (9th Cir. 2012); 42 U.S.C. § 1988(b).  "In the Ninth Circuit, the customary method of determining the permissible amount of attorneys' fees under § 1988 is the 'lodestar' method."  Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir. 2006). Under the lodestar method, the district court "multiplies the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate."  Ballen, 466 F.3d at 746 (internal quotation marks omitted); Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  The product of this computation—the "lodestar figure"—is a "presumptively reasonable" fee under 42 U.S.C. § 1988.  See id.  "The district court may then adjust [the lodestar] upward or downward based on a variety of factors."  Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008).  These factors include:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

Ballen, 466 F.3d at 746.  The moving party has the burden to produce evidence that the rates and hours worked are reasonable.  See Intel Corp. v. Terabyte Int'l, 6 F.3d 614, 623 (9th Cir. 1993).

//
//
//
//
//

**B. Prison Litigation Reform Act**

"Congress has adopted special standards and limitations on attorney's fees for prevailing plaintiffs seeking monetary damages authorized by 42 U.S.C. § 1988 when the prevailing plaintiff is a prisoner." Rodriguez v. County of Los Angeles, 96 F. Supp. 3d 1012, 1017 (C.D. Cal. 2014). "[A]ttorney's fees which are subject to the PLRA are capped at 150% of the judgment awarded to prisoner plaintiffs." Id.; see also 42 U.S.C. § 1997e(d)(2). Moreover, "[n]o award of attorney's fees [under Section 1997e(d)] shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18 for payment of court-appointed counsel." 42 U.S.C. § 1997e(d)(3).

## III. DISCUSSION

Plaintiff requests that the Court award attorneys' fees in the amount of $997,310.00 for 1,378.5 hours worked.[1]

**A. Prevailing Party**

Defendants do not contest that Plaintiff is a prevailing party. (Opp'n at 1.) A jury found in favor of Plaintiff's Fourth Amendment claims against Defendant Hovey and awarded Plaintiff $500,000 in damages. (See Verdict; Mot. at 1, 4.) The Judgment entered pursuant to the Verdict confirmed that Plaintiff was "the prevailing party." (Judgment at 2.) Because Plaintiff "receive[d] at least some relief on the merits of his claim," the Court finds that he has prevailed. Hewitt v. Helms, 482 U.S. 755, 759 (1987); see also Farrar v. Hobby, 506 U.S. 103, 109 ("Under our 'generous formulation' of the term, 'plaintiffs may be considered "prevailing parties" … if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit'" (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).).

**B. Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e**

Defendants do not dispute Plaintiff's entitlement to attorneys' fees, but oppose the amount he seeks. Defendants argue that although Plaintiff is a prevailing party entitled to attorneys' fees under Section 1988, the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, applies here and limits his recovery. (Opp'n at 2.) Defendants contend that any civil rights action filed by a "prisoner," defined as one who is "confined to any jail, prison, or other correctional facility," 42 U.S.C. §§ 1997e(a), (d)(1), falls within the PLRA's scope, and Plaintiff

---

[1] Plaintiff's counsel initially requested $1,015,730 in attorneys' fees for 1,397.1 hours worked. (See Mot.) However, after Defendants identified errors in the number of hours billed, Plaintiff acknowledges that some of the hours billed should be stricken. (Reply at 3; Opp'n at 14–17.) Plaintiff's counsel also requests additional hours for time spent researching and drafting the Reply. (Reply at 11–12.) Based on those adjustments and the Court's own calculations, the Court construes Plaintiff's requested attorneys' fees amount as $997,310.00 for 1,378.5 hours worked.

was in custody at the time he filed his Complaint.  (Id. at 2–3.)  Thus, Defendants argue, even if
Plaintiff's cause of action arose from preincarceration violations, his claim falls within the
PLRA's scope, and he can only recover attorneys' fees as prescribed by the PRLA.

Plaintiff counters that the PLRA has no application to Plaintiff's case, because the PLRA
pertains to causes of action arising from "prison conditions."  (Reply at 1.)  Defendants'
expansive reading would contravene established law confirming that the PLRA is for prison-
related actions.  (Id. at 1–2.)  Moreover, Plaintiff argues that broadening the PLRA's attorneys'
fees provision to subsume preincarceration claims defeats the legislative intent of Section 1983
and Section 1988.  (Id. at 2–3.)

The PLRA limits attorneys' fees in civil rights actions brought by incarcerated persons as
follows:

> In any action brought by a prisoner who is confined to any jail, prison, or other
> correctional facility, in which attorney's fees are authorized under section 1988 of
> this title, such fees shall not be awarded, except to the extent that –
>
> > (A) the fee was directly and reasonably incurred in proving an actual violation
> > of the plaintiff's rights protected by a statute pursuant to which a fee may
> > be awarded under section 1988 of this title; and
> >
> > (B) (i) the amount of the fee is proportionately related to the court ordered
> > relief for the violation; or
> > (ii) the fee was directly and reasonably incurred in enforcing the relief
> > ordered for the violation.

42 U.S.C. § 1997e(d)(1).  The parties do not dispute that Plaintiff was a "prisoner," as defined
by the PLRA, at the time he filed suit.  When Plaintiff brought the action, Plaintiff was confined
at the West Valley Detention Center.  (Opp'n at 2.)

The Court finds that Section 1997e(d) does not apply to claims brought by incarcerated
individuals for violations that occurred prior to their confinement.  Because Section 1997e(d)
implicates civil rights claims brought under Section 1983 and attorneys' fees brought pursuant to
Section 1988, the Court must consider the PLRA in conjunction with Sections 1983 and 1988.
Neither the PLRA nor the purpose and policies behind Sections 1983 and 1988 support
Defendants' position.

The PLRA was created to address claims filed by prisoners regarding violations
experienced in confinement.  The Supreme Court held so nearly twenty years ago.  In Porter v.
Nussle, the Court determined that Section 1997e(a) of the PLRA, which requires incarcerated
persons pursuing Section 1983 civil rights claims to exhaust administrative remedies, "applies to
all inmate suits about prison life."  534 U.S. 516, 532 (2002) (emphasis added).  The Court
specifically rejected the provision's application to "preincarceration claims."  Id. at 529.

---

According to the Court, "Congress inserted 'prison conditions' into the exhaustion provision simply to make it clear that preincarceration claims fall outside § 1997e(a), for example, … , a § 1983 claim against [a prisoner's] arresting officer."  Id.  Though Porter dealt with Section 1997e(a) and not Section 1997e(d), it distinguished between preincarceration claims and claims arising from confinement.  The same line must be drawn with respect to Section 1997e(d).  See, e.g., Robbins v. Chronister, 402 F.3d 1047, 1053 (10th Cir. 2005) ("Robbins I"), reh'g granted, Robbins v. Chronister, 435 F.3d 1238 (10th Cir. 2006) ("Robbins II") ("Constitutional claims arising before the events causing the plaintiff's incarceration are unrelated to prison confinement" (emphasis in original).)

Defendants argue that the Court must read Section 1997e(d) independently from Section 1997e(a).  Whereas Section 1997e(a) explicitly identifies actions "with respect to prison conditions," Section 1997e(d) broadly references "any action brought by a prisoner," without the limiting language of "prison conditions."  (Opp'n at 5.)  Defendants contend that this evidences Congress's intent to treat Section 1997e(d) differently from Section 1997e(a), namely, to restrict attorneys' fees in all civil rights claims filed by incarcerated individuals, even for violations arising before their confinement.

The Court is not persuaded.  First, Defendants unwittingly explain why such a reading is untenable: "One provision of a statute should not be interpreted in a manner that renders other sections of the same statute 'inconsistent, meaningless or superfluous.'"  (Opp'n at 11–12 (quoting United States v. Fiorillo, 186 F.3d 1136, 1153 (9th Cir. 1999)).)  When the text of the two provisions is not identical, this "whole act rule" requires the Court to read Section 1997e(a) and Section 1997e(d) consistently and in accordance with the PLRA's purpose.  Defendants assert that the correct construction of Section 1997e(d) is to not only replace the body of law restricting PLRA's scope to prison conditions with an unsupported proposition; but also to include preincarceration causes of actions that courts had explicitly kept out of the PLRA's scope.  The Court rejects this wholesale reinterpretation of the PLRA.  The Court's binding precedent, such as Porter, finds that Section 1997e(d) only applies to actions arising from prison life.

Application of Defendants' interpretation demonstrates why it cannot hold.  Under their theory, all litigants must quickly file their lawsuits as soon as a violating event occurs and prior to any incarceration (if they are able to anticipate such an event), or after their incarceration ends (if it does end).  This view would punish the act of filing a complaint while in any form of confinement, even when their confinement is incidental, unrelated to the constitutional violation, or unforeseen.  Here, Defendant Holvey violated Plaintiff's Fourth Amendment rights on May 8, 2016, at a gas station parking lot, not in jail, prison, or other correctional facility.  ("Summary Judgment Order," Dkt. No. 60, at 2; Judgment at 2.)  Plaintiff was arrested at the encounter, and his custodial status thereafter remained out of his control.  (Id.)  As Defendants acknowledge, "Plaintiff was incarcerated from May 2016 when he was first booked until October 2018," when he was released because his time in jail was credited to his full sentence.  (Opp'n at 2–3.)  For Plaintiff to file his civil rights lawsuit prior to confinement was impossible.  In Defendants' view, Plaintiff should have anticipated the exact timing of his release and then brought suit in order to

avoid the PLRA's reach.  This result is clearly irrational and bears no relation to Congress's intended goal of "curtail[ing] frivolous prisoners' suits."  Perez, 632 F.3d at 558.

Similarly, Plaintiff contends that "[t]he fee cap application would disproportionately affect the rights of low income and indigent individuals who are forced to remain in custody pending a resolution of their criminal case simply because they cannot afford bail."  (Reply at 3.)  Such a consequence similarly runs counter to Section 1988, which functions "to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel."  City of Riverside v. Rivera, 477 U.S. 561, 578 (1986) (quoting Kerr v. Quinn, 692 F.2d 875, 877 (2d Cir. 1982)).  To cap attorney's fees for confined litigants would encourage them to abandon their claims, and would disproportionately affect those without bail resources.

Second, there is a simple explanation for why Section 1997e(a) specifies "prisons conditions" and Section 1997e(d) does not: Not all prisoners' rights claims necessarily pertain to prison conditions.  For example, prison conditions claims may allege the provision of "[in]adequate food, clothing, shelter, and medical care."  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  But prisoners may also allege other constitutional violations, such as infringement of their free speech rights or due process rights that they suffer while confined.  Turner v. Safley, 482 U.S. 78, 84 ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.").  The statute seeks to capture all civil rights violations detained litigants experience in confinement.  It does not encompass violations that occur outside of that narrow context.  As such, the Court disagrees with Plaintiff to the extent that Plaintiff argues the PLRA governs "prison conditions."  (Reply at 1.)  The PLRA governs civil rights violations that occur in jail, prison, or other correctional facility.

Defendants cite Robbins II, 435 F.3d 1238 (10th Cir. 2006), in support of Section 1997e(d)'s expansion.  Robbins II, however, is non-binding and inapposite.  It purports to apply a "plain language" analysis of Section 1997e(d), then, viewing the provision in isolation, holds that the PLRA caps attorneys' fees for preincarceration civil rights claims.  Id. at 1244.  Robbins II ignores Section 1997e(a) and relevant case law.  This approach, therefore, is incompatible with the Ninth Circuit's whole act rule.

In addition, Robbins II court reaches its decision only by reversing itself.  In Robbins I, the court applied additional principles of statutory interpretation under the "absurdity doctrine"[2] and found that the PLRA's legislative history specifically addresses "prison conditions litigation."  402 F.3d at 1052.  Based on this evidence, the court reasoned that "[f]ailing to distinguish between pre-incarceration cases and post-incarceration cases would lead to absurd results."  Id. at 1054.  The Robbins I court concluded that "Congress gave no indication of any intent to impose a fee limitation on pre-incarceration civil rights claims brought by plaintiffs who

_____

[2] The "absurdity doctrine" allows courts to look to a statute's purpose when "applying the plain language 'would produce an absurd and unjust result which Congress would not have intended."  Robbins I, 402 F.3d at 1050 (internal citations omitted).

subsequently become prisoners and file their action while in prison." Id. at 1051. Upon rehearing the matter en banc, however, the Robbins II court rejected the Robbins I court's compilation of legislative history and elected to look only at the "plain language." Robbins II, 435 F.3d at 1244. Citing no relevant authority, the Robbins II court simply concludes, "[T]here is simply nothing bizarre about treating prisoner suits alleging preincarceration civil-rights violations the same as prisoner suits alleging violations of civil rights during incarceration." Id. A conclusory statement and an imprecise analysis cannot support Defendants' position. Indeed, the conflicting Robbins decisions caution the Court against authorizing sweeping changes to the PLRA's scope.

Significantly, Robbins II's analysis fails to discuss Sections 1983 and 1988. As the Court discusses below, and as Robbins I recognized, interpreting Section 1997e(d) to include preincarceration claims would yield absurd and unjust results that are contrary to the important policies underlying Section 1983 and Section 1988. Accordingly, for the foregoing reasons, the Court declines to follow Robbins II and its interpretation of Section 1997e(d) of the PLRA.[3] While Defendants cite other authority, none are precedential, and they are either not on point or rely on Robbins II, which this Court rejects.

Defendants fail to discuss the impact of their position on the policy goals of Sections 1983 and 1988. Instead, Defendants argue that, because Section 1997e(d) of the PLRA limits attorney's fees to 150% of the hourly rates such established under section 3006A of Title 18, the hourly rates for Plaintiff's counsel are actually 20% to 35% of what Plaintiff requests. (Opp'n at 3–4.) Thus, Defendants contend that Plaintiff's lodestar is $244,145.75, rather than $1,015,730—or 24% of what Plaintiff initially requested.[4] (Id. at 24–25.) Defendants assert further reductions are necessary and claim that, because the PLRA requires a portion of the Plaintiff's damages award to pay for the attorney's fees, Defendants' responsibility is minimal, and likely $0. (Id. at 24–25.) Plaintiff argues that "[t]o apply the PLRA fee cap to pre-incarceration police misconduct and excessive force cases would undercut the intended deterrent effect under sections 1983 and 1988 and create a chilling effect on important civil rights police misconduct litigation." (Reply at 3.) The Court agrees.

//
//
//

---

[3] The facts of Robbins illustrate why Defendants' position is absurd. As a result of Robbins's encounter with police officers, he was taken to the hospital "for treatment of two gunshot wounds to the chest and one to his lower left side." Robbins I, 402 F.3d at 1048. Three days later, he was criminally charged. Trial Br. for Def. at *1, Robbins v. Chronister, 2000 WL 35627450 (D. Kan. Sept. 13, 2000) (No. 97-3489). Under Defendants' view, the plaintiff should have filed his complaint sometime after he was shot, while hospitalized for gunshot wounds, and before he was detained.

[4] Plaintiff's Reply acknowledges that the Motion contained errors in the lodestar calculation. (Reply at 3.)

---

CIVIL MINUTES—GENERAL

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992) (citing Carey v. Piphus, 435 U.S. 247, 254–57 (1978)). In fact, "Congress enacted § 1988 specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process." City of Riverside, 477 U.S. at 576. Reasonable attorneys' fees under Section 1988, thus, must be "sufficient to induce a capable attorney to undertake the presentation of a meritorious civil rights claim." Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552 (2010). "Congress recognized that reasonable attorney's fees under § 1988 are not conditioned upon and need not be proportionate to an award of money damages." City of Riverside, 477 U.S. at 576. Indeed, "[a] rule that limits attorney's fees in civil rights cases to a proportion of the damages awarded would seriously undermine Congress' purpose in enacting § 1988." Id. Therefore, while Congress subsequently enacted the PLRA to limit attorneys' fees in actions brought by detained litigants, this restriction must be applied narrowly to effectuate Section 1988's purpose.

Furthermore, "Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit 'does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest importance.'" City of Riverside, 477 U.S. at 575. Actions for preincarceration violations serve different interests and policy goals than those that seek to remedy conditions of confinement. Blurring this distinction would increase the burdens of litigating an already difficult area of law and create needless confusion in the applicable standards.

Accordingly, the Court concludes that Section 1997e(d) of the PLRA does not apply to preincarceration violations, even if Plaintiff was a "prisoner" as defined by the PLRA when he filed suit. Accordingly, the Court proceeds to review Plaintiff's request for attorneys' fees pursuant to Section 1988.

## C. Section 1988: Lodestar Analysis

Plaintiff's counsel initially requested $1,015,730 in attorneys' fees for 1,397.1 hours worked. (See Mot.) However, after Defendants identified errors in the number of hours billed, Plaintiff acknowledges that some of the hours billed should be stricken. (Reply at 3; Opp'n at 14–17.) Plaintiff's counsel also requests additional hours for time spent researching and drafting the Reply. (Reply at 11–12.) Based on those adjustments and the Court's own calculations, the Court construes Plaintiff's requested attorneys' fees amount as $997,310 based on 1,378.5 hours worked.

Plaintiff's counsel presents the following lodestar calculation for four attorneys, one paralegal, and one legal intern:

//
//

| Attorney / Biller | Years in Practice | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | 32 | 500.1[5] | $1,100.00 | $550,110.00 |
| James S. Terrell | 27 | 369 | $600.00 | $221,400.00 |
| Sharon J. Brunner | 19 | 247[6] | $600.00 | $148,200.00 |
| Hang D. Le | 8 | 90.7[7] | $550.00 | $49,885.00 |
| Karen Slyapich | Paralegal | 39.2 | $200.00 | $7,840.00 |
| Marielle Sider | Leg. Intern | 132.5 | $150.00 | $19,875 |
| **TOTAL** | | **1,378.5** | | **$997,310.00** |

Defendants contest the reasonableness of Plaintiff's attorneys' fees request based on high hourly rates, improper hours, and Plaintiff's success in the litigation.  The Court first calculates a reasonable fee using the lodestar method, and then considers whether an upward or downward multiplier is appropriate.

### 1.  Hourly Rate

Reasonable fees under Section 1988 are calculated according to the prevailing market rates in the relevant legal community.  Gates v. Deukmejian, 987 F.2d 1392, 1405 (9th Cir. 1992).  Generally, "the relevant community is the forum in which the district court sits."  Prison Legal News v. Schwarzenegger, 608 F.3d 446, 454 (9th Cir. 2010).  Thus, the prevailing rates in the Central District of California control.

The Court consults the 2020 Real Rate Report: The Industry's Leading Analysis of Law Firm Rates, Trends, and Practices ("Real Rate Report") as a starting point.  See Relman Colfax PLLC v. Fair Housing Council, 2021 WL 1895905, at *4–5 (C.D. Cal. Mar. 16, 2021).  Because the Real Rate Report "identifies attorney rates by location, experience, firm size, areas of expertise and industry, as well as specific practice areas, and is based on actual legal billing, matter information, and paid and processed invoices from more than eighty companies," it provides "a much better reflection of true market rates than self-reported rates in all practice areas."  Id.

//
//
//
//

---

[5] The Court reduces Mr. Galipo's hours from 513.5 to 510.3 hours, and subtracts the duplicative 10.2 hours noted in Plaintiff's Reply.  (Galipo Decl., Ex. 1; Reply at 3.)

[6] The Court reduces by striking 16.4 hours from Ms. Brunner's originally reported time of 263.4 hours.  (Reply at 3; Mot. at 15.)

[7] Plaintiff's Reply notes that Ms. Le worked an additional 11.2 hours to research and draft the Reply.  Accordingly, the Court increases Ms. Le's billed time to 90.7 hours.

### a.   Dale Galipo

Plaintiff's counsel requests an hourly rate of $1,100 per hour for Dale Galipo.  According to the 2020 Real Rate Report, partners working in commercial litigation at large firms in Los Angeles earn between $941 and $1,235.  (Real Rate Report at 111.)  Mr. Galipo's requested rate of $1,100 does not outpace what other litigation partners earn.  See Frias v. City of Los Angeles, 2020 WL 4001620, at *3 (C.D. Cal. Apr. 23, 2020) (comparing Mr. Galipo's requested rate of $1,200 to the 2018 Real Rate Report).  Nor does his rate appear inflated because of the contingent nature of the case, as Defendants contend.  (Opp'n at 22.)  Plaintiff's counsel has cited other cases in which he has been awarded attorney's fees at or around the rate he currently requests.  (Galipo Decl., Exs. 4–6.)

The Court agrees with the courts that have recognized that, "[w]hen it comes to police excessive force cases in Los Angeles, Mr. Galipo is without question at the top of his field."  Id. at *3 (quoting Valenzuela v. City of Anaheim, et al., SACV 17-278 CJC (DFMx), Dkt. No. 435, at 34).  Plaintiff's counsel submits extensive documentation of Mr. Galipo's success trying police misconduct cases all around California, including in Southern California.  (Galipo Decl. ¶¶ 13–18.)  Declarations submitted by experienced civil rights litigators who practice in Southern California further support Mr. Galipo's exceptional skills.  (See Burton Decl.; Haddad Decl.; Hoffman Decl.; Nisenbaum Decl.)  Accordingly, the Court finds that Mr. Galipo's requested rate of $1,100 per hour is reasonable.

### b.   James Terrell and Sharon Brunner

Plaintiff's counsel requests an hourly rate of $600 per hour for James Terrell and Sharon Brunner.  The 2020 Real Rate Report lists the median rate for litigation partners in Los Angeles at $660 per hour.  (Real Rate Report at 28.)  Mr. Terrell and Ms. Brunner both manage their firms and have practiced for 27 years and 19 years, respectively.  (Mot. at 15; Terrell Decl. ¶ 8; Brunner Decl. ¶ 8.)  Both Mr. Terrell and Ms. Brunner litigate civil rights cases.  (Terrell Decl. ¶¶ 9, 11, 19–20; Brunner Decl. ¶¶ 9, 11, 20.)  They were the two attorneys representing Plaintiff prior to Mr. Galipo's association into the case.  (Terrell Decl. ¶¶ 12, 18; Brunner Decl. ¶¶ 12, 19.)  Accordingly, the Court finds that the requested rate of $600 per hour for Mr. Terrell and Ms. Brunner is reasonable.

