# EXHIBIT A-1

1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE FERNANDO M. OLGUIN, U.S. DISTRICT JUDGE

4

5   TAMMY MURILLO, an individual        )
    and as successor in interest to     )
6   JESSE MURILLO, deceased,            ) CASE NO.
                                        ) 21-cv-08738
7                Plaintiff,             )
                                        )
8          vs.                         )
                                        )
9   CITY OF LOS ANGELES, FRED SIGMAN,   )
    CHRISTOPHER MONTAGUE, DOES 1-50,    )
10  et al.,                            )
                                        )
11               Defendants.            )
    _____)

12

13

14

15        **REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS**

16           **TRIAL DAY 4 - TAMMY MURILLO**

17          THURSDAY, AUGUST 24, 2023

18               11:35 A.M.

19          LOS ANGELES, CALIFORNIA

20

21

22

23   _____

24        MAREA WOOLRICH, CSR 12698, CCRR
         FEDERAL OFFICIAL COURT REPORTER
         350 WEST FIRST STREET, SUITE 4311
25       LOS ANGELES, CALIFORNIA 90012
             mareawoolrich@aol.com


**UNITED STATES DISTRICT COURT**

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR PLAINTIFF:**

4        LAW OFFICES OF DALE K. GALIPO
         BY:  DALE K. GALIPO
5        21800 Burbank Boulevard, Suite 310
         Woodland Hills, CA 91367
6
         LAW OFFICES OF MARO BURUNSUZYAN
7        BY:  MARO BURUNSUZYAN
         550 N. Brand Boulevard, Suite 1050
8        Glendale, CA 91203

9
     **FOR DEFENDANTS:**
10
         TY A. FORD, Deputy City Attorney
11       200 N. Main Street, 6th Floor
         Los Angeles, CA 90012
12

13

14

15

16

17

18

19

20

21

22

23

24

25



**I N D E X**

THURSDAY, AUGUST 24, 2023

---------------------------------------------------------

<u>**CHRONOLOGICAL INDEX OF WITNESSES**</u>

**WITNESS**                                                    **PAGE**

TAMMY MURILLO
        DIRECT EXAMINATION BY MS. BURUNSUZYAN          4
        CROSS-EXAMINATION BY MR. FORD                  21

---------------------------------------------------------

<u>**INDEX OF EXHIBITS**</u>

<u>MARKED FOR IDENTIFICATION</u>

(NONE)

<u>RECEIVED INTO EVIDENCE</u>

(NONE)

**UNITED STATES DISTRICT COURT**

```
1              LOS ANGELES, CALIFORNIA; THURSDAY, AUGUST 24, 2023

2                            11:35 A.M.

3                              -oOo-

4

5              MS. BURUNSUZYAN:  Your Honor, with the Court's

6    permission, we will call Ms. Tammy Murillo.

7              THE COURT:  Okay.

8              THE COURTROOM DEPUTY:  Do you solemnly swear that

9    the testimony you shall give in the cause now before this Court

10   shall be the truth, the whole truth, and nothing but the truth,

11   so help you God?

12             THE WITNESS:  I do.

13             THE COURTROOM DEPUTY:  Thank you.  Please have a

14   seat.

15             Please state your name for the record and spell it.

16             THE WITNESS:  Tammy Murillo, T-a-m-m-y,

17   M-u-r-i-l-l-o.

18                          TAMMY MURILLO,

19   called as a witness by the plaintiff, was sworn and testified

20   as follows:

21                        DIRECT EXAMINATION

22   BY MS. BURUNSUZYAN:

23        Q     Ms. Murillo, good morning.

24        A     Good morning.

25        Q     Are you okay?
```

1        A        Yes.

2        Q        Ms. Murillo, would you please tell the ladies and

3   gentlemen of the jury what you do for work?

4        A        I work at Northrop Grumman, and I support

5   classified contracts and programs.

6        Q        Since when?

7        A        2005.

8        Q        Have you continuously since 2005 been working

9   there until today?

10       A        Yes.

11       Q        And when you first got hired, did you have to go

12  through a government clearance?

