# EXHIBIT B-1

```
 1                UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3       HONORABLE FERNANDO M. OLGUIN, U.S. DISTRICT JUDGE

 4

 5   TAMMY MURILLO, an individual      )
     and as successor in interest to   )
 6   JESSE MURILLO, deceased,          ) CASE NO.
                                       ) 21-cv-08738
 7                 Plaintiff,          )
                                       )
 8          vs.                        )
                                       )
 9   CITY OF LOS ANGELES, FRED SIGMAN, )
     CHRISTOPHER MONTAGUE, DOES 1-50,  )
10   et al.,                           )
                                       )
11                 Defendants.         )
     _____)
12
```

13

14

15 **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

16 **TRIAL DAY 5 - A.M. SESSION**

17 FRIDAY, AUGUST 25, 2023

18 9:07 A.M.

19 LOS ANGELES, CALIFORNIA

20

21

22

23 _____

MAREA WOOLRICH, CSR 12698, CCRR
24 FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, SUITE 4311
25 LOS ANGELES, CALIFORNIA 90012
mareawoolrich@aol.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR PLAINTIFF:**

    LAW OFFICES OF DALE K. GALIPO
    BY:  DALE K. GALIPO
    21800 Burbank Boulevard, Suite 310
    Woodland Hills, CA 91367

    LAW OFFICES OF MARO BURUNSUZYAN
    BY:  MARO BURUNSUZYAN
    550 N. Brand Boulevard, Suite 1050
    Glendale, CA 91203

**FOR DEFENDANTS:**

    TY A. FORD, Deputy City Attorney
    200 N. Main Street, 6th Floor
    Los Angeles, CA 90012

**UNITED STATES DISTRICT COURT**

3

```
 1            LOS ANGELES, CALIFORNIA; FRIDAY, AUGUST 25, 2023
 2                             9:08 A.M.
 3                              -oOo-
 4
 5            THE COURT:  Okay.  We are back on the record in
 6    21-8738.  We are going to bring the jury in.
 7            I just wanted to see -- just remind you before you
 8    do your closing that -- well, I wanted to remind you again
 9    about all the exhibits, to be sure that we agree on what has
10    been admitted, and if you don't review the exhibits that will
11    be sent to the jury, then you have waived any and all arguments
12    regarding improper exhibits being sent to the jury.
13            And so the -- let me ask counsel.  Did you -- both
14    counsel, did you all review the exhibits that are going to be
15    sent to the jury?
16            MR. GALIPO:  There's no concerns on behalf of the
17    plaintiff.
18            MR. FORD:  We did, Your Honor.  There were two
19    exhibits that were shown to the jurors during openings that I
20    don't think were ever actually addressed in the presentation.
21    But we have stipulated to admit -- I don't remember the
22    numbers.  What's one of them?  27, page 7, and Exhibit 2,
23    page 2.
24            THE COURT:  Okay.  Thank you.
25            MR. GALIPO:  That's so stipulated.
```

1  horrific case with huge damages that should be awarded.  But
2  that's totally your purview.  And I'm going to suggest some
3  ranges.  But you talk to each other, and you see what you agree
4  on.
5          Pre-death pain and suffering I would suggest should
6  be between $5 and $7 million.  Loss of life, between $10 and
7  $15 million.  Now, loss of life is the loss of Jesse's life.
8  Whatever one could do after 32 -- and, of course, 32 to me
9  seems very, very young, I can assure you -- in life, through
10 marriage, through children, through family, through your goals,
11 your dreams.  Everything that people enjoy throughout their
12 life was taken from him at 32.  That should be a large number
13 from plaintiff's perspective.  And that's why I give you the
14 range of 10 to 15 million.
15         And then Question 7 is wrongful death damages.
16 Well, these are Tammy's damages for the loss of her son.  And
17 as you'll read in the instruction, there's past loss and future
18 loss.  Now, we are coming up Christmas.  Imagine what
19 Christmases are like for Tammy.  So this December 23rd will be
20 six years.  Six years.  So what would be a fair number
21 for past loss?  If you gave her $2 million a year, it would be
22 $12 million; $1 million a year, it would be $6 million.
23         But how about for the rest of her life?  The rest of
24 her life?  Never seeing her son again, talking to him, hugging
25 him, kissing him, never again.  She's left with trying to smell

at him.  He thinks it's a real gun.  He's about to be killed.
So he fires in self-defense.  And afterwards he finds out it
wasn't a real gun.  It just looked like a real gun.  That's not
this case.

So even though we believe the evidence is
overwhelming that he didn't have a hammer in his right hand,
for all the reasons I said, just so we're clear, it doesn't
matter.  Even if he did have a hammer in his hand, even if they
thought the pull bar was a machete, it doesn't matter because
the law says you can't shoot unless it's an immediate,
immediate defense of life, immediate, right then.