### c.   Hang Le

Plaintiff's counsel requests an hourly rate of $550 per hour for Hang Le, a senior associate attorney at the Law Offices of Dale K. Galipo.  (Le Decl. ¶ 8.)  The 2020 Real Rate Report provides that the median rate for litigation associates in Los Angeles is $535, with rates of $740 in the upper quartile.  (Real Rate Report at 28.)  Ms. Le has practiced for eight years.  (Mot. at 15.)  She has "worked almost exclusively on 42 U.S.C. § 1983 civil rights cases involving police excessive force," including on various civil rights cases resulting in multi-million-dollar verdicts and settlements.  (Le Decl. ¶¶ 8, 10.)  Accordingly, the Court finds that Ms. Le's requested rate of $550 per hour is reasonable.

### d.  Karen Slyapich

Plaintiff's counsel requests an hourly rate of $200 per hour for Karen Slyapich, a litigation assistant at the Law Offices of Dale K. Galipo.  (Slyapich Decl. ¶ 1.)  The 2020 Real Rate Report shows that paralegals typically earn between $175 and $311.  See Relman Colfax PLLC, 2021 WL 1895905, at *5 (citing the Real Rate Report at 11).  Ms. Slyapich has worked in the legal field for approximately 28 years and with the Law Offices of Dale K. Galipo for 5 years.  (Slyapich, Decl. ¶¶ 2–3.)  This Court has previously found that $200 per hour is a reasonable rate for paralegals.  See, e.g., Di Gioia v. Ford Motor Co., 2020 WL 1955311, at *5 (C.D. Cal. Apr. 1, 2020).  Accordingly, the Court finds that Ms. Slyapich's requested rate of $200 per hour is reasonable.

### e.  Marielle Sider

Plaintiff's counsel requests an hourly rate of $150 per hour for Marielle Sider, a legal intern with the Law Offices of Dale K. Galipo.  (Sider Decl. ¶ 1.)  Ms. Sider is a rising third-year law student at Pepperdine University School of Law.  (Id. ¶ 2.)  She has served as a law clerk with the Public Defenders Office of Los Angeles and worked as a legal assistant for one year.  (Id.)  Plaintiff's counsel presents only Ms. Sider's declaration and timesheet as evidence of her credentials.  Mr. Galipo's declaration attests to the work and experience of Ms. Le and Ms. Slyapich, but not of Ms. Sider.  Accordingly, the Court reduces Ms. Sider's hourly rate to $125 per hour.  See Greenpeace, Inc. v. Stewart, 2020 WL 2465321, at *7–9 (9th Cir. May 12, 2020) (finding the rate of $125 per hour reasonable for law student interns).

In sum, the Court concludes that the hourly rates of $1,100 for Mr. Galipo, $600 for Mr. Terrell and Ms. Brunner, $550 for Ms. Le, $200 for Ms. Slyapich, and $125 for Ms. Sider are reasonable.

### 2.  Hours Billed

Plaintiff's counsel requests attorneys' fees for a total of 1,378.5 hours worked on this case:

| Attorney / Biller | Hours |
|---|---|
| Dale K. Galipo | 500.1 |
| James S. Terrell | 369 |
| Sharon J. Brunner | 247 |
| Hang D. Le | 90.7 |
| Karen Slyapich | 39.2 |
| Marielle Sider | 132.5 |
| **TOTAL** | **1,378.5** |

//

---

Defendants argues for a reduction of the total hours Plaintiff's counsel report based on: (a) Mr. Galipo's association into the case, (b) block billing, (c) duplicative time, and (d) administrative time. Moreover, Defendants requests that the Court apply a downward adjustment to the requested lodestar amount, because Plaintiff prevailed against only one of the Defendants.

Plaintiff's counsel also requests to include time spent working on the Motion and Reply.

### a. Work Performed Prior to the Law Offices of Dale K. Galipo's Association into the Case

Defendants assert that Plaintiff's counsel cannot seek fees for the 16.2 hours of work conducted by Mr. Galipo and Ms. Le before Mr. Galipo appeared as counsel of record for Plaintiff. (Opp'n at 15, 19.) Plaintiff's counsel responds that Plaintiff retained Mr. Galipo's firm prior to March 2020 "to perform certain work and consultations in the case." (Reply at 5.)

Plaintiff notified the Court that Mr. Galipo had associated into the case on March 11, 2020. (Dkt. No. 61.) Plaintiff reports 11.5 hours between August 28, 2019 and January 6, 2020 as time worked on the case. (Galipo Decl., Ex. 1 at 1.) Neither Mr. Terrell's nor Ms. Brunner's declarations or timesheets confirm when Plaintiff retained Mr. Galipo's firm. The Court notes, however, that Mr. Galipo's time entry for August 30, 2019 is recorded as "[r]eview 2-200 Agreement for co-counsel and client." (Galipo Decl., Ex. 1 at 1.) Moreover, Mr. Galipo's time entries reflect access to privileged materials and conversations:

- October 21, 2019: "Receive copy of the expert report by Ernest Burwell. Review Same."
- November 4, 2019: "Review defendants' Rule 26 expert reports. Meet with Hang Le to discuss."
- December 17, 2019: "Telephone call with Sharon Brunner re case."
- January 6, 2020: "Review mediation brief and discuss same with Hang Le and Sharon Brunner."

(Id.) Similarly, Ms. Le reports 4.7 hours worked between October 9, 2019 and February 7, 2020 that reflect those same entries. In addition, Ms. Le reports time for "[r]eviewing and provid[ing] input on Plaintiff's opposition to Defendants' MSJ" on February 7, 2020. Accordingly, the Court finds the 16.2 hours reported prior to the association of Mr. Galipo's firm into the case are reasonable.

### b. Block Billing

Defendants argue that a further reduction of Plaintiff's counsel's hours are appropriate, as they have been block-billed. (Opp'n at 15.) "Courts generally frown on block billing where discrete and unrelated tasks are lumped into one entry, as the practice can make it impossible … to determine the reasonableness of the hours spent on each task." Navarro v. Gen. Nutrition Corp., 2004 WL 2648373, at *9 (N.D. Cal. Nov. 19, 2004).

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk NP

From May 30, 2021 to June 15, 2021, Plaintiff's counsel, Mr. Galipo, recorded his time as "trial preparation" or "trial and trial preparation" without specifying what tasks were completed.  A footnote accompanies these labels to explain that "[t]rial preparation includes: discussions and meetings with co-counsel and staff, meeting with and preparing witnesses, reviewing statements, investigation reports, medical records, photos, audio, video, depositions, expert reports, pre-trial documents including jury instructions, verdict form, exhibits, client preparation, preparation for voir dire, opening statement, direct and cross examination, opening, closing and rebuttal arguments."  (Galipo Decl., Ex. 1 at 5.)  The Court acknowledges that two other courts in this district have admonished Plaintiff's counsel expressly for this method of block-billing and reduced Plaintiff's counsel's hours as a result.  See Frias v. City of Los Angeles, 2020 WL 4001620, at *5 (Apr. 23, 2020); Craig v. County of Orange, SACV 17-00491-CJC (KESx), Dkt. No. 231, at *8–9 (C.D. Cal. Sept. 5, 2019).  In those cases, however, counsel billed 300 to nearly 400 hours as "trial preparation."  Those courts found that 247.2 hours and 351.4 hours, respectively, were reasonable for trial preparation.  Here, Plaintiff's counsel's "trial preparation" and "trial and trial preparation" hours" total 224.8 hours over 17 days.  Because this amount of time is reasonable, the Court does not reduce for block-billing.  However, the Court warns Plaintiff's counsel to change his practice of block-billing.

### c.  Duplicative Time

Defendants request deductions from Mr. Terrell, Ms. Brunner, and Ms. Le's hours because Plaintiff's counsel improperly seeks compensation for duplicative hours.  "[D]etermining whether work is unnecessarily duplicative is no easy task."  Moreno, 534 F.3d at 1112.  For example, in cases drawn out over many years, "a lot of legal work product will grow stale; a competent lawyer won't rely entirely on last year's, or even last month's, research[.]"  Id.  Moreover, courts are discouraged from second-guessing staffing decisions.  Id. at 1114–15.  Thus, this Court will only deduct unnecessarily duplicative work from a fee award.  Id. at 1112.

First, Defendants argue that Mr. Terrell's and Ms. Brunner's hours billed to the trial should be reduced because Mr. Galipo tried the case, and Mr. Terrell and Ms. Brunner did not substantially participate.  (Opp'n at 16–17.)  Plaintiff's counsel replies that this was a complex case, involving twelve defendant officers and expert witnesses.  (Reply at 5.)  Thus, it is reasonable to have three attorneys at trial, including to "serve as a sounding board or be necessary to assure that valuable testimony is obtained during the limited time allotted for depositions and trial."  (Id. citing Rodriguez v. Cnty. of Los Angeles, 96 F. Supp. 3d 1012, 1025 (C.D. Cal. 2014)).  The Court agrees with Plaintiff's counsel.  As other courts recognize, "[e]mploying multiple attorneys or firms is per se not unreasonable," and "[m]ultiple attorneys may be essential for planning strategy, eliciting testimony or evaluating facts or law," including at trial.  PSM Holding Corp. v. Nat'l Farm Fin. Corp., 743 F. Supp. 2d 1136, 1157 (C.D. Cal. 2010).  Accordingly, the Court will not reduce Plaintiff's counsel's hours for staffing three attorneys at trial.

Second, Defendants contend that Mr. Terrell and Ms. Brunner's hours are duplicative, because they both billed time for propounding discovery requests, some of which were never served on Defendants. (Opp'n at 17.)  As Defendants acknowledge, however, the time entries for Mr. Terrell and Ms. Brunner denote separate discovery requests.  Plaintiff's failure to serve those requests does not make them duplicative.  Accordingly, the Court finds that Plaintiff's counsel's hours for drafting discovery requests are reasonable.

Third, Defendants contend that time Ms. Le spent reviewing case files and documents duplicates work that Mr. Terrell and Ms. Brunner conducted.  (Opp'n at 18–19.)  In Defendants' view, time spent to "get up to speed" is unnecessarily duplicative.  (Id. at 18.)  The Court disagrees.  As Plaintiff notes, the Ninth Circuit has found that when "[a] lawyer [ ] needs to get up to speed with the research performed," it "is duplication, of course, but it's <u>necessary</u> duplication" and "inherent in the process of litigating over time."  <u>Moreno</u>, 534 F.3d at 1112.  This Court has previously found that "[i]t is a dangerous proposition that only one attorney may properly spend time reviewing a case record, as no reasonable attorney could provide meaningful or ethical litigation support without being familiar with the critical documents."  <u>Harlow v. Metro. Life Ins. Co.</u>, 379 F. Supp. 3d 1046, 1057 (C.D. Cal. 2019).  Thus, it is reasonable—indeed, responsible—that Ms. Le reviewed the record to familiarize herself.  There is no reason why Ms. Le "should perform this necessary work for free."  <u>Moreno</u>, 534 F.3d at 1112.  Thus, the Court finds that Ms. Le's hours for reviewing the case files are reasonable.

### d.  Purely Clerical Time

Defendants contend that Ms. Slyapich's time includes clerical tasks that must be excluded from the total hours billed.  In support, Defendants cite <u>Nadarajah v. Holder</u>, which states, "When clerical tasks are billed at hourly rates, the court should reduce the hours requested to account for the billing errors."  569 F.3d 906, 921 (9th Cir. 2009).  Plaintiff responds that only "purely clerical tasks" cannot be billed for attorneys' fees.  <u>See Missouri v. Jenkins by Agyei</u>, 491 U.S. 274, 288 n.10 (1989) ("[P]urely clerical or secretarial tasks should not be billed at a paralegal rate, ….").  The Court agrees that the standard, including as articulated under <u>Nadarajah</u>, is to exclude purely clerical tasks.

This Court has previously found that "copying and scanning documents and calendaring dates" are "purely clerical tasks," whereas "prepar[ing ] a letter to opposing counsel requesting production of documents," "prepar[ing ] deposition notices," "reviewing and organizing case files and creating and updating pleading clips" are not purely clerical tasks.  <u>Smith v. County of Riverside</u>, 2019 WL 4187381, at *8 (C.D. Cal. June 17, 2019).  The Court reduces Ms. Sidler's hours for any time billed as calendaring, which totals 0.5 hours.  In addition, the Court finds that time billed for confirming schedules of witnesses and making hotel accommodations are also purely clerical, and the Court reduces Ms. Sidler's hours by 0.7 hours.  Other hours that Defendants contest were not spent on clerical tasks.  Accordingly, the Court finds that Ms. Sidler reasonably incurred 38 hours of work on this case.

//

---

**CIVIL MINUTES—GENERAL**

### e.   Time Spent on the Motion

Plaintiff's counsel requests, and Defendants do not seem to oppose, attorneys' fees for work performed on the instant Motion and Reply.  (Mot. at 14; Reply at 11–12.)  Time spent establishing an entitlement to fees under 42 U.S.C. § 1988 is compensable.  See Clark v. City of Los Angeles, 803 F.2d 987, 992 (9th Cir. 1986).  Accordingly, the Court finds that the 0.4 hours Plaintiff's counsel worked on the Motion and 11.2 hours worked on the Reply are reasonable.

Based on the adjustments discussed above, the Court finds that Plaintiff's counsel reasonably billed 1,377.3 hours.  Accordingly, the Court concludes that $993,757.50 is a reasonable lodestar amount.

| Attorney / Biller | Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Dale K. Galipo | 500.1 | $1,100.00 | $550,110.00 |
| James S. Terrell | 369 | $600.00 | $221,400.00 |
| Sharon J. Brunner | 247 | $600.00 | $148,200.00 |
| Hang D. Le | 90.7 | $550.00 | $49,885.00 |
| Karen Slyapich | 38 | $200.00 | $7,600.00 |
| Marielle Sider | 132.5 | $125.00 | $16,562.50 |
| **TOTAL** | **1,377.3** | | **$993,757.50** |

### 3.   Costs

Plaintiff does not request costs, so they are not at issue here.

### 4.   Adjustments

Defendant argues that a downward adjustment of the lodestar figure is appropriate because Plaintiff only prevailed against Defendant Hovey, and not against the other eleven individual Defendants and one municipal Defendant.  (Opp'n at 21.)  Moreover, Defendants contend that Plaintiff spent a substantial time at trial trying to prove claims against other individual Defendants.  (Id.)  Accordingly, Defendants request a 50% reduction of the fee award.  (Id. at 22.)  Plaintiff replies that a downward adjustment is not reasonable, because the time spent on the other named defendant officers directly relates to Plaintiff's success at trial.  (Reply at 7–8.)  "[T]he work performed to obtain deposition and trial testimony from the other defendant officers would have been done regardless," as the officers are "important witnesses to the incident."  (Id. at 8.)  Further, Plaintiff asserts that the damages award is five times the Defendants' last and highest settlement offer and, thus, a great result.  (Galipo Decl. ¶ 29.)  Plaintiff also argues that, by prevailing against even one Defendant, Plaintiff's counsel achieved exceptional results.  (Mot. at 12.)  In addition, because during its deliberations the jury asked whether answers on the special verdict form required unanimity, Plaintiff argues that "there is a strong possibility that the jury's finding of no liability for the individual defendants, except Joshua Hovey, was not unanimous."  (Reply at 8.)

"When a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." Hensley, 461 U.S. at 436. In the Ninth Circuit, courts evaluate the reasonableness of the fee award in light of the results obtained "by answering two questions: 'First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?'" McCown v. City of Fontana, 565 F.3d 1097, 1103 (9th Cir. 2009). However, "[t]here is no precise rule or formula for making these determinations." Hensley, 461 U.S. at 436. The Court has "considerable discretion" to "determine whether the prevailing plaintiff achieved excellent results," but this discretion "must be accompanied by a clear explanation that the district court has considered the relationship between the amount of fees awarded and the results obtained." Navarro, 2004 WL 2648373, at *13.

First, the Court considers whether Plaintiff failed to prevail on claims that were unrelated to the claims on which he succeeded. "[I]n a lawsuit where the plaintiff presents different claims for relief that 'involve a common core of facts' or are based on 'related legal theories,' the district court should not attempt to divide the request for attorney's fees on a claim-by-claim basis." McCown, 565 F.3d at 1103. "Instead, the court must proceed to the second part of the analysis and 'focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" Id. (quoting Hensley, 461 U.S. at 435). All of Plaintiff's claims arise from a common core of facts, namely, his arrest on May 8, 2016. The Court accepts Plaintiff's position that Plaintiff likely would have deposed and examined the other individual Defendants at trial as witnesses, if not as defendants. Accordingly, the Court finds that Plaintiff's claims are all related for the purpose of determining attorneys' fees.

Next, the Court considers whether Plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award. Courts recognize that "success in a lawsuit is not always measured by the formal relief obtained." Clark, 803 F.2d at 990 (citing Maher v. Gagne, 448 U.S. 122, 129 (1980)); see also City of Riverside, 477 U.S. at 575 ("Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief."). The Court must "consider not only the monetary results but also the significant nonmonetary results [Plaintiff] achieved for himself and other members of society." Morales v. City of San Rafael, 96 F.3d 359, 365 (9th Cir. 1996).

Plaintiff prevailed on his Fourth Amendment claim against Defendant Hovey and was awarded $500,000 in damages. The Court acknowledges that Plaintiff obtained success and agrees that it is challenging to prevail at all in civil rights claims against police officers. Moreover, as Plaintiff notes, the case has difficult facts, including Plaintiff's methamphetamine use (Mot. at 12), which present greater hurdles to prevailing. Importantly, the Court cannot discount that the "jury's verdict validates [plaintiff's] belief that [Defendant Holvey's] conduct was unconstitutional." Sanchez v. County of San Bernardino, 2014 WL 12734756, at *19 (C.D. Cal. Mar. 10, 2014).

CIVIL MINUTES—GENERAL                Initials of Deputy Clerk NP

However, the Court cannot agree the results were excellent.  Because Plaintiff prevailed only as to one Defendant, and did not prevail on his Fourth Amendment claims against the other eleven individual Defendants, the intentional infliction of emotional distress claim against all twelve individual Defendants, or the vicarious liability claim against the City of Ontario Defendant, the Court concludes that Plaintiff achieved partial success.  Factors that would compel the Court to find otherwise do not exist here.  See, e.g., Ramirez, et al. v. Oxnard Police Dep't, No. 13-16165, slip op. at *11–13 (C.D. Cal. Sept. 17, 2015) (Dkt. No. 219) (deeming an almost $3 million award and jury verdict on half of the plaintiff's claims "substantial success"); Clark, 803 F.2d at 990 (finding that, where plaintiffs had not sought damages, but received injunctive relief, "they achieved the practical result they sought"); Sanchez, 2014 WL 12734756, at *19 (deeming a $200,000 award in damages and jury verdict against the sole defendant on plaintiffs' excessive force claim "an excellent recovery").

Even as the Court adjusts the lodestar downward, the Court remains cognizant of Section 1988's purpose: "to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel."  City of Riverside, 477 U.S. 561, 578 (1986).  As such, the Court refuses to apply a 50% downward adjustment, as Defendants request.  Doing so would certainly discourage future civil rights plaintiffs, who may mistakenly believe that one must prevail on every claim against every defendant in order to recover.  Moreover, the case upon which Defendants rely, Harris v. Marhoefer, 24 F.3d 16 (9th Cir. 1994), only considers monetary results to determine the plaintiff's "success," and thus has limited value here.

In light of the presumptively reasonable lodestar, Plaintiff's partial success, and the strong policy of encouraging civil rights litigation through attorneys' fees, the Court concludes that a 15% downward adjustment to the lodestar is appropriate.  This conclusion results in an adjusted lodestar of $844,693.88.[8]

Plaintiff requests a multiplier only in the event that the Court determines the PLRA applies to the case.  Because the Court finds the PLRA does not apply, the Court does not address Plaintiff's request.  Moreover, because the time, labor, and skill of Plaintiff's counsel are already reflected in the fee award, the Court also does not find that a multiplier is warranted here.

## IV.   CONCLUSION

The Court GRANTS IN PART Plaintiff's motion for attorneys' fees with the aforementioned adjustments.  The Court AWARDS Plaintiff $844,693.88 in attorneys' fees.

**IT IS SO ORDERED.**

---

[8] The Court rounds the amount up to the nearest hundredth decimal place.

**EXHIBIT 6**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 20-00416 JGB (SPx)** | Date | May 10, 2022 |
| Title | ***Paola French, et al. v. City of Los Angeles, et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| TANISHA CARRILLO | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:     **Order (1) DENYING Defendant's Motion for Judgment as a Matter of
Law (Dkt. No. 138); (2) GRANTING IN PART Plaintiffs' Motion for
Attorneys' Fees (Dkt. No. 145); and (3) VACATING the May 16, 2022
Hearing (IN CHAMBERS)**

Before the Court are two post-trial motions: (1) a motion for judgment as a matter of law,
or alternatively for new trial, filed by Defendant City of Los Angeles ("City") ("Rule 50b
Motion," Dkt. No. 138); and (2) Plaintiffs Paola French and Russell French's ("Plaintiffs")
motion for attorneys' fees ("Fee Motion," Dkt. No. 145) (collectively, "Motions"). The Court
finds these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-
15. After considering the papers filed in support of and in opposition to the Motions, the Court
DENIES the Rule 50(b) Motion and GRANTS IN PART the Fee Motion. The hearing set for
May 16, 2022 is VACATED.

## I.   BACKGROUND

On February 28, 2020, Paola French and Russell French ("Plaintiffs") commenced this
action against Defendants City of Los Angeles ("City") and Salvador Sanchez ("Sanchez")
(collectively, "Defendants"). ("Complaint," Dkt. No. 1.) Plaintiffs alleged that Mr. Sanchez,
who was an officer with the Los Angeles Police Department ("LAPD") at the time, used
excessive force against them and their son Kenneth French ("Decedent," or "Kenneth") inside
of a Costco warehouse store in Corona, California. (See id.) On April 1, 2020, Plaintiffs filed a
first amended complaint as of right. ("FAC," Dkt. No. 10.) Following the Court's order
dismissing Plaintiffs' federal causes of action (Dkt. No. 19), Plaintiffs filed a second amended
complaint on July 20, 2020. ("SAC," Dkt. No. 21.) On January 8, 2021, the Court dismissed-in-

part one of Plaintiffs' municipal liability claims, dismissed Plaintiffs' second municipal liability claim and negligent training, hiring, and retention claim, and granted Plaintiffs leave to amend. (Dkt. No. 45.)  On January 18, 2021, Plaintiffs filed a third amended complaint, the operative complaint.  ("TAC," Dkt. No. 46.)

The TAC asserted twelve causes of action: (1) unreasonable search and seizure, unlawful detention and arrest in violation of 42 U.S.C. § 1983 ("Section 1983"); (2) unreasonable search and seizure, excessive force in violation of Section 1983; (3) unreasonable search and seizure, denial of medical care in violation of Section 1983; (4) interference with familial relationship in violation of the Fourteenth Amendment's Substantive Due Process Clause and Section 1983; (5) municipal liability, unconstitutional custom, practice, or policy in violation of Section 1983; (6) false arrest/false imprisonment; (7) battery, including wrongful death; (8) negligence, including wrongful death; (9) negligent infliction of emotional distress; (10) violation of the Bane Act, Cal. Civil Code § 52.1; (11) negligent training, hiring, and retention; and (12) loss of consortium. (See TAC.)

On October 4, 2021, the Court granted in part and denied in part the City's motion for summary judgment.  ("MSJ Order," Dkt. No. 92.)  The Court dismissed Plaintiffs' municipal liability claim (Count Five), but denied summary judgment on Plaintiffs' state law claims (Counts Six through Twelve).  (Id. at 16.)

Following oral arguments on Plaintiffs' two motions in limine on October 4, 2021, the Court granted the motions on October 12, 2021.  ("MIL Order," Dkt. No. 94.)  The Court precluded any references to Kenneth's alleged theft of a vehicle; statements relating to the alleged theft and Kenneth's mental health; and references to certain conclusions and determinations by the Riverside County District Attorney, Riverside grand jury, the California Attorney General, the Los Angeles Police Commission, and the City, including that Mr. Sanchez's actions were "out of policy."  (Id. at 4–5.)

On October 19, 2021, a jury trial began on Plaintiffs' federal and state law claims.  (Dkt. No. 106.)

On October 26, 2021, following the parties' presentation of the evidence, Plaintiffs voluntarily dismissed their Section 1983 claims for unlawful detention and arrest (Count One), denial of medical care (Count Three), and interference with familial relationship (Count Four), as well as their state law claims for false arrest/false imprisonment (Count Six) and negligent training, hiring, and retention claim (Count Eleven).  (Dkt. No. 129, 10-26-21 RT 550:4-20.)  Plaintiffs' remaining six claims were as follows: (1) excessive force under Section 1983 (Count Two), (2) battery (Count Seven), (3) negligence (Count Eight), (4) negligent infliction of emotional distress ("NIED") (Count Nine), (5) violation of the Bane Act (Count Ten), and (6) loss of consortium (Count Twelve).  (10-26-21 RT 550:21-551:13.)

//
//

CIVIL MINUTES—GENERAL                    Initials of Deputy Clerk TC_

The Court also heard arguments on the parties' respective motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) ("Rule 50a") that day.  The Court granted in part and denied in part Plaintiffs' motion and denied the City's motion, ruling that (1) Mr. Sanchez's use of force was unreasonable and, therefore, excessive, and (2) Mr. Sanchez's excessive force caused Plaintiffs' and Kenneth's injuries as a matter of law.  (Id. 562:7-25.)  The Court determined that, as a result, the corresponding elements for Plaintiffs' battery, negligence, NIED, and Bane Act claims were also satisfied as a matter of law.  (Id. 562:12-16.)  However, the Court found that disputed factual issues required the jury to determine whether Mr. Sanchez acted under color of state law and in the course and scope of his employment.  (Id. 563:1-3.)

On October 27, 2021, the jury returned a verdict for Plaintiffs.  ("Special Verdict," Dkt. No. 114.)  The jury answered, "Yes," to all questions: whether Mr. Sanchez acted under color of state law during the incident, whether Mr. Sanchez acted within the course and scope of his employment with the City as a peace officer during the incident, whether he negligently inflicted severe emotional distress on Plaintiffs, and whether Plaintiffs suffered loss of consortium as a result of Mr. Sanchez's use of unreasonable force against them.  (Id. at 3–4.)  The jury awarded $17,002,000.00 in total damages: (1) $4,000,000.00 for Kenneth's pre-death pain and suffering and loss of life damages; (2) $4,771,000.00 in compensatory damages for Paola French; (3) $400,000.00 in loss of consortium damages for Paola French; (4) $5,431,000.00 in compensatory damages for Russell French; (5) $400,000.00 in loss of consortium damages for Russell French; and (6) $2,000,000.00 for Plaintiffs' past and future wrongful death damages.  (Id. at 5–7.)

On November 29, 2021, the Court entered judgment consistent with the Special Verdict. (Dkt. No. 133.)

On December 27, 2021, the City timely filed the Rule 50b Motion.  (See Rule 50b Mot.) Plaintiffs opposed on January 10, 2022.  ("Rule 50b Mot. Opp'n," Dkt. No. 142.)  On January 11, 2022, they corrected the Rule 50b Opposition.  (Dkt. No. 144.)  On January 24, 2022, the City replied.  ("Rule 50b Mot. Reply," Dkt. No. 148.)

On January 24, 2022, Plaintiffs filed the Fee Motion.[1]  (See Fee Mot.)  In support, Plaintiffs filed the following documents:

- Declaration of Dale K. Galipo, with attached exhibits ("Galipo Declaration," Dkt. No. 145-2);
- Declaration of Eric Valenzuela, with attached exhibits ("Valenzuela Declaration," Dkt. No. 145-10);
- Declaration of John Fattahi, with attached exhibits ("Fattahi Declaration," Dkt. No. 145-16);
- Declaration of Alejandro Monguia, with attached exhibits ("Monguia Declaration," Dkt. No. 145-21);

---

[1] Plaintiffs initially filed the Fee Motion as a motion for application to tax costs, but filed a notice of errata to clarify that it is a motion for attorneys' fees.  (Dkt. No. 149.)

- Declaration of Renee V. Masongsong, with attached exhibits ("Masongsong Declaration," Dkt. No. 150);
- Declaration of Karen Slyapich, with attached exhibits ("Slyapich Declaration," Dkt. No. 145-24);
- Declaration of Santiago Laurel, with attached exhibits ("Laurel Declaration," Dkt. No. 145-26);
- Declaration of Marielle Sider, with attached exhibits ("Sider Declaration," Dkt. No. 145-29); and
- Declaration of Benjamin Nisenbaum ("Nisenbaum Declaration," Dkt. No. 147).

On February 7, 2022, the City opposed the Fee Motion. ("Fee Mot. Opp'n," Dkt. No. 151.)

On February 22, 2022, Plaintiffs replied. ("Fee Mot. Reply," Dkt. No. 156.) In support, Plaintiffs filed the following additional documents:

- Supplemental Declaration of Mr. Galipo ("Supplemental Galipo Declaration," Dkt. No. 156-1);
- Supplemental Declaration of Mr. Valenzuela ("Supplemental Valenzuela Declaration," Dkt. No. 156-2);
- Supplemental Declaration of Ms. Masongsong ("Supplemental Masongsong Declaration," Dkt. No. 156-3);
- Supplemental Declaration of Mr. Fattahi ("Supplemental Fattahi Declaration," Dkt. No. 156-4); and
- Declaration of John Burton ("Burton Declaration," Dkt. No. 156-5).

## II.   DEFENDANT'S RULE 50(B) MOTION

The City renews its motion for judgment as a matter of law on Plaintiffs' Section 1983 and state law claims, arguing that no reasonable jury could have found that Mr. Sanchez acted in the course and scope of his employment or under color of state law. (See Rule 50b Mot.) The City alternatively asserts that errors by the Court serve as grounds for a new trial. (Id. at 12–19.)

### A.  Legal Standard

#### 1.  Rule 50(b): Motion for Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50(b) ("Rule 50(b)"), a court may grant a motion for judgment as a matter of law ("JMOL") after a jury trial if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "The test applied is whether the evidence permits only one reasonable conclusion." E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009). This standard mirrors the summary judgment standard. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). If

there is substantial evidence to support a contention, the court may not grant JMOL.  Watec Co. v. Liu, 403 F.3d 645, 651 n.5 (9th Cir. 2005).  Substantial evidence must be sufficient for reasonable minds to accept it as support for a conclusion, even when the evidence might also support a contrary conclusion.  George v. City of Long Beach, 973 F.2d 706, 709 (9th Cir. 1992).  The court must view the facts and draw inferences in the manner most favorable to the non-moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Procedurally, a Rule 50(b) motion is "a renewed Rule 50(a) motion."  E.E.O.C., 581 F.3d at 961.  Accordingly, a party must first make a Rule 50(a) JMOL motion "before the case is submitted to the jury."  Fed. R. Civ. P. 50(a)(2).  If the court denies the Rule 50(a) motion and allows the case to go to the jury, a party may make a renewed motion for judgment as a matter of law within twenty-eight days after the entry of judgment.  Fed. R. Civ. P. 50(b).  The renewed JMOL motion "may include an alternative or joint request for a new trial under Rule 59."  Id.  Because a Rule 50(b) motion is a renewed motion, "[a] party cannot raise arguments in its post-trial motion [under Rule 50(b)] that it did not raise in its pre-verdict Rule 50(a) motion."  Freund v. Nycomed Amersham, 347 F.3d 752, 761 (9th Cir. 2003).

### 2.  Rule 59: Motion for New Trial

Federal Rule of Civil Procedure 59 ("Rule 59") authorizes new trials "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  A motion for new trial "must be filed no later than 28 days after the entry of judgment."  Fed. R. Civ. P. 59(b).  For a timely motion, a court generally "must uphold a jury verdict if it is supported by substantial evidence."  Guy v. City of San Diego, 608 F.3d 582, 585–86 (9th Cir. 2010).  Evidence is "substantial" to support a jury's finding when it is "'adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.'"  Id. (internal citations omitted).  The Court has "a duty to reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence."  Id. at 586.

However, the court may grant a new trial, even when substantial evidence supports the verdict, if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent ... a miscarriage of justice."  United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999).  Courts may also grant a new trial where the amount of damages is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork."  Del Monte Dunes v. City of Monterey, 95 F.3d 1422, 1435 (9th Cir. 1996).  "[T]he district court can weigh the evidence, make credibility determinations, and grant a new trial for any reason necessary to prevent a miscarriage of justice."  Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd., 762 F.3d 829, 841 (9th Cir. 2014).

"Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order."  Fed. R. Civ. P. 61.  "[T]he court must disregard all errors and defects that do not affect any party's substantial rights."  Id.

### 3. Rule 51: Objections to Jury Instructions and Verdict Form

Federal Rule of Civil Procedure 51 ("Rule 51") controls post-trial objections to jury instructions and the form of the verdict. Fed. R. Civ. P. 51(c); Ayuyu v. Tagabuel, 284 F.3d 1023, 1026 (9th Cir. 2002). "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). To be timely, a party must object (1) "on the record and out of the jury's hearing before the instructions and arguments are delivered," or (2) if "a party was not informed of an instruction or action on a request before" the aforementioned opportunity, then "promptly after learning that the instruction or request will be, or has been, given or refused." Fed. R. Civ. P. 51(c)(2), (b)(2). Objections that a party fails to raise "until after the jury has rendered its verdict and was discharged" are "waived." Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1109 (9th Cir. 2001).

## B. Defendant's Rule 50(b) Motion

The City moves for judgment as a matter of law on the grounds that: (1) no reasonable jury could have found that Mr. Sanchez acted within the course and scope of his employment as an LAPD officer when he shot Plaintiffs; and (2) no reasonable jury could have found that Mr. Sanchez acted under color of state law to impose liability under 42 U.S.C. § 1983. (Rule 50b Mot. at 6–11.) For the reasons below, the Court disagrees.

### 1. Vicarious Liability for State Law Claims

The City first contests the jury's verdict that Mr. Sanchez acted "within the course and scope of his employment with the City of Los Angeles as a peace officer during the incident" on Plaintiffs' vicarious liability claim. (Special Verdict at 3.)

The parties are familiar with the doctrine of respondeat superior by now; the Court summarizes just the pertinent principles. "[A]n employer is vicariously liable for the torts of its employees committed within the scope of the employment." Lisa M. v. Henry Mayo Newhall Mem'l Hosp., 12 Cal. 4th 291, 296 (1995). A tort occurs within the scope of employment when it is "engendered by or arise[s] from the work," meaning that: (1) the act is an "outgrowth of the employment," or the risk of tortious injury is "inherent in the working environment" or "typical of or broadly incidental to the [employer's] enterprise; or (2) the act is "a generally foreseeable consequence" of "the employer's enterprise." Lisa M., 12 Cal. 4th at 298–99. The scope of employment inquiry is "a question of fact," but becomes a "question of law" when "the facts are undisputed and no conflicting inferences are possible." Mary M. v. City of Los Angeles, 54 Cal. 3d 202, 213 (1991). Governmental entities can be held vicariously liable "when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct." Id. at 215. In such cases, a court should consider all facts "in the context of the enterprise of policing." Perez v. City & Cnty. of S.F., 75 Cal. App. 5th 826, 841 (2022).

---

**CIVIL MINUTES—GENERAL**

Renewing its argument from trial, the City argues that the undisputed evidence showed "that Sanchez was off-duty, out of uniform, and shopping with his family when he opened fire on the Frenches in a crowded store far outside the Los Angeles city limits." (Rule 50b Mot. at 7.) The only possible evidence linking Mr. Sanchez to the LAPD was, in the City's view, his possession of an LAPD-approved gun, which is insufficient. (Id.) Because no reasonable jury could conclude from this record that Mr. Sanchez's shooting arose from, or was a foreseeable risk inherent to, LAPD's enterprise, the City asserts that Mr. Sanchez did not act within the scope of his employment and vicarious liability should not have attached. (Id. at y–9.)

The City's argument ignores countervailing evidence presented to the jury. True, Mr. Sanchez was not dressed as a police officer. Mr. Sanchez testified in his videotaped deposition played at trial that he had come home at the end of a shift, changed out of his uniform, then drove to Costco in a personal vehicle. (10-22-21 RT 415:19-417:7.) He wore a polo shirt, shorts, and tennis shoes, and witnesses at Costco did not recognize him as a police officer offhand. (Id. 417:8-10; 10-20-21 RT 31:22-32:21; 10-21-21 RT 136:13–15.)

However, substantial evidence supported a causal nexus between Mr. Sanchez and his employment with LAPD before and during his use of force. Despite leaving his shift and changing his clothes, Mr. Sanchez went to Costco carrying his LAPD-approved gun that contained LAPD-approved ammunition, as well as his LAPD identification card. (10-22-21 RT 404:18-24, 10-20-21 RT 94:7-95:15.) According to LAPD's Person Most Knowledgeable ("PMK") Andrew Kukla's testimony, the only reason why Mr. Sanchez could enter Costco with a concealed firearm at the time was because he was a police officer authorized to do so by the state. (10-21-21 RT 153:2-9.) Firearms also hold a "central role … in policing." Perez, 75 Cal. App. 5th at 837. A jury could reasonably infer from this evidence that Mr. Sanchez was cloaked with the authority of an LAPD officer.

Moreover, this was not a case where "possession of a Department-approved firearm" alone linked Mr. Sanchez's actions to his employment. Perez, 75 Cal. App. 5th at 842. Instead, the jury heard additional evidence tending to show that Mr. Sanchez deployed LAPD training and invoked peace officer authority during the incident—even though he was off-duty. According to William Harmening and Mr. Sanchez, Mr. Sanchez drew his concealed, LAPD-approved gun after he was struck on the head by Kenneth. (10-20-21 RT 280:14-16; 10-22-21 RT 404:18-24.) PMK Kukla testified that off-duty police officers have peace officer authority to respond to public offenses, whether or not they are in uniform or outside the City's geographic jurisdiction, and that being struck on the head could constitute a public offense. (10-21-21 RT 156:7-157:4, 301:6-11.) Paola French testified that she saw Mr. Sanchez pull his gun out and heard him say he was a police officer.[2] (10-20-21 RT 94:7-95:15.) When Mr. Sanchez began to

_____

[2] The City challenges the credibility of this testimony. (Rule 50b Mot. at 3.) The City misapprehends the analysis applicable on a motion for judgment as a matter of law. The Court "may not make credibility determinations or weigh the evidence," but may ask only whether the jury had sufficient evidence to support its conclusion. E.E.O.C., 581 F.3d at 961 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

shoot, a witness observed that he used the gun like a police officer by shooting from the hip.  (10-20-21 RT 48:5-10, 13-16, 58:18-25.)  The witness testified that this stance is taught in law enforcement and indicated that Mr. Sanchez might have been a police officer.  (Id.)  Others testified that after the shooting, Mr. Sanchez verbally identified himself as an off-duty officer, showed his LAPD identification card to officers and witnesses responding to the scene, and indicated that Kenneth was "the shooter."  (Id. 65:22-66:1, 76:6-24; 10-21-21 RT 128:7-15, 129:1-12, 142:5-10.)  Drawing all inferences in Plaintiffs' favor, a jury could reasonably conclude that Mr. Sanchez's conduct was an outgrowth of his employment and a generally foreseeable consequence of LAPD's policing enterprise.

Of course, the jury also heard testimony that could support the City's depiction of Mr. Sanchez as an individual who abused his position for personal reasons.  Mr. Sanchez testified in his deposition that he believed he was acting to protect his life and his son's life.  (10-22-21 RT 434:9-15.)  A jury could find that Mr. Sanchez was more interested in his son's safety than the public's.  A jury could further conclude that Mr. Sanchez only identified himself as an LAPD officer to avoid the consequences of his actions.

But that is not the only possible conclusion, which is what the City must prove at this stage.  While "[a]n act serving only the employee's personal interest is less likely to arise from or be engendered by the employment," Lisa M., 12 Cal. 4th at 298, an "abuse of authority" motivated by personal desire "arise[s] out of the employment" when it does "not evince a complete departure from [an employee's] duties."  Rizzo v. Ins. Co. of State of Penn., 969 F. Supp. 2d 1180, 1192 (C.D. Cal. 2013); see also Farmers Ins. Grp. v. County of Santa Clara, 11 Cal. 4th 992, 1004 (1995) ("[W]here the employee is combining his own business with that of his employer, or attending to both at substantially the same time, no nice inquiry will be made as to which business he was actually engaged in at the time of injury, unless it clearly appears that neither directly nor indirectly could he have been serving his employer.").  A jury, viewing the evidence in the light most favorable to Plaintiffs and drawing all inferences in their favor, could reasonably find that Mr. Sanchez's desire to protect his son overlapped with his duties as a peace officer.  Because he acted, at least in part, as a police officer, his actions were not "purely" motivated by self-interest.  Rizzo, 969 F. Supp. 2d at 1192.  Accordingly, the Court concludes that there was substantial evidence for the jury to reasonably conclude that Mr. Sanchez acted within the scope of employment for LAPD.

The City's arguments for a contrary conclusion—many of which the Court considered and dismissed in the summary judgment order ("MSJ Order," Dkt. No. 92)—are unavailing.  The City first contends that Mr. Sanchez's conduct was not a foreseeable risk as a matter of law because Mr. Sanchez committed an "off-duty battery."  (Rule 50b Mot. at 9.)  California courts, however, have rejected drawing a hard line between on-duty and off-duty actions to determine employer liability.[3]  A police officer's "off-duty" status does not "insulate" an employer "from

---

[3] This aversion reflects the "'deeply rooted sentiment' that it would be unjust for an enterprise to disclaim responsibility for injuries occurring in the course of its characteristic activities."  Perez, 2022 WL 611530, at *3 (quoting Mary M., 54 Cal. 3d at 208).

potential liability for the torts of these officers." Inouye v. County of Los Angeles, 30 Cal. App. 4th 278, 281 (Cal. Ct. App. 1994). Instead, the City can be held vicariously liable for "injuries caused after work hours," as long as the action was "engendered by events or conditions relating to the employment." Farmers Ins. Grp., 11 Cal. 4th at 1006. There is no presumption against vicarious liability solely because an officer is off-duty.[4] Moreover, as discussed above, the evidence supports a conclusion that Mr. Sanchez's off-duty actions occurred within the scope of his or her employment.

The City next claims that the act of "declaring one's self to be a police officer and then summarily opening fire on people in a crowded store" is utterly divorced from "the business of law enforcement." (Rule 50b Mot. at 9.) Yet courts have imposed vicarious liability under similar facts. In Reason v. City of Richmond, 2021 WL 2268892, at *1, 5 (E.D. Cal. June 3, 2021), the court found that an off-duty police sergeant acted within the scope of his employment when—following a confrontation over a parking spot at "a busy gas station" in a different city from his employer—he "identified himself as a police officer and opened fire into the back of [the decedent's] body." In Bradley v. County of San Joaquin, 2018 WL 4026996, at *1, 6 (E.D. Cal. Aug. 23, 2018), a court found that an off-duty deputy sheriff, who was engaged in an illicit transaction in a parking lot, acted within the scope of his employment when he "declared his status as law enforcement" then open fired on individuals in the parking area. Reason and Bradley suggest that erratic shootings by off-duty police officers are "not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." Rizzo, 969 F. Supp. 2d at 1191 (quoting Lisa M., 12 Cal. 4th at 302).[5]

The City finally argues that Mr. Sanchez's actions after he shot the French family are irrelevant to the inquiry. (Rule 50b Mot. Reply at 3.) The City offers no authority in support of this assertion.[6] Even if the Court assumed this position to be true, however, the evidence discussed above substantially supports a jury finding that Mr. Sanchez acted in the course and scope of his employment during the shooting. Therefore, this argument fails.

---

[4] As Plaintiffs note, the City's citations to cases about the "coming and going rule" are inapposite.

[5] The City further asserts that because the shooting occurred "hours away" from the City's jurisdiction, it was not a risk inherent to LAPD's enterprise. (Rule 50b Mot. at 7–8.) Reason rejected this same argument, finding there was no "binding or persuasive authority which states that police officers … outside their jurisdiction are per se unable to act within the scope of their employment." Reason, 2021 WL 2268892, at *6.

[6] Courts, at times, seem to consider may consider an officer's actions after his or her use of force in the scope of employment analysis. See Reason, 2021 WL 2268892, at *5 (noting that after officer open-fired on decedent, he "showed his badge to deter witnesses from attending to [decedent]" and "identif[ied] himself" as an officer when calling for police backup); Jasso v. County of Los Angeles, 2015 WL 13916216, at *14 (C.D. Cal. Oct. 13, 2015) (finding probative defendant's use of his "badge to allegedly deter witnesses from intervening" after he assaulted an individual).

---

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk TC_

In sum, the City fails to meet its burden of showing that only one reasonable conclusion exists. Because the Court concludes that substantial evidence supports the jury's verdict that Mr. Sanchez acted within the scope of his employment, judgment as a matter of law is unwarranted on Plaintiffs' vicarious liability claim.

**2.  Color of State Law under 42 U.S.C. § 1983**

The City also challenges the jury's verdict finding that Mr. Sanchez acted "under color of state law during the incident" for Plaintiffs' Fourth Amendment excessive force claim under 42 U.S.C. § 1983.  (Special Verdict at 3.)

To prevail on their Section 1983 claim, Plaintiffs must have shown that Mr. Sanchez acted under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."  Id. at 50.  However, an officer acts as a private citizen if he or she does not act under color of state law.  Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996).  For off-duty officers, the Ninth Circuit has outlined "three critical requirements" to determine whether they acted under color of state law: (1) "the defendant's action must have been performed while the officer is acting, purporting, or pretending to act in the performance of his or her official duties"; (2) "the officer's pretense of acting in the performance of his duties must have had the purpose and effect of influencing the behavior of others"; and (3) "the challenged conduct must be related in some meaningful way either to the officer's governmental status or to the performance of his duties."  Anderson v. Warner, 451 F.3d 1063, 1068–69 (9th Cir. 2006) (internal citations omitted).

As with its vicarious liability arguments, the City recycles many of the same authority and arguments the Court rejected in the MSJ Order.  To warrant judgment as a matter of law, however, the City must show that the evidence at trial gives rise to only one reasonable jury conclusion: that Mr. Sanchez did not act under color of state law when he shot the French family.  Viewing all evidence in the light most favorable to Plaintiffs, the Court finds that the City fails to meet this burden because there was substantial evidence for the jury to conclude that Mr. Sanchez acted under color of state law.

First, the jury heard testimony that tended to show that Mr. Sanchez acted or pretended to act as a peace officer.  As discussed above, Paola French, who was located nearest to Mr. Sanchez, testified that she heard him say he was a police officer during the shooting.  (10-20-21 RT 94:7-95:15.)  It is well-established that officers who identify themselves as law enforcement act or pretend to act in the performance of their official duties.  See Anderson, 451 F.3d at 1069 (plaintiff testified that he "heard [the officer] tell witnesses he was a cop"); c.f. Hyun Ju Park v. City & Cnty. of Honolulu, 952 F.3d 1136, 1140 (9th Cir. 2020) (officers "never identified themselves as officers, displayed their badges, or 'specifically associated' their actions with their law enforcement duties"); Huffman v. County of Los Angeles, 147 F.3d 1054, 1058 (9th Cir. 1998) (officer "never identified himself as a sheriff's deputy"); Van Ort v. Estate of Stanewich,

92 F.3d 831, 838 (9th Cir. 1996) (officer "conceal[ed] his identity," "did not display a badge to plaintiffs and denied being a police officer"). The City acknowledges, and this Court has already stated, that cases in which the officer "never identified himself" are readily distinguishable. (Rule 50b Mot. at 10–11 (citing Huffman, 147 F.3d at 1058); MSJ Order at 12–13.)

The City's attempt to diminish the significance of Mr. Sanchez's self-identifying statement fails. (Rule 50b Mot. at 11 (citing Cook v. Morrow, 2007 WL 3022607, at *6 (N.D. Cal. Oct. 12, 2007)).) This is not a case where the jury heard just "one comment" without additional "affirmative representations" that Mr. Sanchez was performing official duties. Cook, 2007 WL 3022607, at *6. Witnesses and officers at the scene testified that after the shooting, Mr. Sanchez again verbally identified himself as an off-duty officer and showed his LAPD identification card. (Id. 65:22-66:1, 76:6-24; 10-21-21 RT 128:7-15, 129:1-12, 142:5-10.) Accordingly, there was sufficient evidence to demonstrate the first requirement under Anderson.

Second, the record supports the conclusion that Mr. Sanchez's actions had the purpose and effect of influencing the behavior of others. Again, Mr. Sanchez identified himself as an LAPD officer on scene. While the City argues that this act could further no purpose, a jury could find that Mr. Sanchez announced himself to reassure witnesses and officers that he was not the perpetrator of a crime.[7] Moreover, witness testimony showed that his statements achieved this intended effect. One witness, Omar Barraza, testified that once Mr. Sanchez said he was an off-duty officer and "provid[ed] his ID and badge," he felt that it was not only safe to approach Mr. Sanchez, but also "necessary to believe" Mr. Sanchez's words "[b]ecause he [was] a member of law enforcement." (10-20-21 RT 66:9-15, 69:23-71:5.) Mr. Barraza further testified that he told Mr. Sanchez to "make his weapon safe and holster his weapon" as "the scene did not appear to be a danger anymore." (Id. 68:14-69:3.) A jury could infer that Mr. Barraza, who had served in the Air Force and worked for California's correctional system, could have disarmed Mr. Sanchez

---

[7] The City makes many broad assertions of law—some of which are incorrect—yet includes few citations to the actual record. For example, the City limits its discussion of the evidence to Mr. Sanchez's identification of himself before he began to shoot, then asserts that "[i]t is unclear … how Sanchez could have intended [his comment] to influence the conduct of people whom he then summarily shot." (Rule 50b Mot. at 11.) The City misunderstands the law. In Anderson, the Court found that plaintiff's observations of the officer's actions after plaintiff "regained consciousness" and the assault had ended were significant to the color of state law analysis. Anderson, 451 F.3d at 1066, 1069. Accordingly, the Court's review of the record is not limited to Mr. Sanchez's statements before he fired his gun.

The City also argues that the only difference between a police officer who uses deadly force with a gun under peace officer authority and a private citizen who does the same is an officer's ability to detain and arrest an individual. (Rule 50b Mot. at 10; Rule 50b Mot. Reply at 4–5.) The City stretches the imagination with this incredulous claim. Perhaps the City forgets that private citizens do not ordinarily say that they are a police officer then show law enforcement identification—unless they are officers. See Anderson, 451 F.3d at 1069 (finding that "a janitor employed by the Sheriff's Office" who says, "I am a cop, stand back," is "not invoking his governmental status—for the simple reason that he is not, in fact, a 'cop'") (emphasis omitted).

if necessary—but simply asked Mr. Sanchez to holster the gun because he had learned that Mr. Sanchez was a police officer. (Id. 64:1-10.) Corona Police Department Officer Steven Hungerford, who responded to the shooting, similarly testified that he did not handcuff Mr. Sanchez due, in part, to Mr. Sanchez's statement that he was an off-duty LAPD officer. (10-21-21 RT 128:7-131:8.) Taken together, a jury could reasonably infer that Mr. Sanchez identified himself with the purpose and effect of receiving this more deferential treatment.

Finally, the same evidence that supports the first two Anderson requirements sufficiently demonstrates that Mr. Sanchez's conduct meaningfully related to his governmental status or the performance of his duties. As the Court previously stated, this third requirement means that Mr. Sanchez "invoked his actual status." (MSJ Order at 13 (quoting Anderson, 451 F.3d at 1069).) The jury heard testimony that Mr. Sanchez said he was a police officer during the shooting, told Mr. Barraza and Mr. Hungerford that he was an off-duty officer, and showed his LAPD identification card to Mr. Barraza and Mr. Hungerford. (10-20-21 RT 94:7-95:15, 65:22-66:23, 128:7-16.) A jury could reasonably conclude that at each of these moments Mr. Sanchez invoked his status as a police officer.

Accordingly, the Court concludes that substantial evidence supports the jury's verdict that Mr. Sanchez acted under color of state law when he shot the French family then told witnesses and responding officers that he was an off-duty officer. "[M]isuse of power, possessed by virtue of state law and possibly only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of state law.'" Dang Vang v. Vang Xiong X. Toyed, 994 F.2d 476, 479 (9th Cir. 1991) (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 929 (1982)).

Because the City fails to show that the evidence permits only one conclusion on either Plaintiffs' vicarious liability claim or Section 1983 claim, the Court DENIES the Rule 50b Motion for judgment as a matter of law.

## C. Defendant's Alternative Rule 59 Motion

The City alternatively moves for a new trial on the grounds that: (1) the jury instruction defining course and scope of employment for vicarious liability under California law was erroneous; (2) the failure to bifurcate trial into damages and liability phases resulted in undue prejudice to the City; (3) the special verdict form failed to specifically allocate damages for the state law claims and the Section 1983 claim; (4) the Court erroneously admitted evidence of Mr. Sanchez's subjective beliefs; (5) the Court should have submitted the City's proposed special interrogatories to the jury; and (6) the Court failed to instruct the jury to find intent under the Bane Act. (Rule 50b Mot. at 12–19.) The Court considers each argument in turn.

//
//
//
//
//

**1.  Jury Instructions for "Scope of Employment"**

First, the City argues that the Court's jury instructions defining "scope of employment" for Plaintiffs' vicarious liability claims were erroneous.  The City asserts that the Court should have used California Civil Jury Instructions ("CACI") No. 3721, instead of CACI No. 3720, and should have included the City's proposed instruction that the jury should not consider Mr. Sanchez's subjective beliefs.  The City raised these objections before and during trial.  (Dkt. No. 97 at 41; Dkt. No. 110 at 2; 10-26-21 RT 582:20-584:23.)

"Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading."  Hung Lam v. City of San Jose, 869 F.3d 1077, 1085 (9th Cir. 2017) (quoting Hunter v. County of Sacramento, 652 F.3d 1225, 1232 (9th Cir. 2011)).  The district court holds "substantial latitude in tailoring jury instructions."  Mockler v. Multnomah County, 140 F.3d 808, 812 (9th Cir. 1998).

The Court rejects the City's assertion that CACI No. 3721 is the proper "scope of employment" instruction for police officers.  CACI No. 3721 provides model jury instructions for determining scope of employment with respect to "Peace Officer's Misuse of Authority."  (See CACI No. 3721.)  However, as the Court previously noted, CACI No. 3721 applies to "on-duty" officers.  (Id. § 3721(a) ("The conduct occurs while the peace officer is on duty as a peace officer…."); 10-26-21 RT 583:23-584:10.)  During trial, the Court overruled the City's proposal to use CACI No. 3721 because the City failed to address whether CACI No. 3721 applied to the actions of off-duty officers, like Mr. Sanchez.  Its only suggestion then was to simply delete any references to "on duty" from the instruction, including required elements.  (10-26-21 RT 583:2-6.)  The Court was not obligated to instruct the jury using CACI No. 3721 based on this faulty reasoning.  In the instant motion, the City again fails to cite any authority for its position that CACI No. 3721 covers off-duty officers.  Accordingly, the Court finds that it did not err by declining to follow CACI No. 3721.

Moreover, the Court's given instruction is an accurate statement of the law.  Jury Instruction No. 21 was based on CACI No. 3720, the model instruction for "scope of employment."  (See CACI No. 3720.)  Relying on CACI No. 3720, as well as CACI No. 3722 ("Scope of Employment – Unauthorized Acts"), Jury Instruction No. 21 stated the following:

With respect to Paola French and Russell French's state law claims only, in order to obtain a verdict against the City of Los Angeles, they must prove that Salvador Sanchez was acting within the scope of his employment as a police officer for the City of Los Angeles when he fired the shots at Plaintiffs and Decedent.

Salvador Sanchez's acts were within the scope of his employment with the City of Los Angeles Police Department if:

(a) They are reasonably related to the kinds of tasks that Salvador Sanchez was employed to perform; or

---

**CIVIL MINUTES—GENERAL**

> (b) They are reasonably foreseeable in light of the Los Angeles Police
> Department's business or Salvador Sanchez's job as a police officer.

> The liability of the City of Los Angeles extends beyond its actual or possible
> control of Salvador Sanchez to include risks inherent in or created by the
> enterprise.  Salvador Sanchez need not have been engaged in an act directly
> benefiting the City of Los Angeles.

(Jury Instruction ¶ 21; see also CACI No. 3722.)  This instruction is consistent with established
California precedent.  See Lisa M., 12 Cal. 4th at 298–99 (finding tort arises from employment
when the risk of tortious injury is "typical of or broadly incidental" to the employer's enterprise
or the tort is, "in a general way, foreseeable from the employee's duties"); Farmers Ins. Grp., 11
Cal. 4th at 1006 (noting that off-duty employees act within the scope of employment when their
"tortious actions are engendered by events or conditions relating to the employment"); Carr v.
Wm. C. Crowell Co., 28 Cal. 2d 652, 655–56 (1946) (holding that "[t]he employer's
responsibility for the tortious conduct of his employee 'extends far beyond his actual or possible
control" and involve risks of injury "inherent in the working environment").

        The City argues that an instruction based on CACI No. 3720 was too "general" and
failed to adequately instruct jurors on the scope of employment for off-duty officers.  (Rule 50b
Mot. at 13.)  Yet, as just discussed, courts apply the same, foundational test reflected in CACI
No. 3720 to determine whether any officer acts within the scope of his or her employment, rather
than CACI No. 3721's formulation.  See Farmers Ins. Grp., 11 Cal. 4th at 1007 (finding that a
deputy sheriff who sexually harassed his colleagues did not act within the scope of his
employment because his actions "were motivated for strictly personal reasons unrelated to" his
duties as a deputy sheriff); Mary M., 54 Cal. 3d at 214 (reiterating the same test, without
alteration, to determine whether a sergeant acted within the scope of his employment); Inouye,
30 Cal. App. 4th at 281–82 (stating that "[a]n employer's liability extends to torts of an
employee committed within the scope of his employment" and holding that the County of Los Angeles
could be held vicariously liable for the tortious conduct of an off-duty officer).  In addition, Jury
Instruction No. 21 is specifically tailored to LAPD's "business" as a law enforcement agency and
Mr. Sanchez's "job as a police officer."  (See Jury Instruction No. 21.)

        For the same reason, the City's claim that "reasonably related" and "reasonably
foreseeable" are "legally erroneous and very vague" fails.  (Rule 50b Mot. at 14; Rule 50b Mot.
Reply at 7.)  Jury Instruction No. 21 reflects the law.  The City's contentions do not.[8]  Further, a

---

[8] For example, the City asserts that "California courts have been clear that 'reasonably
foreseeable is not the standard in determining whether an off-duty police officer was acting
within the course and scope of employment," citing Bussard v. Minimed, Inc., 105 Cal. App. 4th
798, 805 (2003).  (Rule 50b Mot. Reply at 7 (emphasis in original).)  In fact, Bussard states that in
going-and-coming cases, "case law applies a foreseeability test."  Bussard, 105 Cal. App. 4th at
804.  It is unclear how Bussard supports the City's seemingly incorrect statement of law.

plain reading of Jury Instruction No. 21 shows that it does not, as the City asserts, allow a finding of acting within the scope of employment solely on the basis of Mr. Sanchez's employment as a police officer.  (Rule 50b Mot. at 13.)

The City finally argues that the Court erred by excluding its proposed instruction concerning Mr. Sanchez's subjective beliefs.  (Rule 50b Mot. at 14.)  The proposed instruction stated that "Mr. Sanchez's subjective beliefs should not be considered in determining whether he was acting within the course and scope of his employment with the City of Los Angeles" and that the jury "should consider the totality of Mr. Sanchez's actions at the time of the incident." (See Dkt. No. 110.)  However, an "employee's motive is [not] irrelevant" to the scope of employment analysis.  Lisa M., 12 Cal. 4th at 298.  Mr. Sanchez's belief that he acted within the scope of his employment tended to show whether he acted only in his personal interest or if his conduct, "even if misguided, was intended to serve the employer in some way."  Lisa M., 12 Cal. 4th at 298.  Therefore, the Court's exclusion of the City's proposed instruction was proper.

Accordingly, the Court concludes that Jury Instruction No. 21 fairly and adequately instructed the jury on the scope of employment elements, correctly stated the law, and was not misleading.  The Court DENIES the Rule 50b Motion for a new trial on this basis.

### 2. Bifurcation

The City next argues that the Court erred by not bifurcating liability from damages at trial.  (Rule 50b Mot. at 15–16.)  The City asserts that evidence of Plaintiffs' "severe and traumatic damages" and "the amount of their alleged economic losses" was unduly prejudicial and irrelevant to whether Mr. Sanchez's use of deadly force was excessive and whether the City was vicariously liable.  (Id. at 15.)

As an initial matter, the City never formally moved for bifurcation before or during trial. Instead, the City submitted a one-sentence request to bifurcate—devoid of any arguments—in its proposed pretrial conference order.[9]  (Dkt. No. 90-1 at 25–26.)  While this request preserved the argument, the City, as the moving party, still held the "burden of proving that the bifurcation will promote judicial economy and avoid inconvenience or prejudice to the parties."  Spectra-Physics

---

The City also contends without support that the jury should have found that Mr. Sanchez's actions were "meaningfully related" to "the LAPD's business of providing police services in the City of Los Angeles."  (Rule 50b Mot. Reply at 7.)  But there is no "meaningfully related" test for vicarious liability.  Instead, this test pertains to the color of state law analysis under Section 1983.  Anderson, 451 F.3d at 1069 (holding that "the challenged conduct must be related in some meaningful way either to the officer's governmental status or to the performance of his duties").  Nor did the City object at trial to Jury Instruction No. 21's definition of relevant enterprise.  Even if it had, this argument fails: because the scope of employment analysis is a "question of fact," the jury, not the Court, determines the scope of the City's "business."

[9] Indeed, the Court wonders why the City failed to lodge any motions in limine of its own if it believed that Plaintiffs would present prejudicial evidence.

---

Lasers, Inc. v. Uniphase Corp., 144 F.R.D. 99, 101 (N.D. Cal. 1992).  The City utterly failed to meet this burden in the pretrial conference order.

Nor has the City satisfied its burden of proving that a single trial on liability and damages was clearly erroneous.  Federal Rule of Civil Procedure 42(b) ("Rule 42(b)") "confers broad discretion upon the district court to bifurcate a trial."  Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1021 (9th Cir. 2004) (quoting Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1088 (9th Cir. 2002)).  A court may order bifurcation "[f]or convenience, to avoid prejudice, or to expedite and economize."  Fed. R. Civ. P. 42(b).  While Rule 42(b) authorizes courts "to separate trials into liability and damage phases," Estate of Diaz v. City of Anaheim, 840 F.3d 592, 601 (9th Cir. 2016), it "does not require" bifurcation.  Hangarter, 373 F.3d at 1021.  Bifurcation "is the exception rather than the rule."  Clark v. I.R.S., 772 F. Supp. 1265, 1269 (D. Haw. 2009) (citing Hangarter, 373 F.3d at 1021).

Here, the City contends that Plaintiffs presented "inflammatory and unduly prejudicial" evidence, but fails to identify any specific item of evidence or testimony or note in the motion the objections it made during trial regarding the allegedly prejudicial evidence.  (Rule 50b Mot. at 15.)  The City belatedly attempts to cure this deficiency in its reply by noting that "the medical witnesses, Kevin French, and Emma [sic] French," and "[t]he admitted exhibits concerning damages" should have been considered separately.  (Rule 50b Mot. Reply at 7.)  But the City fails to define who the "medical witnesses" were or specify what exhibits pertained to damages.[10]  Even if such a vague assertion were sufficient to warrant a new trial—which it is not—neither the law nor the full record supports the City's position.

First, evidence of "the severity of injuries" is relevant to "evaluating the amount of force used."  Felarca v. Birgeneau, 891 F.3d 809, 817 (9th Cir. 2018) (citing Santos v. Gates, 287 F.3d 846, 855 (9th Cir. 2002)).  Evidence of the French family's injuries was thus relevant to Plaintiffs' excessive force claim.  Second, none of the testimony from any of the six medical professionals, Kevin French, or Ema French was so "inflammatory" as to cause undue prejudice.  To be sure, some of the evidence presented was grim.  But that reason alone is not enough to bifurcate a trial, particularly for an excessive force case.  Moreover, whatever prejudicial effect their testimonies could have was limited by the City's opportunity to cross-examine the witnesses and by jury instructions on the elements for each claim.  ("Jury Instructions," Dkt. No. 120.)  See Benson Tower Condo. Owners Ass'n v. Victaulic Co., 105 F. Supp. 3d 1127, 1208 (D.

---

[10] At trial, seventeen witnesses testified, including four doctors and two nurses.  The witnesses in medical professions testified on a variety of topics, however, including "life-care planning," which is not strictly medical.  Elizabeth Holakiewicz, a registered nurse, testified that a life-care plan is "a spreadsheet that itemizes out the items of care" a patient needs, the price of such care, and the frequency that the various components of care are required over the course of a patient's projected life.  (10-22-21 RT 355:18-356:9.)  It is unclear whether Ms. Holakiewicz falls within the City's category of "medical witnesses."  In addition, the parties admitted twenty exhibits during trial.  It is the City's burden, and not that of the Court's, to articulate which exhibits matter on the City's motion.

Or. 2015) (finding no error in declining to bifurcate when defendants "fail[ed] to explain how the Court's jury instructions were insufficient to cure any potential jury confusion"). Finally, nothing in the record supports the conclusion that a separate trial to prove actual damages would have promoted judicial economy and avoided inconvenience.

The City's reliance on Estate of Diaz v. City of Anaheim, 840 F.3d 592 (9th Cir. 2016), is misplaced. There, the district court had granted in part a motion to bifurcate, "severing punitive damages from liability and compensatory damages." Estate of Diaz, 840 F.3d at 597. The court also ruled pretrial that evidence about the decedent's gang membership and drug use could be admitted for the limited purpose of damages. Id. at 598–600. On appeal, the Ninth Circuit held that the district court abused its discretion by admitting evidence that was beyond the scope of its pretrial ruling and irrelevant to any issue—damages or liability. Id. at 601. The Court noted that even "the parties and district court had repeated trouble tracking precisely why this prejudicial evidence was admissible for any purpose." Id. at 602 (emphasis added). In addition, because "gang evidence ha[d] the potential to be particularly prejudicial," the Court found that the district court should have fully bifurcated the liability and damages phases. Id.

Here, evidence and testimony pertaining to the French family's physical and mental damages were relevant to damages and, to a lesser extent, liability. There is no evidence that the jury confused the issues before it because it heard evidence of damages at the same time as that of liability. Nor does the City cite any authority for the proposition that, in excessive force cases, "evidence of severe and traumatic damages" is categorically unduly prejudicial.[11] (Rule 50b Mot. at 15; Rule 50b Mot. Reply at 7.) Therefore, Estate of Diaz is clearly distinguishable.

Accordingly, the Court DENIES the Rule 50b Motion on the basis of bifurcation.

### 3.  Special Verdict Form

The City argues, as it did at trial, that the Court erred by rejecting its proposed special verdict form that separated damages for violations of federal and state law.[12] (Rule 50b Mot. at 16–17.) The special verdict form used did not require the jury to specifically allocate damages for Plaintiffs' Section 1983 claim and for the state law claims. (Special Verdict at 5–7.) The City avers that the state law claims may give rise to post-trial, indemnity claims, but the Special

---

[11] Indeed, such a position would be untenable. As Plaintiffs argue, excessive force cases resulting in death or serious injury would be unable to proceed in a single trial. (Rule 50b Mot. Opp'n at 19.)

[12] To the extent the City challenges the absence of a jury instruction that advised the jury to "separate the amount of the damages between the federal claims and the state law claims on the verdict form," the objection is untimely. (Rule 50b Mot. at 16.) The City withdrew this objection at trial and did not object to Jury Instruction Nos. 24 and 25.[12] (10-26-21 RT 585:14-587:15.) For Jury Instruction No. 25, the Court adopted the City's proposed revision to it. (10-26-21 RT 587:1-16.)

Verdict prevents it from discerning the exact amount at issue.  (Rule 50b Mot. at 17.)
Accordingly, the City seeks a new trial on damages.

The district court holds "complete discretion" over the use of a special or general
verdict, including "the form of the verdict."  Mangold v. Cal. Pub. Utilities Comm'n, 67 F.3d
1470, 1476 (9th Cir. 1995).  The Court need only ensure that "the questions are adequate to
obtain a jury determination of all the factual issues essential to judgment."  Saman v. Robbins,
173 F.3d 1150, 1155 (9th Cir. 1999).  That is why "it is preferable not to combine theories [of
liability]" on a verdict form, Mangold, 67 F.3d at 1476, but not necessarily for damages that have
become "a postverdict legal issue for the court."  Duran v. Town of Cicero, 653 F.3d 632, 640
(7th Cir. 2011).[13]

Based on the above principles, the Court finds that its use of the special verdict form was
not clearly erroneous.  First, indemnification was not an issue before the jury, as the City had not
asserted indemnification as a counterclaim or affirmative defense.  ("City Answer," Dkt. No. 47;
City's Proposed Pretrial Conference Order," Dkt. No. 90-1 at 16; 10-26-21 RT 570:17-24.)  If the
City had done so, a jury would require a special verdict form that specifically apportions damages
for the state law claims and the Section 1983 claim to determine liability.  See, e.g., Magnum
Foods, Inc. v. Continental Cas. Co., 36 F.3d 1491, 1498–99 (10th Cir. 1994) (holding that in an
insurance action "when grounds of liability are asserted" by an insured against the insurer, the
insurer holds a "duty not to prejudice the insured's rights by failing to request special
interrogatories or a special verdict in order to clarify coverage of damages").  However, because
the City did not seek indemnification in the instant litigation, damages are no longer a liability
issue, but "a postverdict legal issue for the court."  Duran, 653 F.3d at 640.

Second, because "[d]amages are not assessed 'by defendant' or 'by claim' but 'for' an
injury," a verdict form need not allocate damages between the separate claims when a plaintiff
suffered "a single, indivisible injury" from "a continuous course of action."  Archibald v.
County of San Bernardino, 2018 WL 6017032, at *9 (C.D. Cal. Oct. 2, 2018) (citing Duran, 653
F.3d at 640); c.f. Thomas v. Cannon, 289 F. Supp. 3d 1182, 1199 (W.D. Wash. 2018) (denying
plaintiff's Rule 50 challenge regarding a verdict form that "listed each claim brought by that
Plaintiff and a line for the jury to assign damages for that claim," where the plaintiff had asserted
divisible injuries arising from multiple federal and state law claims).  This is because "the jury's
task is to award a sum of money to compensate the plaintiff for that injury, not to enter a damages
award against each defendant who is or will be liable on the judgment."  Duran, 653 F.3d at 640
(emphasis in original).

//
//

---

[13] When a plaintiff seeks punitive damages, the Ninth Circuit has expressed that "a
separate verdict for each claim and a separate verdict on punitive damages is strongly preferred."
Canceller v. Federated Dep't Stores, 672 F.2d 1312, 1317 (9th Cir. 1982).  However, Plaintiffs
did not seek punitive damages here.

Archibald addressed the exact issue the City raises.  There, parents of an individual killed by a deputy sheriff brought excessive force and denial of medical care claims under Section 1983 and battery, negligence, and Bane Act claims under state law against the deputy and county. Archibald, 2018 WL 6017032, at *1.  The jury returned a verdict for the plaintiffs on all claims and awarded $7 million in pre-death pain and suffering damages for the decedent and $6.5 million and $2 million damages to the parents, respectively.  Id.  The defendants "complain[ed] that the Special Verdict Form for damages does not allocate damages between the state law negligence claim and the § 1983 claims, or between damages awarded" against the sheriff and the County.  Id. at *9.  The Archibald court disagreed, finding that "it would have made no sense to ask the jury to apportion [the] damages" because the deputy's "conduct resulting in [the decedent's] injury and death was a continuous course of action resulting in a single indivisible injury."  Id.  Moreover, the county's liability "was not a fact issue for the jury," as vicarious liability for the state law claims had been established and there was no Monell claim.  Id.  The court further noted that "asking the jury to award damages per claim and per defendant for an indivisible injury can result in reversible error because it arguably invites the jury to award multiple recoveries for a single injury."  Id.

Like in Archibald and as the Court ruled at trial, Plaintiffs suffered a single, indivisible injury from Mr. Sanchez's conduct: the same facts presented to the jury supported a finding of damages under either the state law claims or Section 1983 claim.  (10-27-21 RT 617:19-22.)  Accordingly, the special verdict form adequately allowed the jury to determine damages on the relevant injury.  Moreover, the jury found that Mr. Sanchez had acted in the course and scope of his employment, which established the City's vicarious liability for the state law claims.  (Special Verdict at 3.)  The Court dismissed Plaintiffs' Monell claims at summary judgment, so the City's liability was no longer a fact issue for the jury.  The jury had no obligation to separately determine the City's and Mr. Sanchez's respective shares of the judgment.  Indeed, a special verdict form that required specific damages allocations for the state law and Section 1983 claims carried the risk of greater jury confusion and double recovery.  Accordingly, the Court concludes that the special verdict form does not warrant a new trial.

### 4.  Admission of Evidence

The City next argues that the Court erred when it admitted evidence of Mr. Sanchez's subjective beliefs about his compliance with LAPD training and policies, but excluded rebuttal evidence of the City's finding that Mr. Sanchez's actions were "out of policy."  (Rule 50b Mot. at 17–18.)  Though the City fails to specifically identify the Court's allegedly objectionable rulings, it appears to challenge the Court's orders: (1) granting Plaintiffs' motion in limine to exclude ex post facto determinations by the Los Angeles Police Commission, the City, and LAPD that Mr. Sanchez's actions were "out of policy," which the City had opposed (MIL Order at 5); and (2) admitting testimony from Lieutenant David Smith of LAPD's Force Investigation Decision about Mr. Sanchez's statements in his employee's report, to which the City specifically objected.  (10-26-21 RT 538:23-539:7.)

//

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk TC_

The "harmless error" standard governs whether a court's admission or exclusion of evidence warrants a new trial. Fed. R. Civ. P. 61. "[T]he court must disregard all errors and defects that do not affect any party's substantial rights." Id.; Haddad v. Lockheed Cal. Corp., 720 F.2d 1454, 1457 (9th Cir. 1983).

The Court initially notes that the City never sought to exclude evidence of Mr. Sanchez's belief that he acted as an off-duty officer through a motion in limine. Nor did the City object at trial to the admission of Mr. Sanchez's videotaped deposition, in which he testified to the contents of his employee report, even though it knew the jury would hear this segment. (10-22-21 RT 406:23-410:8.) Further, the City itself introduced Mr. Sanchez's employee report into evidence. In light of these actions, the Court finds the City's current objection unpersuasive.

Furthermore, the Court finds that its rulings were neither erroneous nor affected the City's substantial rights under the "harmless error" standard. First, evidence of Mr. Sanchez's subjective beliefs was relevant to the vicarious liability analysis for Plaintiffs' state law claims. As discussed above regarding the jury instructions, Mr. Sanchez's motives are relevant to whether he acted in the course and scope of his employment as a police officer. Lisa M., 12 Cal. 4th at 298. His statements in the employee report that he acted pursuant to his LAPD training and job tended to show that he did not act solely to serve his "personal interest," but "intended to serve the employer in some way." Id. The probative value of this evidence was also high given that Mr. Sanchez did not testify at trial.

Second, the admission of this evidence did not unduly prejudice the City. Because the City introduced Mr. Sanchez's employee report into evidence during its examination of Mr. Smith, Plaintiffs were entitled to cross-examine Mr. Smith about the employee report. In addition, as noted above, before the Court admitted the objected to witness testimony, the jury had watched Mr. Sanchez's videotaped deposition, in which he testified to the same statements in his employee report. It was not more prejudicial for the jury to hear the same testimony from the City's own witness than to hear Mr. Sanchez testify about the contents of the report. Moreover, even before this evidence came in, the record was replete with evidence from which a jury could determine that Mr. Sanchez had acted in the course and scope of his employment and under color of state law. As discussed at length above, the jury heard many witnesses testify that Mr. Sanchez had identified himself as an officer multiple times on the scene verbally and by showing his LAPD identification card. Given this testimonial evidence, it is unlikely that the jury afforded much weight to Mr. Sanchez's statements in his employee report.

Nor did the Court's exclusion of the "out of policy" findings make Mr. Smith's testimony more prejudicial to the City. The City chose to introduce Mr. Sanchez's employee report—knowing its contents, without seeking any exclusions or limitations, and knowing it could not rely on LAPD's "out of policy" finding to rebut the contents of the report. The City cannot now argue that its own misstep requires reversal of the MIL Order. Moreover, the Court maintains, as it did before trial, that the ex post facto determinations by LAPD and the City would have been unfairly prejudicial to Plaintiffs. As the Court explained at the motion in limine hearing, whether Mr. Sanchez acted outside of LAPD policy was an administrative standard,

whereas whether he acted under the color of state law and in the course and scope of his employment were constitutional and state law standards. A jury, however, might confuse the relevant standards at issue and give undue weight to "official" decisions and confuse the relevant standards at issue. (MIL Order at 5.) Even with the admission of evidence of Mr. Sanchez's beliefs, the undue prejudice of the LAPD findings outweigh their probative value.

Accordingly, the Court concludes that neither the admission of Mr. Sanchez's statements in his employee report nor the exclusion of LAPD's findings that he acted "out of policy" substantially affected the City's rights. Moreover, because any purported error was harmless, a new trial is not warranted on this basis.

### 5. City's Special Interrogatories

The City further argues that the Court erred when it denied the City's proposed special interrogatories. (Rule 50b Mot. at 18–19.) The Court disagrees.

Federal Rule of Civil Procedure 49(b)(1) allows a court to submit interrogatories "on one or more issues of fact" to the jury with a general verdict form. Fed. R. Civ. P. 49(b)(1). "The decision whether to submit special interrogatories to the jury is a matter committed to the discretion of the district court." Hung Lam, 869 F.3d at 1086 (internal citations and quotation marks omitted).

Here, the proposed special interrogatories included a broad range of questions, such as whether Mr. Sanchez was off-duty during the incident,[14] whether he had probable cause to believe that Plaintiffs committed a public offense, and whether he acted with malice, fraud, or corruption. (Dkt. No. 98.) Contrary to the City's assertion, these interrogatories would not have allowed the Court to determine whether as a matter of law Mr. Sanchez acted under color of law or in the scope of his employment. (Rule 50b Mot. at 18.) The questions focus on specific facts that support the City's theory of the case. However, they omit other disputed facts relevant to the inquiry. Further, the City concedes that some of the questions were directed toward post-trial indemnification issues that were not before the Court. (Rule 50b Mot. Opp'n at 22.) The City's belief that such interrogatories would assist judicial efficiency is insufficient reason to submit unnecessary and potentially confusing questions to the jury. Accordingly, the Court's decision to refuse the City's proposed special interrogatories was not a miscarriage of justice.

### 6. Bane Act

The City finally argues that the Court erred by finding that the intent element of Plaintiffs' Bane Act claim had been met. (Rule 50b Mot. at 19.) It contends that insufficient evidence supported a determination that Mr. Sanchez intended to shoot each Plaintiff and Kenneth and that the jury should have received instructions to find specific intent. (Id.)

---

[14] Whether Mr. Sanchez was off-duty during the incident was not in dispute at trial, as the Court had found it was undisputed that he was off-duty in the MSJ Order. (MSJ Order at n.4.)

Neither the record nor the law supports the City's position.  After the parties' presentations, the Court found based on overwhelming evidence that Mr. Sanchez used excessive force against Plaintiffs and Kenneth.  It is established law that "the elements of [an] excessive force claim under [California Civil Code] § 52.1 are the same as under § 1983."  Cameron v. Craig, 713 F.3d 1012, 1022 (9th Cir. 2013).  Because "[e]xcessive force … is by its very nature egregious," a finding of excessive force establishes the necessary intent to interfere with or attempt to interfere with Plaintiffs' rights under the Bane Act.  Orr v. Brame, 727 F. App'x 265, 268–69 (9th Cir. 2018) (agreeing with majority of California federal district courts that had held that a plaintiff need not prove "coercion independent from the coercion inherent in the seizure or use of force" in Fourth Amendment excessive force cases).  Therefore, the Court was not required to find separate intent or instruct the jury to determine intent under the Bane Act.

In sum, the Court concludes that none of the issues raised by the City support a new trial.  Accordingly, the Court DENIES the Rule 50b Motion.

### III.   PLAINTIFFS' MOTION FOR ATTORNEY'S FEES

Plaintiffs move for attorneys' fees as the prevailing party under 42 U.S.C. § 1988 and California law.  (See Fee Mot.)  The Court considers whether the requested fees are reasonable.

**A.  Legal Standard**

In general, courts apply the "American Rule," where "each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983).  Under 42 U.S.C. § 1988 ("Section 1988"), a court may, in its discretion, award reasonable attorneys' fees in a suit seeking to vindicate rights under 42 U.S.C. § 1983.  Braunstein v. Ariz. Dep't of Transp., 683 F.3d 1177, 1187 (9th Cir. 2012); 42 U.S.C. § 1988(b).  Plaintiffs who prevail on a Bane Act claim are also entitled to attorneys' fees.  Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1112 (9th Cir. 2014) (citing Cal. Civ. Code § 52.1(h)).

The customary method of determining the reasonableness of attorneys' fees under either 42 U.S.C. § 1988 or the Bane Act is the lodestar method.  Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir. 2006) (Section 1988); Chaudhry, 751 F.3d 1096 (Bane Act).  Under this method, a court multiplies "the time spent" with the "reasonable hourly compensation of each attorney involved in the presentation of the case."  Hensley, 461 U.S. at 433.  This lodestar figure is "presumptively reasonable."  Id.  "The district court may then adjust [the lodestar] upward or downward based on a variety of factors."  Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008).  These factors include:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5)

the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases."

Id. Because "California law allows for a multiplier of the lodestar to compensate for the risk of contingent representation," the Ninth Circuit allows a "a plaintiff [who] succeeds on both federal and state claims" to seek "the state-law multiplier. Chaudhry, 751 F.3d at 1112 (citing Ketchum v. Moses, 24 Cal. 4th 1122, 1133 (2001), and Mangold v. Cal. Pub. Utilities Comm'n, 67 F.3d 1470, 1478–79 (9th Cir. 1995)). The fee applicant holds the "burden of showing that the claimed rate and number of hours are reasonable." Blum v. Stenson, 465 U.S. 886, 897 (1984).

**B. Lodestar Analysis**

Plaintiffs' counsel requests $1,928,781.00[15] in attorneys' fees for 1,801.05 hours worked. (See Fee Mot. Reply at 11–12.) The requested fee amount includes time associated with drafting the Fee Motion Reply and represents the lodestar figure multiplied by a 1.5 enhancement, as detailed below:

| Attorney / Biller | | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | Attorney | 547.3 | $1,100.00 | $602,030.00 |
| John Fattahi | Attorney | 37.4 | $785.00 | $29,359.00 |
| Renee V. Masongsong | Attorney | 462.8 | $600.00 | $277,680.00[16] |
| Eric Valenzuela | Attorney | 459 | $700.00 | $321,300.00 |
| Alejandro Monguia | Legal Assistant | 11.4 | $200.00 | $2,280.00 |
| Karen Slyapich | Legal Assistant | 176.9 | $200.00 | $35,380.00 |
| Santiago Laurel | Legal Assistant | 37.75 | $200.00 | $7,550.00 |
| Marielle Sider | Legal Intern | 68.5 | $150.00 | $10,275.00 |
| **SUBTOTAL** | | **1,801.05** | | **$1,285,854.00** |
| 1.5 Multiplier | | | | $642,927.00 |
| **TOTAL** | | | | **$1,928,781.00** |

The City argues that the requested fee award is unreasonable and challenges the hourly rates, number of hours, and lodestar multiplier as excessive. (See Fee Mot. Opp'n.)

---

[15] Plaintiffs' counsel requests $1,929,231.00 in the Fee Motion Reply. (Fee Mot. Reply at 11–12.) However, this amount includes errors in calculation that the Court notes below. As such, the Court construes the requested fee amount as $1,928,781.00.

[16] Plaintiffs' counsel calculates Ms. Masongsong's lodestar as $277,980.00. (Fee Mot. Reply at 12.) However, the Court's own calculation of 462.8 hours at $600 per hour yields $277,680.00.

### 1. Hourly Rate

Reasonable fees under Section 1988 are calculated according to the prevailing market rates in the relevant legal community. <u>Gates v. Deukmejian</u>, 987 F.2d 1392, 1405 (9th Cir. 1992). Because "the relevant community is the forum in which the district court sits," <u>Prison Legal News v. Schwarzenegger</u>, 608 F.3d 446, 454 (9th Cir. 2010), the prevailing rates in the Central District of California control here.

### a. Dale Galipo

Plaintiffs' counsel requests an hourly rate of $1,100 per hour for Mr. Galipo. (Fee Mot. at 22.) The City does not contest this rate. (Fee Mot. Opp'n at 3.) As both parties recognize, this Court has previously found Mr. Galipo's requested rate reasonable. <u>See</u> <u>Donastorg v. City of Ontario</u>, 2021 WL 6103545, at *8 (C.D. Cal. Sept. 23, 2021). The Court finds no reason to reach a different conclusion here. Mr. Galipo's requested rate of $1,100 per hour is reasonable.

### b. John Fattahi

Plaintiffs' counsel requests an hourly rate of $785 per hour for Mr. Fattahi. (Fee Mot. at 22.) The City argues that Mr. Fattahi's rate should be reduced either to $725 per hour, the rate awarded to him by a federal court in 2020, or $740 per hour, which the City states is the upper boundary for rates for litigation associates in the Los Angeles area. (Fee Mot. Opp'n at 2–3.)

Mr. Fattahi is a solo practitioner who has practiced for fifteen years and manages his own firm, the Law Office of John Fattahi, since 2011. (Fattahi Decl. ¶¶ 4, 6; Galipo Decl. ¶ 26.) He has litigated plaintiff's civil rights cases for thirteen years. (Fattahi Decl. ¶¶ 4–6.) In 2020, a different court in this District approved Mr. Fattahi's hourly rate of $725 per hour in another excessive force case against the City. (<u>Id.</u> ¶ 3; <u>id.</u>, Ex. 2 (attaching "Order Granting Plaintiff L.D.'s Supplemental Fee Motion" in <u>L.D., et al. v. City of Los Angeles</u>, No. 2:16-cv-04626-PSG-SK (C.D. Cal. June 30, 2020)).)

Based on Mr. Fattahi's experience, the Court finds that hourly rates for partners provide a more appropriate measure for Mr. Fattahi's compensation than rates for associates. The Court, on its own motion, takes judicial notice of the <u>2021 Real Rate Report: The Industry's Leading Analysis of Law Firm Rates, Trends, and Practices</u> ("2021 Real Rate Report"). While Plaintiffs are correct that the Real Rate Report does not address civil rights practice, this Court has found that the report provides a helpful reference point and consults it here. According to the 2021 Real Rate Report, the median rate for litigation partners in Los Angeles was $715 per hour, while the mean rate was $759 per hour. (2021 Real Rate Report at 17.) Litigation partners in the third quartile earned $1,042 per hour. (<u>Id.</u>) Mr. Fattahi's requested rate of $785 per hour is within the range of what other litigation partners earn. Moreover, this rate reflects a moderate increase from Mr. Fattahi's approved rate in 2020 to account for inflation. The Court, therefore, concludes that Mr. Fattahi's requested rate of $785 per hour is reasonable.

### c.  Renee Masongsong

Plaintiffs' counsel requests an hourly rate of $600 per hour for Ms. Masongsong. (Fee Mot. at 22.) The City does not contest this rate. (Fee Mot. Opp'n at 3.) Ms. Masongsong is a senior associate attorney at the Law Offices of Dale K. Galipo, who has practiced for ten years. (Masongsong Decl. ¶¶ 5, 8.) She has worked almost exclusively on civil rights litigation for the past nine years. (Id. ¶¶ 8–11.) For the instant action, she was one of two associates who handled the day-to-day case management, and she worked on law and motion and discovery issues. (Id. ¶ 12; Valenzuela Decl. ¶ 17.) Mr. Galipo declares that Ms. Masongsong was influential in obtaining the successful verdict here. (Galipo Decl. ¶¶ 24–25.) In April 2020, another court in this district approved Ms. Masongsong's hourly rate of $550 per hour in an officer-involved, excessive force case against the City. (Masongsong Decl. ¶ 14; "Frias Fee Order," Id., Ex. 2 (attaching Juan Frias v. City of Los Angeles, et al., No. 2:16-cv-04626-PSG-SK, ECF No. 199).) Under these facts, the Court finds that Ms. Masongsong's requested rate of $600 per hour is reasonable.

### d.  Eric Valenzuela

Plaintiffs' counsel requests a rate of $700 per hour for Mr. Valenzuela. (Fee Mot. at 22.) The City argues that his rate should be reduced to $600 per hour, like that of Ms. Masongsong. (Fee Mot. Opp'n at 3.) Plaintiffs' counsel responds that Mr. Valenzuela's higher rate is justified because he second chaired the trial and examined witnesses. (Fee Mot. Reply at 1.)

It is true that Mr. Valenzuela and Ms. Masongsong share similarities in practice experience. Like Ms. Masongsong, Mr. Valenzuela is a senior associate attorney at the Law Offices of Dale K. Galipo. (Valenzuela Decl. ¶ 5.) He has practiced for nine years and litigates police excessive force cases almost exclusively. (Id. ¶¶ 5–9.) In this case, he also handled the day-to-day case management with Ms. Masongsong, drafted motions, and propounded discovery. (Id. ¶¶ 16–17.) However, as Plaintiffs' counsel notes, Mr. Valenzuela conducted examinations of four witnesses at trial. (Id. ¶ 10; Galipo Decl. ¶ 22; Fee Mot. Reply at 1.) Accordingly, a higher hourly rate for Mr. Valenzuela is reasonable.

### e.  Alejandro Monguia, Karen Slyapich, and Santiago Laurel

Plaintiffs' counsel requests a rate of $200 per hour for Mr. Monguia, Ms. Slyapich, and Mr. Laurel, all legal assistants. (Fee Mot. at 22.) The City does not contest this rate. (Fee Mot. Opp'n at 3.) This Court has previously approved this same rate for paralegals. See Donastorg, 2021 WL 6103545, at *9; see also Di Gioia v. Ford Motor Co., 2020 WL 1955311, at *5 (C.D. Cal. Apr. 1, 2020). Mr. Galipo attests to the significant contributions Ms. Slyapich and Mr. Monguia made in the instant case. (Galipo Decl. ¶¶ 27–29.) Accordingly, the Court finds that $200 per hour is a reasonable rate for Mr. Monguia, Ms. Slyapich, and Mr. Laurel.

//
//
//

####    f.   Marielle Sider

Plaintiffs' counsel requests an hourly rate of $150 per hour for Ms. Sider, a legal extern at the Law Offices of Dale K. Galipo. (Fee Mot. at 22; Sider Decl. ¶ 1.) The City argues that Ms. Sider's rate should be reduced to $125 per hour, the rate this Court approved for her last year. (Fee Mot. Opp'n at 3 (citing <u>Donastorg</u>, 2021 WL 6103545, at *9).)

The City correctly notes that the Court previously found that an hourly rate of $125 per hour was reasonable for Ms. Sider. <u>Donastorg</u>, 2021 WL 6103545, at *9. The Court based this determination on the evidence submitted to support Ms. Sider's rate as a legal intern and a 2020 case finding $125 per hour reasonable for law student interns. <u>Id.</u> Since then, however, Ms. Sider declares that she has been hired as a permanent employee with the title "legal extern." (Sider Decl. ¶ 3.) Moreover, a modest increase of her rate to account for inflation is appropriate. Accordingly, the Court finds that Ms. Sider's requested rate of $150 per hour is reasonable.

In sum, the Court concludes that Plaintiffs' counsel's requested rates are reasonable.

### 2.  Hours Billed

Plaintiffs' counsel requests attorneys' fees for a total of 1,801.05 hours worked on this case. (Fee Mot. at 22; Fee Mot. Reply at 12.) The City argues that these hours should be reduced because they include (1) unbillable clerical tasks, (2) impermissible block billing and travel time, and (3) duplicative billing. (Fee Mot. Opp'n at 3–10.)

####   a.   Clerical Tasks

The City challenges certain hours billed by Mr. Galipo, Ms. Masongsong, Mr. Laurel, Ms. Slyapich, and Mr. Monguia as clerical tasks that should be excluded. (Fee Mot. Opp'n at 6–8.) This Court has previously found that "copying and scanning documents and calendaring dates" are "purely clerical tasks," whereas "prepar[ing ] a letter to opposing counsel requesting production of documents," "prepar[ing ] deposition notices," "reviewing and organizing case files and creating and updating pleading clips" are not purely clerical tasks. <u>Smith v. County of Riverside</u>, 2019 WL 4187381, at *8 (C.D. Cal. June 17, 2019).

The City first contends that Mr. Galipo's travel time for hearings and work on the federal complaints were unwarranted. (Fee Mot. Opp'n at 6.) The Court disagrees. The Court expects counsel for parties to appear in person unless they request a virtual appearance. Moreover, all "[r]easonable travel time by the attorney is compensable, at full rates." <u>Rodriguez v. County of Los Angeles</u>, 96 F. Supp. 3d 1012, 1025 (C.D. Cal. 2014). The City also offers no evidence in support of its contention that the hours billed for Mr. Galipo's review of the federal complaints were inflated simply because Plaintiffs had already filed a complaint in state court. Accordingly, changes to Mr. Galipo's hours are unnecessary on this basis.

//

---

**CIVIL MINUTES—GENERAL**

The City also challenges various time entries by Ms. Masongsong, such as reviewing and organizing case files, undertaking "paralegal type" tasks, and packing boxes. (Fee Mot. Opp'n at 6–7.) However, reviewing and organizing case files are not purely clerical tasks. Moreover, as Plaintiffs argue, it was reasonable for Ms. Masongsong to directly prepare certain trial exhibits, communicate with the mortuary about expenses, coordinate witnesses and experts, and calculate medical billing because the tasks were essential to proving Plaintiffs' claims and theory of the case. (Fee Mot. Reply at 6.) By contrast, the Court agrees with the City that time spent to pack boxes after trial is not billable. (Masongsong Decl., Ex. 1 at 15 (10/27/2021).) Though Ms. Masongsong's timesheet does not state how long this task took, the Court determines that a reduction of 0.5 hours is appropriate.

The City next asserts that Mr. Laurel, Ms. Slyapich, and Mr. Monguia have multiple time entries for purely clerical tasks. The Court agrees. These tasks include: printing and copying files (Mr. Laurel), as well as downloading and saving court filings and calendaring deadlines (Ms. Slyapich and Mr. Monguia). Accordingly, the Court reduces Mr. Laurel's hours by 5.5 hours, Ms. Slyapich's hours by 5.2 hours, and Mr. Monguia's hours by 0.5 hours.

### b.  Block Billed Time

The City argues that Mr. Galipo, Ms. Masongsong, Mr. Valenzuela, and Mr. Laurel have impermissibly block-billed time. (Fee Mot. Opp'n at 8.) In general, courts look unfavorably on block billing in timesheets because it "does not allow the Court to scrutinize the amount of time spent performing each task." Rahman v. FCA US LLC, -- F. Supp. 3d --, 2022 WL 1013433, at *4 (C.D. Cal. Mar. 29, 2022) (internal citations omitted). A court may "reduc[e] or eliminat[e] certain claimed hours" based on such billing practices, but it may not "deny[] all fees." Mendez v. County of San Bernardino, 540 F.3d 1109, 1129 (9th Cir. 2008), overruled on other grounds by Arizona v. ASARCO LLC, 773 F.3d 1050 (9th Cir. 2014). However, a court need not reduce hours for block-billing if it can determine the reasonableness of the hours spent on each task. See Donastorg, 2021 WL 6103545, at 13–14.

The City challenges Mr. Galipo's time entries for "trial preparation" as overbroad. (Fee Mot. Opp'n at 8.) For each of these entries, however, he explains that "[t]rial preparation includes: discussions and meetings with co-counsel and staff, meeting with and preparing witnesses, reviewing statements, investigation reports, medical records, photos, audio, video, depositions, expert reports, pleadings, pre-trial documents including jury instructions, verdict forms, exhibits, client preparation, preparation for voir dire, opening statement, direct and cross examination, [and] closing and rebuttal arguments." (Galipo Decl., Ex. 1 at 6.) Further, his trial and trial preparation time totals 206 hours over 19 days, which is reasonable. See Donastorg, 2021 WL 6103545, at *14 (finding reasonable Mr. Galipo's 224.8 hours billed for "trial and trial preparation" over 17 days). Thus, the Court will not reduce Mr. Galipo's hours on this basis.[17]

//

---

[17] The City again asserts that travel time is not recoverable, but this is incorrect.

The City also contests certain time entries by Ms. Masongsong, Mr. Valenzuela, and Mr. Laurel.  (Fee Mot. Opp'n at 8.)  The Court finds that Ms. Masongsong's hours billed to "other trial participation" are not vague or unreasonable.  See Rodriguez, 96 F. Supp. 3d at 1025 (finding the presence of more than one attorney reasonable where "[a] second attorney may serve as a sounding board or be necessary to assure that valuable testimony … is obtained during the limited time allotted").  However, the Court agrees that some hours entered by Ms. Masongsong, Mr. Valenzuela, and Mr. Laurel are impermissibly block-billed.  (Masongsong Timesheet at 7/20/20, 12/07/20, 12/09/20, and 5/17/21; Valenzuela Timesheet at 9/20/21, 10/01/21, 10/13/21; Laurel Timesheet at 10/01/21.)  Accordingly, the Court reduces these block-billed hours by 10%.[18]  See Banas v. Volcano Corp., 47 F. Supp. 3d 957, 968 (N.D. Cal. 2014) (recognizing "a district court's authority to reduce block-billed hours by 10% to 30%).  Ms. Masongsong's hours are reduced by 0.8 hours, Mr. Valenzuela's hours are reduced by 1.2 hours, and Mr. Laurel's hours are reduced by 0.2 hours.

### c.  Duplicative Billing

The City finally argues that the timesheets of Mr. Galipo, Ms. Masongsong, Mr. Valenzuela, Mr. Fattahi, and Ms. Sider reflect duplicative billing and unnecessary staffing.  (Fee Mot. Opp'n at 9–10.)  "Even duplicative work, however, is not a justification for cutting a fee, unless 'the lawyer does unnecessarily duplicative work."  Mendez, 540 F.3d at 1129 (quoting Moreno v. City of Sacramento, 534 F.3d 1106, 1113 (9th Cir. 2008)) (emphasis in original).

The Court has reviewed the time entries identified by the City and finds that Plaintiffs' counsel sufficiently explains that such hours were not unnecessarily duplicative.  (Fee Mot. Reply at 8–10.)  Therefore, the Court declines to reduce any hours on this basis.

Accordingly, the Court concludes that Plaintiffs' counsel may seek fees for a total of 1,787.15 hours, as detailed below:

| Attorney / Biller | Hours Billed | Revised Hours |
|---|---|---|
| Dale K. Galipo | 547.3 | **547.3** |
| John Fattahi | 37.4 | **37.4** |
| Renee Masongsong | 462.8 | **461.5** |
| Eric Valenzuela | 459 | **457.8** |
| Alejandro Monguia | 11.4 | **10.9** |
| Karen Slyapich | 176.9 | **171.7** |
| Santiago Laurel | 37.75 | **32.05** |
| Marielle Sider | 68.5 | **68.5** |
| **TOTAL** | 1,801.05 | **1,787.15** |

---

[18] The Court rounds this figure up to the nearest tenth decimal place.

### 3.  Multiplier

Based on the Court's reduced hours, Plaintiffs' counsel's lodestar is $1,281,954.00. Plaintiffs' counsel seeks a 1.5 multiplier of the lodestar to bring their total requested fee amount to $1,922,931.00.  (Fee Mot. at 17–21.)  Though the City argues that a multiplier is unwarranted under federal or state law, this is incorrect.  (Fee Mot. Opp'n at 11–15.)  As noted above, the Ninth Circuit allows a plaintiff who succeeds on both federal claims and a Bane Act claim to seek "the state-law multiplier." Chaudhry, 751 F.3d at 1112.  That is the case here.

To determine whether to apply the state-law multiplier, the Court looks to: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." Ketchum, 24 Cal. 4th at 1132; see also Frias Fee Order at 9.

Here, the issues in this case were more simplified than in other excessive force cases. The determinative questions were whether Mr. Sanchez acted under color of state law and in the course and scope of his employment during the incident.  However, the case presented its own difficulties as Mr. Sanchez was off-duty and outside of Los Angeles County at the time.  (Galipo Decl. ¶ 20; Fattahi Decl. ¶ 6.)  Since Mr. Sanchez did not testify at trial, Plaintiffs' counsel also had to skillfully piece together evidence from numerous witnesses, experts, and Mr. Sanchez's videotaped deposition to make their case to the jury.  (Galipo Decl. ¶ 20.)  Mr. Galipo and Mr. Fattahi declare that working on this case precluded other employment opportunities for their respective firms.  (Id. ¶ 18; Fattahi Decl. ¶ 6.)  Finally, Plaintiffs' counsel litigated the case on a contingency basis without receiving interim payments and incurred over $154,000.00 in costs.  (Galipo Decl. ¶ 30; Fattahi Decl. ¶ 6.)  Under these facts, the Court finds that the requested multiplier is justified.  Accordingly, the Court applies a 1.5 multiplier to the lodestar calculation of $1,281,954.00 for a total award of $1,922,931.00.

In sum, the Court GRANTS IN PART the Fee Motion as follows:

| Attorney / Biller | | Revised Hours | Hourly Rate | Revised Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | Attorney | 547.3 | $1,100.00 | $602,030.00 |
| John Fattahi | Attorney | 37.4 | $785.00 | $29,359.00 |
| Renee v. Masongsong | Attorney | 461.5 | $600.00 | $276,900.00 |
| Eric Valenzuela | Attorney | 457.8 | $700.00 | $320,460.00 |
| Alejandro Monguia | Legal Assistant | 10.9 | $200.00 | $2,180.00 |
| Karen Slyapich | Legal Assistant | 171.7 | $200.00 | $34,340.00 |
| Santiago Laurel | Legal Assistant | 32.05 | $200.00 | $6,410.00 |
| Marielle Sider | Legal Intern | 68.5 | $150.00 | $10,275.00 |
| **SUBTOTAL** | | 1,787.15 | | **$1,281,954.00** |
| 1.5 Multiplier | | | | $640,977 |
| **TOTAL** | | | | **$1,922,931.00** |

### IV.   CONCLUSION

For the above reasons, the Court ORDERS the following:

1.   The Court DENIES the City's Rule 50b Motion;

2.   The Court GRANTS IN PART Plaintiffs' Fee Motion and AWARDS Plaintiffs' counsel
     $1,922,931.00 in attorneys' fees; and

3.   The May 16, 2022 hearing is VACATED.

**IT IS SO ORDERED.**

# EXHIBIT 7

1
2
3
4
5
6
7
8                 **UNITED STATES DISTRICT COURT**
9                 **CENTRAL DISTRICT OF CALIFORNIA**
10                        **SOUTHERN DIVISION**
11
12   **KATHY CRAIG, *et al.*,**                )   **Case No.: SACV 17-00491-CJC(KESx)**
                                              )
13                                            )
          **Plaintiffs,**                     )
14                                            )   **ORDER GRANTING PLAINTIFFS'**
       **v.**                                 )   **MOTION FOR ATTORNEY FEES**
15                                            )   **[Dkt. 271]**
                                              )
16   **COUNTY OF ORANGE, *et al.*,**           )
                                              )
17                                            )
          **Defendants.**                     )
18                                            )
                                              )
19   _____         )
20   **I.  INTRODUCTION & BACKGROUND**
21
22        Plaintiffs Kathy Craig and Gary Witt filed this lawsuit after Orange County
23   Sheriff's Deputy Nicholas Petropulos fatally shot their son, Brandon Lee Witt.
24   Following an April 2019 trial on Plaintiffs' claims for (1) excessive force under 42
25   U.S.C. § 1983, (2) battery, (3) negligence, and (4) violation of the Bane Act, Cal. Civ.
26   Code § 52.1(b), the jury found in favor of Plaintiffs on all their claims and awarded
27   Plaintiffs a total of $3.4 million in damages—$1.8 million for loss of life, $200,000 for
28   pre-death pain and suffering, and $700,000 each for past loss of companionship and

                                      -1-

1   association.  (Dkts. 189, 202.)  The Court awarded Plaintiffs $1,250,415 in attorney fees

2   for the time spent on the trial and post-trial law and motion practice.  (Dkt. 245 [Order

3   Granting in Substantial Part Plaintiffs' Motion for Attorneys' Fees, hereinafter "Order"].)

4

5        Defendants appealed to the Ninth Circuit, arguing that the Court "improperly

6   awarded compensatory damages for 'the loss of life experienced by' Witt."  *Craig v.*

7   *Petropulos*, 856 F. App'x 649, 649 (9th Cir. 2021).  The Ninth Circuit affirmed,

8   explaining that it had "recently rejected [Defendants'] arguments in *Valenzuela v. City of*

9   *Anaheim*, 6 F.4th 1098, 1102–05 (9th Cir. 2021), when [it] upheld the jury's loss of life

10  award and determined that California state law prohibiting such damages was

11  'inconsistent with [42 U.S.C.] § 1983,'" and that this case was "indistinguishable" from

12  *Valenzuela*.  *Craig*, 856 F. App'x at 650.  Defendants' petition for panel rehearing and

13  rehearing en banc was denied.  Defendants then appealed to the Supreme Court, but—

14  after requesting a response to the petition—the Supreme Court denied certiorari.  *County*

15  *of Orange v. Craig*, 143 S. Ct. 526 (2022) (mem.).

16

17       Now before the Court is Plaintiffs' motion for attorney fees for their work

18  responding to Defendants' appeals to the Ninth Circuit and the Supreme Court.  (Dkt. 271

19  [hereinafter "Mot."].)  Plaintiffs request a lodestar amount of $368,797.10 in attorney

20  fees.  (Dkt. 277 [Reply] at 15.)  In opposition, Defendants argue that (1) counsel's hourly

21  rates are excessive, and (2) much of the time spent duplicated efforts between this case

22  and *Valenzuela*, in which many of the same lawyers are separately seeking fees.  (Dkt.

23  276 [hereinafter "Opp."].)  For the following reasons, Plaintiffs' motion is **GRANTED**.[1]

24  The Court awards Plaintiffs $368,797.10 in attorney fees.

25

26

27  _____

[1]  Having read and considered the papers presented by the parties, the Court finds this matter appropriate
28  for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set
    for February 27, 2023 at 1:30 p.m. is hereby vacated and off calendar.

**II.  ANALYSIS**

"The general rule in our legal system is that each party must pay its own attorney's fees and expenses."  *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010).  In an action brought pursuant to 42 U.S.C. § 1983, however, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988(b).  A party is considered the prevailing party if it succeeds on any significant issue in litigation that achieves some of the benefit sought in bringing the lawsuit. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  Defendants do not dispute that Plaintiffs prevailed on their claim on appeal that the scope of recoverable survival damages in California for Section 1983 claims includes survival damages for the decedent's loss of life—a question that was previously unclear.  Rather, Defendants contend that the fees Plaintiffs seek are unreasonable.

In assessing the reasonableness of a fee award, a district court considers twelve factors: "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to the acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases."  *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *cert. denied*, 425 U.S. 951 (1976).

There is a strong presumption that the lodestar figure represents a reasonable fee. *Morales v. City of San Rafael*, 96 F.3d 359, 363 n.8 (9th Cir. 1996); *see also Harris v. Marhoerfer*, 24 F.3d 16, 18 (9th Cir. 1994) ("Only in rare instances should the lodestar

-3-

figure be adjusted on the basis of other considerations.").  The lodestar amount is the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hensley*, 461 U.S. at 433.  Under the lodestar approach, many of the *Kerr* factors have been subsumed as a matter of law.  *Morales*, 96 F.3d at 364 & n.9.

### A.    Hourly Rates

The Court first determines Plaintiffs' counsel's reasonable hourly rates.  "The hourly rate for successful civil rights attorneys is to be calculated by considering certain factors, including the novelty and difficulty of the issues, the skill required to try the case, whether or not the fee is contingent, the experience held by counsel, and fee awards in similar cases."  *Moreno v. City of Sacramento*, 534 F.3d 1106, 114 (9th Cir. 2008).  Courts also are guided by "the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation."  *Trevino v. Gates*, 99 F.3d 911, 925 (9th Cir. 1996); *see also Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005).  Once the party claiming fees presents evidence supporting the claimed rate, the burden shifts to the party opposing fees to present equally specific countervailing evidence.  *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).

### 1.    Dale Galipo

Dale Galipo, the lead trial lawyer who then reviewed and edited the appellate briefs, requests an hourly rate of $1,200.  (Mot. at 23.)  Mr. Galipo graduated from UCLA School of Law in 1984.  (Dkt. 232 [Declaration of Dale K. Galipo, hereinafter "Galipo Decl."] ¶ 3; Mot. at 22.)  Since 1991, he has managed his own law firm, and he has specialized in civil rights cases over the last two decades.  (*See id.* ¶ 4.)

1     To support his hourly rate after trial, Mr. Galipo submitted declarations from

2  several prominent civil rights attorneys attesting to his skill and experience.  (*See* Dkt.

3  231 [Declarations of Thomas Beck, John Burton, Carl Douglas, John Fattahi, Paul

4  Hoffman, and Ronald Brower].)  As the Court noted in its order granting post-trial fees,

5  "[h]is track record backs this up."  (Order at 4.)  At that time, the Court noted that since

6  2015, Mr. Galipo had successfully resolved cases in settlements totaling over $70

7  million, and that in the two years prior, he had prevailed in fourteen jury trials, including

8  twelve civil rights cases.  (Galipo Decl. ¶ 4.)  In 2018, he was nominated for Trial

9  Lawyer of the Year by the Consumer Attorneys Association of Los Angeles ("CAALA"),

10  and in 2019, he was elected to the American College of Trial Lawyers and the Inner

11  Circle of Advocates.  (*Id.* ¶¶ 15, 17, 20.)

12

13     After trial, the Court found that $1,000 was a reasonable hourly rate for Mr.

14  Galipo.  The Court explained that with thirty-five years of experience, this rate was

15  consistent with the prevailing rate in the Central District for attorneys of comparable

16  skill, experience, and reputation.  (Order at 5.)

17

18     Since 2019, Mr. Galipo has continued to develop his impressive track record.  In

19  just the last few years, he prevailed in at least eight civil rights jury trials, with verdicts

20  totaling over $43.2 million, and has settled another ten cases for another $42.65 million.

21  (Dkt. 272 [Supplemental Declaration of Dale Galipo, hereinafter "Supp. Galipo Decl."]

22  ¶¶ 3–4.)  He has also argued seven cases before the Ninth Circuit, including *Valenzuela*.

23  (*Id.* ¶¶ 8–9.)  In 2020, he was awarded Trial Lawyer of the Year by the CAALA and

24  Consumer Attorneys of California's Consumer Attorney of the Year.  (*Id.* ¶¶ 5–6.)

25

26     The Court finds that a $1,200 hourly rate is reasonable for Mr. Galipo's work over

27  the past three years.  Mr. Galipo has continued to demonstrate the value of his advocacy

28  with over $85 million in recovery in civil rights cases in just a few years.  Although this

rate is high, it reflects Mr. Galipo's strong reputation within the legal community and his continued consistent record of success.  It is also consistent with the prevailing rate of other attorneys who practice civil rights litigation in the Central District who graduated law school when Mr. Galipo did.  *See Donastorg v. City of Ontario*, 2021 WL 6103545, at *8 (C.D. Cal. Sept. 23, 2021) ("According to the 2020 Real Rate Report, partners working in commercial litigation at large firms in Los Angeles earn between $941 and $1,235."); *cf. McKibben*, 2019 WL 1109683, at *14 (approving in 2019 adjusted lodestar rates of $887 to $1230 per hour for attorneys practicing civil rights litigation with 26 to 49 years of experience); (Dkt. 275 [Declaration of Carol A. Sobel, hereinafter "Sobel Decl."] ¶¶ 28–39 [collecting evidence that Mr. Galipo's requested rate is consistent with the market rate]).  Indeed, other courts in this district found $1,100 to be a reasonable fee for Mr. Galipo as long as three years ago.  (Supp. Galipo Decl. ¶ 7 [listing two cases from 2020 and 2021 in which courts awarded Mr. Galipo $1,100 per hour]); *Donastorg*, 2021 WL 6103545, at *8 (citing the 2020 Real Rate Report and explaining that "Mr. Galipo's requested rate of $1,100 does not outpace what other litigation partners earn"); *see French v. City of Los Angeles*, 2022 WL 2189649, at *17 (C.D. Cal. May 10, 2022).  When it comes to police excessive force cases, Mr. Galipo continues to be without question at the top of his field.

### 2.    Kelsi Brown Corkran

Kelsi Brown Corkran, who led Plaintiffs' team in preparing and finalizing the brief in opposition to Defendants' petition for a writ of certiorari, seeks an hourly rate of $1,075—her billing rate when she left private practice in 2021.  (Mot. at 22–23; Dkt. 271-1 [Declaration of Kelsi Corkran, hereinafter "Corkran Decl."] ¶¶ 12, 16.)  Ms. Corkran graduated from the University of Chicago with a law degree and a master's degree in public policy in 2005.  (Corkran Decl. ¶ 2.)  After law school, she clerked for Judge David S. Tatel on the D.C. Circuit.  (*Id.* ¶ 3.)  From 2006 to 2012, she was an

1  attorney with the Civil Appellate Staff at the Department of Justice in Washington, DC,

2  where she was lead counsel for the federal government in over 30 federal appeals

3  involving complex administrative and constitutional law issues.  (*Id.* ¶ 4.)  She then

4  became an associate and then counsel at Bancroft PLLC, an appellate litigation boutique

5  in Washington, DC, until she clerked for Justice Ruth Bader Ginsburg in 2013.  (*Id.* ¶¶ 5–

6  6.)  From 2014 to 2021, she was a partner at Orrick, Herrington, & Sutcliffe, LLC, in

7  Washington, DC, where she became the head of the Supreme Court practice in 2020.  (*Id.*

8  ¶ 7.)  In 2014, she was named a 40 Under 40 Rising Star by the National Law Journal,

9  and she was nationally ranked in appellate litigation by Chambers USA in 2019 and

10  2020.  (*Id.* ¶ 8.)  Since 2021, she has been the Supreme Court Director at the Institute for

11  Constitutional Advocacy & Protection ("ICAP"), a public interest litigation boutique

12  affiliated with Georgetown University Law Center, where she is also a Senior Lecturer in

13  Law.  (*Id.* ¶ 9.)  In the over 15 years that she has practiced primarily before the Supreme

14  Court and federal courts of appeals, she has argued two cases before the Supreme Court

15  and over 30 cases in the courts of appeals across 12 of the 13 federal circuits.  (*Id.* ¶ 10.)

16

17       The Court finds that $1,075 is a reasonable hourly rate for Ms. Corkran.  This rate

18  reflects Ms. Corkran's substantial experience in appellate law, her strong reputation

19  within the field, the novelty and difficulty of the issues presented on appeal, and the skill

20  required to litigate the appeal.  It is also consistent with the prevailing rate of other

21  attorneys who practice civil rights litigation and who graduated law school eighteen years

22  ago.  *See Donastorg*, 2021 WL 6103545, at *8 ("According to the 2020 Real Rate

23  Report, partners working in commercial litigation at large firms in Los Angeles earn

24  between $941 and $1,235."); *cf. McKibben*, 2019 WL 1109683, at *14 (approving in

25  2019 hourly rates of $603 to $855 for attorneys practicing civil rights litigation with 9 to

26  15 years of experience and $738 to $1220 for those with 23 to 33 years of experience);

27  (Sobel Decl. ¶¶ 40–44 [collecting evidence that Ms. Corkran's requested rate is

28  consistent with the market rate]).

### 3.   Melanie Partow

Melanie Partow, who was primarily responsible for the day-to-day litigation of the case, for researching, drafting, and editing Plaintiffs' Ninth Circuit answering brief and response to the petition for rehearing and rehearing en banc, for collaborating with Supreme Court counsel on the brief in opposition to the petition for certiorari, and for researching and drafting this motion for fees, seeks an hourly rate of $850.  (Mot. at 23; Dkt. 273 [Supplemental Declaration of Melanie Partow, hereinafter "Supp. Partow Decl."] ¶ 20; Mot. at 21.)  Ms. Partow graduated from Southwestern Law School in 2004. (Dkt. 234 [Declaration of Melanie T. Partow, hereinafter "Partow Decl."] ¶ 2.)  She received a master's degree in international human rights law from Oxford University in 2010.  (*Id.* ¶ 13.)  After law school, she clerked for the Chief Prosecutor of the International Criminal Court in the Hague.  (*Id.* ¶ 3.)  Ms. Partow was then admitted to the California Bar in 2006.  (*Id.* ¶ 4.)  From the beginning of her career, Ms. Partow has litigated civil rights cases, including police excessive force cases, at Schonbrun DeSimone Seplow Harris & Hoffman, LLP, and Helmer Friedman, LLP.  (*Id.*)  In 2009, she joined Mr. Galipo's law firm as an associate attorney.  (*Id.*)  Since then, she has litigated more than one hundred police misconduct excessive force cases with Mr. Galipo.  (*Id.*)  In the ten years before the Court's order awarding fees after trial, she had worked on numerous appeals and second-chaired twelve jury trials and one bench trial. (*Id.* ¶¶ 7, 10.)  In 2015 and 2016, she was selected to the Super Lawyers Rising Stars Southern California list.  (*Id.* ¶ 15.)  She also teaches international human rights law and civil rights litigation at the law schools of the University of Southern California and University of California, Irvine.  (*Id.* ¶ 16; Supp. Partow Decl. ¶ 11.)

After trial, the Court found that $675 was a reasonable hourly rate for Ms. Partow, concluding that it was consistent with the prevailing rate of other attorneys in the Central District who practice civil rights litigation with comparable experience, and reflected Ms.

1  Partow's substantial experience in police misconduct excessive force cases and her strong

2  reputation within the field.  (Order at 6.)  Since then, Ms. Partow has opened a solo

3  practice specializing in police excessive force appeals.  (Supp. Partow Decl. ¶ 10.)  In

4  2019, she joined the U.S. Department of Defense, Office of the Military Commissions,

5  where she serves as a trial attorney for a capitally charged defendant before the Military

6  Commissions in Guantanamo Bay, Cuba.  (*Id.* ¶ 12.)  In 2022, she passed the California

7  State Bar examination to become a California Certified Legal Specialist in Civil

8  Appellate Practice.  (*Id.* ¶ 13.)

9

10       The Court finds that $850 is a reasonable hourly rate for Ms. Partow.  This rate

11  reflects Ms. Partow's increased experience over the last few years, her continued strong

12  reputation within the field, the novelty and difficulty of the issues presented on appeal,

13  and the skill required to litigate the appeal.  It is also consistent with the prevailing rate of

14  other attorneys in the Central District who practice civil rights litigation and who

15  graduated law school nineteen years ago.  *See Donastorg*, 2021 WL 6103545, at *8

16  (explaining that the 2020 Real Rate Report lists partners working in commercial litigation

17  at large firms in Los Angeles as earning between $941 and $1,235, with the median rate

18  for litigation partners in Los Angeles at $660 per hour); *cf. McKibben*, 2019 WL

19  1109683, at *14; (Sobel Decl. ¶¶ 45–49 [collecting evidence that Ms. Partow's requested

20  rate is consistent with the market rate]).

21

22       **4.    Joseph Mead**

23

24       Joseph Mead, who helped research and draft the brief in opposition to Defendants'

25  petition for a writ of certiorari, seeks an hourly rate of $850.  (Mot. at 22–23; Dkt. 271-2

26  [Declaration of Joseph Mead, hereinafter "Mead Decl."] ¶ 10.)  After he graduated from

27  the University of Michigan Law School, *magna cum laude*, in 2007, Mr. Mead clerked

28  for judges in the Eastern District of Michigan and on the Sixth Circuit.  (Mead Decl. ¶ 2.)

From 2010 through 2014, he worked for the U.S. Department of Justice, Civil Division, Federal Programs Branch, via the Honors Program.  (*Id.* ¶ 3.)  In 2014, he became a faculty member at Cleveland State University, where he held a joint appointment at the Cleveland-Marshall College of Law and the Maxine Goodman Levin College of Urban Affairs, and obtained tenure in 2020.  (*Id.* ¶¶ 4, 7.)  That same year, he also joined the ACLU of Ohio as a volunteer litigator and served as Associate General Counsel from 2017 to 2020.  (*Id.* ¶ 5.)  In 2021, he joined ICAP as Senior Counsel, where he has represented clients in constitutional litigation at the Supreme Court of the United States, state supreme courts, and federal appellate courts.  (*Id.* ¶ 9.)

The Court finds that $850 is a reasonable hourly rate for Mr. Mead.  This rate reflects Mr. Mead's substantial experience in appellate law and particular credentials, his strong reputation within the field, the novelty and difficulty of the issues presented, and the skill required to litigate the appeal.  It is also consistent with the prevailing rate of other attorneys in the Central District who practice civil rights litigation and who graduated law school sixteen years ago.  *See Donastorg*, 2021 WL 6103545, at *9 (explaining that according to the 2020 Real Rate Report, litigation associates in Los Angeles make a median of $535 per hour, with rates of $740 in the upper quartile, and that partners make a median of $660 per hour, with those working in commercial litigation at large firms earning between $941 and $1,235 per hour); *cf. McKibben*, 2019 WL 1109683, at *14; (Sobel Decl. ¶¶ 50–55 [collecting evidence that Mr. Mead's requested rate is consistent with the market rate]).

### 5.   Scott Hughes

Scott Hughes, who was primarily responsible for settlement efforts, legal research for and editing of the Ninth Circuit brief, and client communication, seeks an hourly rate of $780.  (Mot. at 22–23; Dkt. 274 [Supplemental Declaration of Scott D. Hughes,

hereinafter "Supp. Hughes Decl."] ¶ 18.)  Before law school, Mr. Hughes enlisted in the U.S. Marine Corps as a Marine Police Officer.  (Dkt. 233 [Declaration of Scott D. Hughes] ¶ 7.)  He received a master's degree in criminology from SUNY Albany in 2003 and graduated from law school at Western State University College of Law in 2007.  (*Id.* ¶ 8.)  Since 2010, he has managed his own law firm focusing on personal injury and criminal defense cases in state and federal court.  (*Id.* ¶ 10.)  Due to his police background, other attorneys began referring civil rights cases to him involving police misconduct resulting in serious injury or death.  (*Id.*)  He has tried over nineteen civil and criminal cases.  (Supp. Hughes Decl. ¶ 11.)  Several times in recent years, he has been named a Super Lawyer Rising Star.  (*Id.* ¶ 14.)  He has also been named Top 40 Under 40 by the National Trial Lawyers.  (*Id.*)  In recent years, he has personally handled six civil rights cases that resulted in six- and seven-figure settlements and verdicts.  (*Id.* ¶ 11.)

After trial, the Court found that $625 was a reasonable hourly rate for Mr. Hughes, explaining that it corresponded to the prevailing rate for civil rights attorneys with similar experience and accounted for his unique police expertise and his accolades.  (Order at 6–7.)  The Court finds that $780 is a reasonable hourly rate for Mr. Hughes' work on appeal.  This rate reflects Mr. Hughes' particular experience and accolades, the novelty and difficulty of the issues on appeal, and the skill required to litigate the appeal, and is consistent with the prevailing rate of other attorneys who practice civil rights litigation and who graduated law school sixteen years ago.  *See Donastorg*, 2021 WL 6103545, at *9 (explaining that according to the 2020 Real Rate Report, litigation associates in Los Angeles make a median of $535 per hour, with rates of $740 in the upper quartile, and that partners make a median of $660 per hour, with those working in commercial litigation at large firms earning between $941 and $1,235 per hour); *cf. McKibben*, 2019 WL 1109683, at *14; (Sobel Decl. ¶ 57 ["The rate of $780 an hour for an attorney with 16 years' experience is well within the range of reasonable rates in the Los Angeles legal market."]).

### 6. Elizabeth Cruikshank

Elizabeth Cruikshank, who assisted with drafting the brief in opposition to Defendants' petition for certiorari, seeks an hourly rate of $733.  (Mot. at 22–23; Dkt. 271-3 [Declaration of Elizabeth Cruikshank, hereinafter "Cruikshank Decl."] ¶ 9.)  She graduated from Columbia Law School in 2015, where she was awarded the Ruth Bader Ginsburg Prize for receiving highest academic honors all three years of law school. (Cruikshank Decl. ¶ 2.)  She was an associate in the litigation department at Cravath, Swaine & Moore LLP for one year and then had clerkships on the Ninth Circuit and Southern District of New York.  (*Id.* ¶¶ 3–4.)  From 2018 to 2021, she was a part of the Supreme Court and Appellate practice group at Orrick, Herrington & Sutcliffe LLP.  (*Id.* ¶¶ 5–6.)  In 2021, she joined ICAP as Senior Counsel.

The Court finds that $733 is a reasonable hourly rate for Ms. Cruikshank.  This rate reflects Ms. Cruikshank's substantial experience and performance in appellate law, the skill required to succeed on appeal, and the novelty and difficulty of the issues presented on appeal, and is consistent with the prevailing rate of other attorneys with her credentials who graduated law school eight years ago.  *See Donastorg*, 2021 WL 6103545, at *9 ("The 2020 Real Rate Report provides that the median rate for litigation associates in Los Angeles is $535, with rates of $740 in the upper quartile."); *cf. McKibben*, 2019 WL 1109683, at *14; (Sobel Decl. ¶¶ 58–61 [collecting evidence that Ms. Cruikshank's requested rate is consistent with the market rate]).

### B. Billed Hours

The Court now determines whether the billed hours are reasonable.  A court may award attorney fees only for the number of hours it concludes were reasonably expended on the litigation.  *Hensley*, 461 U.S. at 434 ("[Counsel] should make a good faith effort to

1  exclude . . . hours that are excessive, redundant, or otherwise unnecessary."). "[T]he fee

2  applicant bears the burden of documenting the appropriate hours expended in the

3  litigation and must submit evidence in support of th[e] hours worked." *Gates*, 987 F.2d

4  at 1397–98.

5

6  In support of the motion for fees, each attorney has submitted time records

7  detailing the work each performed on the case. Mr. Galipo, Ms. Partow, and Mr. Hughes

8  were primarily responsible for tasks related to the Ninth Circuit appeal and billed 291

9  hours to those tasks. Ms. Corkran, Mr. Mead, and Ms. Cruikshank were primarily

10 responsible for tasks related to the Supreme Court petition and billed 77.3 hours to those

11 tasks. The Court has carefully reviewed these attorneys' billing records and finds that the

12 billed hours are reasonable.

13

14 Defendants argue that Plaintiffs' fee request should be denied because it is "an

15 attempt to be paid twice for submitting essentially the same work product" in *Valenzuela*.

16 (Dkt. 276 [Opposition, hereinafter "Opp."] at 5.) They point to numerous examples of

17 *Valenzuela* briefing looking similar or identical to briefing in this case. (*See id.* at 8–11.)

18 But there is no indication that the fact that *Valenzuela* and this case were very similar is

19 not reflected in the hours billed. Indeed, Ms. Corkran explains that the number of hours

20 billed in this case is significantly lower than the number of hours billed in similar cases

21 because of counsel's ability to draw on work from *Valenzuela*. (Corkran Decl. ¶ 15; *see*

22 Mot. at 22; Reply at 8.) And Plaintiffs retained the ICAP team because of their expertise

23 and familiarity with the issues in *Valenzuela*. (Reply at 1, 8.) Just because this case was

24 similar to *Valenzuela* does not mean it did not have to be litigated and that substantial

25 time was not required to draft and edit the multiple briefs submitted. Moreover, the

26 opening brief before the Ninth Circuit in this case was filed before the opening brief in

27 *Valenzuela*, meaning that at least for that brief, counsel did not have substantial

28 *Valenzuela* work product to draw on. (*See id.* at 3.) The Court has reviewed counsel's

-13-

billing records and finds that the amount of time spent appears reasonable even given this case's similarity to *Valenzuela*.

Plaintiffs' counsel also request compensation for their work related to their motion for attorneys' fees.  Time spent establishing an entitlement to fees under 42 U.S.C. § 1988 is compensable.  *See Clark v. City of Los Angeles*, 803 F.2d 987, 992 (9th Cir. 1986).  Plaintiffs' counsel included time spent preparing the motion in their original time records.  In preparing the reply, Ms. Partow billed an additional 33.4 hours.  (*See* Dkt. 278-1.)  The Court will include this additional billed time in its lodestar calculation.

**C.    Lodestar Calculation**

Based on the above analysis, the lodestar amounts for Plaintiffs' counsel are as follows:

| Attorney | Hourly Rate | Hours | Lodestar |
|---|---|---|---|
| Dale Galipo | $1,200 | 61.9 | $74,280 |
| Kelsi Brown Corkran | $1,075 | 44.9 | $48,267.50 |
| Melanie Partow | $850 | 226.5[2] | $192,525 |
| Joseph Mead | $850 | 16.2 | $13,770 |
| Scott Hughes | $780 | 36 | $28,080 |
| Elizabeth Cruikshank | $733 | 16.2 | $11,874.60 |
| **Total** | | | **$368,797.10** |

//

//

---

[2]  This number is calculated based on 193.1 (total billed hours) plus 33.4 (hours spent preparing reply).

**III.  CONCLUSION**

   For the foregoing reasons, Plaintiffs' motion for attorney fees is **GRANTED**. Plaintiffs are awarded $368,797.10 in attorney fees.

   DATED:  February 21, 2023

                     CORMAC J. CARNEY

               UNITED STATES DISTRICT JUDGE

CC: FISCAL

**EXHIBIT 8**

1

2

3

4

5

6

7

8                         **UNITED STATES DISTRICT COURT**

9                         **CENTRAL DISTRICT OF CALIFORNIA**

10                              **SOUTHERN DIVISION**

11

12    **FERMIN VINCENT VALENZUELA,**          ) **Case No.: SACV 17-00278-CJC (DFMx),**
                                              ) **consolidated with**
13                                            ) **SACV 17-02094-CJC (DFMx)**
                                              )
14              **Plaintiff,**                )
                                              )
15         **v.**                             )
                                              )
16    **CITY OF ANAHEIM,** *et al.*,          ) **ORDER GRANTING IN**
                                              ) **SUBSTANTIAL PART PLAINTIFFS'**
17                                            ) **MOTION FOR ATTORNEY FEES**
                                              ) **[Dkt. 459]**
18              **Defendants.**               )
                                              )
19    _____ )
                                              )
20    **VINCENT VALENZUELA and**              )
                                              )
21    **XIMENA VALENZUELA by and**            )
      **through their guardian PATRICIA**     )
22    **GONZALEZ,**                           )
                                              )
23              **Plaintiffs,**               )
                                              )
24                                            )
           **v.**                             )
25                                            )
                                              )
26    **CITY OF ANAHEIM,** *et al.*,          )
                                              )
27                                            )
                **Defendants.**               )
28    _____ )

                                    -1-

## I.    INTRODUCTION & BACKGROUND

On July 2, 2016, members of the Anaheim Police Department applied a neck restraint on Fermin Vincent Valenzuela Junior ("Mr. Valenzuela") called the "carotid hold." Mr. Valenzuela died. Plaintiffs Fermin Vincent Valenzuela Senior (Mr. Valenzuela's father), Vincent Valenzuela (Mr. Valenzuela's son), and Ximena Valenzuela (Mr. Valenzuela's daughter) brought this civil rights action against Defendants City of Anaheim (the "City"), Officers Daniel Wolfe, Officer Woojin Jun, and Sergeant Daniel Gonzalez. In November 2019, they presented evidence to a jury supporting their claims for excessive force, deprivation of substantive due process, municipal liability (on both unlawful policy and failure to train theories), wrongful death (on both negligence and battery theories), and violation of the Bane Act, Cal. Civ. Code § 52.1(b).

After five days of trial, the jury returned a verdict in favor of Mr. Valenzuela's children, finding, among other things, that Officers Jun and Wolfe used excessive force when they attempted to use the carotid hold, that Sergeant Gonzalez was liable as the supervising officer, and that the City's policy permitting the carotid hold in nondeadly force situations was unlawful. (Dkt. 358.) The trial proceeded to a second phase on damages. After two additional days of trial, the jury returned with a second verdict, awarding Mr. Valenzuela's children a total of $13.2 million in damages—$3.6 million in loss of life damages, $6 million in pre-death pain and suffering, and $1.8 million to each child for past and future loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, training, and guidance. (Dkt. 372.) The Court denied Defendants' motions for judgment as a matter of law and for new trial and granted in substantial part Plaintiffs' motion for attorney fees, awarding $1,082,930 in fees incurred through trial. (Dkt. 435.)

Defendants appealed to the Ninth Circuit, arguing that (1) the officers were entitled to qualified immunity, (2) the City was entitled to judgment as a matter of law because the policy was not unconstitutional, (3) Defendants were entitled to judgment on the Bane Act claim because it was inconsistent with the jury's finding on the Fourteenth Amendment claim, and (4) loss of life damages are not recoverable under 42 U.S.C. Section 1983. *See Valenzuela v. City of Anaheim*, 6 F.4th 1098, 1101 (9th Cir. 2021); (Mot. at 17–18).  In a published opinion and an unpublished memorandum decision, both of which drew a dissent from Judge Kenneth K. Lee, the Ninth Circuit affirmed this Court's ruling that Section 1983 permitted recovery of loss of life damages and that California state law to the contrary was inconsistent with Section 1983's goals. *Valenzuela*, 6 F.4th 1098, at 1101–02; *Valenzuela v. City of Anaheim*, 2021 WL 3362847 (9th Cir. Aug. 3, 2021).  The Ninth Circuit denied Defendants' petition for panel rehearing and rehearing en banc, but eleven judges dissented on the issue of availability of loss of life damages.  *Valenzuela v. City of Anaheim*, 29 F.4th 1093, 1094 (9th Cir. 2022).  Defendants appealed to the United States Supreme Court, and the Supreme Court denied certiorari.  *City of Anaheim v. Valenzuela*, 143 S. Ct. 523 (2022) (mem.).

Now before the Court is Plaintiffs' motion for attorney fees for their work responding to Defendants' appeals to the Ninth Circuit and the Supreme Court.  (Dkt. 459 [hereinafter "Mot."].)  Plaintiffs request a lodestar amount of $696,025 in attorney fees. Dkt. 461 [Reply] at 18.)  In opposition, Defendants argue that (1) all of Plaintiffs' attorneys' hourly rates are excessive, and (2) some of those attorneys' hours are excessive and duplicative.  (Dkt. 460 [Opposition, hereinafter "Opp."].)  For the following reasons, Plaintiffs' motion is **GRANTED IN SUBSTANTIAL PART**.[1]  The Court awards Plaintiffs $659,125 in attorney fees.

---

[1]  Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for March 6, 2023 at 1:30 p.m. is hereby vacated and off calendar.

## II.   ANALYSIS

"The general rule in our legal system is that each party must pay its own attorney's fees and expenses." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010).  In an action brought pursuant to 42 U.S.C. § 1983, however, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988(b).  A party is considered the prevailing party if it succeeds on any significant issue in litigation that achieves some of the benefit sought in bringing the lawsuit. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  Defendants do not dispute that Plaintiffs prevailed on their claim on appeal that the scope of recoverable survival damages in California for Section 1983 claims includes survival damages for the decedent's loss of life—a question that was previously unclear.  Rather, Defendants contend that the fees Plaintiffs seek are unreasonable.

In assessing the reasonableness of a fee award, a district court considers twelve factors: "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to the acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases." *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *cert. denied*, 425 U.S. 951 (1976).

There is a strong presumption that the lodestar figure represents a reasonable fee. *Morales v. City of San Rafael*, 96 F.3d 359, 363 n.8 (9th Cir. 1996); *see also Harris v. Marhoerfer*, 24 F.3d 16, 18 (9th Cir. 1994) ("Only in rare instances should the lodestar

1  figure be adjusted on the basis of other considerations.").  The lodestar amount is the

2  "number of hours reasonably expended on the litigation multiplied by a reasonable hourly

3  rate."  *Hensley*, 461 U.S. at 433.  Under the lodestar approach, many of the *Kerr* factors

4  have been subsumed as a matter of law.  *Morales*, 96 F.3d at 364 & n.9.

6  **A. Hourly Rates**

8  The Court first determines Plaintiffs' counsel's reasonable hourly rates.  "The

9  hourly rate for successful civil rights attorneys is to be calculated by considering certain

10  factors, including the novelty and difficulty of the issues, the skill required to try the case,

11  whether or not the fee is contingent, the experience held by counsel, and fee awards in

12  similar cases."  *Moreno v. City of Sacramento*, 534 F.3d 1106, 114 (9th Cir. 2008).

13  Courts also are guided by "the rate prevailing in the community for similar work

14  performed by attorneys of comparable skill, experience, and reputation."  *Trevino v.*

15  *Gates*, 99 F.3d 911, 925 (9th Cir. 1996); *see also Dang v. Cross*, 422 F.3d 800, 813 (9th

16  Cir. 2005).  Once the party claiming fees presents evidence supporting the claimed rate,

17  the burden shifts to the party opposing fees to present equally specific countervailing

18  evidence.  *See Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).

20  **1.  Dale Galipo**

22  Dale Galipo, the lead trial lawyer who then reviewed and edited the appellate

23  briefs and delivered oral argument before the Ninth Circuit panel, requests an hourly rate

24  of $1,200.  (Mot. at 7.)  Mr. Galipo graduated from UCLA law school in 1984.  (Dkt.

25  459-2 [Declaration of Dale K. Galipo] ¶ 3.)  Since 1991, he has managed his own law

26  firm, and he has specialized in civil rights cases over the last two decades.  (*See id.* ¶ 4.)

27  After trial in this case, the Court found that $1,000 was a reasonable hourly rate for Mr.

1  Galipo, citing its recent award in *Craig et.al. v. County of Orange et.al.*, Case No. SACV

2  17-00491-CJC (KESx), Dkt. 245.

3

4       Now, the Court has recently awarded fees for Mr. Galipo's appellate efforts in

5  *Craig*.  *See id*., Dkt. 280 (hereinafter "*Craig* Order").  The Court found that a $1,200

6  hourly rate, although high, was reasonable for Mr. Galipo's work over the past three

7  years, pointing to Mr. Galipo's strong reputation within the legal community, his

8  continued consistent record of success with over $85 million in recovery in civil rights

9  cases since 2019, and multiple courts that awarded him $1,100 hourly rates as early as

10  2020.  (*Id.* at 4–6.)  The Court finds that $1,200 is a reasonable hourly rate for Mr. Galipo

11  in this case as well.

12

13       **2.  Kelsi Brown Corkran**

14

15       Kelsi Brown Corkran, who led Plaintiffs' team in preparing and finalizing the brief

16  in opposition to Defendants' petition for a writ of certiorari, seeks an hourly rate of

17  $1,075—her billing rate when she left private practice in 2021.  (Mot. at 9–11; Dkt. 459-

18  3 [Declaration of Kelsi Brown Corkran, hereinafter "Corkran Decl."] ¶¶ 12, 15.)  Ms.

19  Corkran graduated from the University of Chicago with a law degree and a master's

20  degree in public policy in 2005.  (Corkran Decl. ¶ 2.)  Since 2021, she has been the

21  Supreme Court Director at the Institute for Constitutional Advocacy & Protection

22  ("ICAP").  (*Id.* ¶ 9.)  The Court recently awarded an hourly rate of $1,075 for Ms.

23  Corkran's work in *Craig*, (*Craig* Order at 6–7), and finds that rate to be reasonable in this

24  case as well.

25

26  //

27  //

28  //

### 3.  John Fattahi

John Fattahi, who "had primary responsibility for formulating strategy for, and drafting, Plaintiffs' answering brief and subsequent response to Defendants' petition for rehearing en banc before the Ninth Circuit," requests an hourly rate of $850.  (Mot. at 11–14; Dkt. 459-4 [Declaration of John Fattahi, hereinafter "Fattahi Decl."] ¶ 3.) Mr. Fattahi graduated from UCLA School of Law in 2006.  (Fattahi Decl. ¶ 4.)  He served for one year as a law clerk to then-Chief U.S. District Judge Virginia A. Phillips in the Central District of California, was a litigation associate for two years at Quinn Emanuel Urquhart & Sullivan, LLP, and then worked for about two and a half years in Mr. Galipo's office before opening his own solo practice in 2011.  (*Id.* ¶ 6.)

After trial, the Court found that $500 was a reasonable hourly rate for Mr. Fattahi, concluding that it was consistent with the prevailing rate of other attorneys in the Central District who practice civil rights litigation with similar experience, and reflected the lesser novelty and difficulty of the issues during the post-trial stage when Mr. Fattahi participated.  (Order at 6.)  The Court also considered a then-recent court award to Mr. Fattahi of a $550 hourly rate for second-chairing a police excessive force trial, and fee settlements resulting in $540 and $550 hourly rates.  (*Id.*)

Since the Court's last fee award, Mr. Fattahi has gained substantial additional experience.  He has successfully defended millions of dollars in judgments obtained by Mr. Galipo on post-trial motions and appeal, and courts have awarded Mr. Fattahi $725 and $775 hourly rates in excessive force cases.  (Fattahi Decl. ¶¶ 4, 7.)  In addition, whereas the Court's previous $500 rate for Mr. Fattahi was based in part on its determination that "[t]he more novel and difficult legal issues and the impressiveness of the results obtained by the Plaintiffs happened before and during trial, not after trial when

Mr. Fattahi participated," (Dkt. 435 at 38), this appeal involved multiple novel and difficult legal issues, justifying a higher hourly rate.  *See Moreno*, 534 F.3d at 114.

The Court finds that $850 is a reasonable hourly rate for Mr. Fattahi's work on appeal.  This rate reflects Mr. Fattahi's substantial and increased experience over the last few years, his continued strong reputation within the field, and the skill required to succeed on appeal and the novelty and difficulty of the issues presented on appeal.  It is also consistent with the prevailing rate of other attorneys in the Central District who practice civil rights litigation and who graduated law school seventeen years ago.  *See Donastorg*, 2021 WL 6103545, at *8 (explaining that the 2020 Real Rate Report lists partners working in commercial litigation at large firms in Los Angeles as earning between $941 and $1,235, with the median rate for litigation partners in Los Angeles at $660 per hour); *cf. McKibben*, 2019 WL 1109683, at *14; (Dkt. 459-1 [Declaration of Carol Sobel, hereinafter "Sobel Decl."] ¶¶ 44–50 [collecting evidence that Mr. Fattahi's requested rate is consistent with the market rate]).

### 4. Joseph Mead

Joseph Mead, who helped research and draft the brief in opposition to Defendants' petition for a writ of certiorari, seeks an hourly rate of $850.  (Mot. at 14–15; Dkt. 459-5 [Declaration of Joseph Mead, hereinafter "Mead Decl."] ¶ 10.)  Mr. Mead graduated from the University of Michigan Law School *magna cum laude* in 2007.  (Mead Decl. ¶ 2.)  In 2021, he joined ICAP as Senior Counsel.  (*Id.* ¶ 8.)  The Court awarded an hourly rate of $850 for Mr. Mead's work in *Craig*, (*Craig* Order at 9–10), and finds that that rate is reasonable in this case as well.

//
//

### 5. Shelby Calambokidis

Shelby Calambokidis, who helped draft the brief in opposition to Defendants' petition for a writ of certiorari, seeks an hourly rate of $650.  (Mot. at 16–17; Dkt. 459-6 [Declaration of Shelby Calambokidis, hereinafter "Calambokidis Decl." ¶ 5.)  After graduating *summa cum laude* from The University of Alabama School of Law in 2017, Ms. Calambokidis clerked for judges on the United States District Court for the District of Columbia and the Fourth Circuit and served as a law fellow at the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO). (Calambokidis Decl. ¶¶ 2–3.)  In 2021, she joined ICAP as Counsel, where she has worked on multiple civil rights cases in federal district and appellate courts.  (*Id.* ¶ 4.)

The Court finds that $650 is a reasonable hourly rate for Ms. Calambokidis.  This rate reflects her experience in appellate law, the novelty and difficulty of the issues on appeal, and the skill required to litigate the appeal, and is also consistent with the prevailing rate of other attorneys who graduated law school six years ago.  *See Donastorg*, 2021 WL 6103545, at *9 ("The 2020 Real Rate Report provides that the median rate for litigation associates in Los Angeles is $535, with rates of $740 in the upper quartile."); *cf. McKibben*, 2019 WL 1109683, at *14; (Sobel Decl. ¶¶ 58–61 [collecting evidence that Ms. Calambokidis's requested rate is consistent with the market rate]).

### B. Billed Hours

The Court now determines whether the billed hours are reasonable.  A court may award attorney fees only for the number of hours it concludes were reasonably expended on the litigation.  *Hensley*, 461 U.S. at 434 ("[Counsel] should make a good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary.").  "[T]he fee

applicant bears the burden of documenting the appropriate hours expended in the
litigation and must submit evidence in support of th[e] hours worked." *Gates*, 987 F.2d
at 1397–98.

    In support of Plaintiffs' motion for fees, each attorney has submitted time records
detailing the work they performed on the case.  Mr. Galipo and Mr. Fattahi were
primarily responsible for tasks related to the Ninth Circuit appeal and billed 391.8 hours
to those tasks.  Ms. Corkran, Mr. Mead, and Ms. Calambokidis were primarily
responsible for tasks related to the Supreme Court petition and billed 281.3 hours to those
tasks.  The Court has carefully reviewed these five attorneys' billing records and finds
that the billed hours are reasonable.

    Defendants argue that no work performed by the ICAP attorneys—Ms. Corkran,
Mr. Mead, and Ms. Calambokidis—should be compensated because "[i]t was not
necessary to bring on three more lawyers to oppose the petition" for certiorari as
Plaintiffs already had enough lawyers.  (Opp. at 13.)  The Court is unpersuaded.
Supreme Court litigation is specialized and complex, and it was not unreasonable for
Plaintiffs to bring on a team of specialists to handle the petition.  This is especially so
given that eleven Ninth Circuit judges dissented from the denial of rehearing en banc on
the loss of life damages issue, and that the Supreme Court had previously granted review
of the primary question presented by Defendants' petition, but ultimately dismissed it as
improvidently granted due to a jurisdictional defect.  (*See* Corkran Decl. ¶ 14 [citing
*Jefferson v. City of Tarrant*, 522 U.S. 75 (1997)].)

    Defendants also argue that some of the ICAP attorneys' time duplicates work
performed at the Ninth Circuit level or was excessive.  (Opp. at 13–14.)  They submit
annotations on Ms. Corkran's, Mr. Mead's, and Ms. Calambokidis's time records to this
effect.  (Dkt. 460-1.)  However, the Court has reviewed these attorneys' time records and

1    finds the billed hours reasonable under the circumstances of this case.  This was an

2    extremely complex appeal presenting numerous issues, some of which had never been

3    decided before.  Thorough research was required both before the Ninth Circuit and the

4    Supreme Court.  *See Moreno*, 534 F.3d at 1112 ("When a case goes on for many years, a

5    lot of legal work product will grow stale; a competent lawyer won't rely entirely on last

6    year's, or even last month's, research: Cases are decided; statutes are enacted; regulations

7    are promulgated and amended. A lawyer also needs to get up to speed with the research

8    previously performed. All this is duplication, of course, but it's *necessary* duplication; it

9    is inherent in the process of litigating over time.").  It was not unreasonable to spend

10   substantial time researching, drafting, and revising the several briefs involved, or to have

11   multiple people involved in that process.  *Cf. id.* ("By and large, the court should defer to

12   the winning lawyer's professional judgment as to how much time he was required to

13   spend on the case; after all, he won, and might not have, had he been more of a slacker.").

14

15        The Court will make one deduction to the fees Plaintiffs request, however.

16   Plaintiffs seek fees for work performed by Garo Mardirossian and Lawrence Marks.  (*See*

17   Mot. at 22 [Lodestar Calculation Table].)  However, a review of both attorneys' billing

18   records reveals that nearly all of Mr. Mardirossian's 19.2 hours billed and Mr. Marks'

19   44.4 hours billed was for "receipt and review" of the various documents on appeal.  (*See*

20   Dkt. 459-7, Ex. 1; Dkt. 459-8, Ex. 1.)  Neither Plaintiffs' brief nor Mr. Mardirossian or

21   Mr. Marks' declarations explains why their receipt and review of these documents was

22   necessary or even helpful to Plaintiffs' success on appeal.  Accordingly, the Court will

23   not award fees for their work.

24

25        Finally, Plaintiffs' counsel request compensation for their work related to their

26   motion for attorneys' fees.  Time spent establishing an entitlement to fees under 42

27   U.S.C. § 1988 is compensable.  *See Clark v. City of L.A.*, 803 F.2d 987, 992 (9th Cir.

28   1986).  Plaintiffs' counsel included time spent preparing the motion in their original time

records.  In preparing the reply, Mr. Fattahi billed an additional 27.9 hours.  (*See* Dkt. 461-1 [Supplemental Declaration of John Fattahi].)  The Court will include this additional billed time in its lodestar calculation.

### C. Lodestar Calculation

Based on the above analysis, the lodestar amounts for Plaintiffs' counsel are as follows:

| Attorney | Hourly Rate | Hours | Lodestar |
|---|---|---|---|
| Dale Galipo | $1,200 | 99.7 | $119,640 |
| Kelsi Brown Corkran | $1,075 | 144 | $154,800 |
| John Fattahi | $850 | 320[2] | $272,000 |
| Joseph Mead | $850 | 97.2 | $86,620 |
| Shelby Calambokidis | $650 | 40.1 | $26,065 |
| **Total** | | | **$659,125** |

## III.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for attorneys' fees is **GRANTED IN SUBSTANTIAL PART**.  Based on the Court's lodestar calculation, Plaintiffs are awarded $659,125 in attorneys' fees.

DATED:      February 23, 2023

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

**CC: FISCAL**

---

[2]  This number is calculated based on 193.1 (total billed hours) + 27.9 (hours spent preparing reply).