13       A        I've had a --

14            MR. FORD:  Objection.  Relevance, Your Honor.

15            THE COURT:  What is the relevance of this?

16            MS. BURUNSUZYAN:  Withdrawn, Your Honor.  Just

17  background information.  But withdrawn.

18            Thank you, Your Honor.

19            THE COURT:  Okay.

20  BY MS. BURUNSUZYAN:

21       Q        Ms. Murillo, are you married?

22       A        No.

23       Q        And do you have any children?

24       A        Yes.

25       Q        How many children do you have?

```
 1        A       I have my daughter, Priscilla.

 2        Q       And have we seen Priscilla throughout the trial

 3   in court?

 4        A       Yes.

 5        Q       She's not here today?

 6        A       She's on her way.

 7        Q       Do you have grandchildren?

 8        A       Yes, I do.

 9        Q       How many?

10        A       Six.

11        Q       Have we seen any of your grandchildren here in

12   the courtroom?

13        A       Yes, you have.

14        Q       Do any of your grandchildren currently live with

15   you?

16        A       Yes.

17               MR. FORD:  Objection.  Relevance.

18               THE COURT:  Overruled.

19   BY MS. BURUNSUZYAN:

20        Q       Who lives with you?

21        A       Antonia, the oldest.

22        Q       And she's currently at UCLA?

23        A       Yes.

24        Q       Let's talk about Jesse.

25        A       Okay.
```

**UNITED STATES DISTRICT COURT**

1      Q      When was he born?

2      A      He was born September 24th, 1985.

3      Q      And was there a time when you and Jesse's dad got

4  divorced?

5      A      Yes.

6      Q      How old was Jesse at the time?

7      A      He was 12.

8      Q      After the divorce, was his dad involved in his

9  life?

10          MR. FORD:  Objection.  Relevance.

11          THE COURT:  Overruled.

12          THE WITNESS:  Not really.

13  BY MS. BURUNSUZYAN:

14      Q      Did Jesse continuously live with you through

15  high school?

16      A      Yes, he did.

17      Q      What are some of the things that Jesse loved

18  doing up until high school?

19          MR. FORD:  Objection.  Relevance.

20          THE COURT:  Overruled.

21          THE WITNESS:  Jesse loved music.  He was in the band

22  in junior high.  He also taught himself to play the piano.  He

23  was an amazing drummer and played guitar.  He had two guitars,

24  and he made music.

25  BY MS. BURUNSUZYAN:

1    Q      Did he teach himself how to play the piano you

2    said?

3    A      Yes, he did.

4    Q      At what age?

5    A      13.

6    Q      Did he like sports?

7    A      Yes, he did.

8           MS. BURUNSUZYAN:  Your Honor, with the Court's

9    permission, I'd like to show Exhibit 27-4.

10          THE COURT:  Okay.  Is it an agreed exhibit?

11          MS. BURUNSUZYAN:  Yes, Your Honor.

12          THE COURT:  Go ahead.

13   BY MS. BURUNSUZYAN:

14   Q      Ms. Murillo, tell us, please, what we are seeing

15   here in this exhibit?

16   A      Jesse with his teammates in roller hockey.

17   Q      And is Jesse right there (indicating)?

18   A      Yes.

19   Q      Okay.  What other sports did he love?

20   A      He also was in ice hockey.

21          MS. BURUNSUZYAN:  And next exhibit closer to

22   high-school age, Exhibit 27-8.  Again, Your Honor, admitted by

23   stipulation.

24   BY MS. BURUNSUZYAN:

25   Q      And approximately how old is Jesse here?

1  A  16, 17.

2  Q  And when asked, what about Jesse's face do you

3 miss the most?  What would you tell the ladies and gentlemen of

4 the jury?

5    MR. FORD:  Objection.  Argumentative, irrelevant.

6    THE COURT:  Overruled.

7    THE WITNESS:  I miss his smile, and he was so full

8 of life.  I just miss everything about my son.

9 BY MS. BURUNSUZYAN:

10  Q  Did Jesse graduate from high school, Ms. Murillo?

11  A  Yes, he did.

12    MS. BURUNSUZYAN:  Your Honor, next exhibit is

13 Exhibit 26-2, again stipulated to by parties.

14 BY MS. BURUNSUZYAN:

15  Q  Is this one of the graduation photos?

16  A  Yes, it is.

17  Q  Clearly, we can see you.  And is that Jesse in

18 the middle?

19  A  Yes.

20  Q  And who is to the right of Jesse?

21  A  Priscilla, his sister.

22  Q  Have we seen her in court throughout trial?

23  A  Yes.

24  Q  After graduating from high school, what did he do

25 next?

```
 1        A        He joined the service.

 2        Q        Military?

 3        A        Yes.

 4        Q        Which branch?

 5        A        Navy.

 6        Q        And was that right after high school?

 7        A        Yes.

 8                 MS. BURUNSUZYAN:  Next exhibit, Your Honor, by

 9     stipulation is Exhibit 27-5.

10                 MR. FORD:  That was actually objected to.

11                 THE COURT:  Let's do a sidebar.  Let's see.

12                 MS. BURUNSUZYAN:  Sure.

13                 MR. FORD:  There's another one if you plan to show

14     the other one.

15                 (Held at sidebar.)

16                 MR. FORD:  My objection, Your Honor, is that it is

17     more prejudicial than probative.  His military service is

18     unrelated to this incident and essentially is to just create

19     emotion around the decedent.

20                 MS. BURUNSUZYAN:  Of the three claims we have, as

21     you know, Your Honor, survival loss, wrongful value of his

22     life, and wrongful death, this would fit into value of his

23     life, who he was.

24                 THE COURT:  I'll allow it.

25                 MR. FORD:  He was out of the military.
```

```
1              THE COURT:  I know.  But I'll allow it.  It's his
2    background.  It's who he was.
3              (End sidebar conference.)
4    BY MS. BURUNSUZYAN:
5         Q      Ms. Murillo, getting back to Exhibit 27-5, do you
6    know when this photo was taken?
7         A      Jesse was 18.  He had just joined the service.
8         Q      And by the way, was Jesse ever deployed overseas?
9         A      Yes.
10        Q      Was he honorably discharged?
11        A      Yes.
12        Q      After how many years?
13        A      Four years.
14        Q      After he left the military, did he come back to
15   live with you?
16        A      Yes, he did.
17        Q      Did he continuously live with you up until the
18   time he was shot and killed?
19        A      Yes.
20             MR. FORD:  Objection.  Argumentative.
21             THE COURT:  Overruled.
22   BY MS. BURUNSUZYAN:
23        Q      And when he lived with you, did he support you in
24   any way as far as bills and household needs?
25        A      Yes, he did.
```

```
 1        Q        Did he provide financial support?

 2        A        Yes, he did.

 3        Q        Approximately how much did Jesse contribute

 4   financially more or less on a monthly basis?

 5        A        $2,000.

 6        Q        The next photo, Ms. Murillo, is agreed-upon

 7   Exhibit 26-3.

 8                  Would you please tell the ladies and gentlemen of

 9   the jury and the Court what we are seeing in this photo?

10        A        We were at my niece's wedding.

11        Q        Did you, in fact, go to social events with Jesse?

12        A        Yes.

13        Q        How often did you do that?

14        A        Very often.  This was family.

15        Q        And what did it feel for you like to be at social

16   events with your son?

17        A        Oh, absolutely wonderful.

18        Q        Ms. Murillo, when Jesse came back from his

19   service, did he attempt to continue his education?

20        A        Yes, he did.

21        Q        How?

22        A        He was going to school constantly using the

23   GI bill.

24        Q        And we've already learned as a stipulated fact

25   that he had an AA degree?
```

```
 1        A       Yes.

 2        Q       Did he attempt to transfer his units to a

 3   university before he was shot and killed?

 4        A       Yes, he did.  To Northridge.

 5        Q       And what was his goal?

 6        A       To become an engineer.

 7        Q       Did he also open up his own business after he

 8   returned from his service?

 9        A       Yes, he did.

10        Q       What was it?

11        A       It was a little handyman maintenance business

12   that he did, and he also was a certified welder.

13        Q       Did Jesse have a gas mask?

14        A       Yes, he did.

15        Q       How did he get it?

16        A       In the service.

17        Q       And did he use the gas mask around the house?

18        A       Yes.  He wore it often.

19        Q       Doing what?

20        A       He was always doing repairs.  When he would go

21   under the house -- my home is a raised foundation.  And so he

22   would redo the plumbing under the house.  And all the work he

23   did around the house and the garage he would wear his gas mask.

24        Q       Do you still have Jesse's maintenance handyman

25   business tools at home?
```

**UNITED STATES DISTRICT COURT**

```
 1        A       Yes.  Everything is still in the garage, not
 2   touched.
 3        Q       Why do you still have his tools?
 4        A       Because it's a part of him, and I miss him so
 5   much.  I just go in there thinking he's -- imagining he's still
 6   working and doing things in the garage.
 7        Q       How often do you do that?
 8        A       Pretty often.
 9        Q       Did his business have a name?
10        A       Yes, it did.
11        Q       What was it?
12        A       Bravo Zulu Installations.
13        Q       What does that mean Bravo Zulu?
14        A       Bravo Zulu is a Navy signal that is conveyed by
15   raising a flag or a radio -- a voice radio, and it means "well
16   done."
17        Q       And do you know why he named his handyman
18   maintenance business Bravo Zulu?
19             MR. FORD:  Objection.  Calls for hearsay.
20             THE COURT:  Sustained.
21             THE WITNESS:  He was --
22   BY MS. BURUNSUZYAN:
23        Q       It's sustained.  Let me rephrase it.
24             Did you ever form an understanding as to why that
25   was the name of his business?
```

1      A      Yes, because he was very proud of his work.

2      Q      By the way, do you still have any of his musical

3  instruments?

4      A      Yes, I do.  I have all of them.

5      Q      What do you have?

6      A      I have the piano, his drum set and the guitars

7  and a keyboard that he used to create music.

8      Q      Where's the piano?

9      A      In my living room.

10     Q      Why do you still have it?

11     A      Because it's a part of him, and I would just sit

12  and listen to him play.

13     Q      Where do you have the drum set, the guitars, and

14  the keyboard?

15     A      The keyboard I have.  It's in his closet in his

16  room.  And the drum set is in -- in my spa area in the back of

17  the house.

18     Q      Would Jesse do any repairs throughout your house

19  considering he had this maintenance handyman business?

20     A      Always.  He was always fixing the house and

21  helping me.

22     Q      In fact, is your brother a contractor?

23     A      He's in construction, and he has his own little

24  business.

25     Q      Did he ever do work with your brother?

```
1        A       Yes.

2        Q       There's been some reference and you have been I

3   think in court throughout that reference to a pool bar?

4        A       Yes.

5        Q       And was that part of his maintenance handyman

6   tools?

7        A       Yes.

8        Q       Had you ever seen him use it around the house?

9        A       Yes.  He was redoing my floors in the house.

10       Q       Would Jesse buy you gifts?

11       A       Yes, he would.

12       Q       When was the last time that Jesse bought you a

13  gift?

14       A       December 2017.

15       Q       Before he died?

16       A       Yes.

17       Q       What was it?

18       A       A washer and a dryer.

19       Q       Ms. Murillo, next exhibit admitted by stipulation

20  is Exhibit 26-1.

21               Tell us, please, who everyone is in this photo,

22  and you can point to -- I think to the monitor.

23       A       I'm sorry.  I didn't hear you.

24       Q       Can you point to the monitor to give us context

25  as to who is in the photo?
```

```
1        A      Um...

2        Q      I'll do it.  We'll start with you.  Is that --

3        A      Okay.  That was me.

4        Q      And to your left is?

5        A      Michael.

6        Q      On your lap is Michael?

7        A      Oh.  No, no.  So that's me, Priscilla -- oh, this

8   is Michael, Audrey and Antonia and Jesse.

9        Q      Antonia on Priscilla's --

10       A      That's Audrey.

11       Q      And Antonia is on --

12       A      Yes.

13       Q      Okay.  I'm sorry.  And Priscilla is on Jesse's

14  lap?

15       A      No.

16       Q      I'm sorry.

17       A      So there's me, Priscilla, Jesse, Michael, Audrey,

18  and Antonia.

19       Q      Okay.  And was there a time that Jesse would take

20  out of his personal time to teach your grandchildren sports and

21  music?

22       A      Yes.

23       Q      Was he close to your grandchildren?

24       A      Very close.

25       Q      Did you and Jesse do special things for Mother's
```

```
 1   Day?
 2         A       Yes, we did.
 3         Q       Next exhibit, Ms. Murillo, is Exhibit 26-4 by
 4   stipulation.
 5                 Could you please give us context for this photo?
 6         A       This was Mother's Day out in Westlake Village.
 7         Q       And did Jesse take you out?
 8         A       Yes, he took me out for Mother's Day.
 9         Q       What did you do that day?
10         A       We had --
11              MR. FORD:  Objection.  Relevance.
12              THE COURT:  Overruled.
13              THE WITNESS:  We had a very nice lunch and spent the
14   day together.
15   BY MS. BURUNSUZYAN:
16         Q       And how would you characterize your closeness to
17   Jesse?
18         A       Jesse was such and still is a big part of my
19   life, and he really helped me with everything and always wanted
20   to make sure I was okay and wanted to take care of me forever.
21   Until I grew older.
22                 His laugh, he had such a great laugh.  I miss his
23   laugh.  I miss his hugs and kisses and telling me he loves me.
24   My son loved to cook.  He would cook for me, and he was an
25   amazing barbecue.  He would barbecue all the time.
```

1          And he loved people.  He loved entertaining and

2   having family and friends over and cooking for them.

3          Q      Ms. Murillo, where were you when you learned

4   about Jesse's death?

5          A      I had gone to the hospital, and I had asked the

6   person at the front desk.  And he got the nurse, and I asked

7   how he's doing, and she said not well.  And I asked if I could

8   please see him.  And she said I'd have to go find an officer.

9   So I went out to look for one, and I was never able to get in

10  to see my son.

11         Q      Did you, while at the hospital, learn that he was

12  no longer doing well?

13         A      I was out by the -- when I was looking for the

14  officer, I was by the emergency entrance, and one of the

15  ambulance personnel came out and said he didn't make it.  He's

16  dead.  And that's how I found out my son was dead.  And I just

17  fell to the ground and started crying and screaming.

18         Q      Ms. Murillo, I couldn't even start to imagine how

19  you would have felt.  But could you please just share with us

20  some of what went through your mind and heart at that moment.

21         A      Oh, God.  It was so unbelievable that he was

22  gone.  I just -- I couldn't believe he was gone.  I didn't want

23  to believe it.  And when Jesse died, a part of me died.  And my

24  heart every day feels like it's bleeding.  And the pain gets so

25  deep I just fall to my knees and ask God to take the pain away.

1    And I'll never get to see Jesse become an amazing man that he

2    was.

3         Q      Ms. Murillo, during the first year or two, would

4    you go into his room and spend time there?

5         A      Yes.  I would go into his closet, and I would

6    take his clothes and smell his scent and just sit on his bed

7    and just talk with him.  And I still till this day I can't

8    believe he's truly gone.  I think he's going to walk in the

9    door any time and say, hey, mom, what do you want for dinner?

10        Q      Ms. Murillo, do you still drive his truck?

11        A      Yes, I do.

12        Q      Why do you drive his truck?

13        A      It keeps me close to him.  And I listen on the

14   radio the stations that he used to listen to and sing with the

15   music that he loved.

16        Q      If you were to tell us, the ladies and gentlemen

17   of the jury, one, just one of the most hurtful ways his death

18   has impacted you, what would that be?

19        A      There's more than one.  Just not being able to

20   hold him, not being able to see him come home and give me big

21   hugs.

22        Q      Thank you, Ms. Murillo.

23               MS. BURUNSUZYAN:  No other questions, Your Honor.

24               THE COURT:  Okay.

25   ///

```
 1                    CROSS-EXAMINATION
 2   BY MR. FORD:
 3        Q     Ma'am, Jesse's handyman business was -- at the
 4   time of his death, that was his employment?
 5        A     Yes.
 6        Q     He didn't have a -- he was self-employed; is that
 7   right?
 8        A     Yes.
 9        Q     He didn't have an outside job?
10        A     He would work other jobs off and on.
11        Q     But not a consistent 9:00 to 5:00 everyday type
12   job; right?
13        A     Right.
14        Q     And at the time that he died, you lived in the
15   house with Jesse and Priscilla and Priscilla's six children; is
16   that right?
17        A     Yes.
18        Q     And then on weekends, your fiancé at the time
19   would spend time there as well; correct?
20        A     Sometimes.
21        Q     Well, didn't you tell me in deposition that it
22   was virtually every weekend?
23        A     I don't recall.
24        Q     Okay.  At least some weekends he would spend it
25   at your home with your entire family; correct?
```

```
 1        A       Yes.

 2        Q       Now, you talked about the tools in the garage.

 3   Jesse had a machete in the garage, didn't he?  Not a pull bar,

 4   a machete?

 5              MS. BURUNSUZYAN:  Objection, Your Honor.  Lacks

 6   foundation, calls for speculation.

 7              THE COURT:  If she knows.  Overruled.

 8              Go ahead.

 9   BY MR. FORD:

10        Q       Did he?

11        A       Yes.

12        Q       Okay.  That's all I have.

13              THE COURT:  Okay.  I think we'll -- anything else

14   on --

15              MS. BURUNSUZYAN:  No, Your Honor.

16              THE COURT:  The witness is excused.

17              So I think we'll take the -- let me ask Mr. Ford.

18   Is your witness still set to go at 1:00?

19              MR. FORD:  It's at 1:30, Your Honor.  And I wanted

20   to -- after the jury, I just -- I had a follow-up question for

21   Your Honor about Your Honor's orders.

22              THE COURT:  Okay.

23              MR. FORD:  He will be online at 1:30.

24              THE COURT:  Okay.  Do we have anyone else that we

25   can -- well, it's fine.  We'll break for lunch now.
```

**UNITED STATES DISTRICT COURT**

1          So remember.  Until the trial is over, do not

2    discuss this case with anyone including your fellow jurors,

3    members of your family, people involved with the trial or

4    anyone else.

5          And do not allow others to discuss the case with

6    you.  This includes discussing the case in person, in writing,

7    by phone, electronic means, via e-mail, via text messaging, or

8    any Internet chat room, blog, website, including but not

9    limited to Facebook, YouTube, Twitter, Instagram, Snapchat, or

10   any other forms of social media.  If anyone attempts to

11   communicate with you about the case, please let me know

12   immediately.

13         I'll give you today until -- be back in the jury

14   room by 1:15.  Okay?  A little bit longer than normal.  Okay.

15   Thank you.

16             THE COURTROOM DEPUTY:  All rise.

17             (Outside the presence of the jury.)

18         THE COURT:  I did want to clarify a little bit my

19   ruling earlier regarding Officer Vege's testimony.

20         As I have stated, his observations or feelings when

21   he made the calls for assistance at the residence are not

22   admissible because those observations were unknown to the

23   defendant officers at the time of the shooting.

24         However, I now think that it's important to give the

25   jury at least some context, especially since defendants rely in

UNITED STATES DISTRICT COURT

 1   part on Vege's statements to justify their conduct.  So I want

 2   to be very clear about what I am and not permitting.

 3           Officer Vege may testify about what he saw when

 4   Mr. Murillo ran away from the house.  He may not testify about

 5   any of his observations before then.

 6           Defense counsel, just please admonish Mr. Vege as to

 7   that.

 8           MR. FORD:  And we still can't play the video?

 9           THE COURT:  You still cannot play the video.

10           MR. FORD:  That's understood, Your Honor.

11           But he can or cannot talk about his emotion?

12           THE COURT:  No.

13           MR. FORD:  All right.  Pure observation.

14           I just wanted to get some clarity, Your Honor.  I

15   did hear you earlier regarding my expert, but I want to make

16   sure I understand it.  So you said he cannot quote from POST or

17   policy.  Can he refer to general principles without quotations?

18           THE COURT:  You can ask him what he relied on;

19   right?  You have a right to ask him what he relied on.  And

20   only in that context.  The only way he can open up to go -- he

21   can say that it's -- yes, it's based on this policy.  But if he

22   starts getting into specifics, any specific provisions in the

23   policies, specific sections, chapters, that's not -- he can't

24   do that.

25           MR. FORD:  Okay.  But he can say according to POST

```
 1    standards, my opinion is blah, blah, blah without saying page

 2    1, you know, whatever it is.  Is that right, Your Honor?

 3              THE COURT:  Yes.

 4              MR. FORD:  All right.  Thank you.

 5              THE COURT:  Mr. Galipo, do you have a view on that?

 6              MR. GALIPO:  Yeah.  So I do.  And I agree with the

 7    Court.  Experts obviously can rely on items --

 8              THE COURT:  That are inadmissible --

 9              MR. GALIPO:  Correct.  But I don't want the expert

10    to just start saying POST says X, POST says Y, POST says Z.

11              THE COURT:  No, it has to be very general, Mr. Ford,

12    if you are going to -- in other words, remember that the

13    overall point is that you are allowed to bring out what he

14    relied on whether it's admissible or inadmissible to the jury.

15    You can only get into the specifics of things that are

16    admissible.  Okay?

17              MR. FORD:  I'm trying to obey the Court's orders.

18    I'm trying -- for example, he might use a term of art or a

19    phrase that's mentioned in POST.  As I understand it, he's

20    allowed to do that.  He just can't attribute it to a document.

21              THE COURT:  Exactly.  He can't attribute it to a

22    document.

23              MR. GALIPO:  So I don't have anything else on that

24    issue.  But I wanted to ask a question about your ruling on

25    Officer Vege.
```

```
 1              THE COURT:  Okay.

 2              MR. GALIPO:  So I understand that some context --

 3    he's running away, and he made the broadcast.  As we know,

 4    there's nothing in the broadcast about a hammer.  So I'm

 5    assuming the Court is not going to allow Officer Vege to say "I

 6    saw a hammer in his other hand."

 7              THE COURT:  No.  It's only what's within the

 8    statements.  Right?  The reason I'm allowing it is because it's

 9    what's in those statements that the defendants -- those radio

10    broadcasts --

11              MR. GALIPO:  Understood.  I understand that.

12              And then my last point is I know that at the

13    beginning of the trial, the Court allowed the fiancé Mark

14    Guerrero to be on call and come back.

15              THE COURT:  Yeah.

16              MR. GALIPO:  And his testimony, as I understand it,

17    is what happened that day before the police got there and --

18              THE COURT:  None of that is coming in.

19              MR. GALIPO:  It's my understanding that that will

20    not be permitted.

21              THE COURT:  None of that is coming in.  So I'm not

22    sure you want to call him.  I don't know who was going to call

23    --

24              MR. FORD:  And I do want clarity on that.  I'm glad

25    counsel brought it up.  So I do intend to call Mr. Guerrero
```

1    to -- he is the person.  He is the one that was injured.  He is

2    the 58-year-old man that needed an ambulance which is what the

3    officers heard.  He also witnessed -- can I --

4            THE COURT:  Yeah, go ahead.

5            MR. FORD:  I just would like to make a record,

6    Your Honor.  I understand the Court's ruling.

7            So we would like to call Mark Guerrero to testify to

8    the events of that day.  We would like to call him for the

9    whole day.  But -- everything that happened that day.  But in

10   particular, the incident, the phone call that he made

11   commensurate to this use of force which was calling 911,

12   telling them that Mr. Murillo had attacked him.  You could even

13   hear Mr. Murillo on the 911.  I understand the Court has

14   excluded the 911.

15           But we submit that all of this -- the jury should be

16   allowed to hear it to understand the truth of what the officers

17   believed to be a threat.  It wasn't -- there really was a

18   threat.  He really had harmed people.  And it's been suggested

19   that he didn't.

20           Mr. Guerrero will testify that he tried to gouge his

21   eye out.  And if the Court would allow it, which I know the

22   Court won't, he would testify that Mr. Murillo had brandished a

23   knife at him just before he made this phone call.

24           So we believe this is absolutely important for the

25   jury to understand that the officers -- the messages

```
 1   communicated by Vege to the defendant officers were not
 2   imaginary.  There really was a threat at least at that point.
 3   And he would help to tend to prove the fact that they weren't
 4   mistaken.  He really was a threat.  He really had injured
 5   someone.  He really had threatened someone.
 6              THE COURT:  That's fine.  So I'm excluding it, and
 7   I'm excluding him.  It's --
 8              MR. FORD:  All right.
 9              THE COURT:  It's so unfairly prejudicial it's not
10   even -- it's -- but -- and for all the other reasons -- it's in
11   my order.  I've already went over this issue in my order.  I
12   did a written order even on it.  But I get your point, and I
13   see it.
14              So then if that's all Mr. Guerrero is going to
15   testify -- does he have anything else you want to put him on --
16              MR. FORD:  I was going to bring him up to say that
17   Jesse really did have a machete, but I got that out of Tammy.
18   So I guess there's nothing else.
19              THE COURT:  Yeah.
20              MR. FORD:  Well, I don't know if the Court would
21   allow this.  I mean, Mr. Guerrero says that -- he was the
22   fiancé of the plaintiff at the time.  And he will say that two
23   days after the incident, Tammy ended their engagement because
24   he caused the death of her son.
25              THE COURT:  No.  Well --
```

1           MR. FORD:  Okay.

2           THE COURT:  So we'll see you all back.  So your

3    witness, the expert, is set at 1:30.  And if he's ready to go

4    earlier, let's get started earlier.

5           MR. FORD:  All right.

6           THE COURT:  I think at this point defendant has 2

7    hours and 40 minutes left and plaintiff 2 hours and 8 minutes

8    left.

9           MR. GALIPO:  Thank you.

10           MR. FORD:  I think we are almost finished.  We will

11    be allowed to do our closings tomorrow; is that right,

12    Your Honor?

13           THE COURT:  Yes.  At the rate we are going, yeah.

14    We --

15           MR. FORD:  We are going to be finished early is what

16    I'm saying.  I don't think we are going to use up all that

17    time.

18           MR. GALIPO:  Do you have an estimate of what time --

19    assuming we finish with the evidence this afternoon, which I

20    believe we will, if we are done by 4:00 or 4:30 today, are you

21    envisioning we could leave a little earlier today once we are

22    done with the evidence?

23           THE COURT:  Yeah, once we are done with the

24    evidence, once both sides have rested, and then we'll start up

25    tomorrow probably at 9:00.  And I'll -- what I'll do is I will

```
1   give you the jury instructions and the verdict form in the
2   morning, and then we'll go from there unless there's any
3   last-minute issues or anything.
4               MR. GALIPO:  Thank you, Your Honor.
5               THE COURT:  Thank you.  Have a nice lunch.
6               MS. BURUNSUZYAN:  Thank you, Your Honor.
7               (At 12:10 p.m. the lunch recess was taken.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4

5          I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT

7   FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY

8   THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE

9   THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

12  IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL

13  CONFERENCE OF THE UNITED STATES.

14

15

16          DATED THIS  5TH  DAY OF OCTOBER, 2023.

17

18

19          /S/ MAREA WOOLRICH

20          _____
            MAREA WOOLRICH, CSR NO. 12698, CCRR
21          FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

**UNITED STATES DISTRICT COURT**