And they want to talk about 28 feet, 28 feet and
14 feet.  I used to love playing basketball.  So I know 15 feet
is the free throw.  But I got to tell you, if the center aisle
of this courtroom was the sidewalk and the officers are to the
side and someone is running straight towards the judge and you
are shooting him in the side and in the back, as he's on the
ground or going to the ground, you are going to say he was
immediately trying to attack you?  Really?

And you know what's really sad?  When these officers
were asked, "Would you do anything differently now knowing what
you know now?"  "No.  I would do the exact same thing."

It's up to you.  You are the jurors.  Did you sense
one bit of remorse from those officers?  Zero.  It's his
actions.  That's what they want to do.  Young kid runs from the

```
 1  police, shot in the back.  Generally speaking, it's his fault.
 2  He shouldn't have run.  They always want to blame the other
 3  person and not take any responsibility themselves.
 4              MR. FORD:  Your Honor, I'm going to object to this
 5  line of argument regarding the --
 6              THE COURT:  Overruled.  Sit down.
 7              MR. GALIPO:  Their actions were unreasonable.  Was
 8  it unreasonable to think that maybe he had a weapon?  That's
 9  okay.  Was it unreasonable to think that maybe something
10  happened, they weren't sure?  That's okay.  It was unreasonable
11  to kill him under these circumstances as he's not attacking you
12  but running away.
13              And they want you to ignore that, I guess, Vege
14  never mentioned a hammer in the dispatch.  Montague never saw a
15  hammer in his hand.  Vidal never saw a hammer in his hand.  No
16  one said afterwards, "Hey, watch out.  He's got a hammer."  And
17  the hammer ends up inside a zipped jacket.
18              And I talk about exaggeration and unreasonable.
19  They want you to believe, as he's going to the ground and shot
20  four times, he unzips his jacket, puts the hammer in his jacket
21  and zips it back up where both arms -- bullets went through
22  both arms.  Ask yourself how reasonable that is.
23              Montague said it was a long slender object.  He
24  didn't even know what hand it was in.  You saw how big that
25  hammer was.  If he's got this hammer in his right hand and he's
```

1  about the distance I am from you, how is Montague not going to
2  see it?
3      And Vidal didn't see any object in his hands. He
4  even said in his closing, "Well, they had cover for the first
5  three shots. They had protection." Then why did you shoot?
6  Montague is on the driver's side. Sigman has cover from his
7  door. He didn't step to the side until Jesse is already past
8  him and he realized he deviated his path. He said he was
9  assessing. "I realize now he's running east on the sidewalk."
10 Then what the heck are you continuing to shoot for?
11     And if you believe Flossy with this
12 perception-reaction time, well, it takes at least a half a
13 second or three quarters of a second or whatever it is, that
14 would mean that Sigman decided to shoot him before he said,
15 "Hey, stop," because the "Hey, stop" and the shots are like
16 simultaneous.
17     Is that really giving someone a chance? Is that
18 really giving them a warning before taking another human life?
19 I mean, if someone had to look at this shooting and say is this
20 a close call, I would submit this isn't a close call at all.
21 This is a terrible shooting. It's awful. It really is.
22     And, you know, they talk about these constitutional
23 rights. They are all of our rights as was mentioned by
24 counsel. All of our rights to be free from excessive force,
25 especially excessive deadly force.

1    This can't be business as usual.  This can't be we
2 deny all responsibility.  We call Flossy.  He doesn't even come
3 here, by the way.  We call Flossy.  We get a jury.  We are the
4 police.  We'll just say whatever.  And we'll let Flossy say,
5 you know, seemed okay to me.  Fine.  Police officers have tough
6 jobs.  Let's go on to the next shooting, the next case.  That
7 is not the way it can be.
8    This is not a proposition about police generally.
9 Of course we want to support the police.  I mentioned early in
10 the jury selection I have friends who are police officers.  But
11 we need to have some limitations on their use of deadly force,
12 some accountability, some understanding that we don't want
13 fellow human beings unnecessarily killed like this.
14    And we need jurors like you who have courage -- he
15 mentioned courage -- to stand up for what's right and to say
16 that was excessive and unreasonable.
17    And if the officers had so much courage, then they
18 wouldn't have shot and killed him because shooting someone
19 within a split second of saying "Hey, stop" from 28 feet away
20 is not a courageous thing to do, I would submit.  Nor is it for
21 someone who is running away from you to shoot him a courageous
22 thing to do.
23    They overreacted.  I'm not trying to say they are
24 horrible people.  They totally overreacted, freaked out,
25 whatever you want to say, panicked, contagious fire.  And then

```
1            MR. GALIPO:  Thank you, Your Honor.
2            MR. FORD:  Thank you, Your Honor.
3            THE COURTROOM DEPUTY:  Court is in recess.
4            (At 12:02 p.m. the lunch recess was taken.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**CERTIFICATE OF OFFICIAL REPORTER**

I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  9TH  DAY OF OCTOBER, 2023.

/S/ MAREA WOOLRICH

MAREA WOOLRICH, CSR NO. 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER